Stephen H.M. Bloch (UT #7813)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
hanna@suwa.org

Attorneys for Plaintiff
Southern Utah Wilderness Alliance

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR**, **UNITED STATES BUREAU OF LAND MANAGEMENT**, **ADAM G. SUESS**, in his official capacity as Acting Assistant Secretary for Land and Minerals Management, and **MICHAEL D. GATES**, in his official capacity as Bureau of Land Management West Desert District Manager. <br><br> Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> Case No. 2:25-cv-00657 <br><br> Judge |

## INTRODUCTION

1.     Pursuant to District of Utah Local Civil Rule 7.4, Plaintiff Southern Utah

Wilderness Alliance ("SUWA") seeks judicial review of defendant Bureau of Land

Management's ("BLM") 2019 decision to approve nearly 125,000 acres of potash mining in Utah's remote West Desert, known as the Sevier Playa Potash ("SPP") Project, as well as the agency's 2025 decision to approve a modification of the SPP Project. BLM approved the modified SPP Project using an administrative procedure known as a Determination of NEPA Adequacy ("DNA") that erroneously concluded BLM's 2019 environmental analysis of the SPP Project sufficiently analyzed the modified project.

2.      Sitting between the Cricket Mountains to the east and the House Range and Notch Peak Wilderness Study Area ("WSA") to the west, the 125,000-acre Sevier Lake is located in a remote and largely undisturbed area of Utah's West Desert; an area that is currently entirely devoid of light or noise pollution. Like the Great Salt Lake, Sevier Lake is a highly saline terminal lake and a remnant of Lake Bonneville. Although it is fed by the Sevier River, upstream water diversions cause Sevier Lake to be largely dry during certain times of the year. When Sevier Lake contains surface waters, as it does during high precipitation years, it supports important stop-over habitat for the millions of migratory birds in the Pacific Flyway.



Looking east toward the Cricket Mountains – surface water provides key stopover habitat for migratory birds traveling the Pacific Flyway. © Ray Bloxham/SUWA



Taken from the House Range – this setting gives visitors a feeling of solitude and remoteness unparalleled in most of the United States. © SUWA

3.      Over the past several decades, light pollution throughout the United States has increased due to urbanization and industrialization, making it more difficult to observe celestial objects that are only visible when skies are dark. The SPP Project is located within the Great Basin National Heritage Area ("GBNHA"). The GBNHA is very remote from most light pollution sources, making it the largest contiguous region of dark skies in the United States.[1] Indeed, dark night skies are one of the GBNHA's most significant natural resources that set the region apart of other areas.

4.      Sevier Lake, and the groundwater system that supports it, is part of the Great Salt Lake Desert groundwater flow system. Within this system, groundwater generally flows south to north through a series of interconnected aquifers underneath the Pine and Wah Wah Valleys and the Sevier Lake Playa before ultimately reaching the Fish Springs Valley and sustaining the groundwater-dependent ecosystems in the Fish Springs National Wildlife Refuge.

5.      On August 27, 2019, former Assistant Secretary for Lands and Minerals Management Joseph R. Balash[2] signed the Record of Decision ("ROD") that originally approved the SPP Project as described in Peak Minerals, Inc.'s ("Peak Minerals")[3] 2019 mining plan and considered in an environmental impact statement ("EIS") that analyzed the SPP Project's

---

[1] Congress established the GBNHA in 2006. *See Great Basin National Heritage Area*, Nat'l Park Serv. (last updated April 3, 2024), https://www.nps.gov/places/great-basin-national-heritage-area.htm; *About the Great Basin National Heritage Area*, Great Basin Heritage Area P'ship, https://greatbasinheritage.org/about/ (last visited Aug. 6, 2025).

[2] As of the date of filing this complaint, the position for Assistant Secretary for Land and Minerals Management is vacant. Acting Assistant Secretary for Land and Minerals Management Adam G. Suess is named in lieu of former Assistant Secretary Balash.

[3] At the time the ROD was issued, Peak Minerals, Inc. was doing business as Crystal Peak Minerals ("CPM") and is referred to as such throughout BLM documents.

impacts on various natural resources.[4] The 2019 ROD is final and subject to this Court's review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. As explained below, BLM's analysis was flawed and SUWA seeks the Court's review under the APA for the agency's violations of the National Environmental Policy Act ("NEPA").

6.      BLM's 2019 ROD authorized Peak Minerals to conduct large-scale surface mining operations and develop rights-of-way ("ROWs") across the entire Sevier Lake bed and on nearby public lands (95 percent of the Peak Minerals' leased lands are administered by BLM). As contemplated by the 2019 mining plan and EIS, the Project was anticipated to last thirty-two years and expected to produce approximately 372,000 tons per year of sulfate of potash ("SOP"). To support such a large-scale operation, BLM's decision authorized the construction of extensive on- and off-lease facilities including evaporation ponds, dikes, roads, powerlines, a processing plant, and a rail loadout.

7.      SUWA initially filed suit over the 2019 EIS and ROD in 2023.[5] That suit was dismissed in 2024 without prejudice prior to resolution on the merits after Peak Minerals submitted a proposed amended mining plan to BLM that was intended to replace and supersede the 2019 mining plan on which BLM based its 2019 ROD. The company's proposed amended mining plan went through several iterations before being approved by BLM in 2025 ("2025 mining plan," attached as Ex. 3).

---

[4] Bureau of Land Mgmt., Sevier Playa Potash Project Record of Decision, 3 (Aug. 2019) ("SPP Project ROD") (attached as Ex. 1); *see generally* Bureau of Land Mgmt., Sevier Playa Potash Project Final Environmental Impact Statement (July 2019) ("2019 EIS") (attached as Ex. 2).
[5] *See generally S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 2:23-cv-00492 (D. Utah).

8.      Peak Minerals' proposed 2025 mining plan differed from the 2019 mining plan in several respects:

a.      <u>Project Lifespan</u>: The 2019 mining plan contemplated a 32-year lifespan for the <u>entire</u> SPP Project. However, the 2025 mining plan divides the project into multiple phases and predicts a 25-year <u>initial</u> phase. Although not expressly stated in the 2025 mining plan, Peak Minerals has publicly stated that it now expects the SPP Project <u>to last at least 50 years</u>.[6] Future phases are not detailed in the 2025 mining plan and would require subsequent approval by BLM.

b.      <u>Expected Product Output</u>: The 2019 mining plan estimated that approximately 372,000 short tons of SOP would be mined annually, totaling about 10.2 million short tons of SOP produced over the life of the mine. Phase 1 of the 2025 mining plan estimates an average production of 215,000 short tons of SOP annually with a total output of 5.235 million short tons during Phase 1. Peak Minerals further predicts that, with the implementation of future phases, the SPP Project could produce a total of 474,000 short tons/year.[7] Thus, once the SPP Project is at full-scale operating capacity, nearly 25% more SOP will be mined per year than what was analyzed in the 2019 EIS.

---

[6] *See* Peak Minerals, Inc., *Sevier Playa Sulphate of Potash (SOP) Project Q2 2025*, 5, 15 (June 20, 2025) (attached as Ex. 4) ("Peak Minerals Presentation").
[7] Peak Minerals Presentation at 9, 15 (stating that with a Phase 2 expansion, SOP would be produced at a rate of 474 ktpa [kilo tons per annum], which is equivalent to 474,000 short tons per year).

c.    <u>Project Surface Disturbance</u>: The 2019 mining plan would have resulted in

114,073 acres of on-playa disturbance and 1,821 acres of off-playa

disturbance, while the 2025 mining plan (Phase 1) anticipates 46,472 acres of

on-playa disturbance and 1,490 acres of off-playa disturbance.[8]

9.    The industrial development described in the 2025 mining plan will eliminate the

wild and remote nature of Sevier Lake and the surrounding lands, significantly impair important

habitat for migratory birds, and drastically affect important resource values including scarce

groundwater, dark night skies, and visual resources.

10.    BLM originally announced its intention to analyze the proposed 2025 mining plan

in a supplemental environmental assessment ("EA") and held a public scoping period from

February 11, 2025 to March 27, 2025. SUWA submitted scoping comments (attached as Ex. 5)

that, among other things, urged BLM to consider:

(1) analyzing the SPP Project, as modified by the 2025 mining plan, in a supplemental

EIS;

(2) using its analysis to cure the legal deficiencies with the 2019 EIS and ROD as

originally alleged in SUWA's 2023 lawsuit; and

(3) taking a hard look at impacts to resources such as climate, water, migratory birds, and

dark night skies.

11.    However, on or around April 14, 2025, BLM stopped the EA process and instead

proceeded to approve the 2025 mining plan through a DNA (attached as Ex. 6). By definition, a

---

[8] Subsequent phases are expected to utilize the full playa so overall surface disturbance for the
life of the SPP Project is likely to be similar to that expected in the 2019 mining plan.

DNA is not a new NEPA analysis and thus BLM's approval decision relied entirely on the environmental analysis conducted to support the SPP Project's 2019 EIS. Although BLM did not solicit public comments on the DNA, SUWA sent a letter to BLM on May 19, 2025 (attached as Ex. 7) explaining why BLM's use of the DNA in this instance was improper considering the 2019 EIS's legal flaws. Additionally, SUWA submitted a technical report from a certified hydrogeologist (included in Ex. 7) that explained why the groundwater analysis in the 2019 EIS was inaccurate and could not be relied on to fully analyze the SPP Project's groundwater impacts.

12.     On June 10, 2025, Michael Gates, BLM West Desert District Manager, signed the decision record ("2025 DNA DR," attached as Ex. 8) that approved Peak Minerals' 2025 mining plan according to the conclusions made in the DNA. The DNA did not cure the 2019 EIS's NEPA violations that SUWA previously sued over and has since repeatedly pointed out in comments submitted to BLM. Furthermore, BLM did not consider the new information submitted by SUWA in May 2025 which demonstrates that the 2019 EIS inadequately analyzed the SPP Project's groundwater impacts, including the cumulative effects from other foreseeable projects like the Pine Water Supply Project ("Pine Valley Project" or "PVP").[9]

13.     In short, BLM used the DNA to circumvent the necessary supplemental environmental analysis and quickly approve a modified version of the Sevier Lake Project that, in doing so, violated NEPA and the APA.

---

[9] The PVP has also been referred to as the "West Desert Water Supply and Conservation Project" and the "Pine Valley Groundwater Development Pipeline Project."

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-706.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because it is where a substantial part of the events or omissions giving rise to the claims occurred and the federal public lands at issue are situated in this district.

## PARTIES

16.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE is a non-profit environmental membership organization. Founded in 1983, SUWA is dedicated to the preservation of the outstanding wilderness and wild places found throughout Utah and the management of wilderness-quality lands in their natural state for the benefit of all Americans. SUWA is headquartered in Salt Lake City, Utah. SUWA members use and enjoy BLM-managed lands throughout Utah for a variety of purposes, including recreation, wildlife viewing, cultural appreciation, and aesthetic appreciation, including the public lands threatened by the SPP Project. SUWA members also have an interest in seeing BLM comply with the requirements of federal environmental laws like NEPA which ensures that BLM will at least make fully informed if not environmentally sound decisions.

17.     For years, SUWA and its members have worked to protect wilderness-quality and wild public lands in Utah because, *inter alia*, those areas support environmental values of significant importance including air quality, migratory birds and other wildlife, visual resources, and water resources. This includes places like the Notch Peak wilderness study area and Red

Canyon and Black Hills proposed wilderness areas. Thus, SUWA and its staff and members have direct interests in the SPP Project challenged in this action.

18.    SUWA's staff and members regularly use and enjoy the public lands that will be impacted by the SPP Project for a variety of purposes, including hiking, recreation, photography, wildlife viewing, solitude, and aesthetic appreciation of the surrounding area's natural and wild values; and intend to continue doing so.

19.    SUWA members Ray Bloxham, Jack Hanley, and Talitha McGuire have spent considerable time visiting and working to protect the lands including and surrounding the SPP Project, including the Notch Peak, King Top and Wah Wah Mountain WSAs.[10] Mr. Bloxham has hiked in the Cricket Mountains, Red Canyon, Black Hills and the Notch Peak WSA, from which he can see the Sevier Lake bed and the lands that will be directly disturbed and impacted by the approved SPP Project. When Mr. Bloxham visits these areas, he enjoys the vastness and emptiness of the Sevier Lake bed, especially when it has standing water that provides spectacular reflections of clouds and surrounding land features. Mr. Hanley ran SUWA's volunteer stewardship projects in the Swasey Mountain, Notch Peak, Wah Wah Mountain, King Top WSAs from 2018 to 2023. Since 2023, Ms. McGuire has also run stewardship projects in the Swasey Mountain, Notch Peak, Howell Peak, and Wah Wah Mountain WSAs. The impacts of the SPP Project will be felt on and adjacent to the lakebed itself, as well as in places like the Notch Peak, King Top and Howell Peak WSAs by increased light pollution, as well as dust and noise, generated by project operations even when the lakebed is not directly in view.

---

[10] The Notch Peak, King Top, Wah Wah Mountain WSAs are, among others, currently proposed for wilderness designation in America's Red Rock Wilderness Act, H.R. 2467, S. 1193 (119th Congress).

20.     Mr. Bloxham, Mr. Hanley, and Ms. McGuire intend to continue visiting the Sevier Lake bed and surrounding BLM-managed lands. For example, Mr. Bloxham has plans to visit the Sevier Lake area in the fall of 2025 when he intends to drive along the western reaches of the lakebed to travel between the House Range and the Wah Wah Mountains, as well as recreate and sightsee in the Cricket Mountains along the eastern side of Sevier Lake. Ms. McGuire expects to conduct future stewardship projects on the wilderness-quality lands surrounding Sevier Lake.

21.      SUWA participated extensively in BLM's processes for approving the 2019 ROD and the 2025 DNA DR and has exhausted all legally required administrative remedies before bringing this action.

22.     BLM's violations of NEPA and the APA in approving the SPP Project's 2019 ROD and 2025 DNA DR have already and will continue to injure the interests of SUWA and its staff and members. The relief sought herein would redress these injuries. SUWA has no other adequate remedy at law.

23.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States, including those managed by BLM in Utah, for a variety of competing resources, including the protection of the natural and human environment.

24.     Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is a federal agency within the Department of the Interior and manages approximately twenty-three million acres in Utah. BLM manages the public lands in and around the SPP Project area in accordance with the Federal Land Policy and Management Act, NEPA, their implementing

regulations and relevant policies, and other requirements of law. BLM is the agency responsible

for drafting and issuing the 2019 EIS, 2019 ROD, 2025 DNA, and 2025 DNA DR.

26. Defendant ADAM G. SUESS is sued in his official capacity as Acting Assistant

Secretary for Land and Minerals Management. Mr. Suess oversees programs within the

Department of Interior associated with public land management and minerals leasing and

operations on public lands, including such programs administered by BLM. The Assistant

Secretary for Land and Minerals Management approved the 2019 EIS and ROD.

26. Defendant MICHAEL D. GATES is sued in his official capacity as BLM's West

Desert District Manager. Mr. Gates oversees projects and programs that take place within BLM's

West Desert District. The SPP Project is one such project. Mr. Gates approved the 2025 DNA

and 2025 DNA DR.

## **LEGAL FRAMEWORK**

### I.    **Administrative Procedure Act**

27. Judicial review of agency actions under NEPA and its implementing regulations

and policies is governed by the APA, which provides judicial review for "[a] person suffering

legal wrong because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute." 5 U.S.C. § 702. Review is limited to "final agency

action for which there is no other adequate remedy in a court." *Id.* § 704.

28. Under the APA, a reviewing court "shall…hold unlawful and set aside agency

action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions may also be set

aside where the action is "without observance of procedure required by law." *Id.* § 706(2)(D).

12

## II.    National Environmental Policy Act

29.    Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321 (2019).[11] NEPA is our nation's "basic charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019). It has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental consequences in their decision-making. *Id.* § 1500.1(c) (2019).

30.    NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental effects." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, NEPA requires that federal agencies prepare an EIS for all "major federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C) (2019), to ensure fully informed decision-making and provide for public participation in environmental analysis and decision-making processes. 40 C.F.R. § 1500.1(b)-(c) (2019). NEPA and its implementing regulations require, among other things, that an EIS fully explore and consider all reasonable alternatives to the proposed action, *id.* § 1502.14(a) (2019), and analyze the short- and long-term effects of each alternative. *Id.* §§ 1502.16 (2019), 1508.7 (2019), 1508.8 (2019), 1508.27(a) (2019). This

---

[11] Since the 2019 EIS and ROD were approved, Congress has amended NEPA several times. *See, e.g.*, Pub L. No. 118-5 (June 3, 2023); Pub. L. No. 119-21 (July 4, 2025). On April 11, 2025, the Council on Environmental Quality ("CEQ") revoked its NEPA regulations. *See generally* 90 Fed. Reg. 10610 (Feb. 25, 2025). However, because the SPP Project's EIS and ROD were issued in 2019, all citations to NEPA's statutory and regulatory provisions with respect to the 2019 EIS and ROD are to the versions in effect in 2019 and identified accordingly. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 n.6 (10th Cir. 2023). Citations to NEPA's statutory provisions in effect at the time of the 2025 DR are likewise identified accordingly.

information must be made available to agency officials and the public "before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b) (2019).

### III.    Determinations of NEPA Adequacy

31.    When assessing a proposed action, DOI's regulations implementing NEPA allow BLM to rely entirely on an existing environmental analysis prepared pursuant to NEPA if, "with supporting appropriate documentation," BLM determines "that it adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c).[12]

32.    In other words, BLM may use "non-NEPA procedures," such as a DNA, "to determine whether new NEPA documentation is required." *Pennaco Energy Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1162 (10th Cir. 2004); *see also* Bureau of Land Mgmt. *H-1790-1 National Environmental Policy Act Handbook*, 130 (2008) ("BLM NEPA Handbook") (attached as Ex. 9) (explaining that a DNA is "an interim step in the BLM's internal analysis process that concludes that a proposed action is adequately analyzed in an existing document.").

33.    When using a DNA, BLM "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120(c); *see also* BLM NEPA Handbook at 22 (explaining that a DNA is used to "evaluate new circumstances or

---

[12] DOI's implementing NEPA regulations were revoked on July 3, 2025. *See generally* 90 Fed. Reg. 29498 (July 3, 2025). However, they were in effect when BLM issued the 2025 DNA DR on June 10, 2025. As such, they may be cited and relied upon. *See Ctr. for Biological Diversity*, 72 F.4th at 1178 n.6.

information prior to the issuance of a decision to determine whether [BLM] need[s] to prepare a new or supplemental analysis.").

34.    If BLM concludes that it may rely on a prior NEPA document to authorize a proposed action, the responsible official documents that conclusion in a DNA DR.

35.    In 2023, Congress amended NEPA to expressly identify when an agency must prepare an environmental document for a proposed action as well as the four exceptions to preparing such an environmental document. Notably, relying on an existing environmental analysis that purports to adequately assess the proposed action's environmental effects and reasonable alternatives is <u>not</u> one of the exceptions. *See* 42 U.S.C. § 4336(a). This amendment was finalized before BLM prepared the 2025 DNA and 2025 DNA DR.

### FIRST CAUSE OF ACTION
*Violation of NEPA and the APA: Failure to Take a Hard Look at Environmental Impacts in the 2019 EIS*

36.    SUWA incorporates by reference all preceding paragraphs.

37.    NEPA and its implementing regulations require BLM to take a "hard look" at the environmental impacts of proposed actions. 42 U.S.C. § 4332(2)(C)(i) (2019).

38.    Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." 40 C.F.R. § 1508.5(a) (2019).

39.    Indirect impacts are "caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b) (2019).

40.    Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such

other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2019).

41.    Furthermore, NEPA requires BLM consider in its analysis "[b]oth short- and long-term effects." 40 C.F.R. § 1508.27(a) (2019).

42.    Throughout the SPP Project's NEPA process, SUWA submitted extensive comments highlighting potential project impacts on a number of environmental resources including, but not limited to, water (ground water and water quality), climate, air quality, visual resources, dark night skies, and migratory birds.

43.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts of approving the Proposed Action on the aforementioned resources.

44.    For example, BLM failed to analyze the impacts of a reasonably foreseeable future action—the Pine Valley Project— on groundwater resources even though it would pump water from the same regional aquifer as the proposed freshwater supply for the SPP Project. Instead, BLM entirely deferred this analysis to a later date, in the Pine Valley Project EIS, also being prepared by the agency. BLM also failed to take a hard look at the SPP Project's impacts to water quantity and quality where it discharges at Fish Springs National Wildlife Refuge, an acknowledged part of the regional aquifer system.

45.    Additionally, the SPP Project is located within the GBNHA, which is known for and encompasses the largest contiguous region of dark skies in the United States. Yet BLM did not include any analysis (let alone a hard look analysis) at the SPP Project's impacts to dark night skies, even though BLM had identified dark night skies as an issue to analyze in the 2019 EIS and SUWA raised dark night sky concerns in its comments on the 2019 EIS.

16

46.    BLM's failure to analyze these impacts violates NEPA, its implementing regulations, and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

### SECOND CAUSE OF ACTION
*Violation of NEPA and the APA: Failure to Conduct an Environmental Analysis for the 2025 Mining Plan*

47.    SUWA incorporates by reference all preceding paragraphs.

48.    BLM erred and violated NEPA when it concluded that it could authorize the amended mining project via a DNA.

49.    BLM is required to prepare an environmental document (either an EA or an EIS)[13] with respect to a proposed action unless (1) "the proposed action is not a final agency action;" (2) the proposed action is categorically excluded pursuant to one of BLM/DOI's categorical exclusions; (3) the preparation of an environmental document would "clearly and fundamentally conflict" with another provision of law; or (4) the proposed action "is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a)(1)-(4) (2025).

50.    BLM must prepare an EA with respect to a proposed action "that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown." 42 U.S.C. § 4336(b)(2) (2025). An EIS is required for

---

[13] "Environmental document" is defined as "an environmental impact statement, an environmental assessment, or a finding of no significant impact." 42 U.S.C. § 4336e(5) (2025).

proposed actions "that [have] a reasonably foreseeable significant effect on the quality of the human environment." *Id.* § 4336(b)(1) (2025).

51.    When there is an existing environmental analysis that is relevant to the proposed action, the new environmental document, as required by 42 U.S.C. § 4336(a) (2025), may serve as a supplement to the existing environmental analysis. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) ("[i]f there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental [environmental analysis] must be prepared."). This is particularly relevant when the proposed action is an amendment or revision to a plan or permit. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 73 (2004); *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1123 (10th Cir. 2009) (analogizing approval of a Forest Service permit to approval of a land use plan, and observing that amending the permit could constitute a major federal action necessitating further NEPA analysis).

52.    When deciding whether to evaluate the new information in a supplemental environmental analysis, BLM must make a "reasoned decision based on its evaluation of the significance—or lack of significance—of the new information." *Marsh*, 490 U.S. at 378.

53.    In this instance, none of the environmental document exemptions apply to the SPP Project's 2025 mining plan and a DNA does not meet the definition of an environmental document. Therefore, to comply with NEPA, BLM was required to prepare either an EA or an EIS analyzing the environmental effects of the proposed 2025 mining plan prior to approving the

plan. That analysis should have included an evaluation of new information pertaining to groundwater impacts.

54.     BLM's own actions confirmed that the agency recognized the need to analyze the proposed 2025 mining plan in a new environmental document because BLM first intended to analyze the proposal in an EA and held a public scoping period to inform and support its analysis. Yet BLM did not follow through with finalizing the EA. Furthermore, as alleged in the Fourth Cause of Action, there is new information relevant to the SPP Project's impacts on groundwater and, by extension, the surrounding environment that demonstrate potentially significant effects not previously considered. When explaining why it believed the 2019 EIS water analysis adequately covered the 2025 mining plan, BLM did not address these potential impacts. Instead, it conclusively stated that "[d]isagreements between the modeling efforts exist, however the provided results of the regional model and the modeling used for the 2019 FEIS do not warrant additional or new modeling efforts for the mine plan modification." 2025 DNA at 16. BLM did not provide any reasoning for this conclusion.

55.     BLM's failure to analyze the proposed 2025 mining plan in an environmental document (EA or EIS) violates NEPA and arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

### THIRD CAUSE OF ACTION
*Violation of 43 C.F.R. § 46.120 and the APA: Arbitrary Reliance on an Existing, Unlawful NEPA Document*

56.     SUWA incorporates by reference all preceding paragraphs.

57.     Assuming NEPA, as amended by 42 U.S.C. § 4336, does not preclude the use of a DNA, DOI's implementing NEPA regulations encourage BLM to utilize existing NEPA analyses

(or information contained therein) when assessing a proposed action and its alternatives. 43 C.F.R. § 46.120(a).[14] However, BLM may only do so if "the existing NEPA analyses include data and assumptions appropriate for the analysis at hand." *Id.* § 46.120(b). Further, an existing NEPA analysis may be used "in its entirety" to approve a proposed action only if, with "appropriate supporting documentation," BLM concludes that the existing analysis "adequately assesses the environmental effects of the proposed action and reasonable alternatives." *Id.* § 46.120(c).

58.     Here, BLM approved the 2025 mining plan (thereby modifying the SPP Project) after determining that the environmental analysis contained in the 2019 EIS "fully cover[ed]" the environmental effects of the proposed 2025 mining plan such that the 2025 DNA "constitute[d] BLM's compliance with the requirements of the NEPA." 2025 DNA at 19.

59.     BLM made this determination despite being on notice that the 2019 EIS violates NEPA in several aspects, as first alleged in SUWA's prior litigation over the 2019 EIS and ROD (and realleged in the First Cause of Action of this Complaint).

60.     By definition, the 2025 DNA could not cure these NEPA violations because the document does not contain new NEPA analysis and does not constitute a hard look at the SPP's impacts.

61.     Because the 2019 EIS failed to take a hard look at the impacts of the SPP Project, the 2025 DNA and 2025 DNA DR violate 43 C.F.R. § 46.120. Consequently, BLM's decision to

---

[14] 43 C.F.R. § 46.120 was promulgated prior to the passage and enactment of 42 U.S.C. § 4336, which added the requirement that proposed actions be analyzed in an environmental document..

authorize the 2025 mining plan is arbitrary, capricious, or otherwise not in accordance of law in violation of the APA. 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION
*Violation of NEPA and the APA: Failure to Consider New Scientific Information Before Authorizing the 2025 Mining Plan*

62.    SUWA incorporates by reference all preceding paragraphs.

63.    NEPA requires that BLM ensure the "scientific integrity" of an environmental document. 42 U.S.C. § 4332(2)(D) (2025). In doing so, the agency must "make use of reliable data and resources." *Id.* § 4332(2)(E) (2025).

64.    Assuming NEPA, as amended by 42 U.S.C. § 4336, does not preclude the use of a DNA, when determining whether an existing NEPA analysis adequately covers a proposed action, BLM must evaluate "whether new circumstances, <u>new information</u> or changes in the action or its <u>impacts not previously analyzed</u> may result in significantly different environmental effects." 43 C.F.R. § 46.120(c) (emphases added).[15]

65.    The third NEPA Adequacy criterion assessed in the 2025 DNA asks "[i]s existing analysis adequate in light of any <u>new information or circumstances</u>…?" 2025 DNA at 13. In response, BLM stated "[y]es, no new information or circumstances have arisen that would substantially change the analysis of the [2025 mining plan]," and goes on to explain why suitable habitat for the monarch butterfly (an Endangered Species Act candidate species) and developing a Native American Graves Protection and Repatriation Act Plan of Action would not substantially change BLM's analysis of the 2025 mining plan. *Id.* BLM provides no further discussion of any other resource value.

---

[15] *See supra* footnote 14.

66.     Prior to BLM's release of the 2025 DNA DR, SUWA provided supplemental information to BLM regarding the SPP Project's potential impacts on groundwater. Specifically, SUWA submitted a technical memorandum prepared by a Utah Professional Geologist with expertise in hydrogeology of the Great Basin region, including the Sevier Desert (where the SPP Project is located). That memorandum reviewed existing literature, methodology and conclusions of BLM's water resources analysis in the 2019 EIS, the proposed 2025 mining plan, and the industry-standard Great Basin Carbonate and Alluvial Aquifer System ("GBCAAS") model to run a water simulation that mirrored the simulation BLM relied on to analyze groundwater impacts in the 2019 EIS.

67.     The GBCAAS model was specifically developed by the United States Geological Survey to model groundwater flow for the Great Salt Lake Desert Flow System, which includes aquifers underlying the Sevier Desert. It is widely recognized as an important tool for analyzing groundwater management scenarios in the region. Nonetheless, BLM did not use the GBCAAS model to evaluate the SPP Project's groundwater impacts. Instead, BLM's contractor created its own model that was based on unrealistic assumptions, resulting in an overly narrow project study area that underestimated resource impacts. For instance, and contrary to the GBCAAS modeling results, BLM's groundwater model did not identify important impacts such as changes to Fish Springs Valley, groundwater head losses (*i.e.*, the loss of surface water at springs), and the 100+ year post-project recovery of groundwater levels. Consequently, BLM's water resources analysis in the 2019 EIS is inaccurate and underestimates the full range of effects from the SPP Project to groundwater resources.

68.    Although BLM was aware of the GBCAAS model at the time it conducted its analysis, it did not explain why it declined to use the GBCAAS model and instead created its own model.

69.    In its response to the third NEPA Adequacy criterion, BLM did not acknowledge the new and additional information contained in the technical memorandum provided by SUWA, let alone address how its findings demonstrated significantly different environmental effects from those analyzed in the 2019 EIS.

70.    Consequently, BLM has failed to "ensure the scientific integrity" of the 2019 EIS before relying on it to approve the 2025 mining plan, "make use of reliable data and resources," and evaluate whether the new information provided in the technical memorandum and/or impacts not previously analyzed "may result in significantly different environmental effects." 42 U.S.C. §§ 4332(2)(D), (E) (2025); 43 C.F.R. § 46.120(c).

71.    These failures violate NEPA, its implementing regulations, and are arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, SUWA respectfully requests that this Court enter judgment in its favor and against Defendants and provide the following relief:

1.    Declare that Defendants have violated NEPA, its implementing regulations, and the APA by approving the 2019 ROD and 2025 DNA DR;

2.    Declare unlawful and set aside the 2019 EIS, 2019 ROD, 2025 DNA, and 2025 DNA DR;

3.      Enjoin Defendants from taking any actions pursuant to the 2019 EIS, 2019 ROD, 2025 DNA, or 2025 DNA DR until they have complied with NEPA, its implementing regulations, and the APA;

4.      Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

5.      Award Plaintiff the costs it has incurred in pursuing this action, including attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable provisions; and

6.      Grant other such relief the Court deems just and proper.

Respectfully submitted this 7th day of August, 2025.

*/s/ Hanna Larsen*
Stephen H.M. Bloch
Hanna Larsen

*Attorneys for Plaintiff Southern Utah Wilderness Alliance*