# EXHIBIT 1

U.S. Department of the Interior
Bureau of Land Management

Utah

# Sevier Playa Potash Project
# Record of Decision



**August 2019**

THIS PAGE INTENTIONALLY LEFT BLANK.

# Sevier Playa Potash Project

# Record of Decision

**DOI-BLM-UT-W020-2014-0001-EIS**

**U. S. Department of the Interior**
**Bureau of Land Management**
**Fillmore Field Office**

**Cooperating Agencies**
U. S. Department of Defense (Utah Test and Training Range)
U. S. Environmental Protection Agency
U. S. Fish and Wildlife Service
State of Utah
Millard County
Beaver County

August 2019

**BLM Case File Numbers**

| Mining Project | | | |
|---|---|---|---|
| UTU-88387[1] | UTU-88403 | UTU-88418 | UTU-88445 |
| UTU-88388 | UTU-88404 | UTU-88419 | UTU-88446 |
| UTU-88389 | UTU-88405 | UTU-88420 | UTU-88448 |
| UTU-88390 | UTU-88406 | UTU-88421 | UTU-88449 |
| UTU-88391 | UTU-88407 | UTU-88422 | UTU-88450 |
| UTU-88392 | UTU-88408 | UTU-88423 | UTU-88451 |
| UTU-88393 | UTU-88409 | UTU-88424 | UTU-88452 |
| UTU-88394 | UTU-88410 | UTU-88425 | UTU-88453 |
| UTU-88395 | UTU-88411 | UTU-88426 | UTU-88455 |
| UTU-88396 | UTU-88412 | UTU-88427 | UTU-88456 |
| UTU-88397 | UTU-88413 | UTU-88428 | UTU-88457 |
| UTU-88398 | UTU-88414 | UTU-88429 | UTU-88461 |
| UTU-88399 | UTU-88415 | UTU-88430 | UTU-88462 |
| UTU-88401 | UTU-88416 | UTU-88443 | UTU-88463 |
| UTU-88402 | UTU-88417 | UTU-88444 | -- |
| Rights-of-Way[2] | | | |
| Permanent | | Temporary | |
| UTU-90095[3] | UTU-92068 | UTU-90095-01 | UTU-92069-01 |
| UTU-90097 | UTU-92069 | UTU-90096-01 | UTU-92100-01 |
| UTU-92048 | UTU-92100 | UTU-90097-01 | UTU-94227-01 |
| UTU-92063 | UTU-94227 | UTU-92064-01 | UTU-94232-01 |
| UTU-92064 | UTU-94232 | UTU-92067-01 | UTU-94233-01 |
| UTU-92066 | UTU-94233 | UTU-92068-01 | UTU-94234-01 |
| UTU-92067 | UTU-94234 | -- | -- |
| Mineral Material Sales | | | |
| Pending | | | |

[1] UTU-88387 was the first Federal potassium lease issued as part of the Project. For ease of reference, it is used as the lead case file for the Mining Project. Each of the 59 Federal potassium leases in the Project, are also listed in **Table 2**. **Appendix D** lists the acreages and legal descriptions for the Federal potassium leases.

[2] "Permanent" ROWs will be issued for 30 years, with an option to extend them for as long as the potassium leases and associated facilities are in use. "Temporary" ROWs will be issued for a short-term, variable period during construction and interim reclamation

[3] UTU-90095 is the first case file number in the sequence of rights-of-way (ROWs). For ease of reference, it is used as the lead case file for the ROWs. **Table 3** lists the facilities that are included in each ROW. **Appendix D** lists the extent (length, width, and acreage) and legal description for each ROW.

## Final Agency Action

It is my decision to approve the Sevier Playa Potash Project as described in **Section 2.1** of this Record of Decision. My approval is subject to the lease stipulations, applicant committed design features, mitigation measures, and other requirements outlined in **Section 2.1** of this Record of Decision.

This decision pertains only to Sevier Playa Potash Project facilities and activities on lands administered by the Bureau of Land Management. In making this decision, I considered the information contained in the Final Environmental Impact Statement and its supporting documents, which are listed in **Section 2.1** of this Record of Decision.

Approved By:

_____    8/27/19
Joseph R. Balash                    Date
Assistant Secretary for Land and Minerals Management

THIS PAGE INTENTIONALLY LEFT BLANK.

# Executive Summary

Peak Minerals, Inc., dba Crystal Peak Minerals (CPM), through agreement controls the rights to develop and operate potassium mineral leases on 117,814 acres of federal lands administered by the BLM and an additional 6,409 acres of potash leases on state lands on or adjacent to the Sevier Playa, for a total of 124,223 acres. The Sevier Playa is located in central Millard County in southwestern Utah. CPM proposed to exercise its lease rights by constructing and operating the Sevier Playa Potash Project (Project), which will produce at its peak approximately 372,000 tons per year of potassium sulfate, also known as sulfate of potash, and associated minerals over its 32-year lifetime.

The Environmental Impact Statement (EIS) for the Project and this Record of Decision (ROD), were prepared by the Bureau of Land Management (BLM) Fillmore Field Office in compliance with the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), the Mineral Leasing Act of 1920 (MLA), and the Materials Act of 1947. The EIS analyzed the potential direct, indirect, and cumulative effects of the Project and addressed those issues identified by federal, state, or local agencies; Native American tribes; interested or affected parties; the public; the BLM Interdisciplinary Team; or where an analysis was required by law, regulation, or agency direction.

The selected action for the Project is the proposed action, which is based on CPM's Mining Plan, Plan of Development (POD), and Gravel Pit Mining Plan. Specifically, the BLM has decided to:

1) Approve the Mining Plan, which includes full development of the Project by CPM, subject to all requirements contained therein, including, but not limited to, implementation by CPM of all lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval.

2) Approve issuance of right-of-way (ROW) grants to CPM for construction, operation, maintenance, and decommissioning of off-lease facilities associated with full development of the Project, subject to all requirements contained in the POD including, but not limited to, implementation by CPM of all of the lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval.

3) Approve the Gravel Pit Mining Plan for sales of mineral materials that are needed to support full development of the Project, subject to all requirements contained in the Gravel Pit Mining Plan including, but not limited to, implementation by CPM of all lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval.

The selected action meets the BLM's purpose and need and conforms to the applicable land management plan and other plans, statutes, and objectives. The EIS analyzed in detail the proposed action, five action alternatives, and a no-action alternative. Throughout the NEPA process, the BLM formally and informally involved federal, state, and local agencies; Native American tribes; interest groups; landowners, ROW and permit holders near the Project; and other members of the public. These interactions helped ensure that all interested parties were aware of the Project, had opportunities to provide input to the NEPA process, and that their interests and input were considered and incorporated into the analysis and decision-making process. The Final EIS responded to public and Cooperating Agency comments received by the BLM on the Draft EIS.

THIS PAGE INTENTIONALLY LEFT BLANK.

# Table of Contents

1.0    Introduction ........................................................................................................................... 1
    1.1    Project Location ...................................................................................................... 1
    1.2    Project Background .................................................................................................. 1
        1.2.1    Bureau of Land Management's Regulatory and Decision-making Authority .................. 2
    1.3    Purpose and Need .................................................................................................... 3
    1.4    Decisions to be Made .............................................................................................. 4
2.0    Decision .............................................................................................................................. 4
    2.1    What the Decision Includes ..................................................................................... 5
        2.1.1    Description of the Selected Action .................................................................. 5
        2.1.2    Lease Stipulations ............................................................................................ 6
        2.1.3    Applicant Committed Design Features ............................................................ 6
        2.1.4    Mitigation Measures ........................................................................................ 6
        2.1.5    Supplemental Plans .......................................................................................... 7
        2.1.6    Additional Conditions of Approval ................................................................. 7
        2.1.7    Legal Description ............................................................................................. 8
    2.2    What the Decision Does Not Include ..................................................................... 10
3.0    Management Considerations and Rationale ........................................................................ 11
    3.1    Conformance to Purpose and Need ........................................................................ 11
    3.2    Land Use Plan Conformance .................................................................................. 12
        3.2.1    Biological Resources ..................................................................................... 12
        3.2.2    Cultural Resources ......................................................................................... 12
        3.2.3    Geology and Minerals .................................................................................... 13
        3.2.4    Lands and Access ........................................................................................... 13
        3.2.5    Range Management ......................................................................................... 14
        3.2.6    Recreation ...................................................................................................... 14
        3.2.7    Soils ............................................................................................................... 14
        3.2.8    Visual Resources ........................................................................................... 15
        3.2.9    Water Resources ............................................................................................ 15
    3.3    Consistency with Other Plans, Statutes, and Objectives ........................................ 15
4.0    Alternatives Considered ..................................................................................................... 16
    4.1    Action Alternatives ................................................................................................ 17
        4.1.1    Alternative 1 .................................................................................................. 17
        4.1.2    Alternative 2 .................................................................................................. 17
        4.1.3    Alternative 3 .................................................................................................. 17
        4.1.4    Alternative 4 .................................................................................................. 17
        4.1.5    Alternative 5 .................................................................................................. 18
    4.2    No Action Alternative ............................................................................................ 18
    4.3    Alternatives Considered but Not Analyzed in Detail .............................................. 18
    4.4    Environmentally Preferred Alternative ................................................................... 19
5.0    Consultation and Coordination ........................................................................................... 20
    5.1    Cooperating Agencies ............................................................................................ 20
    5.2    NHPA Section 106 Consultation ............................................................................ 21
    5.3    Government-to-Government Tribal Consultation ..................................................... 22
    5.4    Air Resources ........................................................................................................ 22
    5.5    Endangered Species Act Section 7 Consultation .................................................... 22
    5.6    Wildlife Working Group ......................................................................................... 23
6.0    Public Involvement ............................................................................................................ 23
    6.1    Scoping .................................................................................................................. 23

6.2    Draft Environmental Impact Statement.................................................................... 24
6.3    Final Environmental Impact Statement..................................................................... 25
7.0    References..................................................................................................................... 26

## Figures

Figure 1 Document Organization, Sevier Playa Potash Project....................................... A-1
Figure 2 Project Overview Mining Project........................................................................ A-3
Figure 3 Project Overview Off-Lease Features ................................................................. A-5

## Tables

Table 1 Summary and General Description of the Sevier Playa Leases............................ 2
Table 2 Summary of BLM Case File Numbers and Facilities, Mining Project................ 8
Table 3 Summary of BLM Case File Numbers and Facilities, ROWs............................ 9
Table B-1 Special Lease Stipulations ............................................................................... B-1
Table C-1 Applicant Committed Design Features............................................................ C-1
Table C-2 Mitigation Measures ....................................................................................... C-21
Table C-3 Applicant Committed Design Features, Supplemental Plans ........................ C-23
Table D-1 Summary of Federal Potassium Leases Controlled by CPM......................... D-1
Table D-2 Rights-of-Way on Off-Lease BLM-Administered Lands.............................. D-4

## Appendices

Appendix A Figures
Appendix B Special Lease Stipulations
Appendix C Applicant Committed Design Features and Mitigation Measures
Appendix D Legal Descriptions

# Acronyms and Abbreviations

The following acronyms and abbreviations are used in this Record of Decision.

| | |
|---|---|
| AO | Authorized Officer |
| APLIC | Avian Power Line Interaction Committee |
| AUM | Animal Unit Month |
| AWMP | Adaptive Wildlife Management Plan |
| BA | Biological Assessment |
| BLM | U. S. Bureau of Land Management |
| CAA | Clean Air Act |
| CFR | Code of Federal Regulations |
| CIC | Compliance Inspection Contractor |
| CPM | Crystal Peak Minerals (Peak Minerals, Inc. dba Crystal Peak Minerals) |

| | |
|---|---|
| DEIS | Draft Environmental Impact Statement |
| DR | Decision Record |
| EA | Environmental Assessment |
| ECIP | Environmental Compliance and Inspection Plan |
| EIS | Environmental Impact Statement |
| EO | Executive Order |
| EPA | U. S. Environmental Protection Agency |
| ESA | Endangered Species Act |
| FDCP | Fugitive Dust Control Plan |
| FEIS | Final Environmental Impact Statement |
| FFO | Fillmore Field Office |
| FLPMA | Federal Lands Policy and Management Act |
| GPS | Global Positioning Systems |
| HPTP | Historic Properties Treatment Plan |
| IDT | Interdisciplinary Team |
| $K_2SO_4$ | Potassium Sulfate (Sulfate of Potash) |
| KOP | Key Observation Point |
| kV | Kilovolt |
| LUMA | LUMA Minerals, LLC |
| MBTA | Migratory Bird Treaty Act |
| MLA | Mineral Leasing Act of 1920 |
| MSHA | Mine Safety and Health Administration |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NOA | Notice of Availability |
| NOI | Notice of Intent |
| NRHP | National Register of Historic Places |
| NTP | Notice to Proceed |
| OHV | Off-Highway Vehicle |
| OSHA | Occupational Safety and Health Administration |
| PA | Programmatic Agreement |
| PLPCO | Public Lands Policy Coordinating Office (State of Utah) |
| PLSS | Public Land Survey System |
| POD | Plan of Development |
| PUP | Pesticide Use Proposal |
| Project | Sevier Playa Potash Project |

| | |
|---|---|
| RMP | Resource Management Plan |
| ROD | Record of Decision |
| ROW | Right-of-Way |
| SHPO | State Historic Preservation Office |
| SITLA | State of Utah School and Institutional Trust Lands Administration |
| SOP | Sulfate of Potash |
| SPCC | Spill Prevention, Control, and Countermeasures |
| SR | State Route |
| SWPPP | Stormwater Pollution Prevention Plan |
| TAC | Technical Advisory Committee |
| TUA | Temporary Use Area |
| UDOGM | Utah Division of Oil, Gas, and Mining |
| UDOT | Utah Department of Transportation |
| UDWR | Utah Division of Wildlife Resources |
| UPDES | Utah Pollutant Discharge Elimination System |
| U.S.C. | United States Code |
| USFWS | U. S. Fish and Wildlife Service |
| UTTR | Utah Test and Training Range |
| VRM | Visual Resource Management |
| WSRA | Warm Springs Resource Area |
| WWG | Wildlife Working Group |

# 1.0    Introduction

Peak Minerals, Inc., dba Crystal Peak Minerals (CPM), proposed to construct and operate the Sevier Playa Potash Project (Project), which will produce at its peak approximately 372,000 tons per year of potassium sulfate ($K_2SO_4$), also known as sulfate of potash (SOP), and associated minerals from potassium salts that are present in the brines of the Sevier Playa. The annual average production over the 32-year lifetime of the Project will be about 328,500 tons, with the minimum annual production being approximately 246,000 tons.

The Bureau of Land Management (BLM) Fillmore Field Office (FFO) prepared a Final Environmental Impact Statement (FEIS) for the Project in compliance with the National Environmental Policy Act (NEPA), the Federal Land Policy and Management Act (FLPMA), the Mineral Leasing Act of 1920 (MLA), and the Materials Act of 1947. The FEIS was a site-specific analysis of the potential direct, indirect, and cumulative effects of the proposed action and alternatives for the Project and provided the foundation for the BLM's decision in this ROD.

In accordance with Secretarial Order 3355 and EO 13807, the FEIS was prepared in a streamlined format that summarizes extensive background information and analysis into a limited number of pages. Resource reports containing detailed discussions of the analysis area, regulatory framework, methods, affected environment, and environmental consequences were prepared for each resource analyzed in detail. The content of these reports was then summarized and incorporated into the FEIS. Supporting information that is peripheral to the main analysis in the FEIS was placed into appendices. **Figure 1 (Appendix A)** depicts the relationships among the various Project documents, reports, and appendices.

## 1.1  Project Location

The Sevier Playa is located in central Millard County in southwestern Utah, approximately 130 miles southwest of Salt Lake City, between the towns of Delta (30 miles to the northeast) and Milford (25 miles to the south-southeast). The Sevier Playa is a large terminal lakebed that is normally dry on the surface and contains subsurface potassium-bearing saline brines. The Sevier Playa is approximately 26 miles long by an average of 8 miles wide, and covers approximately 125,000 acres at an elevation of about 4,500 feet. The brine resource, along with the meteorological and topographic conditions at the Sevier Playa, makes the site a viable location from which to produce potash and associated minerals.

## 1.2  Project Background

In February 2011, the BLM published an Environmental Assessment (EA) (DOI-BLM-UT-W020-2010-014-EA – the "Leasing EA") that analyzed the effects of leasing and development of the Sevier Lake competitive potassium lease tracts, which included 125,762 acres in 64 tracts (BLM 2011a). A series of terms, conditions, and stipulations were to be added to any leases issued. The Leasing EA was not limited to the assessment of leasing, but also analyzed the potential effects of reasonable scenarios for extraction of potassium based on known available processes and technology. The Decision Record (DR) for the Leasing EA allowed a competitive Sevier Lake potassium lease sale to move forward. The DR did not authorize development of the leases, which required a separate NEPA review and decision.

The BLM published the Sevier Lake Potassium Lease Sale notice in March 2011. During the sale, 95,802 acres were leased to Peak Minerals, Inc. and 22,012 acres were leased to LUMA Minerals, LLC (LUMA). Approximately 7,950 acres that were included in the Leasing Proposal were not leased. The terms for these leases are 20 years, with provision for extension if the lessee continues to comply with their terms and conditions. Subsequent to the Lease Sale, Peak Minerals, Inc. and LUMA entered into a cooperative

development agreement. CPM through agreement controls the rights to develop and operate potassium mineral leases on 117,814 acres of federal lands administered by the BLM and an additional 6,409 acres of potash leases on lands under the jurisdiction of the State of Utah's School and Institutional Trust Lands Administration (SITLA) (leased in 2008 by Emerald Peak Minerals LLC) on or adjacent to the Sevier Playa, for a total of 124,223 acres. Additional details on the leases and the relationship among the leaseholders are provided in **Table 1**.

| Table 1 Summary and General Description of the Sevier Playa Leases | | | |
|---|---|---|---|
| | **Leaseholder** | | |
| | **Peak Minerals, Inc.** | **LUMA Minerals LLC** | **Emerald Peak Minerals LLC** |
| Relationship to CPM | Wholly-owned subsidiary of Crystal Peak Minerals, Inc. Yukon Corporation | Contractual agreement with Peak Minerals Inc. | In 2018, CPM became the owner of Emerald Peak Minerals LLC |
| Contractual Agreement with CPM | 100 percent owned by CPM | Cooperative Development Agreement with Peak Minerals Inc. for leasehold operations | Owned by CPM |
| Acres Held | 95,801.76 | 22,011.79 | 6,409.48 |
| Land Manager | BLM | BLM | SITLA |
| Effective Date of Leases | June 1, 2011 | June 1, 2011 | September 1, 2008 |

Following issuance of the leases, the BLM completed a second EA (DOI-BLM-UT-W020-2011-0015-EA – the "Exploration EA") to analyze the potential effects of the Sevier Lake Potash Lease Minerals Exploration Program (BLM 2011b). CPM proposed three activities as part of the exploratory phase of development: 1) confirmation of the brine resource, 2) a hydrology analysis, and 3) a screening-level geotechnical study. The BLM issued the DR for the Exploration EA in October 2011. The DR did not authorize full development of the leases, only limited exploratory activities, which began in 2011 and are continuing through 2019. Based on the exploration activities and the analysis in the Feasibility Study (CPM 2018), CPM developed and refined its proposed action for analysis in the EIS process.

### 1.2.1    Bureau of Land Management's Regulatory and Decision-making Authority

The MLA (30 United States Code [USC] § 181 *et seq.*, specifically §§ 281-287) authorizes the leasing of "chlorides, sulphates, carbonates, borates, silicates, or nitrates of potassium in lands belonging to the United States." Regulations promulgated for this activity are located at 43 Code of Federal Regulations (CFR) Part 3500. Any soluble salt containing potassium is defined as potash and there are many different varieties of potash. Leases issued under the MLA also allow for the extraction and sale of minerals associated with the potassium resource. A federal potassium lease provides the lessee the exclusive right to explore for, mine, extract, beneficiate, concentrate, process, and dispose of the potassium and other associated minerals and provides the United States with payment of rental and production royalties, bonding for both production and reclamation, prevention of mineral waste, and other special stipulation requirements. Once a lease is issued, the lessee has the right to conduct mining operations "in a manner to yield the ultimate maximum recovery of the mineral deposits, consistent with the protection and use of other natural resources and the protection and preservation of the environment—land, water and air" (43 CFR § 3594.1). Extraction, development, reclamation, mitigation, and monitoring are only allowed according to the lease stipulations under an approved Mining Plan with any conditions of approval

attached to the plan. The State of Utah is required to issue a State Mining Permit for the Project under its regulations and authorities, which will include approval of the Mining Plan and reclamation bonding.

The Project will be located on federal public lands and will extract federal minerals, both of which are administered by the BLM. Therefore, the Project will be a federal action requiring compliance with NEPA, which requires that an EIS be prepared before a federal agency undertakes any major action that may have significant effects on the human or natural environment. The Project will also include components on SITLA lands and will extract minerals under State jurisdiction. Although the BLM does not have jurisdiction over SITLA or private lands and does not have authority to approve or disapprove extraction of State minerals, the use of SITLA and private lands and extraction of State minerals were analyzed in the FEIS as connected actions, as required by NEPA.

The BLM, as the lead agency, evaluated the Project's potential to affect the natural and human environment and to affect existing land use and resource management plans. The FEIS described the potential environmental effects and present and future conflicts with existing land use and resource management plans that could result from implementation of the Project. The FEIS described approaches for minimizing the identified effects and resolving conflicts (40 CFR § 1502.16). The analysis also considered the potential effects of any alternatives to the proposed action.

Potassium (as potash) is one of the 35 mineral commodities considered critical to the economic and national security of the United States as identified by the Department of the Interior in accordance with Executive Order (EO) 13817. In addition, under Section 103(b) of FLPMA (43 USC § 1702(b)), the BLM is mandated to manage the federal public lands and their various resources so they will best meet the present and future needs of the American people (for example, the need for potash fertilizer). Authorization of the Project is consistent with FLPMA Section 103(b) as well as Section 102(a) (43 USC § 1702(a)(12), in which Congress indicated that it is the policy of the United States that the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals. Consistent with these mandates, the BLM FFO is responsible for management of the Sevier Playa for multiple uses, which can include mineral extraction.

Siting of the Project's potash extraction and processing facilities on leased federal and state lands will not require a right-of-way (ROW) grant from the BLM. However, the location of ancillary facilities on non-leased federal lands will require ROW grants from the BLM. The BLM has a responsibility under Section 501 of FLPMA (43 USC § 1761) to consider requests for ROW grants while avoiding or minimizing adverse effects to other resource values and allowing for ROW uses in conformance with existing land use plans. Temporary ROW grants issued for the Project will be for a variable period, depending on the time required for construction and interim reclamation of each Project component. Permanent ROW grants issued for the Project will be for 30 years with an option to extend as long as the potash leases and associated facilities are in use and CPM continues to comply with the terms and conditions of the grants.

CPM included the purchase of mineral materials from the BLM in its proposed action. The Materials Act of 1947 (30 USC § 601 *et seq.*) provides the BLM with the authority to dispose of sand, gravel, and other mineral materials that are not subject to mineral leasing or location, under regulations at 43 CFR Part 3600. The BLM may not sell mineral materials at less than fair market value, which it determines by appraisal (valuation) (43 CFR Part 3602).

## 1.3  Purpose and Need

Fertilizer rich in potassium is in high demand to support national and global food production. The Food and Agriculture Organization of the United Nations has forecast a 2.4 percent annual increase in demand for potassium fertilizer, also known as potash, between 2015 and 2020. In the United States, agriculture

relies on potash imports for 90 percent of its needs, with 85 percent of these imports originating in Canada. In recognition of its importance, the Department of the Interior has identified potassium as one of 35 critical minerals that the United States is almost completely reliant on importing from foreign markets. Presently, potash produced in the United States is mined from underground ores and the processing of brines in Utah and New Mexico. Additional sources of potash are needed to meet the increasing national and global demands for fertilizer rich in potassium. The purpose of the Project is to help meet this need in an environmentally sound manner that, in accordance with 43 CFR § 3594.1, provides for the ultimate maximum recovery of potassium sulfate.

The BLM's purpose is also to consider CPM's proposed Mining Plan for use of federal lands and minerals consistent with CPM's valid existing lease rights, which allow for development of the mineral resource subject to lease stipulations and reasonable conditions of approval to avoid, minimize, and mitigate adverse environmental effects. The BLM's purpose is also to consider CPM's requests for ROWs and mineral material sales associated with the proposed Mining Plan. The need for action by the BLM is based on both the MLA and the FLPMA, which provide for the mining of potash on the public domain and require the BLM to respond to ROW grant requests while avoiding or minimizing adverse effects, in conformance with existing land use plans.

## 1.4  Decisions to be Made

The BLM will make the following decisions in this Record of Decision (ROD) based on its regulatory and decision-making authority and informed by its purpose and need:

1) Whether or not to approve the Mining Plan, which includes full development of the Project by CPM, as described in Chapter 2 of the FEIS, and under what terms and conditions.

2) Whether or not to grant ROWs to CPM for construction, operation, maintenance, and decommissioning of off-lease facilities associated with full development of the Project, and under what terms and conditions.

3) Whether or not to authorize sales of mineral materials that are needed to support full development of the Project and under what terms and conditions.

# 2.0  Decision

The BLM's decision in this ROD consists of the selected action described in **Section 2.1.1**. Specifically, the BLM has decided to:

1) Approve the Mining Plan (CPM and Stantec 2019a), which includes full development of the Project by CPM, subject to all requirements contained therein, including, but not limited to, implementation by CPM of all lease stipulations (**Section 2.1.2**), applicant committed design features (**Section 2.1.3**), mitigation measures (**Section 2.1.4**), supplemental plans (**Section 2.1.5**), and additional conditions of approval (**Section 2.1.6**), as applicable.

2) Approve the issuance of ROW grants to CPM for construction, operation, maintenance, and decommissioning of off-lease facilities associated with full development of the Project, subject to all requirements contained in the Plan of Development (POD) (CPM 2019a) including, but not limited to, implementation by CPM of all lease stipulations (**Section 2.1.2**), applicant committed design features (**Section 2.1.3**), mitigation measures (**Section 2.1.4**), supplemental plans (**Section 2.1.5**), and additional conditions of approval (**Section 2.1.6**), as applicable.

3) Approve the Gravel Pit Mining Plan (CPM and Stantec 2019b) for sales of mineral materials that are needed to support full development of the Project, subject to all requirements contained in the Gravel Pit Mining Plan (CPM and Stantec 2019b) including, but not limited to, implementation by CPM of all lease stipulations (**Section 2.1.2**), applicant committed design features (**Section 2.1.3**), mitigation measures (**Section 2.1.4**), supplemental plans (**Section 2.1.5**), and additional conditions of approval (**Section 2.1.6**), as applicable.

The selected action was chosen because it meets the BLM's purpose and need; because it conforms to the Warm Springs Resource Area (WSRA) Resource Management Plan (RMP); because it conforms to other applicable plans, statutes, and objectives; and because it is the environmentally preferred alternative. **Section 3.0** contains additional discussion of the BLM's rationale for its decision. Additional rationale for the identification of the BLM's environmentally preferred alternative is presented in **Section 4.4**. Consultation and coordination that took place as part of the NEPA process and that informed this decision is summarized in **Section 5.0**. Public involvement that took place as part of the NEPA process and that informed this decision is summarized in **Section 6.0**.

## 2.1  What the Decision Includes

The decision includes the approval of the Mining Plan, approval to issue ROW grants, and approval of the Gravel Pit Mining Plan described in **Section 2.0**. The decision also includes requirements that CPM will implement, consisting of the lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval. Collectively, the lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval contain all practicable mitigation measures and monitoring requirements. Each part of the decision is summarized in the following sections.

### 2.1.1  Description of the Selected Action

The selected action is the proposed action for the Project, which was described in the FEIS based on CPM's Mining Plan (CPM and Stantec 2019a), POD (CPM 2019a), and the Gravel Pit Mining Plan (CPM and Stantec 2019b). The FEIS, Mining Plan, POD, and Gravel Pit Mining Plan are incorporated in this ROD by reference.

The Mining Plan forms the basis for the on-lease mining components of CPM's proposed action (the Mining Project) and includes facilities that will be constructed and activities that will take place on leases controlled by CPM on or near the Sevier Playa as part of full commercial development of the potassium resource. **Figure 2** (**Appendix A**) illustrates the Mining Project.

The POD describes the off-lease infrastructure required to support the mining components of CPM's proposed action and includes facilities that will be constructed and activities that will take place outside of leases controlled by CPM on ROWs issued by the BLM, along with equivalent agreements on state and private lands, to support full development of the potassium resource. **Figure 3** (**Appendix A**) illustrates the off-lease features of the Project to be located in ROWs.

The Gravel Pit Mining Plan is specific to gravel pits that CPM will operate to support development of mining components and off-lease infrastructure and includes sales of mineral materials to CPM by the BLM and SITLA to support full development of the potassium resource.

It is important to note that some Project components are divided into on-lease and off-lease portions. For example, the 69-kilovolt (kV) Power and Communication Line will be located primarily in a ROW; however, about two miles of the line will be located in the lease area. Similarly, the Preconcentration and

Heel Brine Ponds will be located primarily in the lease area; however, about ten percent of these ponds will be located in a ROW. Additional details of the proposed action are provided in Appendix L in the FEIS.

The description of the selected action represents the best available information, based on the Mining Plan, POD, Gravel Pit Mining Plan, and their supporting documents. CPM is continuing work on more detailed engineering and refinement of processes. This additional detail in engineering may lead to changes to the design of facilities, activities, and processes that are different than those described and analyzed in the FEIS. If such refinements are proposed by CPM, the BLM will review the proposals, determine the adequacy of the analysis of effects in the FEIS, and conduct any additional NEPA analysis it determines is required prior to the proposals being approved or implemented.

The selected action for the Natural Gas Pipeline provides the BLM with the flexibility to determine if a specific section of the pipeline should be constructed above- or below-ground. The specific section includes an area of shallow bedrock and surface rock outcrops running from State Route 257 east for approximately one mile. In this area, blasting may be required to bury the pipeline because of the rock. This option is described in more detail in Section 3.4 in Appendix L of the FEIS and is illustrated in Figure L-17 in Appendix L of the FEIS. Prior to constructing the Natural Gas Pipeline, CPM will conduct additional engineering studies and provide the BLM with the results of these studies. The BLM will consider potential effects to resources, and then provide CPM direction for this section (whether the pipeline should be constructed above- or below-ground). The FEIS analyzed the potential effects for both above- and below-ground siting in this section. The BLM will review the analysis in the FEIS and determine if any additional analysis or mitigation measures may be needed for the selected siting.

### 2.1.2   Lease Stipulations

Special stipulations for resource protection were attached to each potassium lease controlled by CPM at the time of leasing (**Appendix B**). Appendix E in the FEIS identifies how each special stipulation was incorporated into the proposed action for the Project. Although the special stipulations are only applicable to on-lease activities, incorporation of the stipulations into the proposed action led to development of some of the applicant committed design features (**Section 2.1.3**) that apply to both the on-lease and off-lease components of the Project.

### 2.1.3   Applicant Committed Design Features

When reviewing and considering whether to approve proposed projects, the BLM's approach is to first avoid, then minimize, and finally mitigate adverse effects. CPM and the BLM worked collaboratively throughout development of the selected action to design the applicant committed design features, which will avoid, minimize, or mitigate the potential adverse effects of the Project. **Table C-1 (Appendix C)** lists these design features, which are integral to the selected action. CPM will implement these design features as applicable throughout construction, operation, maintenance, and decommissioning of the selected action.

### 2.1.4   Mitigation Measures

During the analysis of effects, the BLM identified several mitigation measures in addition to the applicant committed design features (described in **Section 2.1.3** and listed in **Table C-1, Appendix C**) and the supplemental plans (**Section 2.1.5**) that will reduce the potential adverse effects of the Project. These measures were listed in Section 4.4 in the FEIS and are reproduced in **Table C-2 (Appendix C)** in their entirety. All of the mitigation measures identified by the BLM have been incorporated in this ROD; no measures have been excluded from this ROD. These mitigation measures are integral to the selected

action. CPM will implement these mitigation measures as applicable throughout construction, operation, maintenance, and decommissioning of the selected action.

### 2.1.5  Supplemental Plans

CPM developed several supplemental plans to address specific resource issues or management requirements. Each of these plans supplements information and requirements in the FEIS, the Mining Plan, the POD, and the Gravel Pit Mining Plan and provides a foundation for the BLM's decision in this ROD. Some of these plans contain applicant committed design features that CPM will implement in addition to the design features described in **Section 2.1.3**. **Table C-3** (**Appendix C**) lists these design features. The analysis of effects in Chapter 4 of the FEIS considered the design features in the supplemental plans to be integral to the selected action. The supplemental plans also contain other requirements (for example, monitoring and reporting) that are not listed in **Table C-3**, but that CPM will implement as part of the Project. The supplemental plans include:

- Adaptive Wildlife Management Plan (AWMP) (CPM 2019b)

- Blasting Plan (CPM 2019c)

- Cultural Resource Plan (CPM 2019d)

- Environmental Compliance Inspection Plan (ECIP) (CPM 2019e)

- Fugitive Dust Control Plan (FDCP) (CPM 2019f)

- Noxious and Invasive Weed Management Plan (CPM 2019g)

- Reclamation Plan (CPM 2019h)

- Site Safety Plan (CPM 2019i)

- Solid and Hazardous Waste and Hazardous Materials Management Plan (CPM 2019j)

- Spill Prevention, Control, and Countermeasures Plan (SPCC) (CPM 2019k)

- Stormwater Pollution Prevention Plan (SWPPP) (CPM 2019l)

- Transportation and Traffic Management Plan (CPM 2019m)

- Water Monitoring Plan (CPM 2019n)

### 2.1.6  Additional Conditions of Approval

The BLM has added the following terms, conditions, and stipulations to the selected action in this ROD as conditions of approval:

1) Prior to commencement of surface disturbing activities, each disturbance phase of the Project shall be bonded. The BLM will require that bond calculations be submitted by the operator/lessee/grantee and a bond be accepted by the AO in a form and amount that is sufficient to cover the third-party cost of reclamation activities for the upcoming disturbance phase of the Project.

2) The operator/lessee may request in writing that the BLM approve changes to reclamation procedures identified in the Reclamation Plan. Approval of any changes by UDOGM may also be required. Potential changes to reclamation procedures may include changes to seed mixes, site preparation, or other activities where more efficient or effective procedures have been identified. The intended result of reclamation shall remain the same and all lease stipulations shall be followed.

3) Prior to final bond release, the operator/lessee/grantee shall submit to the BLM in a paper copy and electronic files (including GIS data), drawings of any features that are buried or left as part of decommissioning and reclamation activities both on- and off-lease. The drawings shall contain but no be limited to the following: basis of the public land grid, coordinates of the features that will remain in the ground, starting coordinates and ending coordinates, nominal burial depth, diameter or size of feature, and feature material type (concrete, steel, PVC, etc.). The operator/lessee shall obtain advance approval from the BLM in writing on which coordinate system should be used, types of electronic files to be submitted, and the scale of the paper copy maps prior to commencement of the work.

### 2.1.7  Legal Description

**Table 2** lists each of the case file numbers for the Federal potassium leases that are part of the Mining Project and provides a summary of the facilities that will be located within the lease boundary. **Appendix D** contains a complete, detailed listing of the legal descriptions for the Federal potassium leases, including their acreages.

| Table 2 Summary of BLM Case File Numbers and Facilities, Mining Project | | | | Description of Facilities |
|---|---|---|---|---|
| **Case File Number** | | | | **Description of Facilities** |
| UTU-88387[1] | UTU-88403 | UTU-88418 | UTU-88445 | |
| UTU-88388 | UTU-88404 | UTU-88419 | UTU-88446 | |
| UTU-88389 | UTU-88405 | UTU-88420 | UTU-88448 | |
| UTU-88390 | UTU-88406 | UTU-88421 | UTU-88449 | |
| UTU-88391 | UTU-88407 | UTU-88422 | UTU-88450 | |
| UTU-88392 | UTU-88408 | UTU-88423 | UTU-88451 | |
| UTU-88393 | UTU-88409 | UTU-88424 | UTU-88452 | |
| UTU-88394 | UTU-88410 | UTU-88425 | UTU-88453 | All on-lease facilities, including on-lease gravel pits. |
| UTU-88395 | UTU-88411 | UTU-88426 | UTU-88455 | |
| UTU-88396 | UTU-88412 | UTU-88427 | UTU-88456 | |
| UTU-88397 | UTU-88413 | UTU-88428 | UTU-88457 | |
| UTU-88398 | UTU-88414 | UTU-88429 | UTU-88461 | |
| UTU-88399 | UTU-88415 | UTU-88430 | UTU-88462 | |
| UTU-88401 | UTU-88416 | UTU-88443 | UTU-88463 | |
| UTU-88402 | UTU-88417 | UTU-88444 | -- | |

[1] UTU-88387 was the first Federal potassium lease issued as part of the Project. For ease of reference, it is used as the lead case file for the Mining Project.

**Table 3** lists the case file numbers for each of the ROWs associated with the Project and provides a summary of the facilities that will be located in each ROW. **Table 3** also identifies whether each ROW will be temporary or permanent. **Appendix D** contains a complete, detailed listing of the legal descriptions for the ROWs, including their extent (length, width, and acreage).

| Table 3 Summary of BLM Case File Numbers and Facilities, ROWs | | |
|---|---|---|
| **Case File Number** | **ROW Type[1]** | **Description of Facilities** |
| UTU-90095[2] | Permanent | Water Supply Pipeline, Wells 2 & 4 (1 & 3 are on SITLA land), Water Supply Pipeline Spurs to support Wells 1-4, , Well Access Roads to support Wells 1, 3 & 4 (Well 2 is via a Millard County Class B Road), and 12.47-kV Power Line Spur to support Water Supply Wells #1-4. |
| UTU-90095-01 | Temporary | Water Supply Pipeline Temporary ROW; temporary ROWs for the Water Supply Pipeline Spurs; temporary ROWs for the 12.47-kV Power Line Spur; and temporary ROWs for Water Supply Wells 2 & 4. |
| UTU-90096-01 | Temporary | Temporary ROW for Long Ridge Communication Tower and Access Road |
| UTU-90097 | Permanent | 69-kV Power and Communication Line and Access Road |
| UTU-90097-01 | Temporary | Temporary ROW for the 69-kV Power and Communication Line + Access Road Spurs and 15 Temporary Use Areas (staging or laydown areas) |
| UTU-92048 | Permanent | Rail Loadout Facility |
| UTU-92063 | Permanent | Black Rock Communication Tower and Access Road |
| UTU-92064 | Permanent | Perimeter Road Segments 1-11 and turnouts (approximately 15; 1 per mile) |
| UTU-92064-01 | Temporary | Perimeter Road Segments 1-11 Temporary ROWs |
| UTU-92066 | Permanent | Access Road Segments A, B, C1, C2, D1, D2, E, F, and G |
| UTU-92067 | Permanent | Natural Gas Pipeline, Spur and Access Roads 1A,1B, 2, 3, 5A, 5B, 6,7, & 8 |
| UTU-92067-01 | Temporary | Natural Gas Pipeline and Spur Temporary ROWs |
| UTU-92068 | Permanent | 25-kV Power Line and Access Road and the North Playa Substation |
| UTU-92068-01 | Temporary | 25-kV Power Line Temporary ROW |
| UTU-92069 | Permanent | 12.47-kV Power and Communication Line |
| UTU-92069-01 | Temporary | 12.47-kV Power and Communication Line Temporary ROWs + 2 Temporary Use Areas (staging or laydown areas) |
| UTU-92100 | Permanent | Rail Spur and Access Corridor and Rail Loadout Facility Access Roads 1 & 2 |
| UTU-92100-01 | Temporary | Rail Spur and Access Roads 1 & 2 Temporary ROWs |
| UTU-94227 | Permanent | Preconcentration and Heel Brine Ponds |
| UTU-94227-01 | Temporary | Preconcentration and Heel Brine Ponds Temporary ROWs |
| UTU-94232 | Permanent | Monitoring Wells CPM-20-NACT, CPM-20-WACT, COM-20-WAC, CPM-20-NAC, CPM-20-WBRT, CPM-20-WBR, CPM-20-SBRWS, CPM-20-EBRWS, and Monitoring Well Access Roads |
| UTU-94232-01 | Temporary | Monitoring Well Temporary ROWs |
| UTU-94233 | Permanent | 12.47-kV Power Line |
| UTU-94233-01 | Temporary | 12.47-kV Power Line Temporary Use Area |
| UTU-94234 | Permanent | Recharge Canal Segments 1-9, Recharge Collector Segments A, B, & C, and Brine Transfer Canal Segments 1-3 |
| UTU-94234-01 | Temporary | Temporary ROWs for Recharge Canal Segments 1-9 and Recharge Collector Segments A, B, & C |

| Table 3 Summary of BLM Case File Numbers and Facilities, ROWs | | |
| --- | --- | --- |
| **Case File Number** | **ROW Type[1]** | **Description of Facilities** |

Note: For the most part, temporary ROWs will be used for extra construction width or space. Temporary Use Areas (TUAs) refer to staging or laydown areas. Temporary ROWs include TUAs.

[1] "Permanent" ROWs will be issued for 30 years, with an option to extend them for as long as the potassium leases and associated facilities are in use. "Temporary" ROWs will be issued for a short-term, variable period during construction and interim reclamation.

[2] UTU-90095 is the first case file number in the sequence of rights-of-way (ROWs). For ease of reference, it is used as the lead case file for the ROWs.

A case file number has not yet been assigned for the mineral material sale for the off-lease Pass Federal Gravel Pit. **Appendix D** contains a complete, detailed legal description for the Pass Federal Gravel Pit.

## 2.2 What the Decision Does Not Include

This decision does not authorize CPM to begin any ground-disturbing activities or construct any facilities. Commencement of any ground-disturbing activities and facility construction is contingent on completion of the following requirements:

1) **Equivalent Authorizations for State and Private Lands**: CPM proposed to place some parts of the Mining Project on state lands. Parts of some ROWs were proposed for state and private lands. In addition, one of the proposed gravel pits will be located on state lands. This ROD does not approve any facility construction, ground-disturbance, or other activities associated with the Project on state or private lands. CPM will need to secure agreements from the state and private landowners before any Project activities can take place on those lands.

2) **Bonding**: CPM will be required to develop reclamation cost estimates for the Mining Project, all ROWs, and gravel pits, and then submit a performance bond in compliance with BLM and Utah Division of Oil, Gas, and Mining (UDOGM) requirements. The purpose of this bond is to ensure that adequate funds are available for the BLM and UDOGM to complete all reclamation and related environmental requirements in the event that CPM, for whatever reason, is unable to meet such requirements. The BLM and UDOGM will jointly determine by whom and where the reclamation bond will be held and will enter into a written agreement detailing this determination. The bond for this Project will reflect the phased nature of Project construction, including annual updates based on new and planned disturbance. The initial bond estimate will be tied to the initial disturbance area for the agreed-upon initial period of Project development. Annual reviews will then be conducted to update the bond. The performance bond must be in place and accepted by the BLM and UDOGM before ground-disturbing activities or facility construction may begin.

3) **BLM ROWs**: The BLM will issue 14 permanent and 12 temporary ROW grants in support of the Project. While the decision in this ROD approves issuance of the ROW grants, it does not issue the grants themselves. The BLM may issue the ROW grants within 90 days of the signature date on this ROD, starting with the grants identified as highest priority by CPM.

4) **Other Federal, State, or Local Permits**: This ROD does not approve any other federal, state, or local permits that CPM is required to obtain. Appendix I in the FEIS provides a list of potential authorizations, permits, reviews, and approvals that may be required for the Project.

5) **Notice-to-Proceed**: The start of facility construction or other ground-disturbing activities in ROWs will be authorized by the issuance of written Notices-to-Proceed (NTPs). The BLM anticipates issuing multiple NTPs because of the complex nature of the Project including, at a minimum, one NTP for each ROW grant. Before the BLM issues a NTP for a particular ROW, CPM will need to comply with all applicable preconstruction requirements included in the POD, supplemental plans, and this ROD.

6) **Mineral Material Sales**: Before a mineral material sale can proceed, CPM will need to submit a request for the sale and provide cost recovery funds. The BLM will conduct a mineral evaluation to determine price of the respective mineral materials. The BLM will issue a mineral material sale document once it confirms that the required funds have been deposited.

# 3.0   Management Considerations and Rationale

The BLM considered the following issues and information in making the decision set forth in this ROD.

## 3.1  Conformance to Purpose and Need

The selected action meets the BLM's purpose because it will help meet the need for potash, one of the 35 mineral commodities considered critical to the economic and national security of the United States as identified by the Department of the Interior in accordance with EO 13817. Potash production will be conducted in an environmentally sound manner that, in accordance with 43 CFR § 3594.1, provides for ultimate maximum recovery.

The selected action meets the BLM's purpose because it considers CPM's Mining Plan for use of federal lands and minerals consistent with the MLA and CPM's valid existing lease rights, which allow for development and ultimate maximum recovery of the mineral resource subject to lease stipulations and reasonable conditions of approval to avoid, minimize, and mitigate adverse environmental effects. The lease stipulations, as well as applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval will protect other natural resources and the environment, while avoiding, minimizing, and mitigating adverse environmental effects, as described in the FEIS.

The selected action meets the BLM's purpose because it considers the issuance of ROW grants requested by CPM to support development of the Mining Project, meeting the BLM's responsibility under the FLPMA to consider such requests while avoiding or minimizing adverse effects to other resource values and allowing for ROW uses in conformance with existing land use plans. The applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval will avoid, minimize, and mitigate adverse environmental effects of the use of the ROWs by CPM, and conform to existing land use plans, as described in the FEIS.

The selected action meets the BLM's purpose because it considers mineral material sales requested by CPM to support development of the Mining Project, in accordance with the Materials Act. The applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval will avoid, minimize, and mitigate adverse environmental effects of the development of the gravel pits, as described in the FEIS.

The selected action meets the BLM's need for action because it provides for the mining of potash in the public domain as authorized by the MLA, and because it responds to ROW grant requests while avoiding or minimizing adverse effects, in conformance with existing land use plans, as required by the FLPMA.

## 3.2  Land Use Plan Conformance

Applicable BLM land use planning and management objectives for the federal lands affected by the Project are contained in the WSRA RMP (BLM 1987). The WSRA RMP contains goals and objectives for many of the resources analyzed in the FEIS. The following sections list these goals and objectives by resource and explain how the Project conforms to them. **Section 3.3** of this ROD, as well as Section 4.3 in the FEIS and the equivalent sections in the resource reports, address consistency of the Project with other plans, laws, regulations, and policies. Several resources analyzed in the FEIS (Air Quality and Climate, Native American Religious Concerns, Paleontology, and Socioeconomics) are not specifically addressed in the WSRA RMP. Conformance of the Project with other plans, laws, regulations, and policies applicable to these resources is addressed in Section 4.3 in the FEIS and in their supporting resource reports.

### 3.2.1  Biological Resources

The objectives for wildlife in the WSRA RMP (page 23) are to:

1) Protect, regulate use of, and develop habitat and waters on public lands to sustain or enhance wildlife populations

2) Monitor populations and status of sensitive and T&E species

3) Protect and enhance riparian habitat

4) Achieve objective big game numbers

The Project conforms to the WSRA RMP through implementation of applicant committed design features that avoid and minimize potential mortalities and disturbance (**Appendix C**). These design features, along with monitoring and adaptive management specified in the AWMP, will sustain wildlife populations by minimizing habitat loss and degradation.

### 3.2.2  Cultural Resources

The objectives for cultural resources in the WSRA RMP (page 37) are to:

1) Protect and preserve representative samples of the full array of cultural resources for the benefit of scientific and socio-cultural use by present and future generations

2) Insure that cultural resources are given full consideration in all land-use planning and management decisions

3) Manage cultural resources so that scientific and socio-cultural values are not diminished, but rather maintained and enhanced

4) Insure that BLM's undertakings avoid inadvertent damage to cultural resources, both Federal and non-Federal

A Programmatic Agreement (PA) (BLM et al. 2018) has been prepared for the Project. The PA provides for the protection of cultural resources by defining the general and specific measures that the BLM, CPM, and the State Historic Preservation Office (SHPO) will take to ensure that the agencies' objectives and responsibilities are fulfilled regarding protection of historic properties under the National Historic

Preservation Act of 1966 (NHPA). The PA sets forth the terms and conditions agreed upon to resolve potential effects to historic properties in accordance with Section 106 of the NHPA. The Project conforms to the WSRA RMP because implementation of the requirements in the PA will avoid, minimize, and mitigate effects to cultural resources consistent with the objectives of the RMP.

### 3.2.3  Geology and Minerals

The goals for minerals in the WSRA RMP (page 47) are to:

1) Provide for the discovery, development, and use of minerals on public land consistent with applicable laws and regulations

2) Require the least restrictive stipulations necessary to adequately protect other resources

3) Continue to meet public demand for saleable and free-use mineral materials on a case-by-case basis

The Project conforms to the WSRA RMP because the Sevier Playa is located in a portion of the WSRA planning area designated as suitable for mineral extraction. The Leasing Environmental Assessment (BLM 2011a) found the underlying leasing action, including subsequent exploration and development, conformed to the WSRA RMP.

Page 48 of the WSRA RMP, regarding saleable minerals (such as gravel) states: "Sale permits will be processed on a case-by-case basis, with appropriate mitigating measures and stipulations attached to protect other resource values." The Project is consistent with this requirement.

Page 49 of the WSRA RMP, regarding solid, non-energy leasable minerals (such as potassium) states: "Leases will be issued and mining plans evaluated in order to define appropriate stipulations to protect other resources." The Project is consistent with this requirement.

### 3.2.4  Lands and Access

The objectives for lands in the WSRA RMP (page 39) are to:

1) Provide more effective public land management and to improve land use, productivity, and utility

2) Accommodate community expansion and economic development needs

3) Authorize legitimate uses of public lands

The Project conforms to the WSRA RMP direction that the BLM manage the affected federal public lands for multiple uses. The ROW grants will contain sufficient terms and conditions (based on the applicant committed design features and mitigation measures in **Appendix C**) as needed to protect resources, other land uses, and existing ROWs.

The WSRA RMP directs that existing major ROWs are designated as corridors and that new ROWs should be restricted to these corridors wherever feasible. Several off-lease segments of the selected action do not fall within existing, designated corridors (for example, 69-kV Power and Communication Line Segments T1 and T3, Natural Gas Pipeline Segments G2 and G5). During development of the proposed action and alternatives, the use of existing, designated corridors was considered, but not analyzed in detail (Appendix J in the FEIS). The BLM ultimately determined that options for utility lines to follow existing corridors did not need to be developed into complete alternatives or carried forward for detailed analysis

because they would substantially increase the length of the utility lines and substantially increase overall disturbance, while only minimally decreasing the extent of new disturbance corridors. Based on this determination, the selected action conforms to the WSRA RMP.

### 3.2.5  Range Management

The goals for range management in the WSRA RMP (page 12) are to:

1) Provide a balanced allocation of forage resources for livestock, wild horses, and big game while ensuring the protection of rangeland values and providing a stable, renewable forage base

2) Improve range condition, forage production, and management of 39 Category Improve (I) allotments identified for intensive management

3) Maintain or improve current resource conditions on the remaining 24 Category Maintain (M) and Custodial (C) allotments

4) Achieve and maintain a forage production goal of approximately 108,100 AUMs [Animal Unit Months] for livestock in the long term

The FEIS considered the potential effects of the selected action on management of range allotments, forage, and AUMs. In summary, minimal short- and long-term effects were predicted and will be mitigated in part through the applicant committed design features (**Appendix C**). No change in allocated AUMs is expected; therefore, the selected action conforms to the goals of the WSRA RMP for range management.

### 3.2.6  Recreation

The goals and objectives for recreation in the WSRA RMP (page 32) are to:

1) Provide recreational opportunities under BLM's basic stewardship responsibilities for unstructured, extensive types of recreation uses

2) Maximize visitor freedom of choice

3) Continue management of important recreational resources in Federal ownership to preserve those values and make them available for appropriate recreational enjoyment by the public

4) Protect the cultural and historic values from accidental or intentional destruction and give special protection to high value cultural and historic sites

The WSRA RMP states that recreation resources should be evaluated during project-level planning. To that end, the Project complies with the direction of the WSRA RMP. The FEIS predicted minimal, generally short-term effects to recreation from the Project, which conforms to the goals and objectives of the WSRA RMP.

### 3.2.7  Soils

The objectives for soils management in the WSRA RMP (page 55) are to continue maintenance of resource productivity and minimization of erosion. The WSRA RMP directs management to evaluate effects to soil productivity and soil erosion. Applicant committed design features (**Appendix C**) will be

implemented to maintain resource productivity and minimize soil erosion; thus, the Project conforms to the WSRA RMP.

### 3.2.8  Visual Resources

The goals and objectives for visual resources in the WSRA RMP (page 36) are to plan, modify, and implement resource management activities in a manner minimizing impacts to visual resources. To meet Visual Resource Management (VRM) objectives, special emphasis will be applied during environmental assessment and project design on projects to be located in view areas (foreground visual zone).

The selected action will be located in areas designated as VRM Class IV, which allows major modification and dominance of the view by management activities. The facilities that will be visible from each of the Key Observation Points (KOPs) meet the designated VRM class and, therefore, conform to the WSRA RMP. Additionally, all Project facilities that are not encompassed by the views from the KOPs conform to the VRM class designations in the WSRA RMP.

### 3.2.9  Water Resources

The goals and objectives for watersheds and water resources in the WSRA RMP (page 52) are to:

1) Improve watershed conditions on areas with significant erosion condition problems and other sensitive watershed areas (riparian areas)

2) Avoid deterioration of or improve watershed conditions of all other Federal land

3) Insure an adequate supply of water for existing and proposed BLM management activities

4) Insure production of quality water as required by State and Federal legislative acts and regulations for on-site and downstream users

5) Coordinate with the proper local, State, and Federal authorities on water-related issues

The FEIS analyzed the potential effects of the Project on water resources, including quality and quantity of groundwater and surface water, as well as water rights. Applicant committed design features and mitigation measures (**Appendix C**) will be implemented to avoid, minimize, or mitigate the potential effects to water resources. In addition, certain aspects of water resources will be monitored, and adaptive or mitigative actions taken as needed, as required by the lease stipulations. Collectively, these components of the Project conform to the goals and objectives of the WSRA RMP.

## 3.3  Consistency with Other Plans, Statutes, and Objectives

What the BLM considers during the NEPA process is governed by various laws, regulations, and policies that help establish the outline of the analysis, provide focus for the issues identified during scoping, and guide preparation of the Draft and Final EISs. The Draft and Final EISs for this Project were prepared in compliance with the applicable laws, regulations, and policies that are listed in Appendix H in the FEIS. Conformance of the Project to these laws, regulations, and policies is discussed in Section 4.3 in the FEIS. The remainder of this section of the ROD highlights the consistency of the selected action with several plans that may apply to the Project.

In 2006, the United States Congress acknowledged the importance of the Great Basin region by designating the Great Basin National Heritage Area. As established by Congress, the purpose of the Heritage Area is:

1) To foster a close working relationship with all levels of government, the private sector, and the local communities within White Pine County, Nevada, Millard County, Utah, and the Duckwater Shoshone Reservation;

2) To enable communities in the area to conserve their heritage while continuing to develop economic opportunities; and

3) To conserve, interpret, and develop the archaeological, historical, cultural, natural, scenic, and recreational resources related to the unique ranching, industrial, and cultural heritage of the Great Basin, in a manner that promotes multiple uses permitted as of the date of establishment of the area, without managing or regulating land use (Great Basin Heritage Area Partnership 2013).

The heritage area includes all of Millard County, which encompasses the analysis area for the Project. A management plan (Great Basin Heritage Area Partnership 2013) containing goals and strategies has been prepared for the heritage area. These include support for land use planning and sustainable economic development. The management plan for the Great Basin National Heritage Area did not amend the WSRA RMP, nor is there any requirement that actions taken in the analysis area, such as the Project, conform to the plan. Nevertheless, the selected action is compatible with the management plan for the Great Basin National Heritage Area. Compatibility of specific aspects of the Project with the management plan for the Great Basin National Heritage Area is discussed in Section 4.3 in the FEIS.

The State of Utah's (2018) Resource Management Plan contains objectives, policies, and guidelines designed to promote cooperation, coordination, and consistency between the interests of state and local governments and the management of federal lands. The state's plan is supported by Millard County's (2018) Resource Management Plan, which shares similar objectives, policies, and guidelines. The State of Utah (through the Public Lands Policy Coordinating Office [PLPCO]) and Millard County have been involved in the Project since the beginning of the NEPA process as Cooperating Agencies, consistent with the state and county Resource Management Plans.

State lands that will be affected by the Project are managed by SITLA. The state's primary management goal for SITLA lands is to produce funding for the state's school system. The Project's uses of SITLA lands will generate revenue for the state's school system, which is consistent with this goal.

The Millard County General Plan (2013) supports the responsible use and development of natural resources in the County, consistent with the General Plan and without adverse permanent effects to the environment or water and air quality. Millard County has been involved throughout the NEPA process as a Cooperating Agency, consistent with the General Plan.

# 4.0  Alternatives Considered

Five action alternatives (**Section 4.1**) and a no-action alternative (**Section 4.2**) to the proposed action were analyzed in detail in the FEIS. In addition, a number of options and potential alternatives were considered, but not analyzed in detail in the FEIS (**Section 4.3**). The environmentally preferred alternative is identified in **Section 4.4**.

## 4.1 Action Alternatives

The alternatives carried forward for detailed analysis were presented in the FEIS as variations of specific Project components, rather than re-iterations of the entire Project in which only certain components are changed. If one or more of these alternatives were to be selected in this ROD, the components of the selected alternative(s) would replace the corresponding components in the proposed action, while the remainder of the proposed action would be implemented as described above. The action alternatives are illustrated in Figures 2.5-1 through 2.5-6 in the FEIS. The alternatives analyzed in detail are summarized as follows. Additional details of the alternatives, including comparison with the proposed action, are provided in Section 2.5 of the FEIS.

### 4.1.1  Alternative 1

Alternative 1 would replace the northern portion of the proposed action for the 69-kV Power and Communication Line from the Black Rock Substation to the intersection of the State Route (SR) 257 Cutoff Road and the Power Line Access Road. The purpose of this alternative would be to minimize new disturbance in previously undisturbed areas and minimize habitat fragmentation by following existing disturbance corridors. This alternative was not selected because it would be longer and would disturb more area (and thus more vegetation, wildlife habitat, rangelands, and soils) than the proposed action. In addition, this alternative would cross more state and private lands and would be more visible from public roads, particularly SR 257.

### 4.1.2  Alternative 2

Alternative 2 would replace the southern portion of the proposed action for the 69-kV Power and Communication Line from the point where the proposed action leaves the Power Line Access Road and runs west toward the Processing Facility. The purpose of this alternative would be to minimize new disturbance in previously undisturbed areas and minimize habitat fragmentation by following existing disturbance corridors. This alternative was not selected because it would be longer and would disturb more area (and thus more vegetation, wildlife habitat, rangelands, and soils) than the proposed action. In addition, this alternative would be more visible from public roads, particularly Crystal Peak Road.

### 4.1.3  Alternative 3

Alternative 3 would replace the portion of the proposed action for the Natural Gas Pipeline between SR 257 on the east and the Rail Loadout Facility on the west. The purpose of this alternative would be to provide a route for the Natural Gas Pipeline that is entirely on BLM-administered land and avoids crossing private lands. This alternative was not selected because it would increase overall disturbance and habitat fragmentation because the Rail Spur and Rail Spur Access Corridor would remain in private lands and any opportunity to reduce disturbance by overlapping ROWs would be lost.

### 4.1.4  Alternative 4

Alternative 4 would replace the western portion of the proposed action for the Natural Gas Pipeline from the point where the pipeline leaves Crystal Peak Road and heads northwest, then west toward the Processing Facility. The purpose of this alternative would be to minimize new disturbance in previously undisturbed areas and minimize habitat fragmentation by following existing disturbance corridors. This alternative was not selected because it would be longer and would disturb more area (and thus more vegetation, wildlife habitat, rangelands, and soils) than the proposed action. In addition, the disturbance caused by this alternative would be more visible from public roads, particularly Crystal Peak Road.

### 4.1.5  Alternative 5

Alternative 5 would be an alternative method of diverting flows from the Sevier River into the recharge system. The purpose of this alternative would be to place the diversion within the boundary of the playa, which would minimize effects to riparian vegetation, wildlife habitat, and known cultural resources that may be present at the location of the proposed diversion. This alternative was not selected because it would not substantially reduce effects to resources and because it would be more technically difficult to construct, operate, and maintain.

This alternative would require more total surface disturbance because the Diversion Channel (Alternative 5) would need to be larger than the Diversion Canal (proposed action) to effectively contain Sevier River flows on the nearly flat playa surface. In addition, the Diversion Channel would have a lower gradient than the Diversion Canal, which would increase sediment deposition and require more frequent maintenance, minimizing the potential for any riparian vegetation to develop in this area with the advent of increased recharge water. Thus, moving the diversion farther onto the playa would not substantially change the extent or quality of riparian vegetation compared with the proposed action.

While the proposed action has a greater potential to affect known cultural resources, the area of Alternative 5 has not been subject to Class III surveys. The lack of surveys, the nearby presence of known sites, and past and current conditions in the area (lake margin, wetlands, and shifting sand dunes), suggest a very high likelihood that Alternative 5 may bisect large, complex archaeological sites with undocumented surface and sub-surface components, similar to the proposed action. It is possible, though currently unknown, that the proposed and alternative diversions of the Sevier River could have similar direct effects on cultural resources. Regardless, the requirements of the PA would be implemented in any cases where either the proposed action or Alternative 5 could not completely avoid eligible resources, including development and implementation of mitigation through the Historic Properties Treatment Plan (HPTP) process and monitoring during ground-disturbing activities; therefore, effects to cultural resources would not be substantially different between the proposed action and Alternative 5.

## 4.2  No Action Alternative

The potassium leases controlled by CPM provide it with the exclusive right to extract potassium and associated minerals on lands leased from the BLM and SITLA on and around the Sevier Playa, subject to the terms and conditions in the leases. They also give CPM the right to use the surface of the leased land as needed for the development of the potassium resource. A potassium lease is not cancellable except by due process in cases where the lessee does not meet the terms and conditions of the lease. Thus, the no-action alternative does not imply that the leases controlled by CPM would never be developed, only that they would not be developed as proposed in the Mining Plan, the POD, the Gravel Pit Mining Plan, or the action alternatives evaluated in detail in the FEIS. Under the no-action alternative, the Mining Project, associated activities on ROWs, and the mineral material sales would not be approved for construction or operation. Selection of the no-action alternative would not preclude mining of the potassium resource in the future, which would require submittal of a new Mining Plan, POD, and Gravel Pit Mining Plan, as well as completion of a new NEPA process. This no-action alternative was not selected because it would not be consistent with FLPMA's multiple use mandate, nor would it provide critical mineral commodities in accordance with EO 13817.

## 4.3  Alternatives Considered but Not Analyzed in Detail

The BLM considered 23 additional alternatives for portions of the Project, including 10 for the Mining Project and 13 for the ROWs. Appendix J in the FEIS describes these alternatives and explains why they were not analyzed in detail. In summary, the BLM examined these alternatives and determined that they

were outside of the scope of the Project, would not meet the purpose and need of the Project, would be substantially similar in design or effects to another alternative analyzed in detail, or were not technically or economically feasible; therefore, they were eliminated from detailed analysis.

## 4.4 Environmentally Preferred Alternative

CEQ regulations (40 CFR § 1505.2 (b)) require the ROD to identify an environmentally preferred alternative. The environmentally preferred alternative is the alternative that best promotes the national environmental policy in Section 101 of NEPA and is the alternative that causes the least damage to the biological and physical environments and best protects, preserves, and enhances cultural and natural resources.

For the Project, the environmentally preferred alternative could be the no-action alternative because it would cause the least damage to the biological and physical environment. However, the no-action alternative would fail to meet the BLM's purpose and need because it would not meet the need for domestic production of potassium, one of 35 minerals critical to the economic and national security of the United States as identified by the Department of the Interior in accordance with EO 13817. The no-action alternative would also fail to meet the BLM's purpose and need because it would deny CPM's proposal to develop the valid existing lease rights that it controls, which allow for development of the mineral resource subject to lease stipulations and reasonable conditions of approval to avoid, minimize, and mitigate adverse environmental effects.

Each of the action alternatives, including the selected action, would meet the BLM's purpose and need, unlike the no-action alternative. The BLM considered the trade-offs in terms of potential effects to the biological and physical environment among the action alternatives and decided that the proposed action (described in **Section 2.1.1** as the selected action) is the environmentally preferred alternative. The rationale for this decision includes the following:

- The proposed action will disturb the smallest area of vegetation and wildlife habitat.

- The proposed action will have the lowest risk of invasion or spread of noxious weeds.

- The proposed action will disturb slightly more of the marginal wetlands / riparian areas at the mouth of Sevier River and will have slightly less of a temporary benefit to wetlands / riparian areas from acquired recharge water than Alternative 5. However, these differences are small, will cease to exist once the Project is decommissioned and acquired recharge water is no longer present, and are balanced by reduced disturbance to vegetation and wildlife habitat in general.

- The proposed action will have the same potential effects to cultural resources (known and unknown combined), and any potential adverse effects will be mitigated as required by the PA.

- The proposed action will disturb the smallest area of rangelands.

- The proposed action will have the lowest potential reduction in AUMs, although no change in allocated AUMs is expected for any action alternative.

- The proposed action will disturb the smallest area of soils.

- The proposed action will have the least change to views and the appearance of the landscape from typical viewpoints.

# 5.0    Consultation and Coordination

The BLM is required to prepare an EIS in coordination with any studies or analyses required by the Fish and Wildlife Coordination Act, the NHPA, the Endangered Species Act (ESA) of 1973, and other environmental review laws and EOs (40 CFR § 1502.25(a)).

The following sections describe the BLM's consultation and coordination related to Cooperating Agencies, cultural resources, Native American tribes, and biological resources. Other interagency consultation (for example, with the U. S. Army Corps of Engineers in regard to the Clean Water Act) is described in the appropriate resource sections in Chapter 4 of the FEIS or in the resource reports.

## 5.1 Cooperating Agencies

As part of scoping, an interagency meeting was held at the BLM's office in Fillmore, Utah on August 5, 2015 to discuss the Project and solicit comments from potential cooperating and other interested agencies. The BLM invited agencies to participate as Cooperating Agencies for the EIS process in a letter sent on August 22, 2015. In response, the following participated as Cooperating Agencies in the BLM's NEPA process for the Project:

- U. S. Department of Defense, Utah Test and Training Range

- U. S. Environmental Protection Agency

- U. S. Fish and Wildlife Service

- State of Utah

    o Utah Public Lands Policy Coordinating Office

    o Utah Department of Environmental Quality

    o Utah Department of Transportation

    o Utah Division of Air Quality

    o Utah Division of Oil, Gas, and Mining

    o Utah Division of Water Quality

    o Utah Division of Water Rights

    o Utah Division of Wildlife Resources (UDWR)

    o School and Institutional Trust Lands Administration

    o Utah Division of State History

    o University of Utah Telescope Array Project

- Millard County

- Beaver County

The BLM invited the following Native American Tribes to participate as Cooperating Agencies in a letter sent on April 7, 2016:

- Confederated Tribes of the Goshute Reservation

- Hopi Tribe

- Kaibab Band of Paiute Indians

- Navajo Nation

- Paiute Indian Tribe of Utah (including additional direct mail to Kanosh Band of Paiute Indians)

- Skull Valley Band of Goshute Indians

- Ute Indian Tribe

In a letter dated April 22, 2016, the Hopi Tribe declined to participate as a Cooperating Agency, but stated that it would participate in the Project through the NHPA Section 106 process. No other tribes responded to the Cooperating Agency invitation. The BLM received no requests from any other entities to participate as Cooperating Agencies.

The BLM worked closely with the Cooperating Agencies throughout the NEPA process. Monthly Cooperating Agency updates (meetings, conference calls, or written updates) were held beginning in November 2015 and continuing through August 2019. The Cooperating Agencies were provided the opportunity to review and comment on early drafts of the Mining Plan, POD, Gravel Pit Mining Plan, the proposed action and alternatives, supplemental plans, resource reports, the Administrative Draft EIS (DEIS), and the Administrative FEIS.

## 5.2 NHPA Section 106 Consultation

Section 106 of the NHPA requires the lead federal agency to consider the effects of the agency's undertakings on properties listed or eligible for listing in the National Register of Historic Places. A PA has been prepared for the Project (BLM et al. 2018) and provides some of the foundation for the BLMs decision in this ROD. The PA sets forth the terms and conditions agreed upon to resolve potential effects to historic properties in accordance with Section 106 of the NHPA. The PA for this Project defines the general and specific measures that the BLM, CPM, and the SHPO will take to ensure that the agencies' objectives and responsibilities are fulfilled regarding protection of historic properties under the NHPA.

In a letter dated December 11, 2015, the tribes listed in **Section 5.1** were invited to participate in the PA process as Consulting Parties. The Hopi Tribe responded to the invitation on December 16, 2015, deferring to the SHPO and other participating tribes, and requesting continued consultation on the Project. The Paiute Indian Tribe of Utah and the Ute Indian Tribe declined to participate as Consulting Parties. No response was received from the other tribes. Signatories of the PA included the BLM and SHPO. Invited signatories of the PA included SITLA, UDOGM, and CPM. Concurring parties included Millard County, PLPCO, Utah Rock Art Research Association, and Southern Utah Wilderness Alliance. The Advisory Council on Historic Preservation declined to participate in this Project.

## 5.3  Government-to-Government Tribal Consultation

The BLM has consulted with Native American tribes on a government-to-government basis in accordance with EO 13175 and other policies. Interested tribes were invited to participate in the Project as Cooperating Agencies (**Section 5.1**) and in development of the PA (**Section 5.2**). In addition to the formal consultation described below, the BLM conducted less formal consultation in the form of emails or phone conversations on an occasional basis. Tribal concerns, including, but not limited to, effects to Indian trust assets, effects to eligible properties (cultural resources), and effects to traditional cultural properties were considered during development of the FEIS.

As part of scoping (**Section 6.1**), the BLM mailed Project notification letters to the tribes listed in **Section 5.1** on July 17, 2015 to inform them about the Project, the NEPA process, and to solicit any comments or relevant information. The Hopi Tribe responded to the scoping letter on July 27, 2015, requesting continued consultation on the Project. No other responses were received from the tribes in response to scoping.

The Native American tribes were included in the notification of the availability of the DEIS for review (**Section 6.2**). The BLM did not receive any comments from the tribes on the DEIS.

As part of ongoing consultation, the BLM sent letters to the tribes on November 19, 2018 summarizing the status of the Project and the environmental analysis, the status of the PA as finalized, and the status of efforts taken to date to address cultural resource concerns. The Hopi Tribe responded on December 3, 2018, requesting additional information on the cultural resource surveys and reiterating its desire for continued consultation on the Project. The requested documents were sent to the Hopi Tribe on December 17, 2018. The Hopi Tribe responded on December 27, 2018, thanking the BLM for the information and requesting continued consultation.

On June 21, 2019, the BLM sent letters to the tribes providing an update on the current status of the environmental review and inviting continued consultation on the Project. The Hopi and Paiute responded that they wanted to continue to participate in consultation for the Project. Additionally, the Hopi and Paiute requested copies of the cultural inventory reports and HPTP as the Project proceeds.

## 5.4  Air Resources

An air resources working group was formed early in the NEPA process from a subset of the Cooperating Agencies with an interest in air resources, including climate change and greenhouse gases. The primary members of the air group were the BLM (including its contractors), CPM (including its contractors), the EPA, and UDAQ. The purpose of the air group was to review and provide input on the Fugitive Dust Control Plan, air modeling protocol, emission inventory, and air modeling results for the Project. This group met occasionally through development of the air modelling, DEIS, and FEIS for this purpose.

## 5.5  Endangered Species Act Section 7 Consultation

A Biological Assessment (BA) (BLM and ENValue 2018) was prepared by the BLM to evaluate whether the Project may affect any listed species or designated critical habitat. The BA determined that the Project would not affect or would not be likely to adversely affect any listed species nor would it destroy or adversely modify any designated critical habitat. The BLM requested and received concurrence from the USFWS on the determinations in the BA. The BA and concurrence letter from USFWS are provided in Appendices A and B, respectively, of the resource report for Biological Resources (ENValue 2019). After completion of the DEIS and BA, CPM completed detailed engineering for several Project components

that resulted in some changes to the Project description. The BLM reviewed the changes and concluded that the findings of the BA remained valid and that a revised BA did not need to be prepared. The BLM conducted informal discussions of these changes with the USFWS, who concurred with the BLM's conclusions.

## 5.6 Wildlife Working Group

The Wildlife Working Group (WWG) was formed early in the NEPA process from a subset of the Cooperating Agencies with an interest in biological resources. The primary members of the WWG were biologists from the BLM (including its contractors), U. S. Fish and Wildlife Service (USFWS), and Utah Division of Wildlife Resources (UDWR). As needed and appropriate, representatives from CPM and its contractors were invited to join WWG meetings. The purpose of the WWG was to discuss and resolve questions or concerns related to wildlife, including providing input to and review of the AWMP (CPM 2019b). Following the issuance of this ROD, the WWG will transition into the Technical Advisory Committee (TAC). The TAC will be composed of one representative each from the BLM, USFWS, UDWR, and CPM. The TAC will be responsible for reviewing monitoring results, evaluating mitigation effectiveness, determining if resource objectives are being met and, if necessary, recommending adjustments to elements of the AWMP (for example, incorporating new mitigation measures or adjusting monitoring requirements) to the BLM.

# 6.0  Public Involvement

The BLM promotes an open NEPA process through collaboration with other agencies, stakeholders, and the public. Throughout development of the EIS, the BLM made formal and informal efforts to involve federal, state, and local agencies; Native American tribes; interest groups; landowners, ROW and permit holders near the Project; and other members of the public. These interactions helped ensure that all interested parties were aware of the Project, had opportunities to provide input to the BLM in its NEPA process, and that their interests and input were considered and incorporated into the analysis and decision-making.

## 6.1 Scoping

The BLM published a Notice of Intent (NOI) to prepare an EIS for the Project in the Federal Register on March 12, 2014 (BLM 2014). Publication of the NOI initiated the public scoping process and provided for a 30-day comment period. The NOI stated that in order for comments to be included in the DEIS, they must be received prior to the close of the 30-day scoping period or 15 days after the last public meeting, whichever is later. Because of delays with development of the proposed action for the Project, the comment period was extended until after the public scoping meeting, which was held on August 5, 2015. The scoping comment period ended on August 31, 2015. In addition to the publication of the NOI, scoping and public involvement activities included:

- Advertisements placed in five publications in July 2015, informing the public of the upcoming scoping meeting and the opportunity to comment. These publications included the Salt Lake Tribune, Deseret News, Millard County Chronicle Progress, Nephi Times-News, and Beaver County Journal.

- A news release distributed in July 2015 to inform the public of the upcoming scoping meeting and the opportunity to comment.

- Flyers placed in public locations in towns near the Project in July 2015, informing the public of the upcoming scoping meeting and the opportunity to comment.

- A letter briefly describing the Project (including a map) and opportunities to provide comment was distributed to interested parties on the Project mailing list, including federal, state, and local agencies; Native American tribes; interest groups; landowners; ROW and permit holders near the Project; and interested individuals

- An interagency meeting held at the BLM's office in Fillmore, Utah on August 5, 2015 to discuss the Project and solicit comments from potential cooperating and other interested agencies.

- The BLM's Interdisciplinary Team (IDT) completed an IDT checklist for the Project to identify preliminary resource issues and concerns.

- A public scoping meeting held on August 5, 2015, in Delta, Utah to describe the Project, explain the planning and permitting process, and solicit comments from the public.

A detailed discussion of each of these activities, as well as the comments received, and a summary of the issues that were identified, are presented in the Scoping Report (Appendix F in the FEIS). During scoping, the BLM solicited input from the public; interested federal, state, and local agencies; and Native American tribes. Information received during scoping was used by the BLM to identify potential issues, alternatives, and design features, and mitigation measures.

## 6.2  Draft Environmental Impact Statement

The U. S. Environmental Protection Agency (EPA) published a Notice of Availability (NOA) for the DEIS in the Federal Register on November 30, 2018 (EPA 2018). Publication of the NOA initiated the public comment process for the DEIS and provided for a 45-day comment period, ending January 14, 2019. The BLM published a NOA for the DEIS in the Federal Register on November 30, 2018 (BLM 2018). In addition to the NOAs, the BLM took several other actions to notify the public of the availability of the DEIS for review and comment, including:

- The BLM distributed a mailing to 155 agencies, organizations, Native American tribes, and individuals using the mailing list developed for the Project.

- The BLM issued a news release to local and regional print and broadcast media announcing the availability of the DEIS for public review.

- Electronic versions of the DEIS and supporting documents were published on the BLM's ePlanning website.

- Paper and digital copies of the DEIS and supporting documents were made available for review at the BLM FFO, the BLM West Desert District Office, the Fillmore City Library, and the Delta City Library.

The BLM provided opportunities to comment via mail, fax, and a Project-specific email account. Contact information, including the telephone number, physical address, and email address for the BLM's Project Manager was provided for questions or additional information on the Project. The BLM's NOA stated that to ensure comments are considered, the BLM must receive them within 45 days following the date the EPA publishes its NOA in the Federal Register. Based on the publication date of EPA's NOA, the comment period ended on January 14, 2019. Subsequent to publication of the DEIS, a lapse in funding

resulted in a partial government shutdown (including the BLM, EPA, and USFWS) from December 22, 2018 through January 25, 2019. The final 24 days of the comment period were during the shutdown. During this period, the DEIS remained available on the ePlanning website and at the Delta and Fillmore City Libraries.

The EPA and USFWS were prevented from submitting comments on the DEIS during the public comment period because of the partial government shutdown. After the conclusion of the shutdown, the BLM informed the EPA and USFWS that they could have additional time to submit comments (until February 13, 2019) because of their Cooperating Agency status and their inability to complete their review of the DEIS or consult with the BLM during the comment period.

Appendix G in the FEIS describes the process the BLM used to solicit comments on the DEIS for the Project. It summarizes comments submitted during review of the DEIS and provides responses to those comments. Attachments to Appendix G in the FEIS contain marked-up comments, the EPA and BLM NOAs, the BLM's notification mailing and mailing list, and the BLM's news release.

The BLM received six comment letters or other communications from individuals, agencies, or organizations during the public comment period. The BLM received four additional communications after the end of the comment period, but determined that these comments could be included in the analysis and response because of delays related to the partial government shutdown. The BLM reviewed all of the communications to identify substantive comments. The BLM's IDT reviewed and responded to all substantive comments. To the extent possible, the respective responses indicate where supporting information can be found in the FEIS, appendices, resource reports, or other Project documents.

## 6.3 Final Environmental Impact Statement

The EPA published a Notice of Availability (NOA) for the FEIS in the *Federal Register* on July 26, 2019 (EPA 2019). Publication of the NOA initiated the 30-day availability period for the FEIS, ending August 26, 2019. The BLM published a NOA for the FEIS in the *Federal Register* on July 26, 2019 (BLM 2019). In addition to the NOAs, the BLM took several other actions to notify the public of the availability of the FEIS, including:

- The BLM distributed a mailing to 157 agencies, organizations, Native American tribes, and individuals using the mailing list developed for the Project.

- The BLM issued a news release to local and regional print and broadcast media announcing the availability of the FEIS.

- Electronic versions of the FEIS and supporting documents were published on the BLM's ePlanning website.

- Paper and digital copies of the FEIS and supporting documents were made available at the BLM Fillmore Field Office and the BLM West Desert District Office.

- Contact information, including telephone number, and email address for the BLM's Project Manager was provided for questions or additional information on the Project.

The BLM received one communication (with attachments) from an organization during the availability period. The BLM evaluated and considered the submission and its attachments. The BLM determined that the submission did not identify any significant new circumstances or information relevant to environmental concerns that have bearing on the proposed action or its effects; therefore, supplementation

of the FEIS in accordance with BLM NEPA Handbook 1790-1, Section 9.6.1 was not required and the BLM subsequently decided to issue this ROD.

## 7.0    References

Avian Power Line Interaction Committee. 2018. Eagle Risk Framework: A Practical Approach for Power Lines. Edison Electric Institute and APLIC. Washington, DC.

Avian Power Line Interaction Committee. 2012. Reducing Avian Collisions with Power Lines: The State of the Art in 2012. Edison Electric Institute and APLIC. Washington, D.C.

Avian Power Line Interaction Committee. 2006. Suggested Practices for Avian Protection on Power Lines: The State of the Art in 2006. Edison Electric Institute, APLIC, and the California Energy Commission. Washington, D.C. and Sacramento, California.

Crystal Peak Minerals. 2019a. Plan of Development for Off-Lease Facilities for the Sevier Playa Potash Project. April 2019.

Crystal Peak Minerals. 2019b. Sevier Playa Potash Project. Adaptive Wildlife Management Plan. April 2019.

Crystal Peak Minerals. 2019c. Sevier Playa Potash Project. Blasting Plan. April 2019.

Crystal Peak Minerals. 2019d. Sevier Playa Potash Project. Cultural Resources Plan. April 2019.

Crystal Peak Minerals. 2019e. Sevier Playa Potash Project. Environmental Compliance Inspection Plan. June 2019.

Crystal Peak Minerals. 2019f. Sevier Playa Potash Project. Fugitive Dust Control Plan. April 2019.

Crystal Peak Minerals. 2019g. Sevier Playa Potash Project. Noxious and Invasive Weed Management Plan. April 2019.

Crystal Peak Minerals. 2019h. Sevier Playa Potash Project. Reclamation Plan. June 2019.

Crystal Peak Minerals. 2019i. Sevier Playa Potash Project. Site Safety Plan. April 2019.

Crystal Peak Minerals. 2019j. Sevier Playa Potash Project. Solid and Hazardous Waste and Hazardous Materials Management Plan. April 2019.

Crystal Peak Minerals. 2019k. Sevier Playa Potash Project. Spill Prevention, Control, and Countermeasures Plan. May 2019.

Crystal Peak Minerals. 2019l. Sevier Playa Potash Project. Stormwater Pollution Prevention Plan. May 2019.

Crystal Peak Minerals. 2019m. Sevier Playa Potash Project. Transportation and Traffic Management Plan. May 2019.

Crystal Peak Minerals. 2019n. Sevier Playa Potash Project. Water Monitoring Plan. June 2019.

Crystal Peak Minerals. 2018. NI 43-101 Technical Report Summarizing the Feasibility Study for the Sevier Playa Potash Project, Millard County, Utah. Prepared for Crystal Peak Minerals Inc. by Novopro Projects Inc. and Norwest Corporation. Report Date: February 21, 2018. Effective Date: January 11, 2018.

Crystal Peak Minerals and Stantec. 2019a. Mining Plan for the Sevier Playa Potash Project. BLM Case File Number UTU-88387. June 2019.

Crystal Peak Minerals and Stantec. 2019b. Gravel Pit Mining Plan. February 2019.

ENValue. 2019. Sevier Playa Potash Project. Resource Report. Biological Resources. Prepared for the Bureau of Land Management, Fillmore Field Office. May 2019.

Great Basin Heritage Area Partnership. 2013. Management Plan for the Great Basin National Heritage Area. Baker, Nevada. April 2013.

Millard County. 2018. Millard County Resource Management Plan. Available online at: https://drive.google.com/drive/folders/1Cn80Wzst8eoa0o_BqoTBHOPfPm8M6MIe. Accessed on October 1, 2018.

Millard County. 2013. General Plan. County Goals, Objectives, and Action Steps. Fall 1998. Last update October 2013.

Ramboll. 2019. Final Air Dispersion Modeling Report for NEPA Analysis, Crystal Peak Minerals, Sevier Playa Potash Project. April 2019.

Romin, L. A., and J. A. Muck. 2002. Utah Field Office Guidelines for Raptor Protection from Human and Land Use Disturbances. Salt Lake City, Utah: U.S. Fish and Wildlife Service, Utah Field Office.

State of Utah. 2018. Resource Management Plan. Available online at: http://publiclands.utah.gov/current-projects/rmp/. Accessed on October 1, 2018.

U. S. Bureau of Land Management. 2019. Notice of Availability of the Final Environmental Impact Statement for the Sevier Playa Potash Project, Utah. Federal Register 84(144): 36121-36122.

U. S. Bureau of Land Management. 2018. Notice of Availability of the Draft Environmental Impact Statement for the Sevier Playa Potash Project, Utah. Federal Register 83(231): 61668-61670.

U. S. Bureau of Land Management. 2014. Notice of Intent to Prepare an Environmental Impact Statement for the Proposed Sevier Playa Project, Millard County, UT. Federal Register 79(48): 14078-14079.

U. S. Bureau of Land Management. 2011a. Environmental Assessment and Decision Record, DOI-BLM-UT-W020-2010-014-EA. Sevier Lake Competitive Potash Leasing Proposal. February 2011.

U. S. Bureau of Land Management. 2011b. Environmental Assessment and Decision Record, DOI-BLM-UT-W020-2011-0015-EA. Sevier Dry Lake Exploratory Testing. October 2011.

U. S. Bureau of Land Management. 2006. Appendix M – Best Management Practices for Raptors and their Associated Habitats in Utah. In: Monticello Resource Management Plan. Draft. Available at: https://eplanning.blm.gov/epl-front-office/projects/lup/68097/85910/103099/Appendix_M_Raptor_BMPs_10-2-07.pdf. Accessed February 28, 2019.

U. S. Bureau of Land Management. 1987. Warm Springs Resource Area. The Resource Management Plan. Record of Decision and Rangeland Program Summary.

U. S. Bureau of Land Management and ENValue. 2018. Sevier Playa Potash Project. Biological Assessment. September 2018.

U. S. Bureau of Land Management, Fillmore Field Office; Utah State Historic Preservation Office; State of Utah, School and Institutional Trust Lands Administration; Utah Division of Oil, Gas, and Mining; and Crystal Peak Minerals, Inc. 2018. Programmatic Agreement regarding the Sevier Playa Potash Project. August 2018.

U. S. Environmental Protection Agency. 2019. Environmental Impact Statements; Notice of Availability. Federal Register 84(144): 36099.

U. S. Environmental Protection Agency. 2018. Environmental Impact Statements; Notice of Availability. Federal Register 83(231): 61632.

THIS PAGE INTENTIONALLY LEFT BLANK.

# Appendix A Figures

THIS PAGE INTENTIONALLY LEFT BLANK.

**Figure 1 Document Organization, Sevier Playa Potash Project**



THIS PAGE INTENTIONALLY LEFT BLANK.



THIS PAGE INTENTIONALLY LEFT BLANK.



Figure 3
Project Overview
Off-Lease Features

SEVIER PLAYA
POTASH PROJECT

THIS PAGE INTENTIONALLY LEFT BLANK.

# Appendix B Special Lease Stipulations

THIS PAGE INTENTIONALLY LEFT BLANK.

# Appendix B Special Lease Stipulations

**Table B-1** lists special stipulations that were attached to each potassium lease controlled by CPM at the time of leasing. An example of a potassium lease document is provided in Appendix D in the FEIS. Appendix E in the FEIS identifies how each special stipulation was incorporated into the selected action.

| | Table B-1 Special Lease Stipulations |
|---|---|
| 1 | **Ditches, Berms, Drill Holes, and Other Excavations:** The lessee shall fill in pits, ditches, and other excavations within reason, to restore the surface of the leased land and access roads to their former conditions as far as reasonably possible, including removal of structures and removal of all debris. All drill holes shall be filled with cement or other suitable material as approved by the Authorized Officer (AO) prior to abandonment of the wells. This shall take place upon any partial or total lease relinquishment or cancellation or at any other time prior thereto when required and to the extent deemed necessary by the lessor. |
| 2 | **Mining Unit:** Prior to production, a Unit Agreement (royalty allocation agreement) shall be approved which establishes the fee, Federal, and State lands as a unit for production royalty purposes. Along with this, the mining unit shall count production from anywhere on the fee, Federal, or State lands as production on any of these lands. |
| 3 | **Waste Certification:** The lessee shall provide upon abandonment and/or sealing off a mined area and prior to lease termination/relinquishment, certification to the lessor that, based upon a complete search of all the operator's records for the mine and upon their knowledge of past operations, there has been no hazardous substances per (40 CFR 302.4) or used oil as per Utah State Management Rule R-315-15, deposited within the lease, either on the surface or underground, or that all remedial action necessary, including disposal in an appropriately permitted disposal facility, has been taken to protect human health and the environment with respect to any such substances remaining on the property. The back-up documentation to be provided shall be described by the lessor prior to the first certification and shall include all documentation applicable to the Emergency Planning and Community Right-to-know Act (EPCRA, Public Law 99-499), Title III of the Superfund Amendments and Reauthorization Act of 1986 or equivalent. *All waste must be removed and all hazardous materials used or produced must be reported to the Fillmore Field Office (FFO). |
| 4 | **Noxious Weeds:** Equipment will be cleaned prior to entering the proposed Project area to minimize the introduction of noxious/invasive weeds in other areas. The lessee/operator shall annually inspect active and inactive operational areas on each lease for noxious weeds (that are listed for control by the State of Utah, the Utah BLM, and Millard County). If any of the listed weeds are found, control must be initiated by the lessee. The lessee shall contact the Weed Control official at the FFO in advance to discuss the planned control method (lessees are required to obtain a permit prior to the control through the application of approved herbicides). The lessee shall chemically treat annual invasive weeds (such as cheatgrass) in areas of high activity so as to prevent the potential of fire on the site and buildup of fire potential. Active and inactive operational areas on leases shall be inspected annually on each lease for noxious weeds. A plan shall be submitted and approved by the AO prior to the initiation of any control of weeds. |
| 5 | **Survey Monuments:** The Lessee at the conclusion of the mining operation, or at other times as surface disturbance related to mining may occur, will replace all damaged, disturbed, or displaced corner monuments (section corners, quarter corners, etc.) their accessories (witness trees, bearing trees, etc.), or restore them to their original condition and location, or at other locations that meet the requirements of the rectangular surveying system. This work shall be conducted at the expense of the Lessee, by the BLM, to the standards and guidelines found in the Manual of Surveying Instructions, U.S. Department of Interior. |

| | Table B-1 Special Lease Stipulations |
|---|---|
| 6 | **As Built Drawings:** The Lessee will submit to the Deputy State Director, Lands and Mineral Resources, BLM Utah State Office, and the FFO, a scaled map showing the construction and the survey coordinates (State Plane or metes and bounds description) of each of the mine features, buildings, ditches, pumps etc., within 90 days after construction is complete. The surveyor that conducts the survey will be licensed and shall stamp the drawing. Land features will be shown on the drawing. These will include but are not limited to section corners, roads, and section lines. An updated map will be sent to BLM within 90 days after construction is completed on any new sites. |
| 7 | **Reclamation:** The mining plan must include an interim reclamation plan and a final reclamation plan. A seeding and grading plan and schedule will be submitted and approved by the AO prior to finalizing any reclamation. Upon reclamation of disturbed areas surrounding the lakebed where revegetation is planned, plant growth shall be monitored for a minimum of three years or until the reclamation standards of success have been attained. All previously vegetated disturbed areas will attain **75% basal cover** based on similar undisturbed adjacent native vegetative community, and comprised of desired species and/or seeded species within 5 years of initial reclamation action. However if after three (3) growing seasons there is less than **30%** of the basal cover based on similar undisturbed native vegetative community, then the AO may require additional seeding efforts. The reclamation bond/liability will not be released until the AO accepts the reclamation in writing. Concurrent reclamation practices will be used. In the event that this standard cannot be met, the lessee may request a waiver to this stipulation. The waiver must state as a minimum, the reasons for the request and show a history of the reclamation attempts by the lessee. The AO may waive the requirement on his discretion. |
| 8 | **Water Replacement:** The Lessee at his expense, will be responsible to replace any water resources (that contain in a baseline analysis of <10,000 mg/l Total Dissolved Solids (TDS)), that are lost or adversely affected (quality or quantity) by their mining operations. These shall include (1) developed ground water sources existing at lease issuance or new sources that may be developed during the term of the lease, and (2) other surface and/or ground water sources that may be identified by the BLM for protection as part of the conditions for any mining plan approvals. If replacement is required, the lessee shall replace the sources with an alternate source in the same quantity and quality to maintain existing uses. The existing uses shall include but not limited to riparian habitat, fishery habitat, livestock, wildlife, domestic, agricultural, or other land uses. The lessee/operator shall obtain sufficient base line data and monitoring in order to establish parameters to show whether water resources are affected. |
| 9 | **Wildlife and Plant Species:** Sufficient base line data shall be established as determined necessary by the AO. In order to accomplish this, the lessee shall submit an acceptable wildlife and plant inventory prior to conducting any surface disturbing activity. Prior to conducting the inventory, an inventory plan shall be submitted and approved by the AO for the mining and/or exploration plan. The inventory plan shall include Federally Listed or Candidate species, as well as BLM Sensitive plant or wildlife species, including FWS Birds of Conservation Concern (2008) and big game species. The inventory plan shall address, but not be limited to the following: species occurrence, migration corridors, winter use, reproductive periods, and habitat value, including the invertebrate community. The plan shall address the time periods to be inventoried by species. The inventory shall be conducted by a qualified individual approved by the AO prior to the commencement of the inventory. The final inventory shall be submitted to the AO within 60 days after completion. A Wildlife Mitigation Plan shall be submitted as part of any mining or exploration plan and will describe actions to be taken to avoid, minimize, or reduce any future impacts to wildlife. The plan shall include but will not be limited to survey/monitoring of species; the rescue, recovery, reporting, and rehabilitation of injured wildlife as practicable; recovery and reporting of wildlife mortalities; and mitigation and adaptive management strategies. The species to be monitored shall include species on the Wildlife Action Plan, developed by the Utah Division of Wildlife Resources, and the Partners in Flight priority species. The lessee shall submit a report annually discussing mortality rates and the effectiveness of any mitigation measures taken. At the discretion of the AO this reporting requirement may be waived. The cost of conducting the inventory, preparing reports and the mitigation plan, and carrying out subsequent mitigation measures and reporting on the effectiveness of such measures, shall be borne by the Lessee. |

| Table B-1 Special Lease Stipulations | |
|---|---|
| 10 | **Cultural Resources:** The Lessee shall contact the AO with sufficient information and request a determination if a cultural inventory and/or tribal consultation is necessary. If it is necessary and prior to BLM approval to initiate potash production, the lessee shall conduct a cultural resource inventory to BLM Utah Class III inventory standards on all lands where they [there] may be surface disturbance within the boundaries of the leased lands. The inventory shall be conducted by a qualified professional cultural resource specialist (i.e. Archaeologist, historian, or historical architect, as appropriate), approved by the AO. A report shall be generated of the inventory and recommendation for protecting any cultural resources that are identified. The lessee shall undertake measures, in accordance with instructions from the AO to protect cultural resources on the leased land. The lessee shall not commence the surface disturbing activities until permission to proceed is given by the AO. The cost of conducting the inventory, preparing reports, and carrying out mitigation measures shall be borne by the Lessee. The lessee shall protect all cultural resource properties within the lease area from lease related activities until the cultural resource mitigation measures can be implemented. If cultural resources are discovered during the operations under this lease, the lessee shall immediately bring them to the attention of the AO. The lessee shall not disturb such resources without written authorization from the AO. It may be necessary for the lessee to hire a cultural contractor to assist the BLM in determining the following: 1) whether the materials appear eligible for the National Historic Register of Historic Places; 2) the mitigation measures that the lessee will likely have to undertake before the site can be used (assuming in situ preservation is not necessary); and, 3) a time frame for the AO to complete an expedited review under 36 CFR 800.11 to confirm, through the State Historic Preservation Officer, that the findings of the AO are correct and that mitigation is appropriate. All cultural resources shall remain under the jurisdiction of the United States until ownership is determined under applicable law. |
| 11 | **Corps of Engineers:** The lessee shall work with the BLM in contacting the Corps of Engineers to comply with Section 404 of the Clean Water Act and, as necessary, in obtaining a 404 Permit. |
| 12 | **Drilling Results:** The lessee must provide the AO within 30 days of completion, all geologic, geochemistry, water chemistry, groundwater occurrence, aquifer test results, completion details, and other similar data that they collect from any wells or borings that are installed or tested as part of exploration or development activities on the leases or associated with the leases. |
| 13 | **Hydrologic Analysis:** Sufficient base line data shall be established prior to conducting any surface disturbing activity which shall be determined necessary by the AO. In order to accomplish this, the lessee shall submit for review and approval by the AO a plan to analyze ground and surface water interactions as part of any operations or exploration on the leases. The plan shall be submitted prior to or concurrent with a Mining or Exploration plan under 43 CFR 3592.1. The plan shall include, but not be limited to the following items, and shall describe how the lessee proposes to; (1) develop sufficient baseline groundwater information to document existing hydrogeology associated with Sevier Lake basin fill and underlying carbonates, encompassing a reasonable area of potential resources, springs, and the alluvial and bedrock aquifers. This shall include items such as the location, size, and depth of any hole that will encounter water and/or brine as well as any information that will be collected on each hole. (2) Determine the potential impacts to existing water right holders, wells, wetlands, and surface and groundwater throughout their operations. Water chemistry (including stable isotopes as necessary), estimated flow, and water quantity (water balance) shall be addressed. (3) Monitor the actual impacts to groundwater resources throughout and surrounding the operation including but not limited to changes in meteoric precipitation and springs, wells (base conditions, water levels, and chemistry conditions prior to construction and monitoring after construction), wetlands, and ditches. Wells, wetlands, and springs (at sites determined to be relevant based upon the groundwater study that would be conducted prior to development) shall be monitored during operations in order to minimize potential impacts to groundwater resources by allowing an early identification. Further, the plan shall contain sufficient detail to allow it to be independently assessed, and include such things as the type of groundwater model that would be used (and/or other methods of analysis), phasing of the analysis, and proposed iterative studies. The plan shall also contain a list of people and their qualifications to accomplish the work and a list of deliverables with a timing schedule. The lessee shall be responsible for any cost incurred for the plan and the accomplishing of the work. |

| | **Table B-1 Special Lease Stipulations** |
|---|---|
| 14 | **Lands and Realty:** Existing roads and trails would be used for travel to the maximum extent feasible unless otherwise authorized. During wet road conditions, any ruts deeper than four inches remaining on the road from the Project would be repaired at the AO discretion. The proposed Project would be subject to valid prior existing right-of-way. The Master Title Plat and LR2000 Geo Report show an existing right-of-way within the Project area. The proposed Project is subject to this existing right-of-way. This Holder shall be contacted and coordinated with if their ROW would be affected by this Project. |
| 15 | **Dust Control Plan:** The operator/lessee shall develop a dust control plan for review by the AO prior to conducting any operations under the lease. This shall include but not be limited to (1) the treatment of road and disturbed surfaces, (2) speed limits to control dust, (3) stabilizing piles, and (4) conditions under which work will cease, such as operations during high wind conditions. The costs of the controls shall be borne by the lease/operator. |
| 16 | **Riparian and Wetland Inventory:** The operator/lessee shall conduct an inventory for riparian and wetlands. The inventory shall be acceptable to the AO prior to the commencement of any surface disturbing activities. The inventory shall include but not be limited to: (1) maps at a sufficient scale to show the size and location of these areas. This inventory shall include the Project area and the Sevier River within Township 20 South, Range 10 West if the AO deems it necessary. (2) Vegetation species shall be addressed along with percent cover, and water quality, temperature and quantity, and soil types. The cost of the inventory shall be borne by the lessee/operatory. |
| 17 | **Lighting:** The operations plan shall describe the measures that the operator/ lessee will take to minimize the amount of light that will be produced. These shall include but not be limited to lighting shield, directional lighting, and use and placement of portable lights. The AO may require a night sky model. |
| 18 | **Royalty Value of Un-Mined Potassium and Related Products:** The Lessee shall be required to pay the value of the royalty due on any salable potassium or related products which would have been produced under an approved mine plan, which is otherwise lost or left economically inaccessible by mining practices, unless approval for leaving the potassium or related products has been granted in writing by the authorized officer. |
| 19 | **Diligence Requirements:** The authorized officer will pursue cancellation of this lease if, at the end of the lease term, or any readjusted term, potassium or related products are not being produced in paying quantities from:<br>  a. This lease; or<br>  b. The contiguous mining block, as defined under a royalty allocation agreement, in which this lease is included.<br>  c. "Potassium or related products are not being produced in paying quantities" when the gross value of the potassium compounds and other related products produced from this lease or the contiguous mining block at the point of shipment to market does not yield a return in excess of all direct and indirect operating costs allocable to their production. |

# Appendix C Applicant Committed Design Features and Mitigation Measures

THIS PAGE INTENTIONALLY LEFT BLANK.

# Appendix C Applicant Committed Design Features and Mitigation Measures

The design features listed in **Table C-1** are organized according to the primary resource that will be protected and are not repeated for other resources that will benefit from their implementation. For example, the implementation of design features to protect vegetation will also minimize effects to wildlife habitat and are not repeated. Some of the design features apply to the entire Project, while others only apply to certain parts of the Project. Design features indicated with an asterisk (*) will only apply to those portions of the Project outside the boundary of the Sevier Playa.

| **Table C-1 Applicant Committed Design Features** | | | | |
|---|---|---|---|---|
| | **Applicability to the Project**<br>* Not applicable within the playa boundary | | | |
| **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| **General** | | | | |
| 1   CPM will avoid or minimize degradation of land, water quality, landscape, cultural, and biological resources. During construction, operation, maintenance, and decommissioning of the Project, CPM will perform its activities in accordance and compliance with applicable air and water quality standards, related facility siting standards, and related permits associated with implementation, including but not limited to: NEPA; the Clean Air Act (CAA); Endangered Species Act (ESA); state and federal historic preservation acts; and other established federal, state, and local regulations as required by law. | ✔ | ✔ | ✔ | ✔ |
| 2   CPM will conduct kickoff meetings prior to commencing construction and surface-disturbing activities for the Project. The contractors and agents involved with construction, other surface-disturbing activities, and monitoring will attend this meeting to review the construction stipulations, including those in the Record of Decision (ROD), Mining Plan (CPM and Stantec 2019a), leases, Plan of Development (POD) (CPM 2019a), right-of-way (ROW) grants, mineral material sales contracts (CPM and Stantec 2019b), supplemental plans (CPM 2019b-n), and other applicable Project documents. | | ✔ | ✔ | ✔ |
| 3   All personnel will be instructed on the protection of cultural, paleontological, and ecological resources before starting work on the Project. Training materials and briefings will include, but will not be limited to, discussion of the federal ESA, the consequences of non-compliance with this act, identification and values of wildlife and natural plant communities, general behavior and sensitivity to human activities, penalties for violation of state and federal laws (including the Migratory Bird Treaty Act [MBTA] and Bald and Golden Eagle Protection Act), hazardous substance spill prevention and containment measures, all required and recommended design features and mitigation measures, and reporting requirements. | | ✔ | ✔ | ✔ |

| | **Table C-1 Applicant Committed Design Features** | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 4 | The construction contractors will maintain copies of the ROD, Mining Plan (CPM and Stantec 2019a), POD (CPM 2019a), Gravel Pit Mining Plan (CPM and Stantec 2019b), and ROW grants, along with design features, mitigation measures, and ROW grant terms and conditions on the construction site at all times. | | ✓ | ✓ | ✓ |
| 5 | CPM will survey and clearly mark the centerline and exterior limits of the ROWs, at 200-foot intervals or as determined by the Authorized Officer (AO). No surface disturbance or construction activity will be allowed within buffers around culturally and environmentally sensitive areas, which will be clearly marked as specified by the AO. Any deviation from this requirement will have the prior written approval of the AO. CPM will set centerline stakes to identify the locations of the linear routes as directed by the AO. Markers will be used to limit access within work and travel areas to restrict construction access from unnecessarily affecting important culturally and environmentally sensitive areas. Buffers for culturally sensitive areas are defined in the Programmatic Agreement (PA) (BLM et al. 2018) (see Design Feature #23). Buffers for environmentally sensitive areas are defined in other design features (for example, Design Feature #98 for raptors and Design Feature #103 for migratory birds). | | ✓* | ✓* | ✓* |
| 6 | If disturbance must occur outside of the flagged areas, a BLM-approved biologist will survey the area prior to disturbance. If wildlife species are found within the area to be disturbed, the AO will be notified immediately. Prior to disturbance, an appropriate course of action will be taken to ensure proper protection of the species. | | ✓* | ✓* | ✓* |
| 7 | Clearing, grading, and other surface disturbance will be limited to the minimum area required for construction. New disturbance will be limited to that which is necessary for safe and efficient construction, operation, and decommissioning of the Project. Clearing or grading equipment paths and other overland access routes will be limited to the extent necessary to allow for safe and effective vehicle passage. In most areas, clearing or grading of the site will be substantially less than the temporary work area limits to reduce potential effects to existing resources. | | ✓* | ✓* | ✓* |
| 8 | CPM will construct, operate, maintain, and decommission Project facilities, improvements, and structures in strict conformity with the ROD, Mining Plan (CPM and Stantec 2019a), leases, POD (CPM 2019a), ROW grants, and mineral material sales contracts (CPM and Stantec 2019b). Any relocation, additional construction, or use that is not in accord with the ROD, Mining Plan, leases, POD, ROW grants, or terms and stipulations of mineral material sales will not be initiated without the prior written approval of the AO. | | ✓ | ✓ | ✓ |
| 9 | All design, material, construction, operation, maintenance, and decommissioning activities will be in accordance with safe and proven engineering practices. | ✓ | ✓ | ✓ | ✓ |

| | | Applicability to the Project *Not applicable within the playa boundary | | | |
|---|---|---|---|---|---|
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance¹ | Decommissioning¹ |
| **10** | All work will be performed in compliance with Mine Safety and Health Administration (MSHA) or Occupational Safety and Health Administration (OSHA) regulations, as appropriate. Project personnel will be instructed in health and safety procedures and will participate in regular safety meetings during construction and operation. Adaptive management will be used to continuously monitor the safety of workers and the public during construction and operation of the Project with a goal of zero injuries or accidents. | | ✔ | ✔ | ✔ |
| **11** | CPM will develop and implement a Site Safety Plan (CPM 2019i) for construction, operation, maintenance, and decommissioning of the Project. The Site Safety Plan will include, at a minimum, sections on site safety, emergency response, and fire safety. CPM and its contractors will be responsible for implementing the Site Safety Plan, including compliance with applicable MSHA or OSHA standards. | ✔ | ✔ | ✔ | ✔ |
| **12** | Adaptive management will be used to respond to local, recreational, OHV travel, hunting, and other public uses of BLM-administered lands to assure that multiple uses are continued without hazard to the health or safety of either the public or Project operators and workers. | | ✔ | ✔ | ✔ |

**Table C-1 Applicant Committed Design Features**

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | | Applicability to the Project<br>* Not applicable within the playa boundary | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 13 | **Winter Construction**<br><br>Snow will be removed where necessary to provide access to roads, work sites, and to expose soils for backfilling and grading. Snow will typically be bladed or pushed off the roads and work area (but within the ROW, lease area, or gravel pit) with a motor grader, snowplow, or dozer. Care will be taken when removing snow to minimize mixing of soil with snow. If snow removal is required in off-road areas, backfilling and grading in muddy or frozen areas will be postponed until the soil is dry enough to result in good seedbed preparation, unless approved in advance by the AO. Tracked equipment used for snow removal operations in off-road areas, if required, will be equipped with shoes to keep the blade 2 inches off the ground. Special precautions will be taken where the surface of the ground is uneven and at drainage crossing to ensure equipment blades do not destroy vegetation.<br><br>In areas where snow fills trenches or holes, CPM or its contractors will be responsible for removing it to allow visual inspection of the trench or holes prior to installing Project facilities and backfilling.<br><br>CPM and its contractors will backfill trenches with unfrozen soils to minimize the potential for ditch line settlement resulting from voids between frozen chunks of backfill.<br><br>As directed by the AO, roads will be winterized by providing a well-drained roadway. This may be achieved by water barring, maintaining drainage, and other measures necessary to minimize erosion and other damage to the roadway or the surrounding public lands. | | ✔* | ✔* | ✔* |
| 14 | Speed limits for Project traffic will be set at a maximum of 30 mph on-road and 15 mph off-road to reduce the generation of fugitive dust and minimize the risk for collisions between Project traffic and livestock or wildlife. This design feature will apply on all unpaved roads authorized for use by Project traffic, including unpaved Millard County Class B roads. This design feature will not apply on paved roads, where Project traffic will follow posted speed limits. The Adaptive Wildlife Management Plan (CPM 2019b) (Design Feature #95) will include monitoring and adaptive measures to adjust speed limits to changes in road conditions or use, or for corrective actions (for example, fencing, or signage) in the event that Project traffic causes an unacceptable increase in collisions between Project vehicles and wildlife or livestock. In the event that vehicle traffic causes visible dust emissions, equipment operators will be instructed to reduce speed to a level that does not cause excessive dust in accordance with the Fugitive Dust Control Plan (CPM 2019f) (Design Feature #16). | | ✔ | ✔ | ✔ |
| **Air Quality** | | | | | |

| Table C-1 Applicant Committed Design Features | | | | |
|---|---|---|---|---|
| | | **Applicability to the Project**<br>* Not applicable within the playa boundary | | |
| **Design Feature** | **Design and Engineering** | **Construction** | **Operation and Maintenance**¹ | **Decommissioning**¹ |
| 15 | CPM will meet all applicable federal, state, and local emission standards for air quality. | ✓ | ✓ | ✓ | ✓ |
| 16 | CPM will develop and implement a Fugitive Dust Control Plan (CPM 2019f), to be approved by BLM, to minimize Project effects from fugitive dust. | ✓ | ✓ | ✓ | ✓ |
| 17 | Dust control will be provided throughout construction, operation, maintenance, and decommissioning to protect soils from erosion and minimize fugitive dust from Project activities. Dust control methods will be specified in the Fugitive Dust Control Plan (CPM 2019f) and will be approved by the BLM prior to their implementation. | | ✓ | ✓ | ✓ |
| 18 | Trucks hauling the finished product from the Processing Facility to the Rail Loadout Facility will minimize dust emissions by limiting vehicle speed or using dust control methods specified in the Fugitive Dust Control Plan (CPM 2019f). | | | ✓ | |
| 19 | Earthen and other materials, which may become airborne, will be promptly removed from paved roads or handled as described in the Fugitive Dust Control Plan (CPM 2019f). | | ✓ | ✓ | ✓ |
| 20 | No burning of debris, garbage, or other materials will be allowed. | | ✓ | ✓ | ✓ |
| 21 | Dust emissions caused by truck loading and unloading will be minimized, as described in the Fugitive Dust Control Plan (CPM 2019f). The drop distance at material transfer points will be minimized to reduce dust generation as described in the Fugitive Dust Control Plan. | | | ✓ | |
| 22 | Tailpipe emissions from diesel-powered equipment will be minimized through use of engines meeting Tier 2 standards or better. | | ✓ | ✓ | ✓ |
| **Cultural Resources** | | | | | |
| 23 | Section 106 requirements will be determined through a Programmatic Agreement (PA) (BLM et al 2018), as described in 36 CFR 800.14.b. | ✓ | | | |
| 24 | Clearance surveys for cultural resources will be conducted prior to the start of construction. Prior to the initiation of any pre-construction surveys, the necessary permits for federal and state land and rights-of-entry to privately owned land will be obtained. Mitigation measures could include avoidance of specific areas during construction, or modification of facility locations to avoid or minimize effects. | ✓ | ✓ | ✓ | ✓ |

| | | Applicability to the Project<br>* Not applicable within the playa boundary | | | |
|---|---|:---:|:---:|:---:|:---:|
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| **25** | If National Register of Historic Places (NRHP)-eligible cultural resources sites are identified during pre-construction surveys, they will be avoided through design and layout selection, or effects to the sites will be minimized or mitigated through data recovery or other appropriate efforts, as identified in the Cultural Resource Management Plan (CPM 2019d). CPM will adjust workspace boundaries, if necessary, to achieve this goal. | ✔ | ✔ | ✔ | ✔ |
| **26** | The protocol for discoveries covered under the Native American Graves Protection and Repatriation Act (NAGPRA) will be determined during development and implementation of the PA (BLM et al. 2018). | ✔ | ✔ | ✔ | ✔ |
| **27** | Where required by the BLM through the Section 106 process, ground-disturbing activities will be monitored by a qualified, professional archaeologist. If any archaeological evidence is discovered, the archaeological monitor will report the discovery to the Compliance Inspection Contractor (CIC) and follow protocols determined through the PA (BLM et al. 2018). | | ✔ | ✔ | ✔ |
| **28** | NRHP-eligible sites, if any are identified, will be protected with a 100-foot buffer. The buffer area will be staked and flagged by a qualified archaeologist as a location outside of the work area. | | ✔ | ✔ | ✔ |
| **29** | Cultural resources (historic or prehistoric site or object) discovered by CPM, or any person working on their behalf, will be immediately reported to the AO. All operations will be suspended within 300 feet of such discovery until written authorization to proceed is issued by the AO. After initial investigation by an archaeologist, the buffer may be reduced to 100 feet. Discoveries will be handled as determined in the PA (BLM et al. 2018). | | ✔ | ✔ | ✔ |
| **Fire Management** | | | | | |
| **30** | CPM will develop and implement a Site Safety Plan (CPM 2019i), which includes measures for prevention and suppression of fire. Project personnel will be instructed regarding individual responsibility in implementation of the plan. | ✔ | ✔ | ✔ | ✔ |
| **31** | CPM and its contractors will notify the BLM of any fires and comply with all rules and regulations administered by the BLM concerning the use, prevention, and suppression of fires on federal lands, including any fire prevention orders that may be in effect at the time of the permitted activity. CPM or its contractors may be held liable for the cost of fire suppression, stabilization, and rehabilitation if they are the cause of the fire. In the event of a fire, personal safety will be the first priority of CPM and its contractors | | ✔ | ✔ | ✔ |

Table header: **Table C-1 Applicant Committed Design Features**

| | **Table C-1 Applicant Committed Design Features** | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 32 | CPM and its contractors will operate all internal and external combustion engines (for example, off-highway vehicles, chainsaws, generators, and heavy equipment) with a qualified spark arrester. Qualified spark arresters will be maintained and not modified, and meet the Society of Automotive Engineers Recommended Practices J335 or J350. Refer to 43 CFR §8343.1. | | ✓ | ✓ | ✓ |
| 33 | CPM and its contractors will maintain and clean all equipment regularly to remove flammable debris buildup and prevent fluid leaks that can lead to ignitions. | | ✓ | ✓ | ✓ |
| 34 | CPM and its contractors will carry at least one shovel, water, and a fire extinguisher rated at a minimum of ABC - 10 pound on each piece of equipment and each vehicle. | | ✓* | ✓* | ✓* |
| 35 | When welding, grinding, cutting or conducting other similar, spark-producing work outside of an enclosed building, choose an area large enough to contain the sparks that is naturally free of all flammable vegetation or remove the flammable vegetation in a manner compliant with the permitted activity. If adequate clearance cannot be made, wet an area large enough to contain all sparks prior to the activity and periodically throughout the activity to reduce the risk of wildfire ignition. Regardless of clearance, maintain readiness to respond to an ignition at all times. In addition, keep one shovel per person and at least one fire extinguisher ready, minimum, as specified above (Design Feature #34) during this activity. | | ✓ | ✓ | ✓ |
| 36 | CPM and its contractors will keep apprised of current and forecasted weather and fire conditions at http://www.wrh.noaa.gov/firewx/?wfo=slc and take additional fire precautions when fire danger is rated High or greater. Red Flag Warnings for high winds and low humidity are issued by the National Weather Service when fire conditions are most dangerous and ignitions escape control quickly. Extra precautions will be required during these warnings such as additional water, patrols, and tools. When fire danger is rated Extreme and a Red Flag Warning is forecasted, all off-playa activities, including any road improvements, will be shut down. All on-playa activities, activities that take place within the graveled areas at the Processing and Rail Loadout Facilities, and travel on established and regularly-maintained access roads will be exempt from this shutdown. Any exceptions must be approved in advance by the AO. | | ✓* | ✓* | ✓* |
| 37 | CPM and its contractors will initiate fire suppression actions in the work area to prevent fire spread to or on federally administered lands. If a fire spreads beyond the capability of workers with the stipulated tools, all will cease fire suppression action and leave the area immediately via pre-identified escape routes. | | ✓ | ✓ | ✓ |

| | Table C-1 Applicant Committed Design Features | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** | | | |
| | | * **Not applicable within the playa boundary** | | | |
| | **Design Feature** | **Design and Engineering** | **Construction** | **Operation and Maintenance**[*] | **Decommissioning**[*] |
| 38 | CPM and its contractors will call **911** or the **Richfield Interagency Fire Center at 435-896-8404** immediately with the location and status of any fire **AND** notify the **BLM Fillmore Field Office at 435-743-3100** immediately to report the incident. | | ✓ | ✓ | ✓ |
| **Geology** | | | | | |
| 39 | Project facilities will be designed, constructed, maintained, and reclaimed to avoid or minimize the potential for land subsidence and landslides. | ✓ | ✓ | ✓ | ✓ |
| **Hazardous Materials and Solid Wastes** | | | | | |
| 40 | CPM will develop and implement a Solid and Hazardous Waste and Hazardous Materials Management Plan (CPM 2019j), to be approved by the BLM, which will include measures that address the transportation, storage, use, and disposal of hazardous materials used during Project construction, operation, maintenance, and decommissioning. This plan will also address non-hazardous and non-petroleum wastes generated by construction, operation, maintenance, and decommissioning of the Project. | ✓ | ✓ | ✓ | ✓ |
| 41 | CPM will develop a Spill Prevention, Control, and Countermeasures (SPCC) Plan (CPM 2019k), to be approved by the BLM. The SPCC Plan will be implemented to ensure protection of surface and ground water resources, prevent spills of petroleum products, and identify response procedures. Specific measures will prohibit vehicle refueling or maintenance areas within 100 feet from any stream bank or wetland, canal, or other drainage feature outside of the Sevier Playa. Contaminated soil from accidental spills will be cleaned up immediately as required by regulation. | ✓ | ✓ | ✓ | ✓ |
| 42 | Hazardous materials usage, storage, and disposal will comply with applicable local, state, and federal environmental laws and regulations. | | ✓ | ✓ | ✓ |
| 43 | Hazardous materials will be stored in a manner that provides secondary containment. Where space allows, transfer of hazardous materials will also occur within secondary containment. Personnel will be trained in the proper handling, use, storage, and cleanup of hazardous chemicals used for the Project. | | ✓ | ✓ | ✓ |
| 44 | Hazardous materials spill mitigation, cleanup, and disposal procedures will be in place, including EPA spill notification quantities and contact information. | | ✓ | ✓ | ✓ |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | **Design Feature** | **Applicability to the Project** *Not applicable within the playa boundary* | | | |
| | | Design and Engineering | Construction | Operation and Maintenance* | Decommissioning* |
| 45 | Routine maintenance of vehicles and equipment will be restricted to locations authorized for such use by the BLM. Only emergency repairs of vehicles and equipment will take place away from authorized locations. Disabled/inoperative vehicles or equipment will typically be trucked or towed to authorized locations for repair. | | ✔ | ✔ | ✔ |
| 46 | It will be necessary and practical for heavy equipment left on the site during construction, operation, maintenance, or decommissioning to be refueled in place. CPM and its contractors will implement standard refueling procedures, including spill prevention practices. Each fueling station will be equipped with a spill kit and will be operated consistent with SPCC requirements (CPM 2019k). | | ✔ | ✔ | ✔ |
| 47 | Fuel trucks will be equipped with automatic shut-off valves and will carry spill kits, and spill protection measures will be in place. | | ✔ | ✔ | ✔ |
| 48 | No personal or light-duty vehicles will be refueled on the site, except at locations authorized by the BLM. The equipment refueling section of the SPCC Plan (CPM 2019k) will identify authorized methods and locations for refueling. | | ✔ | ✔ | ✔ |
| 49 | Vehicle drip pans will be used for overnight parking of non-passenger vehicles. | | ✔ | ✔ | ✔ |
| **Land Management** | | | | | |
| 50 | The Project will be subject to valid prior existing ROWs, and its construction, operation, maintenance, and decommissioning will be coordinated with other ROW holders and adjacent non-federal landowners. | ✔ | ✔ | ✔ | ✔ |
| 51 | CPM will provide notification and will obtain any necessary encroachment permit or approval from operators of pipelines, transmission lines, railroads, state or county roads, and other existing ROWs to be crossed or paralleled by Project facilities. The BLM will provide the names and addresses for existing ROW holders and applicants for pending ROWs to CPM. A letter, reviewed by the BLM, will be sent by CPM to the ROW holders and applicants. CPM will provide the BLM with documentation (a copy of the final letter and recipient list) that contact was made and copies of any agreements reached. Prior to commencing construction, the contractors will notify utility companies with existing lines near Project facilities (via the One-Call system or similar utility notification system) for field marking. | ✔ | ✔ | ✔ | ✔ |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** ***Not applicable within the playa boundary** | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance¹ | Decommissioning¹ |
| 52 | Protection of Survey Corner and Boundary Line Markers: The responsible party (CPM) will identify and protect evidence of the Public Land Survey System (PLSS) and related federal property boundaries prior to commencement of any ground-disturbing activity. The AO will contact BLM Cadastral Survey to coordinate data research, evidence examination and evaluation, and locating, referencing, or protecting monuments of the PLSS and related land boundary markers from destruction. In the event of obliteration or disturbance of the federal boundary evidence, the responsible party will immediately report the incident in writing to the AO. BLM Cadastral Survey will determine how the marker will be restored. In rehabilitating or replacing the evidence, the responsible party will reimburse the BLM for the costs or, if instructed to use the services of a Certified Federal Surveyor, procurement will be per qualification-based selection. All surveying activities will conform to the <u>Manual of Surveying Instructions</u> and appropriate state laws and regulations. BLM Cadastral Survey will review local surveys before being finalized or filed in the appropriate state or county office. The responsible party will pay for all survey, investigation, penalties, and administrative costs. | | ✔ | ✔ | ✔ |
| **Livestock Grazing** | | | | | |
| 53 | The BLM will be notified 15 days prior to construction on an allotment so affected livestock permittees could be contacted. Construction activities during April and October will take precautions to avoid sheep trailing along Black Rock and Crystal Peak Roads. | | ✔* | ✔* | ✔* |
| 54 | Gates on established roads on public lands will be left open or closed, as found, or as designated by the AO. | | ✔* | ✔* | ✔* |
| 55 | CPM will minimize disturbance to existing fences and other improvements and will promptly repair damaged improvements to their original state or better. If fences need to be disturbed, they will be braced and secured to prevent loss of tension before cutting. Gates and cattle guards will be installed or replaced as required. If cattle guards, fences, or gates are damaged by CPM or its contractors, they will be repaired or replaced to their original conditions, as required by the BLM. Temporary gates will be installed only with the permission of the BLM. | | ✔* | ✔* | ✔* |
| 56 | Cuts or breaks in fences or natural barriers used for livestock control will be temporarily fenced to prevent passage of livestock during construction activities. After construction is completed in that area, the original fence or natural barrier will be reestablished to pre-construction conditions. | | ✔* | ✔* | ✔* |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance¹ | Decommissioning¹ |
| 57 | Stock watering pipelines that must be crossed by construction activities will be marked in advance for avoidance as appropriate. Any cut or damaged pipelines to stock watering features will be repaired immediately. | | ✓* | ✓* | ✓* |
| 58 | The Project will be designed to avoid disruption of the flow of water to stock watering reservoirs and to avoid disturbance that will prevent them from functioning properly. | | ✓* | ✓* | ✓* |
| 59 | Revegetation of disturbed areas will be designed on a site-specific basis in consultation with the BLM to maintain or enhance the value of grazing allotments. | | ✓* | ✓* | ✓* |
| 60 | CPM will notify Project personnel and contractors when livestock are grazing along the roadway and that extra caution is required to avoid collisions. Speed limits will be reduced, if necessary, when livestock are present along Project roads. If a vehicle collision with livestock does occur, CPM will notify the BLM as soon as practical. The BLM will notify the permittee. CPM will be responsible for removing the carcass after the BLM is notified, to prevent attracting wildlife along the roadway and causing additional hazards. CPM will be responsible for compensating the permittee for the value of any livestock killed or injured by Project personnel and contractors. | | ✓* | ✓* | ✓* |
| **Noise** | | | | | |
| 61 | Equipment will be properly muffled. | | ✓ | ✓ | ✓ |
| **Noxious Weeds** | | | | | |
| 62 | CPM will develop and implement a Noxious Weed Management Plan (CPM 2019g), to be approved by BLM, to control, manage, and prevent the introduction or spread of noxious weeds and invasive species by Project construction, operation, maintenance, or decommissioning. | ✓ | ✓ | ✓ | ✓ |
| 63 | State-designated noxious weeds or others listed by Millard County that are found prior to or during construction will be avoided or treated prior to disturbance. | | ✓* | | |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature** | **Design and Engineering** | **Construction** | **Operation and Maintenance**[1] | **Decommissioning**[1] |
| 64 | Prior to entering BLM lands, all equipment will be cleaned of soils, seeds, vegetative matter, or other debris that could contain noxious weed seeds. Designated wash stations will be established at key locations to assure vehicles entering federal lands are cleaned and weed free. Any vehicles working off-road in an area of known noxious weed infestation will be washed before leaving the area. Daily washing will not be required for vehicles that are only traveling to and from the Project and have not entered an area with a known noxious weed infestation. | | ✔* | ✔* | ✔* |
| 65 | Gravel, sand, and other materials brought in for road and other Project activities will be weed-free to the greatest extent possible. | | ✔* | ✔* | ✔* |
| 66 | After construction, all areas of soil disturbance will be monitored for noxious weeds and invasive species as outlined in the Noxious Weed Management Plan (CPM 2019g). Infested areas will be inventoried, mapped (using Global Positioning Systems [GPS]), and treated. Weed control measures will be initiated according to the Noxious Weed Management Plan upon evidence of noxious weed or invasive species introduction. Treatment will be completed during the first growing season following completion of construction to ensure that weed populations are controlled. Noxious weed control will continue during the revegetation process and operation, maintenance, and decommissioning phases of the Project. | | ✔* | ✔* | ✔* |
| 67 | Weed control will consist of the appropriate manual, mechanical, biological, and chemical methods. If herbicides are used, their use will be coordinated with the BLM. All herbicide applications will be performed in accordance with federal, state, and local regulation, and in compliance with the BLM requirements. If needed, a Pesticide Use Proposal (PUP) will be submitted to the BLM for approval prior to any chemical treatment. It is the BLM's responsibility to monitor pesticide applications on public land, to ensure the product label and approved PUP are followed, and the PUP is completed. To comply with this requirement, the BLM will be notified when spraying/treating on public land will occur, and all completed Daily Pesticide Application Records will be sent to the BLM within 24 hours after treatment. Pesticides will be applied by a certified licensed applicator in strict accordance with the product label, the PUP, and design features outlined in the EIS and ROD. Pesticides will not be permanently stored on public lands. | | ✔* | ✔* | ✔* |
| **Paleontology** | | | | | |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** <br> * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 68 | CPM will immediately notify the AO of any paleontological resources discovered during construction, operations, maintenance, or decommissioning, protect the discovery from damage or looting, and suspend all activities within 300 feet of such discovery until written authorization to proceed is issued by the AO. CPM is not required to suspend operations if activities can avoid further effects to a discovered locality or be continued elsewhere. | | ✓ | ✓ | ✓ |
| 69 | The AO will evaluate, or will have evaluated, such discoveries as soon as possible but not later than 10 working days after being notified. Appropriate measures to mitigate adverse effects to important paleontological resources will be determined by the AO after consulting with CPM. Approval for the Project to proceed will be granted when recovery of the fossil material and field data is completed. | | ✓ | ✓ | ✓ |
| 70 | CPM will be responsible for the cost of any investigation necessary for the evaluation and mitigation of paleontological resources. CPM will not be responsible for the cost of recovery outside of the approved area of disturbance plus a 50-foot buffer, even if the paleontological resource continues outside that area. | | ✓ | ✓ | ✓ |
| **Reclamation** | | | | | |
| 71 | CPM will develop and implement a Reclamation Plan (CPM 2019h), to be approved by the BLM, which will address both interim reclamation of temporary construction disturbance and final reclamation during Project decommissioning. | ✓ | ✓ | ✓ | ✓ |
| 72 | Following construction, areas that have been temporarily disturbed by grading or other construction activities will be returned to the original contours of the land, consistent with future operating needs, as approved by the BLM. Reclamation work may consist of re-contouring eroded areas, extending water bars, creating berms, installing rock barriers, establishing vegetation, applying mulch to provide additional erosion control, and other activities as required by the AO. Reclamation will begin as soon as practical after construction is complete to minimize the potential for erosion, except that re-seeding may be deferred until the fall following completion of construction to improve the opportunity for successful seed germination. | | ✓* | ✓* | ✓* |
| 73 | Seed mixes and seeding methods will be determined by the AO, in consultation with the BLM's Rangeland Management Specialist. Seed mixes will be appropriate for different soil types and ecological sites. Revegetation on private lands will occur according to landowner specifications. When broadcast seeding is used, it will be followed by raking or harrowing to cover the seed. Should an area be broadcast seeded, the seeding rate will be doubled unless the soil is disturbed sufficiently following seeding to cover the seed with soil. | | ✓* | ✓* | ✓* |

| | | | Applicability to the Project |||
|---|---|---|---|---|---|
| | | | \* **Not applicable within the playa boundary** |||
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 74 | Trees, brush, other woody material, and rocks removed during construction will be placed in designated areas for later use in reclamation, at the AO's direction. CPM will pull these materials back over disturbed areas following construction to aid in erosion control, create wildlife habitat, and discourage OHV use of the disturbed areas. | | ✔\* | ✔\* | ✔\* |
| **Soil and Water Resources** ||||||
| 75 | A Stormwater Pollution Prevention Plan (SWPPP) (CPM 2019l), to be approved by the BLM, will be prepared for the UPDES permit(s) required for the Project. The SWPPP will include best management practices to ensure compliance with applicable regulations and to prevent offsite migration of contaminated stormwater or increased soil erosion. Construction practices will comply with the UPDES permit(s) and SWPPP. Construction, operation, maintenance, and decommissioning crew supervisors will ensure compliance with SWPPP guidelines to stabilize disturbed soils and minimize erosion and sedimentation. Erosion control measures will be implemented in areas where surface disturbance or slope leave the soil open to wind or water erosion. Erosion control methods may include construction of water diversion structures and site-specific applications of mulch or other materials as approved by the AO to dissipate water flow as needed to control surface water runoff across disturbed areas. | | ✔\* | ✔\* | ✔\* |
| 76 | Topsoil that is suitable for reclamation will be removed in conjunction with clearing and grading and reserved in shallow windrows for use in reclamation of temporarily disturbed areas. The depth of topsoil segregation will depend on the soil type and will be determined by CPM, its contractors, or the CIC (as applicable), with approval by the AO. Erosion control measures will be used in areas where surface disturbance or slope leave the stockpiled soil susceptible to wind or water erosion. | | ✔\* | ✔\* | ✔\* |
| 77 | Inspections will be conducted to monitor the success and maintenance of erosion control measures. The monitoring program will identify problem areas and corrective measures to ensure vegetation cover and erosion control. | | ✔\* | ✔\* | ✔\* |
| 78 | Concrete trucks will not be washed out on public lands except at designated sites where washout materials will be handled in accordance with the SWPPP (CPM 2019l). The designated sites will be reclaimed in accordance with the Reclamation Plan (CPM 2019h) once work is completed. Concrete will be disposed of at an authorized location and will not be disposed of in drains, inlets, stormwater drainages, or watercourses. | | ✔\* | ✔\* | |

**Table C-1 Applicant Committed Design Features**

| | Table C-1 Applicant Committed Design Features | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** | | | |
| | | * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 79 | CPM will develop and implement a Blasting Plan (CPM 2019c), to be approved by the BLM, if blasting is deemed necessary at any point during construction, operation, maintenance, or decommissioning of the Project. The Blasting Plan will include notification and safety measures, as well as monitoring (pre- and post-blasting) of springs or other groundwater sources near blasting areas. | ✔ | ✔ | ✔ | ✔ |
| **Transportation and Access** | | | | | |
| 80 | CPM will develop and implement a Transportation and Traffic Management Plan (CPM 2019m), to be approved by the BLM, which describes regional and local access routes and affected roadways, traffic volumes, pavement conditions, and traffic design features. It will also discuss traffic and circulation within and in the immediate vicinity of Project facilities. | ✔ | ✔ | ✔ | ✔ |
| 81 | Existing roads will be used to the extent possible to minimize new disturbance. Overland vehicle traffic through undisturbed areas will be minimized. Unless authorized by the AO, travel will be restricted to public roads, authorized existing roads, and the ROWs. Where appropriate, CPM will upgrade or maintain authorized existing roads using the standards outlined in BLM Road Manual 9113. | | ✔* | ✔* | ✔* |
| 82 | Nighttime travel will be minimized to reduce the potential for vehicle collisions with wildlife and livestock. | | ✔ | ✔ | ✔ |
| 83 | The at-grade crossings and associated warning devices will be designed and constructed to achieve compliance with UDOT standards. A New Rail Crossing Application, including a development plan and preliminary engineering drawings, will be submitted to UDOT to begin the approval process. | ✔ | ✔ | | |
| 84 | Design and construction of the Rail Loadout Facility access roads and the Rail Spur Access Corridor will be coordinated with Millard County staff to achieve compliance with county standards and with the BLM to achieve compliance with design standards in BLM Road Manual 9113. | ✔ | ✔ | | |
| 85 | All roads to be used by the Project will be evaluated based on the frequency and weight of Project vehicles that are anticipated to travel each road. A table will be developed and placed in the Transportation and Traffic Management Plan (CPM 2019m) and SWPPP (CPM 2019l) for the Project. The table will identify any requirements for maintenance or improvements that may be needed to accommodate the anticipated use and loading. Road improvements will include construction of proper subgrade and addition of a wear course, where appropriate. | ✔* | | | |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance¹ | Decommissioning¹ |
| 86 | This design feature applies to roads that will not be improved or maintained. Travel on these roads will be avoided to the extent practicable during periods when the soil is too wet to support equipment adequately, as evidenced by the creation of ruts in excess of four inches deep. The Transportation and Traffic Management Plan (CPM 2019m) will identify measures to minimize rutting (for example, placement of mats or gravel), if equipment creates ruts more than 4 inches deep. If Project activities create any ruts deeper than 4 inches, the AO will be notified. Damage to soils, including compaction, rutting, and displacement, will be repaired as described in the Transportation and Traffic Management Plan. | | ✔* | ✔* | ✔* |
| 87 | This design feature applies to roads that will be improved and maintained. If at any time during the life of the Project, equipment creates ruts that penetrate the native soil or wear course and start to damage the native soil or subgrade, localized activities will be halted and repairs made. Ruts more than 4 inches deep will be repaired regularly to ensure a smooth and stable road surface. | | ✔* | ✔* | ✔* |
| 88 | Oversize loads greater than 16 feet in width will require permits and police escorts. | | ✔* | ✔* | ✔* |
| 89 | CPM will plan for safe and accessible conditions at roadway crossings and access points during construction, operation, maintenance, and decommissioning of the Project. | | ✔* | ✔* | ✔* |
| 90 | For public safety, appropriate road signs such as "Caution Heavy Truck Traffic" or "Be Prepared to Stop" will be used during construction, operation, maintenance, and decommissioning of the Project. Flaggers will be used when required by existing law. | | ✔* | ✔* | ✔* |
| 91 | Equipment and material hauling will be performed in such a manner as to prevent damage to areas outside the Project and to minimize interference with normal uses of lands crossed. | | ✔* | ✔* | ✔* |
| 92 | Permanent roads and parking areas will be constructed to provide drainage and minimize erosion. Gravel, rock, or other appropriate surfacing materials will be applied if needed, subject to BLM approval. Culverts will be installed if necessary to maintain drainage. | | ✔* | ✔* | |

| Table C-1 Applicant Committed Design Features | | Applicability to the Project * Not applicable within the playa boundary | | | |
|---|---|---|---|---|---|
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| **93** | CPM will conduct regular inspections to identify road problems such as ruts, holes, crown-and-ditch elements, standing water on the road surface, surfacing materials, blockage of water flowing into and discharging from culverts, interim reclamation, and control of noxious and invasive weeds. Inspections will be conducted following rapid snowmelt and prolonged rain events. Maintenance activities may include, but will not be limited to, blading, resurfacing, dust abatement, spot repairs, placement of rock or gravel, culvert cleaning, noxious and invasive weed control, reseeding, regrading, and snow removal, as approved by the BLM. The road surface and shoulders will be kept in a safe and usable condition and will be maintained in accordance with the original construction standards. All drainage ditches and culverts will be kept clear and free flowing and will be maintained according to original construction standards. | | ✔ | ✔ | ✔ |
| **BLM Sensitive Plant Species** | | | | | |
| **94** | If a sensitive plant species that could be affected or disturbed is discovered during the course of Project construction, operation, maintenance, or decommissioning, the AO will be immediately notified. All ground-disturbing activities that may affect the resource will immediately cease until the AO issues written authorization to proceed. The AO, in coordination with the BLM's Threatened and Endangered Species Plants Specialist will develop and implement appropriate mitigation measures. | | ✔ | ✔ | ✔ |
| **Wildlife** | | | | | |
| **95** | CPM will develop and implement an Adaptive Wildlife Management Plan (AWMP) (CPM 2019b), to be approved by the BLM, to guide the evaluation of information collected during wildlife monitoring and to inform management of wildlife resources. Operational monitoring and reporting will be conducted as described in the AWMP. CPM will provide the monitoring results to, and consult with, the BLM regarding potential management decisions regarding unanticipated effects to wildlife. | ✔ | ✔ | ✔ | ✔ |
| **96** | All power and communication lines, including structures and substations, will be designed to minimize the potential for adverse avian interactions, including collision and electrocution. Avian protection measures will be consistent with guidance provided by the Avian Power Line Interaction Committee (APLIC) and the USFWS (APLIC 2006, 2012, 2018). | ✔ | ✔ | ✔ | |

| Table C-1 Applicant Committed Design Features | | | | |
|---|---|---|---|---|
| | **Applicability to the Project** | | | |
| | **\* Not applicable within the playa boundary** | | | |
| **Design Feature** | **Design and Engineering** | **Construction** | **Operation and Maintenance¹** | **Decommissioning¹** |
| **97** Pre-construction biological clearance surveys for migratory birds and other terrestrial resources will be conducted for wildlife species identified as having the potential to occur in the area or to be affected by the Project. Survey protocols, buffers distances, timing restrictions, and other details of these surveys will be coordinated with the BLM, USFWS, and UDWR. If special-status species are encountered during the pre-construction surveys or construction, appropriate design features or mitigation measures will be implemented to avoid or minimize any anticipated effects. Prior to the surveys, permits for federal and state land and rights-of-entry to privately owned land will be obtained. Design features or mitigation measures could include, but are not limited to, avoidance of specific areas during the construction process or modification of facility locations to avoid or minimize effects. The AWMP (CPM 2019b) will contain additional information on pre-construction surveys. | ✔ | ✔ | ✔ | ✔ |
| **98** Appropriate seasonal and spatial buffers will be placed on all known and discovered raptor (eagle, falcon, hawk, and owl) nests in accordance with Utah Field Office Guidelines for Raptor Protection from Human and Land use Disturbances (Romin and Muck 2002) and Best Management Practices for Raptors and their Associated Habitats in Utah (BLM 2006). Construction activities will not occur within these buffers if pre-construction monitoring indicates the nests are active, unless a site-specific evaluation is completed prior to construction and a BLM wildlife biologist, in coordination with USFWS and UDWR, recommends that activities may proceed. The BLM will coordinate with the USFWS and UDWR and have a recommendation within 3 to 5 business days of notification. Any construction activities authorized within a spatial or seasonal buffer for raptors will require an on-site monitor. If there are any indications that activities are adversely affecting the raptor or its young, the on-site monitor will suspend activities and contact the AO immediately. Construction may be considered within the buffers of inactive nests, after coordination with the BLM, if proper surveys have been completed and have shown that the nest is unoccupied, has become unsuccessful, or young have fledged and are no longer dependent on the nest. The AWMP (CPM 2019b) will contain additional information on seasonal and spatial buffers. | | ✔ | ✔ | ✔ |
| **99** Existing roads will be used to the extent possible for access and linear components of the Project, such as power and communication lines, the Natural Gas Pipeline, and water supply pipelines, to minimize disturbance, loss, and fragmentation of wildlife habitat, unless approved by the AO. Site clearing will be limited to the minimum time, duration, and space necessary. Clearing of sagebrush shrubland, a high-value habitat type that is increasingly rare in the Project vicinity, will be limited to the greatest extent practicable. | ✔\* | ✔\* | ✔\* | |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | **Design Feature** | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | | **Design and Engineering** | **Construction** | **Operation and Maintenance¹** | **Decommissioning¹** |
| 100 | At the end of each workday, all excavated holes and trenches that may trap wildlife will be inspected before backfilling. If backfilling is not feasible, excavations will be sloped at the ends to provide escape ramps or covered to completely prevent access by wildlife. Before work commences, excavation areas will be inspected and any wildlife removed. | | ✔* | ✔* | ✔* |
| 101 | Construction, operation, maintenance, and decommissioning of the Project will be conducted in a manner that does not cause "take" as defined by the applicable law(s) for each wildlife species. Any take or wildlife problems will be reported to the BLM biologist as soon as practicable. All wildlife are to be appreciated and given space to carry out their biological/ecological activities. | | ✔ | ✔ | ✔* |
| 102 | A litter control program will be implemented to reduce the attractiveness of Project facilities to opportunistic predators such as common ravens, coyotes, and kit fox. All domestic trash will be promptly placed in covered containers that will be removed on a regular basis for disposal at an authorized facility. | | ✔ | ✔ | ✔ |
| 103 | CPM will attempt to avoid or minimize ground-disturbing activities, noise, and light during the migratory bird (non-raptor) nesting season (March 1 through July 30) so as not to disturb nesting avian species during the critical nesting season. Anticipating that ground-disturbing activities may be proposed during the migratory bird nesting season, CPM will develop a migratory bird nest survey protocol and nest avoidance buffers to mitigate disturbance to nesting migratory birds. Nest survey protocols and nest avoidance buffers will be included in the AWMP (CPM 2019b), which will be reviewed by the BLM, UDWR, and USFWS, and approved by the BLM. | | ✔* | ✔* | ✔* |
| 104 | To prevent and avoid birds becoming entrapped, all vertical pipes that will not allow a bird to exit will be permanently capped. | | ✔ | ✔ | ✔ |
| 105 | All open pipes, culverts, and similar Project features greater than 4 inches in diameter will be inspected prior to disturbance or removal to avoid trapping, injuring, or killing kit foxes. | | ✔ | ✔ | ✔ |

| Table C-1 Applicant Committed Design Features | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project**<br>* Not applicable within the playa boundary | | | |
| | **Design Feature** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| **106** | Over the term of the authorization for the Project, information regarding a plant or animal species may change. If the status of a species changes (for example, a species is proposed for listing or becomes listed under the ESA, or is added to the BLM's Special Status Species list), the BLM will notify CPM. The BLM and CPM will discuss the potential for construction, operation, maintenance, or decommissioning to affect the species and any appropriate design features or mitigation measures. Should it be determined by the BLM that construction, operation, maintenance, or decommissioning may adversely affect a federally listed (ESA) species, consultation with the USFWS will be initiated. | | ✓ | ✓ | ✓ |
| **107** | Fences will be constructed according to BLM standards (BLM Handbook H-1741-1). Wire spacing and type will comply with BLM specifications, including a smooth lower wire and sufficient clearance to allow passage of pronghorn. Metal fence posts with white tips will be used for visibility and to minimize perch locations for raptors. In areas of high wildlife migration, new fence wires will be flagged during construction to be conspicuous. Post spacing, number of stays, and other fence specifications will be determined based on site conditions. This measure does not apply to security or other fencing that is specifically designed to exclude wildlife (for example, at the Processing Facility, Rail Loadout Facility, North Playa Substation, etc.). | | ✓* | ✓* | |
| **108** | Roadways will be monitored for carcasses of wildlife or livestock that have collided with vehicles. Carcasses will be removed immediately (within 24 hours of discovery) to the extent practical. CPM will coordinate in advance with the UDWR and USFWS to obtain all required permits to avoid delays in carcass removal. | | ✓* | ✓* | ✓* |
| **109** | If direct disturbance of active burrows or dens of any special-status species is necessary, it will occur outside critical breeding periods according to species biology, unless approved by the AO. Physical destruction of known, active kit fox or burrowing owl burrows will be avoided wherever possible. No other burrows, regardless of activity classification, will be destroyed unnecessarily. | | ✓* | ✓* | ✓* |

* Not applicable within the playa boundary.
[1] During operations, maintenance, and decommissioning, some design features will only apply to the initiation of new activities.

During the analysis of effects, the BLM identified several mitigation measures in addition to the applicant committed design features in **Table C-1** and the supplemental plans (**Table C-3**) that will reduce the potential adverse effects of the Project. These measures were listed in Section 4.4 in the FEIS and are reproduced in **Table C-2** in their entirety. All of the mitigation measures identified by the BLM have been incorporated in this ROD; no measures have been excluded from this ROD. These mitigation measures are integral to the selected action. CPM will implement these mitigation measures as applicable throughout construction, operation, maintenance, and decommissioning of the selected action.

| Table C-2 Mitigation Measures | | | | |
|---|---|---|---|---|
| | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| **Mitigation Measure** | **Design and Engineering** | **Construction** | **Operation and Maintenance[1]** | **Decommissioning[1]** |
| **Air Quality and Climate** | | | | |
| 110 CPM shall use equipment that at a minimum meets the pollution controls for equivalent equipment to that included in the Final Air Dispersion Modeling Report for NEPA Analysis (Ramboll 2019). | ✓ | ✓ | ✓ | ✓ |
| **Lands and Access** | | | | |
| 111 CPM shall coordinate its use of radio frequencies with the TA project and UTTR to avoid the potential for conflicts. | ✓ | ✓ | ✓ | ✓ |
| 112 CPM shall coordinate with UTTR to develop procedures for work stoppages, which may be needed if the potential for conflict is identified between UTTR's mission and CPM's operations. | ✓ | ✓ | ✓ | ✓ |
| 113 CPM shall coordinate with UTTR to develop a "Hold Harmless Agreement", which may be needed if the potential for conflict is identified between UTTR's mission and CPM's operations. | ✓ | ✓ | ✓ | ✓ |
| **Range Management** | | | | |
| 114 Construction, operation, maintenance, and decommissioning of the Project shall avoid limiting or preventing access by livestock to existing water sources to the extent feasible. If a Project activity will limit or prevent access by livestock to existing water sources, CPM shall provide alternative water sources until access is restored to pre-activity conditions. | ✓* | ✓* | ✓* | ✓* |
| 115 CPM shall implement adaptive measures to address unacceptable conflicts that may develop between livestock and Project activities. This may include temporary or permanent fencing at the playa boundary or elsewhere, constructing barriers around standing water created by the Project, installation of cattle guards on access roads, or other similar measures, all of which shall be constructed and maintained by CPM, in coordination with the BLM and the grazing permittees. | ✓ | ✓ | ✓ | ✓ |

| Table C-2 Mitigation Measures | | | | | |
|---|---|---|---|---|---|
| | | Applicability to the Project<br>* Not applicable within the playa boundary | | | |
| **Mitigation Measure** | | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| **Water Resources** | | | | | |
| **116** | All stream crossing structures shall be designed to carry the peak flow from the 25-year, 6-hour precipitation event. Road-side ditches shall be similarly designed to convey the runoff from both the road and run-on from adjacent areas laterally along the road to an adequately sized culvert. [Note: This measure applies to all road construction activities that take place off the playa.] | ✔* | ✔* | ✔* | ✔* |
| **117** | Roads shall be designed to minimize hydrologic connection between any segment of the road prism and a natural stream channel during a design runoff event. [Note: This measure applies to all road construction activities that take place off the playa.] | ✔* | ✔* | ✔* | ✔* |

* Not applicable within the playa boundary.
[1] During operations, maintenance, and decommissioning, some mitigation measures will only apply to the initiation of new activities.

**Table C-3** lists the applicant committed design features that were added to the supplemental plans. The analysis of effects in Chapter 4 of the FEIS considered the design features in the supplemental plans to be integral to the selected action. CPM will implement these design features in addition to the design features listed in **Table C-1** and the mitigation measures listed in **Table C-2** throughout construction, operation, maintenance, and decommissioning of the selected action.

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | |
|---|---|---|---|---|
| | **Applicability to the Project**<br>* Not applicable within the playa boundary | | | |
| **Design Feature[1, 2]** | **Design and Engineering** | **Construction** | **Operation and Maintenance[3]** | **Decommissioning[3]** |
| **Adaptive Wildlife Management Plan** | | | | |
| **118** CPM would apply for and obtain a Federal Migratory Bird Special Purpose Utility Permit (SPUT) from the USFWS. This permit is valid for 3 years and would authorize utilities to collect, handle, transport, and temporarily possess migratory birds found dead on utility property, structures, and ROWs. Live stressed or injured birds would be taken to the nearest washing station for cleaning and held in an animal transport carrier until sufficiently recovered. If the bird is evaluated and determined not to be recovering, CPM would contact the nearest permitted wildlife rehabilitation facility (more than 20 birds), the USFWS, BLM, and UDWR would be contacted for assistance. This permit would allow CPM to monitor migratory bird mortalities and retain specimens. This permit would only be issued to CPM, who plans on collecting, transporting, and possessing dead migratory birds or parts, and may contract someone to conduct these activities. All activities involving migratory birds would be completed and reported in accordance with the SPUT. The SPUT is included as Attachment C [of the AWMP]. | | ✔ | ✔ | ✔ |
| **119** In the event that post-construction monitoring identifies areas along the power lines that pose a high risk for bird injury or mortality as a result of in-flight collisions, CPM would implement measures to reduce this risk as described in Section 5.1.3.1 [of the AWMP]. | ✔ | ✔ | ✔ | |
| **120** CPM would implement measures to reduce the risk of avian power line electrocutions as described in Section 5.1.3.2 [of the AWMP]. | ✔ | ✔ | ✔ | |
| **121** CPM would implement a Brine Pond Stepped Monitoring and Mitigation Plan (see Attachment A [of the AWMP]) to avoid and minimize impacts on waterfowl and shorebirds. | | | ✔ | |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | Applicability to the Project * Not applicable within the playa boundary | | | |
| | **Design Feature[1, 2]** | Design and Engineering | Construction | Operation and Maintenance[3] | Decommissioning[4] |
| 122 | CPM would implement the Migratory Bird Nest Survey Protocol and Nest Avoidance Program (Attachment D [of the AWMP]). Nest buffers would be marked using signs and flagging placed at the edge of the buffer facing the work area. No work or travel would be completed in the buffer area until a biological monitor determines that the nest site is no longer active. Nest buffer areas may be reduced in consultation with the BLM and the USFWS. Reduced nest buffers would be monitored by a qualified biologist while construction activities are occurring. | | ✓ | ✓ | ✓ |
| 123 | In order to deter migratory bird nesting activity within approved work areas, vegetation may be cleared from approved work areas or chipped in place. If clearing is not feasible, vegetation may be left in place and crushed. Clearing, chipping, or crushing of vegetation shall occur before the migratory bird nesting season. | | ✓ | ✓ | ✓ |
| 124 | All legally available methods would be used to prevent migratory bird nesting in approved work areas, or on Project infrastructure, materials, or construction equipment. This may include removing sticks or other materials placed by birds before eggs are laid or netting/tarping stored materials. No methods may be employed that would prevent an active nest from being used once eggs have been laid in it or if nestlings are present. In situations where nests have been initiated in spite of deterrent methods, all feasible means to allow the nest to remain and successfully complete its entire nesting cycle without having to halt Project activities in the area would be implemented. Under no circumstances can an active nest be removed, destroyed, or harmed in any way through either direct or indirect action. | | ✓ | ✓ | ✓ |
| 125 | In the event that post-construction monitoring identifies areas along the power lines that pose a high risk for bird injury or mortality as a result of in-flight collisions, CPM would implement measures to reduce this risk as described in Section 5.1.3.1 [of the AWMP]. | ✓ | ✓ | ✓ | |
| 126 | CPM would implement measures to reduce the risk of avian power line electrocutions as described in Section 5.1.3.2 [of the AWMP]. | ✓ | ✓ | ✓ | |
| **Fugitive Dust Control** | | | | | |
| 127 | Minimize disturbed surface area by adhering to strict construction plans to limit maximum actively disturbed construction areas. | | ✓ | ✓ | ✓ |
| 128 | Restrict vehicle travel to only established roads by using signage and training, except for activities where overland travel has been approved. | | ✓ | ✓ | ✓ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | |
|---|---|---|---|---|
| | **Applicability to the Project** *Not applicable within the playa boundary* | | | |
| **Design Feature[1,2]** | Design and Engineering | Construction | Operation and Maintenance[3] | Decommissioning[4] |
| 129 | Employ a Dust Control Supervisor, who would be responsible for monitoring visible dust and control measures. | | ✓ | ✓ | ✓ |
| 130 | Stabilize on-playa disturbed surfaces with water, commercial-grade $MgCl_2$, other agency-approved commercially-available dust suppressant or soil stabilizer, and/or brine, to minimize visible fugitive dust plumes. | | ✓ | ✓ | ✓ |
| 131 | Stabilize off-playa, on-road disturbed surfaces with water, commercial-grade $MgCl_2$, or other agency-approved commercially-available dust suppressant or soil stabilizer to minimize visible fugitive dust plumes. Stabilize off-playa, off-road disturbed surfaces with water to minimize visible fugitive dust plumes. | | ✓* | ✓* | ✓* |
| 132 | Stabilize Crystal Peak Road and Crystal Peak Spur Road with commercial-grade $MgCl_2$, other agency-approved commercially-available dust suppressant or soil stabilizer, lime chips, and/or water. | | ✓* | ✓* | ✓* |
| 133 | Construct berms with compacted, engineered fill so that the berms can withstand ongoing disturbance while minimizing fugitive dust generation. | | ✓ | ✓ | |
| 134 | Except when loading/unloading material, restrict haul truck travel to Perimeter Road (including associated spurs, segments, and turnouts), approved engineered berms, Processing Facility haul roads, and Rail Loadout Facility Access Roads. This measure would be publicized through signage and presented in training. | | ✓ | ✓ | ✓ |
| 135 | Cover trucks hauling product from the Production Ponds to the Processing Facility and between the Processing Facility and the Rail Loadout Facility. | | ✓ | ✓ | |
| 136 | Provide dedicated transport for on-playa travel to take employees from a centralized parking area at the Processing Facility to the playa operational and construction areas. | | ✓ | ✓ | ✓ |
| 137 | Utilize engineering controls such as shrouds on drop points and enclosed conveyors for the transfer of materials between the haul trucks and the railway containers at the Rail Loadout Facility. | | ✓ | ✓ | |
| 138 | Apply track-out prevention measures or devices (e.g., track-out pads, grizzly plates) at key locations where unpaved roadways intersect with paved roadways. The measures would either be implemented on the unpaved roadways themselves or at adjoining pull-outs. | ✓ | ✓ | ✓ | |
| **Noxious and Invasive Weed Management** | | | | |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | | Applicability to the Project \* Not applicable within the playa boundary | | |
| | **Design Feature[1, 2]** | Design and Engineering | Construction | Operation and Maintenance[3] | Decommissioning[4] |
| 139 | The Construction Contractor(s) would ensure that equipment and vehicles are free of debris and soils capable of transporting noxious weed seeds, roots, rhizomes, and plant parts before the vehicles and equipment access or leave the Project. | | ✓ | ✓ | ✓ |
| 140 | Where feasible, construction would start in weed-free areas before moving to areas with noxious or invasive weeds. | | ✓ | ✓ | ✓ |
| 141 | Construction personnel would inspect, remove, and properly dispose of plant parts and weed seeds found on their clothing. | | ✓ | ✓ | ✓ |
| 142 | Straw or hay bales used for sediment barrier installations or mulch distributions would be obtained from state-cleared sources that are certified free of noxious weeds. | | ✓ | ✓ | ✓ |
| 143 | Whenever feasible, temporary disturbance would be avoided in areas with known populations of noxious weeds to reduce the risk of spreading these weeds. | | ✓ | ✓ | ✓ |
| 144 | In areas where noxious weeds are present and temporary disturbance is necessary, pre-disturbance treatment of noxious weeds would be implemented. Movement of salvaged topsoil and stockpiled vegetation would be minimized to reduce the spread of soil-borne noxious weed seeds. Salvaged topsoil would be labeled as containing noxious weed seed materials to avoid mixing with weed-free soil. | | ✓ | ✓ | ✓ |
| 145 | Weed control would consist of the appropriate manual, mechanical, biological, and chemical methods. | | ✓ | ✓ | ✓ |
| **Transportation and Traffic Management** | | | | | |
| 146 | Functional use of livestock improvements would be maintained at all times. The contractor would contact the BLM prior to disturbing any livestock facilities. | | ✓\* | ✓\* | ✓\* |
| 147 | In addition to watering, track-out of dirt onto paved highways or well-maintained, graveled BLM and county-maintained roads would be minimized by the installation of gravel pads or grates to remove dirt and debris prior to entering these roads. Gravel pads or grates should be used throughout the life of the Project, remaining through Project decommissioning. | | ✓ | ✓ | ✓ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** <br> * Not applicable within the playa boundary | | | |
| | **Design Feature[1, 2]** | **Design and Engineering** | **Construction** | **Operation and Maintenance[1]** | **Decommissioning[1]** |
| **148** | Disturbed areas would be reclaimed and reseeded per the Reclamation Plan (CPM 2019h). Damage to roads caused by Project use would be repaired as specified in the Maintenance Measures below and according to any signed road agreements for the Project. Any damage would be repaired to pre-Project or better conditions using standard road construction/repair procedures and equipment. | | ✔* | ✔* | ✔* |
| **149** | Project traffic would be limited to public roads, authorized existing roads, and ROWs. Construction vehicles would be routed to minimize congestion and traffic or pedestrian interference. Authorized access roads would be clearly marked with signs before construction begins. The construction contractor(s) would review the location of the proposed access roads and would be responsible for ensuring construction travel is limited to designated areas. | | ✔* | ✔* | ✔* |
| **150** | All employee parking would be established prior to construction. Parking areas would be selected to minimize resource impacts and would be approved by the BLM. Construction crews would park only in designated areas and would use the fewest vehicles possible to travel to work sites. For off-lease construction, all employee parking would occur within the approved temporary or permanent ROW in specific areas designated by CPM and approved by the BLM, such as previously disturbed areas or areas devoid of vegetation. Parking along existing roads would be avoided because it can widen the road footprint and create safety issues. For on-lease construction, all employee parking would occur within the developed boundaries of the Processing Facility and administration building in Section 16, and in the turnouts on the Perimeter Road. | ✔ | ✔ | ✔ | ✔ |
| **151** | Approved Project access roads would be signed appropriately to accommodate increased traffic and to prevent unwarranted access to the Project during construction, operation, maintenance, and decommissioning. "Approved Project Access" signs would be posted on access roads approved for the Project; roads not approved for access for the Project would be signed with "No Project Access". Additionally, signage would be posted to discourage public access to temporary construction and site access roads. Signs would comply with BLM, county, and UDOT standards, would be maintained throughout the life of the Project (remaining until Project completion), and then would be removed. | | ✔ | ✔ | ✔ |
| **152** | If roads need to be temporarily closed during construction, they would be closed to public access by installing "Notice – Project Construction Area – Not for Public Access" signs. If deemed necessary, public outreach would be conducted to warn of temporary road closures. Warning signs would be located at a distance well in advance of temporarily closed roads, so that the public has an adequate opportunity to find alternate routes. | | ✔ | ✔ | ✔ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** * Not applicable within the playa boundary | | | |
| | **Design Feature[1, 2]** | Design and Engineering | Construction | Operation and Maintenance[1] | Decommissioning[1] |
| 153 | Traffic safety signs would be used whenever construction is adjacent to any road, at all equipment crossings of improved roads (paved or gravel), when a high volume of traffic would be entering or exiting an improved road from a ROW, and when utility construction crosses roads. All signage would comply with agency requirements and standards and the MUTCD (Federal Highway Administration 2009). In accordance with the Traffic Control Plan (see Section 3 [of the Transportation and Traffic Management Plan]), flaggers, barricades, warning signs, lights, and other safety measures would be provided to ensure public and worker safety, minimize traffic congestion, and meet federal, state, and local requirements. The company providing traffic control would provide signs, barricades, lights, signals, and other traffic control equipment. | | ✔ | ✔ | ✔ |
| 154 | Smaller and more maneuverable vehicles would be required to yield to larger, less maneuverable vehicles. When two vehicles are traveling in the same direction, the rear vehicle may not pass the front vehicle until the front vehicle has stopped. Heavy equipment such as cranes and fork trucks must stop and signal following vehicles when it is safe to pass. | | ✔ | ✔ | ✔ |
| 155 | Off-road vehicles should not be operated on public roads without prior approval from the Project superintendent and must have UDOT flashers and slow-moving vehicle signage. Off-road vehicle use on public roads may require special permits from local authorities. | | ✔ | ✔ | ✔ |
| 156 | All field personnel would attend an orientation that provides instruction on the location and use of approved access roads, driving within delineated road limits, jurisdictional and posted speed limits, and other transportation and traffic issues. The exception to this rule is delivery truck drivers who do not leave their vehicle cab. All persons who have completed the training would be given a sign, sticker, badge, or other proof of the successful completion of training, which must be prominently displayed. The use of seat belts would be required in the Project and general access road networks any time a vehicle is in motion. | | ✔ | ✔ | ✔ |
| 157 | The construction contractor, the compliance inspection contractor, compliance monitors, and all environmental monitors would maintain a communication network that consists of either (or both) two-way radios or cellular phones to allow for the coordination of equipment and traffic along access roads. | | ✔ | ✔ | ✔ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | Applicability to the Project | | | |
| | | * Not applicable within the playa boundary | | | |
| | **Design Feature[1, 2]** | **Design and Engineering** | **Construction** | **Operation and Maintenance[3]** | **Decommissioning[4]** |
| 158 | A flagging or sign scheme would be developed with the construction contractor and approved by the BLM as the Project progresses. Flagging (or signage) for Project access roads, temporary work areas, sensitive resource areas, invasive weed-cleaning stations, proposed structure locations, structure offsets, the outside edge of permitted ROWs or centerlines, and non-authorized access roads would be defined. Flagging and sign installation would be completed by the construction contractor. | | ✔ | ✔ | ✔ |
| 159 | The construction contractor would coordinate with jurisdictional utilities as necessary. The construction of any utilities across roads (e.g., pipeline borings or transmission lines) would require appropriate signage and safety measures and follow the traffic control recommendations detailed in Section 3. Any necessary permits for the movement of equipment and traffic would be obtained by the construction contractor. | | ✔ | ✔ | ✔ |
| 160 | Construction of new access roads and related surface-disturbing activities would conform to standards outlined in the BLM Manual MS 9113 and associated handbooks (BLM H-9113-1 and BLM H-9113-2). Road design elements such as crowns, horizontal and vertical alignments, design speed, loading, structure widths, drainage, and grades would conform to BLM specifications. Any change from the manual and handbook specifications would require approval from the BLM and coordination with Millard County. In general, roads would be constructed to the appropriate standard necessary to accommodate anticipated traffic and weather, and to provide year-round access. Graveling or capping the roadbed would be performed, as necessary, to provide a safe, well-constructed road. Appropriate water control features would be included to control erosion. | ✔ | ✔ | ✔ | |
| 161 | Should soft spots develop on a road during construction, they would be immediately covered with crushed rock or gravel. Where identified during on-site review by BLM, problem areas on roads would be graveled to a depth of 4 to 6 inches to reduce erosion and sedimentation. Graveling would be accomplished within a time period specified by the BLM. | | ✔ | ✔ | ✔ |
| 162 | Topsoil would be spread, vegetation would be windrowed to the side slopes of newly constructed access roads, and revegetation would begin during the first appropriate season following construction. | ✔ | ✔ | | ✔ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | | |
|---|---|---|---|---|---|
| | | **Applicability to the Project** **\* Not applicable within the playa boundary** | | | |
| | **Design Feature[1, 2]** | Design and Engineering | Construction | Operation and Maintenance[3] | Decommissioning[4] |
| 163 | Culverts sized to accommodate storm events, as defined by BLM drainage guidelines, would be used for small drainage crossings on Project access roads. Low water crossings also may be used in shallow channel crossings. The locations of such crossings would be approved by the BLM and identified in the Final Transportation and Traffic Management Plan. Low water crossings of channels would consist of excavating an area approximately 4 feet deep under the travel way and filling it with rock and gravel to the level of the drainage bottom. Channel banks on either side of such crossings would be cut down to reduce grade, where necessary. Generally, culverts would be installed on smaller, steeper channel crossings. Topsoil would be saved before channel-crossing construction occurs. Also, the areas to be disturbed would be flagged before construction begins. | ✔ | ✔ | | |
| 164 | In general, drainage crossings would be minimized and emphasis would be placed on drainages that have potentially large runoff flows and floodplains. Road drainages would be designed so they do not cause siltation, accumulation of debris in the drainage crossing, or obstruction of the drainage by the roadbed. Erosion of drainage ditches by runoff water would be prevented by diverting water from the ditch at frequent intervals by the use of cutouts. | ✔ | ✔ | | |
| 165 | The construction contractor would follow all applicable design features in the Noxious and Invasive Weed Management Framework Plan (CPM 2019g), including, but not limited to, Design Features 3, 4, 8, 9, 10, 11, 12, and 13. | | ✔ | ✔ | ✔ |
| 166 | Turnout locations on the Perimeter Road would be included in design plans and approved by the BLM. | ✔ | ✔ | | |
| 167 | Any installation or modification of gates, cattle guards, and fences would be coordinated with the BLM. | ✔ | ✔ | | |
| 168 | Prior to moving equipment into the Project, cattle guards would be inspected and photographed to document pre-construction conditions. Repairs would be made if needed to prevent collapses from heavy loads, or gates would be installed to provide detours around cattle guards that cannot support heavy loads (by-pass gates would be installed adjacent to the cattle guard). | | ✔ | ✔ | ✔ |
| 169 | All existing and new roads would be maintained and kept in good repair throughout the life of the Project, in accordance with BLM and county guidelines. Approved Project access roads would be kept free of trash during construction, operations, and decommissioning. | | ✔ | ✔ | ✔ |

| Table C-3 Applicant Committed Design Features, Supplemental Plans | | | | |
|---|---|---|---|---|
| | Applicability to the Project * Not applicable within the playa boundary | | | |
| **Design Feature[1,2]** | Design and Engineering | Construction | Operation and Maintenance[3] | Decommissioning[3] |
| **170** Roadway inspections would be conducted following rapid snowmelt and prolonged rain events. | | ✔* | ✔* | ✔* |
| **171** Snow removed from roads during the winter months would be pushed outside borrow ditches, and the cutouts kept clear so that snowmelt would be channeled away from roads. | | ✔* | ✔* | ✔* |
| **172** If equipment creates ruts more than 4 inches deep, measures to minimize rutting would be used as appropriate, including the placement of mats, the placement of aggregate such as gravel, and grading. Damage to soils, including compaction, rutting, and displacement, would be repaired through methods such as grading and aggregate placement. | | ✔* | ✔* | ✔* |
| **173** Measures to control unauthorized vehicle access to reclaimed ROWs would be applied during final restoration. Control measures would be determined in consultation with the BLM and Millard County and may include the use of boulders, vegetative material, and signage (e.g., "Watershed Restoration in Progress, Please Keep Off") to deter access to the ROW. Alternative closure methods may be recommended by the jurisdictional agency upon completion of restoration activities. | | | | ✔ |

* Not applicable within the playa boundary.
[1] Design features listed in this table include only those unique to the supplemental plans. The supplemental plans also include some of the Project-wide design features that are applicable to their resource of concern; these are listed in **Table C-1** and are not reproduced here.
[2] Design features are numbered sequentially in the ROD and do not match numbering in the supplemental plans.
[3] During operations, maintenance, and decommissioning, some design features will only apply to the initiation of new activities.

THIS PAGE INTENTIONALLY LEFT BLANK.

# Appendix D Legal Descriptions

THIS PAGE INTENTIONALLY LEFT BLANK.

# Sevier Playa Potash Project

# Legal Descriptions

**Prepared For:**

Bureau of Land Management
Fillmore Field Office

**Prepared By:**

ENValue
Castle Rock, Colorado

August 2019

THIS PAGE INTENTIONALLY LEFT BLANK

# Introduction

This document lists the legal descriptions associated with the Sevier Playa Potash Project (Project). The first section lists the legal descriptions for the leases controlled by Peak Minerals, Inc., dba Crystal Peak Minerals (CPM) that make up the Mining Project. The second section lists the legal descriptions for the rights-of-way (ROWs) requested by CPM to support the Mining Project. The last section lists the legal description for the off-lease gravel pit that CPM will develop to support the Project.

## Mining Project

The legal descriptions for the 59 individual potassium leases that make up the Mining Project are listed in **Table D-1**. A complete, combined listing of the legal description for the Mining Project is provided after this table. Figure 2-1 in the Mining Plan provides a detailed depiction of the leases.

| Table D-1 Summary of Federal Potassium Leases Controlled by CPM | | |
|---|---|---|
| **Case File Number** | **Location[1]** | **Acres** |
| UTU-88387[2] | T24S, R12W, S3–5 | 1,929.01 |
| UTU-88388 | T24S, R12W, S9–11 | 1,920.00 |
| UTU-88389 | T24S, R12W, S14–15 | 1,280.00 |
| UTU-88390 | T23S, R12W, S26–27 | 1,280.00 |
| UTU-88391 | T24S, R12W, S7-8, S17–18 | 2,487.76 |
| UTU-88392 | T23S, R12W, S33–35 | 1,920.00 |
| UTU-88393 | T24S, R12W, S1, S12 | 1,283.38 |
| UTU-88394 | T23S, R12W, S14–15, S22–23 | 2,560.00 |
| UTU-88395 | T23S, R12W, S25<br>T23S, R11W, S30–31 | 2,032.74 |
| UTU-88396 | T23S, R12W, S21, S28 | 1,280.00 |
| UTU-88397 | T23S, R12W, S12–13 | 1,280.00 |
| UTU-88398 | T23S, R12W, S24<br>T23S, R11W, S19 | 1,335.32 |
| UTU-88399 | T23S, R12W, S3, S9–10 | 1,921.63 |
| UTU-88401 | T23S, R12W, S4–5<br>T22S, R12W, S33 | 1,922.86 |
| UTU-88402 | T22S, R12W, S21, S28–29 | 1,920.00 |
| UTU-88403 | T23S, R12W, S1<br>T23S, R11W, S6 | 1,366.56 |
| UTU-88404 | T23S, R12W, S2, S11 | 1,281.88 |
| UTU-88405 | T22S, R12W, S34–36 | 1,919.40 |
| UTU-88406 | T22S, R12W, S25–27 | 1,918.55 |
| UTU-88407 | T22S, R12W, S22–24 | 1,917.81 |
| UTU-88408 | T22S, R12W, S13–15 | 1,917.09 |
| UTU-88409 | T22S, R12W, S9–12 | 1,918.37 |
| UTU-88410 | T22S, R11W, S18–19, S29–31 | 2,510.11 |
| UTU-88411 | T22S, R11W, S17, S20–21 | 1,924.48 |

| Table D-1 Summary of Federal Potassium Leases Controlled by CPM | | |
|---|---|---|
| **Case File Number** | **Location[1]** | **Acres** |
| UTU-88412 | T22S, R12W, S1–2<br>T22S, R11W, S6 | 1,798.33 |
| UTU-88413 | T22S, R11W, S7–10 | 2,421.09 |
| UTU-88414 | T21S, R12W, S34–36<br>T21S, R11W, S31 | 2,400.77 |
| UTU-88415 | T22S, R11W, S3–5 | 1,982.65 |
| UTU-88416 | T21S, R11W, S32–34 | 1,933.20 |
| UTU-88417 | T21S, R12W, S25–27<br>T21S, R11W, S30 | 2,396.57 |
| UTU-88418 | T21S, R11W, S27–29 | 1,920.00 |
| UTU-88419 | T21S, R12W, S22–24<br>T21S, R11W, S19 | 2,395.65 |
| UTU-88420 | T21S, R12W, S13–15<br>T21S, R11W, S18 | 2,394.72 |
| UTU-88421 | T21S, R11W, S20–22 | 1,920.00 |
| UTU-88422 | T21S, R12W, S1–2, S11–12 | 2,406.53 |
| UTU-88423 | T21S, R11W, S7–8, S16–17 | 2,393.82 |
| UTU-88424 | T21S, R11W, S4–6, S9 | 1,869.64 |
| UTU-88425 | T21S, R11W, S3, S10, S15 | 1,728.85 |
| UTU-88426 | T20S, R12W, S25–26, S35–36 | 2,560.00 |
| UTU-88427 | T20S, R11W, S31–34 | 2,559.21 |
| UTU-88428 | T20S, R11W, S25–26, S35–36 | 2,560.00 |
| UTU-88429 | T20S, R11W, S27–30 | 2,557.64 |
| UTU-88430 | T20S, R11W, S19–22 | 2,556.07 |
| UTU-88443 | T20S, R11W, S23–24 | 1,280.00 |
| UTU-88444[3] | T20S, R11W, S15–18 | 2,554.50 |
| UTU-88445[3] | T20S, R11W, S11–14 | 2,557.18 |
| UTU-88446[3] | T20S, R11W, S3, S10 | 1,358.44 |
| UTU-88448[3] | T20S, R10W, S7–8, S17 | 2,012.41 |
| UTU-88449[3] | T20S, R10W, S18–20 | 2,115.47 |
| UTU-88450[3] | T20S, R10W, S29–31 | 2,129.20 |
| UTU-88451[3] | T20S, R11W, S4–5, S9 | 2,048.40 |
| UTU-88452[3] | T20S, R11W, S6–8 | 1,953.40 |
| UTU-88453[3] | T20S, R12W, S12–13, S24 | 1,799.62 |
| UTU-88455[3] | T20S, R12W, S11, S14–15 | 1563.17 |
| UTU-88456[3] | T20S, R12W, S22–23, S27 | 1,920.00 |
| UTU-88457 | T20S, R12W, S28, S33–34 | 1,886.40 |
| UTU-88461 | T21S, R12W, S3–4, S9–10 | 2,393.45 |
| UTU-88462 | T21S, R12W, S16–17, S20–21 | 2,548.83 |
| UTU-88463 | T21S, R12W, S28–29, S33 | 1,911.39 |

| Table D-1 Summary of Federal Potassium Leases Controlled by CPM | | |
|---|---|---|
| **Case File Number** | **Location[1]** | **Acres** |
| | Total | **117,813.55** |

[1] Township, Range, and Section (Salt Lake Meridian, Utah). Some leases do not occupy the entirety of all listed sections.

[2] UTU-88387 was the first Federal potassium lease issued as part of the Project. For ease of reference, it is used as the lead case file for the Mining Project.

[3] These leases are held by LUMA Minerals, LLC, but controlled by CPM through a cooperative development agreement.

## <u>UTU-88387, et.al.</u>: Potassium Leases (Overall Legal Description – Including All Leases)

Salt Lake Meridian, Utah
T. 20 S., R. 10 W.,
    secs. 7 and 8, secs. 17 thru 20, and secs. 29 thru 31.
T. 20 S., R. 11 W.,
    secs. 3 thru 36.
T. 21 S., R. 11 W.,
    secs. 3 thru 10, secs. 15 thru 22, and secs. 27 thru 34.
T. 22 S., R. 11 W.,
    secs. 3 thru 10 and secs. 17 thru 21;
    sec. 29, lots 1 thru 4, S1/2NE1/4, S1/2NW1/4, and SW1/4;
    secs. 30 and 31.
T. 23 S., R. 11 W.,
    secs. 6, 19, 30, and 31.
T 20 S., R12 W.,
    sec. 11, lots 1 and 2, and lots 5 thru 11;
    sec. 12, lots 1 and 3, and lots 5 thru 17;
    secs. 13 thru 15, secs. 22 thru 28, and secs. 33 thru 36.
T. 21 S., R. 12 W.,
    secs. 1 thru 4, secs. 9 thru 17, secs. 20 thru 29, and secs. 33 thru 36.
T. 22 S., R. 12 W.,
    secs. 1 and 2;
    sec. 9, lots 3 and 4, E1/2 SW1/4, and SE1/4;
    sec. 10, lots 3 and 4, E1/2 SW1/4, and SE1/4;
    secs. 11 thru 15, secs. 21 thru 29, and secs. 33 thru 36.
T. 23 S., R. 12 W.,
    secs. 1 thru 5, secs. 9 thru 15, secs. 21 thru 28, and secs. 33 thru 35.
T. 24 S., R. 12 W.,
    sec. 1, secs. 3 thru 5, secs. 7 thru 12, and secs. 14, 15, 17, and 18.

# Rights-of-Way

Fourteen permanent ROWs and twelve temporary ROWs will be issued to support the on-lease Mining Project. Temporary ROW grants issued for the Project will be for a variable period, depending on the

time required for construction and interim reclamation of each Project component. Permanent ROW grants issued for the Project will be for 30 years with an option to extend as long as the potash leases and associated facilities are in use and CPM maintains compliance with the terms and conditions of the grants. **Table D-2** lists detailed information on the ROWs that will be issued for the selected action in this ROD. Legal descriptions for each ROW are listed starting on page D-7. The Plan of Development, Appendix A: 24k Map Set Panels, depicts the ROWs in detail.

| Table D-2 Rights-of-Way on Off-Lease BLM-Administered Lands | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case File Number[1]** | **Facility** | **Permanent ROW[2]** | | | **Temporary ROW[3]** | | |
| | | **Width (feet)** | **Length (miles)** | **Area (acres)** | **Width (feet)** | **Length (miles)** | **Area (acres)** |
| **Power and Communication Lines** | | | | | | | |
| UTU-90097 | 69-kV Power and Communication Line | 100 | 36.21 | 438.9 | -- | | -- |
| UTU-90097-01 | 69-kV Power and Communication Line Temporary ROW | -- | -- | -- | Irregular | | 43.9[4] |
| UTU-90097 | Power Line Access Road | 25 | 34.47 | 104.5 | -- | -- | -- |
| UTU-90097-01 | Power Line Access Road Spurs Temporary ROW | -- | -- | -- | 25 | 3.13 | 9.5 |
| UTU-90097-01 | 69-kV Power and Communication Line Temporary Use Areas (TUAs) | -- | -- | -- | 15 TUAs of varying sizes | | 26.3 |
| UTU-92068 | 25-kV Power Line | 60 | 5.16 | 37.6 | -- | -- | -- |
| UTU-92068-01 | 25-kV Power Line Temporary ROW | -- | -- | -- | 35 | 5.16 | 21.9 |
| UTU-92068 | 25-kV Power Line Access Road | 25 | 1.78 | 5.4 | -- | -- | -- |
| UTU-92068 | North Playa Substation | 90 feet by 176 feet | | 0.4 | -- | -- | -- |
| UTU-92069 | 12.47-kV Power and Communication Line | 60 | 12.04 | 87.5 | -- | -- | -- |
| UTU-92069-01 | 12.47-kV Power and Communication Line Temp ROW | -- | -- | -- | 35 | 12.04 | 51.1 |
| UTU-92069 | Rail Loadout Facility Substation [5] | -- | -- | -- | -- | -- | -- |
| UTU-92069-01 | 12.47-kV Power and Communication Line TUA | -- | -- | -- | 1 TUA | | 0.5 |
| UTU-94233 | 12.47-kV Power Line | 60 | 4.91 | 35.7 | -- | -- | -- |
| UTU-94233-01 | 12.47 kV Power Line Temporary ROW | -- | -- | -- | 35 | 4.91 | 20.8 |
| UTU-94233-01 | 12.47-kV Power Line TUAs | -- | -- | -- | 2 TUAs of varying sizes | | 0.8 |
| **Communication Facilities** | | | | | | | |
| UTU-90096-01 | Long Ridge Communication Tower Temporary ROW | -- | -- | -- | 50 feet by 50 feet | | 0.1 |
| UTU-90096-01 | Long Ridge Access Road Temporary ROW | -- | -- | -- | 25 | 3.66 | 11.1 |
| UTU-92063 | Black Rock Communication Tower | 50 feet by 50 feet | | 0.1 | -- | -- | -- |

| Table D-2 Rights-of-Way on Off-Lease BLM-Administered Lands | | | | | | | |
|---|---|---|---|---|---|---|---|
| Case File Number[1] | Facility | Permanent ROW[2] | | | Temporary ROW[3] | | |
| | | Width (feet) | Length (miles) | Area (acres) | Width (feet) | Length (miles) | Area (acres) |
| UTU-92063 | Black Rock Access Road | 30 | 0.62 | 2.3 | -- | -- | -- |
| Natural Gas Facilities (to be authorized under 43 CFR 2880 in accordance with the Mineral Leasing Act) | | | | | | | |
| UTU-92067 | Natural Gas Pipeline (partly within Rail Loadout Facility) | 30 | 25.92 | 94.3 | -- | -- | -- |
| UTU-92067-01 | Natural Gas Pipeline Temporary ROW | -- | -- | -- | 20 | 25.92 | 62.8 |
| UTU-92067 | Natural Gas Pipeline 2" Spur and Valve (Within Rail Loadout Facility) | 30 | 0.03 | 0.1 | -- | -- | -- |
| UTU-92067-01 | Natural Gas Pipeline Spur Temporary ROW | -- | -- | -- | 20 | 0.03 | 0.1 |
| UTU-92067 | Natural Gas Pipeline Access Roads | 25 | 12.99 | 39.3 | -- | -- | -- |
| Rail Facilities | | | | | | | |
| UTU-92100 | Rail Spur | 60 | 1.81 | 13.2 | -- | -- | -- |
| UTU-92100-01 | Rail Spur Temporary ROW | -- | -- | -- | 60 | 1.81 | 13.2 |
| UTU-92100 | Rail Spur Access Corridor | 15 | 1.81 | 3.3 | -- | -- | -- |
| UTU-92100 | Rail Loadout Facility Access Roads | 40 | 0.58 | 2.8 | -- | -- | -- |
| UTU-92100-01 | Rail Loadout Facility Access Roads Temporary ROW | -- | -- | -- | 20 | 0.58 | 1.4 |
| UTU-92048 | Rail Loadout Facility | Irregular | | 131.8 | -- | -- | -- |
| Water Supply Facilities | | | | | | | |
| UTU-90095 | Water Supply Pipeline | 25 | 4.29 | 13.0 | -- | -- | -- |
| UTU-90095-01 | Water Supply Pipeline Temporary ROW | -- | -- | -- | 25 | 4.29 | 13.0 |
| Water Supply Well 1 and Supporting Facilities (Water Supply Well 1 is located on SITLA land)[6] | | | | | | | |
| UTU-90095 | Water Supply Pipeline Spur 1 | 25 | 1.22 | 3.7 | -- | -- | -- |
| UTU-90095-01 | Water Supply Pipeline Spur 1 Temporary ROW | -- | -- | -- | 25 | 1.22 | 3.7 |
| UTU-90095 | Water Supply Well Access Road 1 | 25 | 0.73 | 2.2 | -- | -- | -- |
| UTU-90095 | 12.47-kV Power Line Spur 1 | 60 | 1.04 | 7.5 | -- | -- | -- |
| UTU-90095-01 | 12.47-kV Power Line Spur 1 Temporary ROW | -- | -- | -- | 35 | 1.04 | 4.4 |
| Water Supply Well 2 and Supporting Facilities (access to Water Supply Well 2 is via Millard County Class B Road)[6] | | | | | | | |
| UTU-90095 | Water Supply Well 2 | 30 feet by 40 feet | | <0.1 | -- | -- | -- |
| UTU-90095-01 | Water Supply Well 2 Temporary ROW | -- | -- | -- | 125 feet by 150 feet | | 0.4 |
| UTU-90095 | Water Supply Pipeline Spur 2 | 25 | 0.75 | 2.3 | --- | -- | -- |
| UTU-90095-01 | Water Supply Pipeline Spur 2 Temporary ROW | -- | -- | -- | 25 | 0.75 | 2.3 |

| Table D-2 Rights-of-Way on Off-Lease BLM-Administered Lands | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Case File Number[1]** | **Facility** | **Permanent ROW[2]** | | | **Temporary ROW[3]** | | |
| | | **Width (feet)** | **Length (miles)** | **Area (acres)** | **Width (feet)** | **Length (miles)** | **Area (acres)** |
| UTU-90095 | 12.47-kV Power Line Spur 2 | 60 | 0.76 | 5.5 | -- | -- | -- |
| UTU-90095-01 | 12.47-kV Power Line Spur 2 Temporary ROW | -- | -- | -- | 35 | 0.76 | 3.2 |
| *Water Supply Well 3 and Supporting Facilities (Water Supply Well 3 is located on SITLA land)[6]* | | | | | | | |
| UTU-90095 | Water Supply Pipeline Spur 3 | 25 | 0.63 | 1.9 | -- | -- | -- |
| UTU-90095-01 | Water Supply Pipeline Spur 3 Temporary ROW | -- | -- | -- | 25 | 0.63 | 1.9 |
| UTU-90095 | Water Supply Well Access Road 3 | 25 | 0.64 | 1.9 | -- | -- | -- |
| UTU-90095 | 12.47-kV Power Line Spur 3 | 60 | 0.50 | 3.6 | -- | -- | -- |
| UTU-90095-01 | 12.47-kV Power Line Spur 3 Temporary ROW | -- | -- | -- | 35 | 0.5 | 2.1 |
| *Water Supply Well 4 and Supporting Facilities* | | | | | | | |
| UTU-90095[7] | Water Supply Well 4 | 30 feet by 40 feet | | <0.1 | -- | -- | -- |
| UTU-90095-01 | Water Supply Well 4 Temporary ROW | -- | -- | -- | 125 feet by 150 feet | | 0.4 |
| UTU-90095 | Water Supply Pipeline Spur 4 | 25 | 2.14 | 6.5 | -- | -- | -- |
| UTU-90095-01 | Water Supply Pipeline Spur 4 Temporary ROW | -- | -- | -- | 25 | 2.14 | 6.5 |
| UTU-90095 | Water Supply Well Access Road 4 | 25 | 0.88 | 2.7 | -- | -- | -- |
| UTU-90095 | 12.47-kV Power Line Spur 4 | 60 | 0.86 | 6.3 | -- | -- | -- |
| UTU-90095-01 | 12.47-kV Power Line Spur 4 Temporary ROW | -- | -- | -- | 35 | 0.86 | 3.7 |
| **Access Roads** | | | | | | | |
| UTU-92066 | Access Roads | 25 | 19.91 | 60.2 | -- | -- | -- |
| UTU-92064 | Perimeter Road Segments | 60 | 12.39 | 90.3 | -- | -- | -- |
| UTU-92064-01 | Perimeter Road Segments Temporary ROW | -- | -- | -- | 20 | 12.39 | 30.1 |
| UTU-92064 | Perimeter Road Turnouts (one per mile, 15 total on BLM) | 100 feet long, up to 10 feet wide, each 1,000 ft2 total | | 0.3 | -- | -- | -- |
| **Evaporation Ponds** | | | | | | | |
| UTU-94227 | Preconcentration and Heel Brine Ponds | Irregular shape | | 2,338.6 | -- | -- | -- |
| UTU-94227-01 | Preconcentration and Heel Brine Ponds Temporary ROW | -- | -- | -- | 20 | n/a | 13.7 |
| **Recharge System & Brine Transfer System** | | | | | | | |
| UTU-94234 | Recharge Canal and Collector Segments | 120 | 10.29 | 149.8 | -- | -- | -- |
| UTU-94234-01 | Recharge Canal and Collector Segments Temporary ROW | -- | -- | -- | 20 | 10.29 | 24.9 |
| UTU-94234 | Brine Transfer Canal Segments | 100 | 0.53 | 6.3 | -- | -- | -- |

| Table D-2 Rights-of-Way on Off-Lease BLM-Administered Lands | | | | | | | |
|---|---|---|---|---|---|---|---|
| Case File Number[1] | Facility | Permanent ROW[2] | | | Temporary ROW[3] | | |
| | | Width (feet) | Length (miles) | Area (acres) | Width (feet) | Length (miles) | Area (acres) |
| Monitoring Wells [8] | | | | | | | |
| UTU-94232 | Monitoring Wells (8) | 25 feet by 25 feet (625 ft² per well) | | 0.1 | -- | -- | -- |
| UTU-94232-01 | Monitoring Wells (8) Temporary ROW | -- | -- | -- | 100 ft. by 100 ft. less the permanent ROW (9,375 ft² per well) | | 1.6 |
| UTU-94232 | Monitoring Well Access Road | 25 | 6.5 | 19.7 | -- | -- | -- |

[1] Suffix "-01" indicates a temporary ROW.

[2] "Permanent" ROWs will be issued for 30 years, with an option to extend them for as long as the potassium leases and associated facilities are in use.

[3] "Temporary" ROWs will be issued for a short-term, variable period during construction and interim reclamation.

[4] The exact location and extent of the temporary ROW associated with the 69-kV Power and Communication Line has not been determined. It has been estimated as 10 percent of the permanent ROW

[5] This substation will be located within the Rail Loadout Facility and will not increase the disturbance area of that facility; therefore, no additional rental will be charged for this substation.

[6] Water Supply Wells 1 and 3 are located on SITLA land and the access road to Water Supply Well 2 is a Millard County Class B road, therefore, no ROWs will be issued for these facilities.

[7] UTU-90095 is the first case file number in the sequence of rights-of-way (ROWs). For ease of reference, it is used as the lead case file for the ROWs.

[8] Monitoring Well CPM-20-EBRWS will be located within the Rail Loadout Facility and will not increase the disturbance area of that facility; therefore, no additional rental will be charged for this monitoring well.

## <u>UTU-90097</u>: 69-kV Power and Communication Line and Access Road, Permanent ROW

Salt Lake Meridian, Utah
T. 19 S., R. 8 W.,
     sec. 19, S1/2SE1/4;
     sec. 20, S1/2SW1/4 and E1/2SE1/4;
     sec. 21, SE1/4NE1/4, N1/2SW1/4, and N1/2SE1/4;
     sec. 22, SW1/4NE1/4, S1/2NW1/4, and NW1/4SW1/4.
T. 19 S., R. 9 W.,
     sec. 25, N1/2NE1/4, NE1/4NW1/4, and S1/2NW1/4;
     sec. 26, S1/2NE1/4, SE1/4NW1/4, and N1/2SW1/4;
     sec. 27, NE1/4SW1/4, S1/2SW1/4, and N1/2SE1/4;
     sec. 28, S1/2SW1/4 and S1/2SE1/4;
     sec. 29, SW1/4NE1/4, N1/2SW1/4, SW1/4SW1/4, and NW1/4SE1/4;
     sec. 31, lots 3 and 4, and NE1/4NE1/4, S1/2NE1/4, SE1/4NW1/4 NE1/4SW1/4, and SE1/4SE1/4;
     sec. 33, NW1/4NW1/4.
T. 20 S., R. 9 W.,
     sec. 6, lots 1 and 4, and SE1/4NE1/4, SE1/4SW1/4, N1/2SE1/4, and SW1/4SE1/4;
     sec. 7, lot 1 and NE1/4NW1/4.
T. 20 S., R. 10 W.,
     sec. 1, lot 1 and S1/2NE1/4, SE1/4SW1/4, and W1/2SE1/4;

    sec. 11, NE1/4SE1/4 and S1/2SE1/4;

    sec. 12, NE1/4NE1/4, S1/2NE1/4, N1/2NW1/4, SW1/4NW1/4, SW1/4, and NW1/4SE1/4;

    sec. 13, W1/2NW1/4 and W1/2SW1/4;

    sec. 14, W1/2NE1/4, SE1/4NW1/4, and SW1/4 SE1/4SE1/4;

    sec. 22, lot 1 and SE1/4NE1/4, SE1/4SW1/4, N1/2SE1/4, and SW1/4SE1/4;

    sec. 23, N1/2NE1/4, NE1/4NW1/4, S1/2NW1/4, and NW1/4SW1/4;

    sec. 27, lots 3 and 4, S1/2NW1/4, and W1/2SW1/4;

    sec. 28, E1/2SE1/4;

    sec. 33, NE1/4, SW1/4NE1/4, NE1/4SW1/4, S1/2SW1/4, N1/2SE1/4, and SW1/4SE1/4;

    sec. 34, NW1/4NW1/4.

T. 21 S., R. 10 W.,

    sec. 4, lots 2, 3, and 4, and S1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;

    sec. 5, E1/2NE1/4, NE1/4SE1/4, and S1/2SE1/4;

    sec. 8, W1/2NE1/4, E1/2NW1/4, NE1/4SW1/4, and S1/2SW1/4;

    sec. 9, SW1/4SW1/4;

    sec. 17, E1/2NE1/4, W1/2NW1/4, N1/2SE1/4, and SW1/4SE1/4;

    sec. 18, SE1/4NE1/4, NE1/4SE1/4, and S1/2SE1/4;

    sec. 19, lots 8, 9, 15, and 16, and W1/2NE1/4;

    sec. 20, W1/2NE1/4, SE1/4NW1/4, N1/2SW1/4, and SW1/4SW1/4;

    sec. 29, NW1/4NW1/4;

    sec. 30, lots 2, 3, 6, 9, and 11 thru 16, and E1/2NE1/4 and N1/2SE1/4;

    sec. 31, lots 3 and 4.

T. 21 S., R. 11 W.,

    sec. 25, SE1/4SE1/4.

T. 22 S., R. 11 W.,

    sec. 1, lot 3, S1/2NW1/4, N1/2SW1/4, and W1/2SW1/4;

    sec. 11, E1/2NE1/4, NE1/4SE1/4, and S1/2SE1/4;

    sec. 12, W1/2NW1/4 and NW1/4SW1/4;

    sec. 14, lots 1 thru 7, and 10, 11 and 12;

    sec. 23, lots 2 and 3, and SW1/4NE1/4, S1/2NW1/4, W1/2SW1/4; SE1/4SW1/4, and W1/2SE1/4;

    sec. 26, E1/2NW1/4, NW1/4NW1/4, and E1/2SW1/4;

    sec. 27, E1/2NE1/4, NE1/4SE1/4, and S1/2SE1/4;

    sec. 34, lots 2, 7, thru 12 and E1/2SW1/4;

    sec. 35, N1/2NW1/4 and SW1/4NW1/4.

T. 23 S., R. 11 W.,

    sec. 3, lots 3 thru 6, and S1/2NW1/4, NE1/4SW1/4, and W1/2SW1/4;

    sec. 4, lot 9 and E1/2SE1/4;

    sec. 9, N1/2NE1/4, SW1/4NE1/4, SE1/4SW1/4, and W1/2SE1/4;

    sec. 10, W1/2NW1/4 and W1/2SW1/4;

    sec. 15, W1/2NW1/4 and W1/2SW1/4;

    sec. 20, SE1/4NE1/4 and E1/2SE1/4;

    sec. 21, E1/2NE1/4, W1/2NW1/4; NE1/4SE1/4, and S1/2SE1/4;

    sec. 22, NW1/4NW1/4;

    sec. 28, W1/2NE1/4, SENW1/4, and E1/2SW1/4;

    sec. 29, NE1/4, SE1/4SW1/4, and W1/2SE1/4;

    sec. 33, N1/2NW1/4, SW1/4NW1/4, and W1/2SW1/4.

T. 24 S., R. 11 W.,

    sec. 4, lot 4;

    sec. 5, lots 1 and 4, and SE1/4NE1/4, SW1/4NW1/4, NW1/4SW1/4, S1/2SW1/4, N1/2SE1/4, and
        SW1/4SE1/4;

    sec. 6, E1/2SE1/4;

sec. 7, NE1/4 and W1/2SE1/4;
sec. 18, lot 1 and lots 6 thru 9, and lot 11, and W1/2NE1/4;
sec. 19, lots 2, 3, and 4.
T. 24 S., R. 12 W.,
    sec. 13, N1/2SW1/4 and N1/2SE1/4.
    sec. 24, SE1/4NE1/4, N1/2SE1/4, and SW1/4SE1/4;
    sec. 25, NW1/4NE1/4 and E1/2NW1/4.

## UTU-90097-01: 69-kV Power and Communication Line and Access Road Spurs, Temporary ROW

Salt Lake Meridian, Utah
T. 19 S., R. 8 W.,
    sec. 22, NW1/4NE1/4, S1/2NE1/4, and SE1/4NW1/4.
T. 19 S., R. 9 W.,
    sec. 28, SW1/4SW1/4;
    sec. 31, SE1/4NW14.
T. 20 S., R. 10 W.,
    sec. 22, SE1/4NE1/4;
    sec. 23, SW1/4NW1/4;
    sec. 27, W1/2SW1/4.
T. 21 S., R. 10 W.,
    sec. 4, S1/2NW1/4;
    sec. 5, S1/2SE1/4;
    sec. 19, lots 9 and 16, and S1/2SE1/4;
    sec. 30, N1/2NE1/4.
T. 22 S., R. 11 W.,
    sec. 11, SE1/4NE1/4;
    sec. 12, SW1/4NW1/4.
    sec. 26, S1/2SW1/4;
    sec. 27, NE1/4SE1/4.
    sec. 34, lot 10 and NE1/4SW1/4.
T. 23 S., R. 11 W.,
    sec. 28, S1/2NW1/4 and N1/2SW1/4;
    sec. 29, N1/2SE1/4.
T. 24 S., R. 11 W.,
    sec. 7, NE1/4NE1/4;
    sec. 8, NW1/4NW1/4;
    sec. 18, lot 7.

## UTU-92068: 25-kV Power Line, Access Road and North Playa Substation, Permanent ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
    sec. 5, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and S1/2SE1/4;
    sec. 6, lots 1 thru 4, 8, 9, 11, 12, 14, and 15, and NE1/4;
    sec. 7, lot 4;

sec. 8, NE1/4NE1/4.
T. 21 S., R. 11 W.,
sec. 12, NE1/4NE1/4, S1/2NE1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
sec. 13, NW1/4NW1/4;
sec. 14, N1/2NE1/4 and NE1/4NW1/4.

## <u>UTU-92068-01</u>: 25-kV Power Line, Temporary ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
sec. 5, SW1/4NW1/4, N1/2SW1/4, SE1/4SW1/4, and S1/2SE1/4;
sec. 6, lots 1 thru 4, 8, 9, 11, 12, 14, and 15, and NE1/4;
sec. 7, lot 4;
T. 21 S., R. 11 W.,
sec. 12, NE1/4NE1/4, S1/2NE1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
sec. 13, NW1/4NW1/4;
sec. 14, N1/2NE1/4 and NE1/4NW1/4.

## <u>UTU-92069</u>: 12.47-kV Power and Communication Line and Rail Facility Substation, Permanent ROW

Salt Lake Meridian, Utah
T. 24 S., R. 10 W.,
sec. 19, lot 2, NW1/4NE1/4, and E1/2NW1/4.
T. 24 S., R. 11 W.,
sec. 23, S1/2SE1/4;
sec. 24, SE1/4NE1/4, NE1/4SW1/4, S1/2SW1/4, and N1/2SE1/4;
sec. 26, NW1/4NE1/4 and N1/2NW1/4;
sec. 27, N1/2NE1/4, SW1/4NE1/4, NE1/4NW1/4, and S1/2NW1/4;
sec. 28, S1/2NE1/4, S1/2NW1/4, and N1/2SW1/4;
sec. 29, S1/2NE1/4 and S1/2NW1/4;
sec. 30, lots 4, 5, and 6, and S1/2NE1/4.
T. 24 S., R. 12 W.,
sec. 21, E1/2SE1/4;
sec. 22, N1/2NW1/4, SW1/4NW1/4, and NW1/4SW1/4;
sec. 25, S1/2NE1/4, S1/2NW1/4, and NW1/4SW1/4;
sec. 26, SW1/4NW1/4, N1/2SW1/4, and N1/2SE1/4;
sec. 27, S1/2NE1/4 and S1/2NW1/4;
sec. 28, NE1/4.

## <u>UTU-92069-01</u>: 12.47-kV Power and Communication Line, Temporary ROW

Salt Lake Meridian, Utah
T. 24 S., R. 10 W.,
sec. 19, lot 2, NW1/4NE1/4, and E1/2NW1/4.
T. 24 S., R. 11 W.,
sec. 23, S1/2SE1/4;

       sec. 24, SE1/4NE1/4, NE1/4SW1/4, S1/2SW1/4, and N1/2SE1/4;
       sec. 26, NW1/4NE1/4 and N1/2NW1/4;
       sec. 27, N1/2NE1/4, SW1/4NE1/4, NE1/4NW1/4, and S1/2NW1/4;
       sec. 28, S1/2NE1/4, S1/2NW1/4, and N1/2SW1/4;
       sec. 29, S1/2NE1/4 and S1/2NW1/4;
       sec. 30, lots 4, 5, and 6, and S1/2NE1/4.
T. 24 S., R. 12 W.,
       sec. 21, E1/2SE1/4;
       sec. 22, N1/2NW1/4, SW1/4NW1/4, and NW1/4SW1/4;
       sec. 25, S1/2NE1/4, S1/2NW1/4, and N1/2SW1/4;
       sec. 26, SW1/4NW1/4, N1/2SW1/4, and N1/2SE1/4;
       sec. 27, S1/2NE1/4 and S1/2NW1/4;
       sec. 28, NE1/4.

## UTU-94233: 12.47-kV Power Line, Permanent ROW

Salt Lake Meridian, Utah
T. 22 S., R. 11 W.,
       sec. 15, lots 2, 3, 6 and 7, SW1/4NE1/4, SE1/4NW1/4, and NE1/4SW1/4;
       sec. 28, lots 1, 2 and 3, and NW1/4SW1/4;
       sec. 29, N1/2SE1/4 and SW1/4SE1/4.
T. 23 S., R 11 W.,
       sec. 7, lots 1, 2, 5, 8, 9 and 11;
       sec. 18, lots 1, 2, 5, 6, 7 and 12.

## UTU-94233-01: 12.47-kV Power Line, Temporary ROW

Salt Lake Meridian, Utah
T. 22 S., R. 11 W.,
       sec. 15, lots 2, 3, 6 and 7, SW1/4NE1/4, SE1/4NW1/4, and NE1/4SW1/4;
       sec. 28, lots 1, 2 and 3, and NW1/4SW1/4;
       sec. 29, N1/2SE1/4 and SW1/4SE1/4.
T. 23 S., R 11 W.,
       sec. 7, lots 1, 2, 5, 8, 9 and 11;
       sec. 18, lots 1, 2, 5, 6, 7 and 12.

## UTU-92063: Black Rock Communication Tower and Access Road, Permanent ROW

Salt Lake Meridian, Utah
T. 19 S., R. 8 W.,
       sec. 22, SE1/4NE1/4;
       sec. 23, SW1/4NE1/4 and S1/2NW1/4.

## UTU-90096-01: Long Ridge Communication Tower and Access Road, Temporary ROW

Salt Lake Meridian, Utah
T. 18 S., R. 11 W.,
 sec. 27, N1/2SW1/4 and SW1/4SW1/4;
 sec. 28, N1/2SW1/4, N1/2SE1/4, and SE1/4SE1/4;
 sec. 29, S1/2NE1/4, SE1/4SW1/4, N1/2SE1/4, and SW1/4SE1/4;
 sec. 31, lots 2 and 3, NE1/4SW1/4, and N1/2SE1/4.
T. 18 S. R. 12 W.,
 sec. 25, SW1/4SW1/4.


## UTU-92067: Natural Gas Pipeline, Pipeline Spur, and Access Roads, Permanent ROW

Salt Lake Meridian, Utah
T. 24 S., R. 8 W.,
 sec. 31, lots 8, 9, 11, 12, and 13.
T. 25 S., R. 8 W.,
 sec. 4, NW1/4SW1/4, S1/2SW1/4, and SW1/4SE1/4;
 sec. 5, lot 4, SW1/4NE1/4, S1/2NW1/4, W1/2SW1/4, and N1/2SE1/4;
 sec. 6, lots 1 and 2, and SE1/4NE1/4 and E1/2SE1/4;
 sec. 7, E1/2NE1/4 and E1/2SE1/4;
 sec. 8, NW1/4NW1/4;
 sec. 9, NE1/4, NE1/4NW1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
 sec. 10, S1/2NW1/4, E1/2SW1/4, NW1/4SE1/4, and S1/2SE1/4;
 sec. 11, SW1/4SW1/4;
 sec. 14, lots 2, 3, 4 and 7, and SE1/4NE1/4, S1/2SW1/4, N1/2SE1/4, and SW1/4SE1/4;
 sec. 17, N1/2SE1/4;
 sec. 21, NE1/4NE1/4;
 sec. 22, lots 1, 4, 5 and 6;
 sec. 23, NW1/4NW1/4.
T. 24 S., R. 9 W.,
 sec. 18, lot 4;
 sec. 19, lot 1, NW1/4NE1/4, S1/2NE1/4, and NE1/4NW1/4;
 sec. 20, SW1/4NW1/4, N1/2SW1/4, SW1/4SW1/4, and SE1/4;
 sec. 21, S1/2SW1/4;
 sec. 26, NW1/4SW1/4, S1/2SW1/4, and SW1/4SE1/4;
 sec. 27, S1/2NW1/4, NE1/4SW1/4, and N1/2SE1/4;
 sec. 28, N1/2NE1/4, SE1/4NE1/4, NE1/4NW1/4, N1/2SE1/4, and SW1/4SE1/4;
 sec. 29, W1/2NW1/4 and W1/2SW1/4;
 sec. 31, SE1/4NE1/4 and E1/2SE1/4;
 sec. 32, W1/2NW1/4 and NW1/4SW1/4;
 sec. 33, W1/2NE1/4, NE1/4SW1/4, and W1/2SE1/4;
 sec. 35, N1/2NE1/4.
T. 24 S., R. 10 W.,
 sec. 10, SW1/4 and S1/2SE1/4;
 sec. 11, SW1/4SW1/4;
 sec. 13, SW1/4NW1/4, N1/2SW1/4, NW1/4SE1/4, and S1/2SE1/4;
 sec. 14, W1/2NE1/4, S1/2NE1/4, N1/2NW1/4, SE1/4SW1/4, NE1/2SE1/4, and W1/2SE1/4;

sec. 16, N1/2SE1/4;
sec. 17, SE1/4SW1/4 and S1/2SE1/4;
sec. 19, lot 2, N1/2NE1/4, SW1/4NE1/4, and SE1/4NW1/4;
sec. 20, N1/2NW1/4.
sec. 23, N1/2NW1/4 and SW1/4NW1/4.
T. 24 S., R. 11 W.,
sec. 18, lots 7, 8, 9, and 12;
sec. 19, lot 1, W1/2NE1/4, N1/2SE1/4, and SE1/4SE1/4;
sec. 23, S1/2SE1/4;
sec. 24, S1/2NE1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
sec. 26, NW1/4NE1/4 and N1/2NW1/4;
sec. 27, N1/2NE1/4, NE1/4NW1/4, and S1/2NW1/4;
sec. 28, NE1/4NE1/4, S1/2NE1/4, and S1/2NW1/4;
sec. 29, S1/2NE1/4, NW1/4NW1/4, and S1/2NW1/4;
sec. 30, NE1/4NE1/4.
T. 24 S., R 12 W.,
sec. 13, N1/2SW1/4 and N1/2SE1/4.


## UTU-92067-01: Natural Gas Pipeline and Pipeline Spur, Temporary ROW

Salt Lake Meridian, Utah
T. 24 S., R. 8 W.,
sec. 31, lots 8, 9, 11, 12, and 13.
T. 25 S., R. 8 W.,
sec. 4, NW1/4SW1/4, S1/2SW1/4, and SW1/4SE1/4;
sec. 5, lot 4, SW1/4NE1/4, S1/2NW1/4, and N1/2SE1/4;
sec. 6, lots 1 and 2;
sec. 9, N1/2NE1/4, SE1/4NE1/4, and NE1/4NW1/4;
sec. 10, S1/2NW1/4, NE1/4SW1/4, NW1/4SE1/4, and S1/2SE1/4;
sec. 11, SW1/4SW1/4;
sec. 14, lots 2, 3, 4 and 7, and SE1/4NE1/4.
T. 24 S., R. 9 W.,
sec. 18, lot 4;
sec. 19, lot 1, NW1/4NE1/4, S1/2NE1/4, and NE1/4NW1/4;
sec. 20, SW1/4NW1/4, N1/2SW1/4, and SE1/4;
sec. 21, S1/2SW1/4;
sec. 26, NW1/4SW1/4, S1/2SW1/4, and SW1/4SE1/4;
sec. 27, S1/2NW1/4, NE1/4SW1/4, and N1/2SE1/4;
sec. 28, N1/2NE1/4, SE1/4NE1/4, and NE1/4NW1/4;
sec. 35, N1/2NE1/4.
T. 24 S., R. 10 W.,
sec. 10, SW1/4 and S1/2SE1/4;
sec. 11, SW1/4SW1/4;
sec. 13, SW1/4NW1/4, N1/2SW1/4, NW1/4SE1/4, and S1/2SE1/4;
sec. 14, NW1/4NE1/4, S1/2NE1/4, and N1/2NW1/4;
sec. 16, N1/2SE1/4;
sec. 17, SE1/4SW1/4 and S1/2SE1/4;
sec. 19, lot 2, N1/2NE1/4, SW1/4NE1/4, and SE1/4NW1/4;
sec. 20, N1/2NW1/4.
T. 24 S., R. 11 W.,

sec. 18, lots 7, 8, 9, and 12;
sec. 19, lot 1, W1/2NE1/4, N1/2SE1/4, and SE1/4SE1/4;
sec. 23, S1/2SE1/4;
sec. 24, S1/2NE1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
sec. 26, NW1/4NE1/4 and N1/2NW1/4;
sec. 27, N1/2NE1/4, NE1/4NW1/4, and S1/2NW1/4;
sec. 28, NE1/4NE1/4, S1/2NE1/4, and S1/2NW1/4;
sec. 29, S1/2NE1/4, NW1/4NW1/4, and S1/2NW1/4;
sec. 30, NE1/4NE1/4.
T. 24 S., R 12 W.,
sec. 13, N1/2SW1/4 and N1/2SE1/4.


## UTU-92100: Rail Spur, Rail Spur Access Corridor, and Rail Loadout Facility Access Roads, Permanent ROW

Salt Lake Meridian, Utah
T. 24 S., R. 10 W.,
sec. 9, SE1/4SE1/4;
sec. 10, SE1/4NE1/4, N1/2SW1/4, SW1/4SW1/4, and N1/2SE1/4;
sec. 16, N1/2SE1/4;
sec. 17, SE1/4SE1/4;
sec. 19, NW1/4NE1/4 and E1/2NW1/4;
sec. 20, NW1/4NW1/4.


## UTU-92100-01: Rail Spur, Rail Spur Access Corridor, and Rail Loadout Facility Access Roads, Temporary ROW

Salt Lake Meridian, Utah
T. 24 S., R. 10 W.,
sec. 9, SE1/4SE1/4;
sec. 10, SE1/4NE1/4, N1/2SW1/4, SW1/4SW1/4, and N1/2SE1/4;
sec. 16, N1/2SE1/4;
sec. 17, SE1/4SE1/4;
sec. 19, NW1/4NE1/4 and E1/2NW1/4;
sec. 20, NW1/4NW1/4.


## UTU-92048: Rail Loadout Facility, Permanent ROW

Salt Lake Meridian, Utah
T. 24 S., R. 10 W.,
sec. 17, S1/2SW1/4 and S1/2SE1/4;
sec. 18, S1/2SE1/4;
sec. 19, N1/2NE1/4, SW1/4NE1/4, and E1/2NW1/4;
sec. 20, N1/2NW1/4.

## UTU-90095: Water Supply Facilities, Permanent ROW

Salt Lake Meridian, Utah
T. 24 S., R. 11 W.,
    sec. 30, lots 4, 5, 6, and 12, S1/2NE1/4, N1/2SE1/4, and SW1/4SE1/4;
    sec. 31, lot 1.
T. 24 S., R. 12 W.,
    sec. 21, E1/2SE1/4;
    sec. 22, N1/2NW1/4, SW1/4NW1/4, and NW1/4SW1/4;
    sec. 25, S1/2NE1/4, S1/2NW1/4, SW1/4, and W1/2SE1/4;
    sec. 26, SW1/4NW1/4, N1/2SW1/4, SW1/4SW1/4, and N1/2SE1/4;
    sec. 27, S1/2NE1/4 and S1/2NW1/4;
    sec. 28, NE1/4, SE1/4NW1/4, N1/2SW1/4, and SW1/4SW1/4;
    sec., 29, SE1/4SE1/4;
    sec. 33, NW1/4NW1/4;
    sec. 35, NW1/4NW1/4.

## UTU-90095-01: Water Supply Facilities, Temporary ROW

Salt Lake Meridian, Utah
T. 24 S., R. 11 W.,
    sec. 30, lots 4, 5, 6, and 12, S1/2NE1/4, N1/2SE1/4, and SW1/4SE1/4;
    sec. 31, lot 1.
T. 24 S., R. 12 W.,
    sec. 21, E1/2SE1/4;
    sec. 22, N1/2NW1/4, SW1/4NW1/4, and NW1/4SW1/4;
    sec. 25, S1/2NE1/4, S1/2NW1/4, and SW1/4, and NW1/4SE1/4
    sec. 26, SW1/4NW1/4, N1/2SW1/4, SW1/4SW1/4, and N1/2SE1/4;
    sec. 27, S1/2NE1/4 and S1/2NW1/4;
    sec. 28, NE1/4, SE1/4NW1/4, N1/2SW1/4, and SW1/4SW1/4;
    sec. 29, SE1/4SE1/4.
    sec. 33, NW1/4NW1/4.
    sec. 35, W1/2NW1/4.

## UTU-92066: Access Roads, Permanent ROW

Salt Lake Meridian, Utah
T. 19 S., R. 10 W.,
    sec. 21, SE1/4SE1/4;
    sec. 22, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4;
    sec. 28, N1/2NE1/4, NE1/4NW1/4, and S1/2NW1/4;
    sec. 29, SE1/4NE1/4, E1/2SW1/4, and N1/2SE1/4.
T. 19 S., R. 11 W.,
    sec. 14, SW1/4SW1/4;
    sec. 23, N1/2NW1/4, SE1/4NW1/4, NE1/4SW1/4, and W1/2SE1/4;
    sec. 25, SW1/4SW1/4;
    sec. 26, N1/2NE1/4, SE1/4NE1/4, and E1/2SE1/4;
    sec. 35, E1/2NE1/4 and E1/2SE1/4.

T. 20 S., R. 10 W.,
    sec. 5, lots 2 and 3, SW1/4NE1/4, NE1/4SW1/4, S1/2SW1/4, and NW1/4SE1/4.
T. 20 S., R. 11 W.,
    sec. 1, lots 4, 5, and 12, and W1/2SW1/4.
T. 21 S., R. 11 W.,
    sec. 35, S1/2NE1/4, S1/2NW1/4, and NE1/4SE1/4.
T. 23 S., R. 11 W.,
    sec. 7, lots 2, 3, 5 and 6, and S1/2NE1/4;
    sec. 8, S1/2NE1/4 and S1/2NW1/4;
    sec. 9, SW1/4NW1/4, N1/2SW1/4, and N1/2SE1/4;
    sec. 10, NW1/4SW1/4, S1/2SW1/4, and S1/2SE1/4;
    sec. 11, S1/2SE1/4;
    sec. 13, NW1/4NW1/4;
    sec. 14, N1/2NE1/4 and N1/2NW1/4;
    sec. 15, NE1/4NE1/4.
T. 20 S., R. 12 W.,
    sec. 10, lots 2 and 3, E1/2SW1/4, and NW1/4SE1/4.
T. 22 S., R. 12 W.,
    sec. 7, lot 3, S1/2NE1/4, SE1/4NW1/4, NE1/4SW1/4;
    sec. 8, N1/2NE1/4, N1/2NW1/4, SW1/4NW1/4;
    sec. 9, lots 1 and 2, SE1/4NW1/4.
T. 23 S., R. 12 W.,
    sec. 6, lot 7, E1/2SW1/4, and SE1/4.
T. 22 S., R. 13 W.,
    sec. 12, N1/2SE1/4.


## UTU-92064: Perimeter Road Segments, Permanent ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
    sec. 6, lots 3, 8, 9, 11, 12, and 13.
T. 21 S., R. 11 W.,
    sec. 1, NE1/4SE1/4 and S1/2SE1/4;
    sec. 12, W1/2NE1/4, E1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;
    sec. 13, W1/2NW1/4;
    sec. 14, SE1/4NE1/4, N1/2SE1/4, and SW1/4SE1/4;
    sec. 23, NW1/4NE1/4, E1/2NW1/4, and E1/2SW1/4;
    sec. 26, NW1/4 andW1/2SW1/4;
    sec. 35, lot 1, W1/2NW1/4, and NW1/4SW1/4.
T. 22 S., R. 11 W.,
    sec. 15, lot 4.
T. 23 S., R. 11 W.,
    sec. 7, lots 2 and 3;
    sec. 18, lots 9, 10, and 11.
T. 24 S., R. 11 W.,
    sec. 6, lots 4, 6, 7, and 11.
T. 20 S., R. 12 W.,
    sec. 10, lot 3;
    sec. 21, lots 6, 7, 8, 11, 12, and 13.
T. 21 S., R. 12 W.,

sec. 8, E1/2SE1/4.
T. 22 S., R. 12 W.,
      sec. 3, lots 5 and 6, E1/2SW1/4, and SW1/4SE1/4;
      sec. 10, N1/2NE1/4 and SE1/4NE1/4.
T. 23 S., R. 12 W.,
      sec. 8, NE1/4NE1/4.


## UTU-92064-01: Perimeter Road Segments, Temporary ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
      sec. 6, lots 3, 8, 9, 11, 12, and 13.
T. 21 S., R. 11 W.,
      sec. 1, NE1/4SE1/4 and S1/2SE1/4;
      sec. 12, W1/2NE1/4, E1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;
      sec. 13, W1/2NW1/4;
      sec. 14, SE1/4NE1/4, N1/2SE1/4, and SW1/4SE1/4;
      sec. 23, NW1/4NE1/4, E1/2NW1/4, and E1/2SW1/4;
      sec. 26, NW1/4 andW1/2SW1/4;
      sec. 35, lot 1, W1/2NW1/4, and NW1/4SW1/4.
T. 22 S., R. 11 W.,
      sec. 15, lot 4.
T. 23 S., R. 11 W.,
      sec. 7, lots 2 and 3;
      sec. 18, lots 9, 10, and 11.
T. 24 S., R. 11 W.,
      sec. 6, lots 4, 6, 7, and 11.
T. 20 S., R. 12 W.,
      sec. 10, lot 3;
      sec. 21, lots 6, 7, 8, 11, 12, and 13.
T. 21 S., R. 12 W.,
      sec. 8, E1/2SE1/4.
T. 22 S., R. 12 W.,
      sec. 3, lots 5 and 6, E1/2SW1/4, and SW1/4SE1/4;
      sec. 10, N1/2NE1/4 and SE1/4NE1/4.
T. 23 S., R. 12 W.,
      sec. 8, NE1/4NE1/4.


## UTU-94227: Preconcentration and Heel Brine Ponds, Permanent ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
      sec. 6, lots 3 thru 8 and lots 12 and 13.
T. 21 S., R. 11 W.,
      secs. 1, 2, and 11;
      sec. 12, NW1/4NE1/4, NW1/4, N1/2SW1/4, and SW1/4SW1/4;
      sec. 13, NW1/4NW1/4;
      sec. 14, N1/2NE1/4 and W1/2;

       sec. 23, W1/2;

       sec. 26, W1/2NW1/4.

## **UTU-94227-01**: Preconcentration and Heel Brine Ponds, Temporary ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
       sec. 6, lots 3, 4, 7, 8, 12, and 13.
T. 21 S., R. 11 W.,
       sec. 1, NE1/4SE1/4 and S1/2SE1/4;
       sec. 11, SE1/4SE1/4;
       sec. 12, NW1/4NE1/4, E1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;
       sec. 13, NW1/4NW1/4;
       sec. 14, N1/2NE1/4, E1/2NW1/4, and E1/2SW1/4;
       sec. 23, E1/2NW1/4 and SW1/4;
       sec. 26, W1/2NW1/4.

## **UTU-94234**: Recharge System and Brine Transfer System, Permanent ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
       sec. 6, lots 3, 4, 7, 8, 9, 11, 12, and 13.
T. 21 S., R 11 W.,
       sec. 1, NE1/4SE1/4 and S1/2SE1/4;
       sec. 12, NW1/4NE1/4, E1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;
       sec. 13, W1/2NW1/4;
       sec. 14, SE1/4NE1/4, N1/2SE1/4, and SW1/4SE1/4;
       sec. 23, NW1/4NE1/4, E1/2NW1/4, and E1/2SW1/4;
       sec. 26, N1/2NW1/4, SW1/4NW1/4, and W1/2SW1/4;
       sec. 35, lot 1, W1/2NW1/4, and NW1/4SW1/4.
T. 22 S., R. 11 W.,
       sec. 15, lot 4.
T. 23 S., R. 11 W.,
       sec. 7, lots 2 and 3.
       sec. 18, lots 9, 10, and 11.
T. 24 S., R. 11 W.,
       sec. 6, lots 4, 6, 7, and 11.
T. 20 S., R. 12 W.,
       sec. 21, lots 6, 7, 8, 9, 11, and 13.
T. 21 S., R. 12 W.,
       sec. 8, E1/2SE1/4.
T. 23 S., R. 12 W.,
       sec. 8, NE1/4NE1/4.

## UTU-94234-01: Recharge System and Brine Transfer System, Temporary ROW

Salt Lake Meridian, Utah
T. 21 S., R. 10 W.,
      sec. 6, lots 3, 4, 7, 8, 9, 11, 12, and 13.
T. 21 S., R 11 W.,
      sec. 1, NE1/4SE1/4 and S1/2SE1/4;
      sec. 12, NW1/4NE1/4, E1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;
      sec. 13, W1/2NW1/4;
      sec. 14, SE1/4NE1/4, N1/2SE1/4, and SW1/4SE1/4;
      sec. 23, NW1/4NE1/4, E1/2NW1/4, and E1/2SW1/4;
      sec. 26, N1/2NW1/4, SW1/4NW1/4, and W1/2SW1/4;
      sec. 35, lot 1, W1/2NW1/4, and NW1/4SW1/4.
T. 22 S., R. 11 W.,
      sec. 15, lot 4.
T. 23 S., R. 11 W.,
      sec. 7, lots 2 and 3.
      sec. 18, lots 9, 10, and 11.
T. 24 S., R. 11 W.,
      sec. 6, lots 4, 6, 7, and 11.
T. 20 S., R. 12 W.,
      sec. 21, lots 6, 7, 8, 9, 11, and 13.
T. 21 S., R. 12 W.,
      sec. 8, E1/2SE1/4.
T. 23 S., R. 12 W.,
      sec. 8, NE1/4NE1/4.

## UTU-94232: Monitoring Wells and Access Roads, Permanent ROW

Salt Lake Meridian, Utah
T. 19 S., R. 10 W.,
      sec. 7, lot 8.
T. 24 S., R. 10 W.,
      sec. 19, N1/2NE1/4.
T. 22 S., R. 12 W.,
      sec. 8, NE1/4NW1/4.
T. 23 S., R. 12 W.,
      sec. 31, SE1/4SW1/4.
T. 24 S., R. 12 W.,
      sec. 6, lots 3 thru 7, SE1/4SW1/4, N1/2SE1/4, and SW1/4SE1/4;
T. 25 S., R. 12 W.,
      sec. 3, NE1/4SW1/4
T. 22 S., R. 13 W.,
      sec. 12, NW1/4SE1/4.
T. 24 S., R. 13 W.,
      sec. 1, SE1/4SE1/4;
      sec. 10, NW1/4NE1/4;
      sec. 12, E1/2NE1/4 and E1/2SE1/4;
      sec. 13, NE1/4NE1/4, S1/2NE1/4, S1/2NW1/4, N1/2SW1/4, and SW1/4SW1/4;

sec. 14, SE1/4SE1/4;
sec. 22, NE1/4SE1/4 and S1/2SE1/4;
sec. 23, N1/2NE1/4, SW1/4NE1/4, S1/2NW1/4, and N1/2SW1/4.

## <u>UTU-94232-01</u>: Monitoring Wells, Temporary ROW

Salt Lake Meridian, Utah
T. 19 S., R. 10 W.,
        sec. 7, lot 8.
T. 24 S., R. 10 W.,
        sec. 19, N1/2NE1/4.
T. 22 S., R. 12 W.,
        sec. 8, NE1/4NW1/4.
T. 23 S., R. 12 W.,
        sec. 31, SE1/4SW1/4.
T. 25 S., R. 12 W.,
        sec. 3, NE1/4SW1/4.
T. 22 S., R. 13 W.,
        sec. 12, NW1/4SE1/4.
T. 24 S., R. 13 W.,
        sec. 10, NW1/4NE1/4;
        sec. 13, SW1/4NW1/4.

# Mineral Material Sales

This section lists the legal description for the one gravel pit that will be located off-lease. The Gravel Pit Mining Plan contains a figure depicting this gravel pit.

## Pass Federal Gravel Pit

Salt Lake Meridian, Utah
T. 24 S., R. 11 W.,
        Sec. 29, SE1/4NE1/4.