Stephen H.M. Bloch (UT #7813)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
hanna@suwa.org

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR** *et al*., <br><br> Defendants, and <br><br> **PEAK MINERALS, INC.**, <br><br> Intervenor-Defendant. | **PLAINTIFF'S OPENING BRIEF** <br><br> Case No. 2:25-cv-00657-DBB-JCB <br><br> District Judge David Barlow <br> Magistrate Judge Jared Bennett |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ IV

GLOSSARY ...................................................................................................................... VIII

INTRODUCTION ................................................................................................................. 1

STATEMENT OF ISSUES .................................................................................................... 3

STATEMENT ON STANDING.............................................................................................. 3

LEGAL FRAMEWORK ........................................................................................................ 4

FACTUAL BACKGROUND ................................................................................................. 8

    I.      SEVIER LAKE.............................................................................................................. 8

    II.    ANALYSIS OF THE SPP PROJECT AND ITS ALTERNATIVES ............................ 10

        A.    Scoping and Development of Alternatives............................................................ 10

        B.    The Draft Environmental Impact Statement ........................................................ 12

        C.    The Final Environmental Impact Statement and Record of Decision.................... 12

    III.   SUWA'S INITIAL SUIT ......................................................................................... 13

    IV.   THE 2025 AMENDED MINING PLAN AND DNA................................................... 14

        A.    2025 Amended Mining Plan ................................................................................ 14

        B.    Determination of NEPA Adequacy and Decision Record ..................................... 15

STANDARD OF REVIEW .................................................................................................. 16

SUMMARY OF THE ARGUMENT ..................................................................................... 17

ARGUMENT....................................................................................................................... 18

    I.      BLM FAILED TO TAKE A HARD LOOK AT THE ENVIRONMENTAL IMPACTS OF THE SPP PROJECT............................................................................................. 18

        A.    BLM Failed to Take a Hard Look at Greenhouse Gas Emissions and Climate Change.................................................................................................................. 19

        B.    BLM Failed to Take a Hard Look at Cumulative Water Impacts......................... 27

    C.     BLM Failed to Analyze Dark Night Skies ................................................................. 29

II.    BLM FAILED TO CONDUCT AN ENVIRONMENTAL ANALYSIS OF THE 2025 MINING PLAN ........................................................................................................... 34

    A.     BLM was Required to Prepare an Environmental Document Analyzing the 2025 Mining Plan ...................................................................................................... 34

    B.     The 2025 DNA Does Not Qualify as an Environmental Document Analyzing the 2025 Mining Plan ...................................................................................... 36

III.    BLM ARBITRARILY RELIED ON AN EXISTING, UNLAWFUL NEPA DOCUMENT................................................................................................................. 38

CONCLUSION ........................................................................................................................... 40

CERTIFICATE OF COMPLIANCE .......................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**

*All. for Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (9th Cir. 2018) ........................................................................................ 37

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) .......................................................................................................... 6

*Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. Bureau of Land Mgmt.*,
  584 F. Supp. 3d 949 (D. Colo. 2022) ..................................................................... 7, 36, 39

*Bennett v. Spear*,
  520 U.S. 154 (1997) ...................................................................................................... 35

*Burlington Truck Lines v. United States*,
  371 U.S. 156 (1962) ...................................................................................................... 17

*Citizens for a Healthy Comm. v. Bureau of Land Mgmt.*,
  377 F. Supp. 3d 1223 (D. Colo. 2019) ........................................................................... 25

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................................................... 17

*Diné Citizens Against Ruining Our Env't. v. Haaland*,
  59 F.4th 1016 (10th Cir. 2023) ................................................................................ passim

*Friends of the Earth v. Laidlaw Env't. Servs., Inc.*,
  528 U.S. 167 (2000) ........................................................................................................ 3

*High Country Conserv. Advoc. v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) ....................................................................... 22, 39

*High Country Conserv. Advoc. v. U.S. Forest Serv.*,
  951 F.3d 1217 (10th Cir. 2020) ..................................................................................... 39

*Idaho Sporting Cong. Inc. v. Alexander*,
  222 F.3d 562 (9th Cir. 2000) ......................................................................................... 36

*Judulang v. Holder*,
  565 U.S. 42 (2011) ........................................................................................................ 17

*Klamath Tribes v. U.S. Bureau of Reclamation*,
   No. 1:22-cv-00680-CL, 2024 WL 472047 (D. Or. Feb. 7, 2024) ............................................... 37

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ...................................................................................................... 40

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989) ........................................................................................................ 5

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................................... 17, 31

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
   565 F.3d 683 (10th Cir. 2009) .................................................................................... 8, 37

*Nat. Res. Def. Council, Inc. v. Berklund*,
   609 F.2d 553 (D.C. Cir. 1979) ...................................................................................... 35

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) ...................................................................................... 19

*Olenhouse v. Commodity Credit Corp.*,
   42 F.3d 1560 (10th Cir. 1994) ...................................................................................... 17

*Or. Nat. Res. Council v. Marsh*,
   52 F.3d 1485 (9th Cir. 1995) .................................................................................... 32, 33

*Pennaco Energy Inc. v. U.S. Dep't of the Interior*,
   377 F.3d 1147 (10th Cir. 2004) ..................................................................... 7, 36, 38, 39

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ............................................................................................ 4, 5, 18

*Rocky Mountain Wild v. Bernhardt*,
   506 F. Supp. 3d 1169 (D. Utah 2020) ........................................................................... 39

*S. Utah Wilderness All. v. Norton*,
   457 F. Supp. 2d 1253 (D. Utah 2006) ..................................................................... passim

*S. Utah Wilderness All. v. Palma*,
   707 F.3d 1143 (10th Cir. 2013) ................................................................................... 3, 4

*San Juan Citizens All. v. Stiles*,
   654 F.3d 1038 (10th Cir. 2011) ............................................................... 24, 26, 27, 29

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
605 U.S. 168 (2025) ................................................................................................ 5, 40

*State ex rel. Kobach v. U.S. Dep't of Interior*,
72 F.4th 1107 (10th Cir. 2023) ................................................................................... 17

*Summit Lake Paiute Tribe of Nevada v. Bureau of Land Mgmt.*,
496 Fed. Appx. 712 (9th Cir. 2012) ............................................................................ 36

*Town of Superior v. U.S. Fish & Wildlife Serv.*,
913 F. Supp. 2d 1087 (D. Colo. 2012) ........................................................................ 18

*Triumvirate, LLC v. Bernhardt*,
367 F. Supp. 3d 1011 (D. Alaska 2019) ...................................................................... 37

*Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*,
528 F. Supp. 3d 1222 (D. Utah 2021) .................................................................. passim

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ..................................................................................................... 5

*W. Watersheds Project v. U.S. Bureau of Land Mgmt.*,
76 F.4th 1286 (10th Cir. 2023) ..................................................................................... 5

*WildEarth Guardians v. Bernhardt*,
502 F. Supp. 3d 237 (D.D.C. 2020) ............................................................................ 22

**Statutes**

42 U.S.C. § 4321 ............................................................................................................. 4

42 U.S.C. § 4332 ................................................................................................. 5, 18, 34

42 U.S.C. § 4336 ................................................................................................. 6, 34, 35

42 U.S.C. § 4336e .................................................................................................... 6, 36

5 U.S.C. § 706 .................................................................................................... 16, 38, 40

Fiscal Responsibility Act of 2023, Pub L. No. 118-5, 137 Stat. 10 (June 3, 2023) ........................ 4

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (July 4, 2025) ............................... 4

**Regulations**

40 C.F.R. § 1500.1 ................................................................................................ 4, 22, 34

40 C.F.R. § 1501.7 ......................................................................................................... 32

40 C.F.R. § 1502.14 .......................................................................................................... 5

40 C.F.R. § 1502.16 ..................................................................................................... 5, 18

40 C.F.R. § 1503.4 .......................................................................................................... 32

40 C.F.R. § 1508.7 .................................................................................................... 18, 24

40 C.F.R. § 1508.8 .................................................................................................... 18, 19

40 C.F.R. § 98.6 ............................................................................................................. 20

43 C.F.R. § 46.120 ................................................................................................... passim

**Rules**

90 Fed. Reg. 10610 (Feb. 25, 2025) .............................................................................. 4

90 Fed. Reg. 29498 (July 3, 2025) ................................................................................. 6

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | United States Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| $CH_4$ | Methane |
| CIAA | Cumulative Impacts Analysis Area |
| $CO_2$ | Carbon dioxide |
| $CO_2e$ | Carbon dioxide equivalent |
| CPM | Peak Minerals Inc./Crystal Peak Minerals |
| DEIS | Draft Environmental Impact Statement |
| DNA | Determination of NEPA Adequacy |
| DOI | United States Department of the Interior |
| DR | Decision Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FWS | United States Fish and Wildlife Service |
| GBNHA | Great Basin National Heritage Area |
| GHG | Greenhouse gas |
| LUMA | LUMA Minerals, Inc. |
| MLA | Mineral Leasing Act |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| ROW | Right-of-way |
| SPP | Sevier Playa Potash |
| SUWA | Southern Utah Wilderness Alliance |
| WSA | Wilderness Study Area |

## INTRODUCTION

This case is about the Bureau of Land Management's ("BLM") 2019 decision to approve nearly 125,000 acres of potash mining, processing, and shipping in Utah's remote West Desert, known as the Sevier Playa Potash ("SPP") Project, and its 2025 decision to approve the modified SPP Project. BLM's decision allows the Project proponent, Peak Minerals, Inc. ("CPM"),[1] to conduct large-scale surface mining operations and develop rights-of-way ("ROWs") across the entire Sevier Lake bed, a remote area devoid of industrial activity.

The Southern Utah Wilderness Alliance ("SUWA") originally filed suit in 2023 over the BLM's 2019 Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") which authorized a version of the Project that was anticipated to last thirty-two years and produce approximately 372,000 tons per year of potassium sulfate. SUWA's suit was dismissed without prejudice in 2024 after CPM submitted to BLM a proposed amended mining plan intended to change the nature of the SPP Project and supersede the original mining plan. BLM approved the amended plan (the "2025 mining plan") using an administrative procedure called a Determination of NEPA adequacy ("DNA"). BLM's Decision Record for the DNA ("2025 DNA DR") authorized the 2025 mining plan based solely on the environmental analyses in the 2019 FEIS, even though CPM anticipates a longer, multi-phased project timeline and nearly 25% more potassium sulfate mining.

To support such a large-scale operation, BLM's decisions (both originally and as amended in 2025) authorized CPM to construct extensive surface facilities that will blanket the

---

[1] During the environmental review process and at the time BLM's original 2019 decision was made, Peak Minerals was known as Crystal Peak Minerals or "CPM." For consistency with the administrative record, we refer to Peak Minerals as "CPM."

lakebed and surrounding area, including evaporation ponds, dikes, roads, powerlines, a processing plant, and a rail loadout facility. Industrial development of this magnitude will seriously degrade, if not eliminate, the remote and wild nature of Sevier Lake and nearby lands, significantly impair important habitat for migratory birds, and drastically affect important resource values including climate, water, and dark night skies.

BLM concluded its National Environmental Policy Act ("NEPA") review of the original 2019 plan without taking a hard look at the Project's impacts to several resources, including climate and greenhouse gas ("GHG") emissions, water, and dark night skies. Further, BLM approved the 2025 mining plan using a DNA—an administrative procedure that is not an independent environmental analysis and instead relies solely on prior analyses. BLM issued the 2025 DNA DR authorizing the 2025 mining plan even though the 2019 FEIS failed to properly analyze the Project's impacts to these resources. As such, not only was BLM's original 2019 decision to approve the SPP Project arbitrary and capricious under the Administrative Procedure Act ("APA") and in violation of NEPA and its implementing regulations, but BLM violated NEPA and the APA again by failing to conduct an environmental analysis for the 2025 mining plan and instead relying entirely on an existing, unlawful NEPA document. This Court should declare unlawful and set aside BLM's decision and underlying environmental analysis and enjoin Federal Defendants and CPM from taking any actions pursuant to the SPP Project until they have complied with NEPA, its implementing regulations, and the APA.

**STATEMENT OF ISSUES**

1.      Whether BLM acted arbitrarily and capriciously and in violation of NEPA in the 2019 FEIS and ROD by approving the SPP Project without fully analyzing, considering and disclosing the direct, indirect and cumulative impacts to:

      a.      Climate change from GHG pollution, including for identified past, present, and reasonably foreseeable future actions;

      b.      Water resources, especially with regard to the reasonably foreseeable West Desert Water Supply and Conservation Project; and

      c.      Visual resources, particularly impacts to dark night skies.

2.      Whether BLM acted arbitrary and capriciously and in violation of NEPA by failing to conduct an environmental analysis for the 2025 mining plan.

3.      Whether BLM acted arbitrarily and capriciously and in violation of NEPA and 43 C.F.R. § 46.120 by relying on an existing, unlawful NEPA document to approve the 2025 mining plan.

**STATEMENT ON STANDING**

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *S. Utah Wilderness All. v. Palma*, 707 F.3d 1143, 1153 (10th Cir. 2013) (quoting *Friends of the Earth v. Laidlaw Env't. Servs., Inc.*, 528 U.S. 167, 181 (2000)). SUWA members and staff have a demonstrated interest in the federal public lands and resources in this case. *See* Decl. of Ray Bloxham ¶¶ 5-13 (attached as Ex. 1).

3

These members and staff have been and will continue to be harmed by BLM's decision to authorize the SPP Project, and a decision in SUWA's favor will redress those harms. *Id.* ¶¶ 13-14. Thus, SUWA has standing to bring this case. *See Palma*, 707 F.3d at 1153-54.

**LEGAL FRAMEWORK**

## I.      National Environmental Policy Act

NEPA was enacted "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. It is our nation's "basic charter for protection of the environment," 40 C.F.R. § 1500.1(a) (2019),[2] and has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision-making. *Id.* § 1500.1(c) (2019)*; Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (citations omitted) ("[B]y focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."). In other words, "NEPA ensures that the agency

---

[2] Since the 2019 EIS and ROD were approved, Congress has amended NEPA several times. *See, e.g.*, Pub L. No. 118-5 (June 3, 2023); Pub. L. No. 119-21 (July 4, 2025). On April 11, 2025, the Council on Environmental Quality ("CEQ") removed its NEPA regulations from the Code of Federal Regulations. *See generally* 90 Fed. Reg. 10610 (Feb. 25, 2025). However, because the SPP Project's EIS and ROD were issued in 2019, all citations to NEPA's statutory and regulatory provisions with respect to the 2019 EIS and ROD are to the versions in effect in 2019 and identified accordingly. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 n.6 (10th Cir. 2023). Citations to NEPA's statutory provisions and the Department of Interior ("DOI") implementing regulations in effect at the time of the 2025 DNA DR are likewise identified accordingly.

4

will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (citations omitted).

NEPA achieves its purpose through "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Robertson*, 490 U.S. at 349 (citation omitted); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 177 (2025) ("NEPA . . . prescribes the necessary process[] for an agency's environmental review of a project."). Thus, NEPA requires that federal agencies prepare "a detailed statement" for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2019). Known as an Environmental Impact Statement ("EIS"), this statement must "rigorously explore and objectively evaluate all reasonable alternatives;" analyze all direct, indirect, and cumulative environmental impacts; and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16 (2019); *see also* 42 U.S.C. § 4332(E) (2019) ("all agencies of the Federal Government shall … study, develop, and describe appropriate alternatives"); *Seven Cnty.*, 605 U.S. at 181 ("The EIS must also identify significant environmental impacts and feasible alternatives.").

When reviewing an EIS and the resulting ROD, "courts look to determine whether agencies have taken a 'hard look' at the environmental consequences of their decisions." *Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*, 528 F. Supp. 3d 1222, 1227 (D. Utah 2021) (Barlow, J.); *see also W. Watersheds Project v. U.S. Bureau of Land Mgmt.*, 76 F.4th 1286, 1290 (10th Cir. 2023). That is, the court must determine whether the agency's NEPA analysis is "fully informed and well-considered," *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978), such that the agency has adequately "disclosed the

5

environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983).

In 2023, Congress amended NEPA to clarify that a federal agency is required to prepare an environmental document for a proposed action. An "environmental document" is defined as an EIS, an EA, or a Finding of No Significant Impact. 42 U.S.C. § 4336e(5) (2025).  There are four exceptions to this requirement: (1) "the proposed action is not a final agency action;" (2) the proposed action is categorically excluded pursuant to one of the agency's categorical exclusions; (3) the preparation of an environmental document would "clearly and fundamentally conflict" with another provision of law; or (4) the proposed action "is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a)(1)-(4) (2025). Notably, relying on an existing environmental analysis that purports to adequately assess the proposed action's environmental effects is not one of the exceptions. *See id.* This statutory provision was enacted before BLM prepared the 2025 DNA and 2025 DNA DR.

## II.     Determination of NEPA Adequacy

DOI's regulations implementing NEPA allow BLM to rely on an existing environmental analysis prepared pursuant to NEPA if, "with supporting appropriate documentation," BLM determines that the existing analysis "adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c) (2025).[3] Known as a DNA,

---

[3] DOI's implementing NEPA regulations were largely rescinded on July 3, 2025. *See generally* 90 Fed. Reg. 29498 (July 3, 2025). However, because they were in effect when BLM issued the 2025 DNA DR on June 10, 2025, they may be cited and relied upon. *See Ctr. for Biological Diversity*, 72 F.4th at 1178 n.6.

this paperwork exercise is not an environmental document but rather an administrative procedure that allows the agency "to determine whether new NEPA documentation is required." *Pennaco Energy Inc. v. U.S. Dep't of the Interior*, 377 F.3d 1147, 1162 (10th Cir. 2004); *see also* AR044563 (BLM's NEPA Handbook explaining that a DNA is "an interim step in the BLM's internal analysis process that concludes that a proposed action is adequately analyzed in an existing document").

When using a DNA, BLM "must include an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120(c) (2025); *see also* AR044560 (explaining that a DNA is used to "evaluate new circumstances or information prior to the issuance of a decision to determine whether [BLM] need[s] to prepare a new or supplemental analysis"). If BLM concludes that it may rely on a prior NEPA document to authorize a proposed action, the responsible official documents that conclusion in a DNA DR. DNAs are appropriate when used to determine "the sufficiency of a previously issued NEPA document," and whether new information or changed circumstances requires the preparation of additional documentation. *S. Utah Wilderness All. v. Norton* ("*SUWA v. Norton*"), 457 F. Supp. 2d 1253, 1262 (D. Utah 2006) (Kimball, J.) (citing *Pennaco*, 377 F.3d at 1162). BLM cannot rely on a DNA, however, when there is a new action that was not previously analyzed in an existing environmental document, especially when the public would not have been informed of the new action during the original public involvement process. AR044561; *see also Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. Bureau of Land Mgmt.*, 584 F. Supp. 3d 949, 973 (D. Colo. 2022) (rejecting BLM's argument that because a "category of impacts anticipated from oil and gas development

7

were well-known after circulation of the Final EIS, any change in the location or extent of the impacts were immaterial.") (citing *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 707 (10th Cir. 2009)).

## FACTUAL BACKGROUND

### I.    Sevier Lake

Sitting between the Cricket Mountains to the east and the House Range and Notch Peak Wilderness Study Area ("WSA") to the west, the 125,000-acre Sevier Lake is located in a remote and largely undisturbed area of Utah's West Desert—an area that is currently devoid of light or noise pollution. AR041135; AR041137 (map showing the regional context of Sevier Lake).



*Looking southeast toward the Cricket Mountains Credit: Ray Bloxham/SUWA. See Bloxham Decl. ¶ 11.*

Like the Great Salt Lake, Sevier Lake is a highly saline terminal lake that is a remnant of the ancient Lake Bonneville. AR041135; AR014460. Although it is fed by the Sevier River, upstream water diversions cause Sevier Lake to be mostly dry during certain times of the year. AR041135; AR014460; AR013021. When Sevier Lake contains surface waters, as it does seasonally and during high precipitation years, it supports important stopover habitat for the millions of migratory birds in the Pacific Flyway. AR009219. Sevier Lake is viewable from locations within the Notch Peak WSA as well as the Red Tops and Cricket Mountains proposed wilderness units.[4] Bloxham Decl. ¶ 11.

Sevier Lake and the surrounding lands are also part of the Great Basin National Heritage Area ("GBNHA"), GBNHA Mgmt. Plan at 5,[5] which was designated by Congress in part "to conserve, interpret, and develop the archaeological, historical, cultural, natural, scenic, and recreational resources related to the unique ranching, industrial, and cultural heritage of the Great Basin" in a manner consistent with multiple use land management. GBNHA Mgmt. Plan at ix. The GBNHA Management Plan serves as a guide to foster informed decision-making for actions located within the Area (*e.g.*, the SPP Project).[6] *Id.* at ix-xi. The Management Plan describes the

---

[4] The Cricket Mountains, along with the Red Tops citizen-proposed wilderness units and the Notch Peak, King Top WSAs, are in the greater Sevier Lake area and are proposed for wilderness designation in America's Red Rock Wilderness Act, H.R. 2467, S. 1193 (119th Congress).

[5] The GBNHA Management Plan (file number 6-01-007) is identified in the administrative record index with Bates numbers AR014366-AR014490. However, these Bates numbers are not displayed on the document itself and instead show up on the Millard County General Plan (file number 6-01-008), which is identified in the administrative record index with Bates numbers AR014991-AR014697. No other documents in the administrative record appear to be affected. Because the GBNHA Management Plan is not Bates stamped, all citations to the Plan are to the page number in the Plan (*e.g.*, GBNHA Mgmt. Plan at 5).

[6] BLM served as an advisory agency for the GBNHA Management Plan and assisted in its preparation. *See* GBNHA Mgmt. Plan at v.

GBNHA as "remote from most pollution sources thus providing marvelously clear skies," pure air and water, and "isolat[ion] from mechanical sounds." *Id.* at 6. Indeed, the Area's "fabulous night skies" are a defining feature of the GBNHA, *id.* at 75, and the night skies in Snake Valley—to the west of Sevier Lake—"are spectacular due to low humidity, high elevation, good air quality and little light pollution." *Id.* at 92. "The Milky Way Galaxy, along with myriads of other celestial objects, is visible from just about anywhere in the GBNHA." *Id.*

## II.      Analysis of the SPP Project and its Alternatives

BLM first analyzed the effects of potassium leasing and development on Sevier Lake in 2011 and issued a Decision Record authorizing the agency to hold a competitive potassium lease sale.[7] AR041136. BLM did so and leased 95,802 acres to Peak Minerals, Inc. (a subsidiary of CPM) and 22,012 acres to LUMA Minerals Inc. ("LUMA"). *Id.* Peak Minerals and LUMA subsequently entered into a cooperative development agreement granting CPM the rights to "develop and operate potassium mineral leases on 117,814 acres of federal lands" managed by BLM and 6,409 acres of lands managed by the state of Utah (for a total of 124,223 acres). *Id.* Concurrently with an "exploration phase" that lasted from 2011-2018, CPM began planning the SPP Project as detailed in the 2019 FEIS. *Id.*

### A.      Scoping and Development of Alternatives

BLM published a Notice of Intent to prepare an EIS for the SPP Project in 2014. AR000073-74; AR041141. Public scoping for the SPP Project took place in 2015 and was intended to solicit information to "identify potential issues, alternatives, and mitigation

---

[7] BLM authorized this potassium lease sale based on an estimated production scenario where the "life of the mine" would last a total of 6.5 years, AR013961, not the 50 years estimated in CPM's 2025 amended mine plan (discussed *infra* in Factual Background § IV).

measures." AR041141. Though BLM's publicly available scoping materials gave a brief overview of the SPP Project and generally listed the resources and issues BLM expected to analyze in the EIS, it did not provide any information on alternatives to the Proposed Action. *See generally* AR000629-43 (copies of public scoping meeting materials). The scoping comment period ended on August 31, 2015. *Id.*; AR041395. SUWA, as well as other conservation organizations, submitted timely scoping comments raising issues related to, *inter alia*, hydrology and water consumption, climate change, and wildlife (including birds). AR000665-72; AR041415-22. BLM held an interagency scoping meeting with various federal and state agencies, including the U.S. Fish and Wildlife Service and Environmental Protection Agency. AR000651-54.

Based on internal agency review and input received during the scoping comment period, BLM's Scoping Report, *see generally* AR000591-680; AR041390-509, identified the following resources and issues (among others) for detailed analysis in the EIS: GHG emissions from the Project and impacts to/from climate change, water resources (including the effects of the alteration of surface and groundwater quantity), effects to migratory birds, and the effects of project lighting on the night sky.[8] AR000600-01. The Scoping Report concluded that BLM would develop the Draft Environmental Impact Statement ("DEIS") and focus "on the identified issues including evaluating a range of reasonable alternatives, assessing potential impacts, and

---

[8] The 2015 Scoping Report expressly stated that impacts to dark night skies would be analyzed in the EIS. AR000601. In contrast, the Scoping Report prepared for and attached to the FEIS as Appendix F which was "updated" in July 2019 does not mention analyzing dark night sky impacts. *Compare* AR000601 (visual resources row) *with* AR041400 (visual resources row). Dark night skies are not listed in the FEIS's sections for "Issues Eliminated from Detailed Study" or "Issues Dismissed." AR041401-02.

identifying possible mitigation measures." AR000603. By July 2016, BLM had finalized

alternatives to be analyzed in detail in the DEIS. AR000967-71 (explaining alternatives analyzed

in detail and those dismissed from further analysis); AR000879 (2016 map showing SPP Project

Alternatives). In the DEIS, BLM announced it would analyze the Proposed Action, minor

variations of the Proposed Action that served as "alternatives" to the Proposed Action, and the

NEPA-mandated No-Action Alternative.

###### B.     The Draft Environmental Impact Statement

BLM released the DEIS on November 30, 2018, and held a 45-day public comment

period that closed on January 14, 2019. AR000075-77. SUWA submitted timely, detailed

comments on the DEIS that raised issues regarding the narrow range of alternatives and pointed

out errors and shortcomings with BLM's analysis of several resources including air quality,

wildlife, visual resources (including dark night skies), climate change and GHG emissions, and

water. *See generally* AR000730-60. For air quality, wildlife, and water resources, SUWA

supported its comments with detailed analyses prepared by subject matter experts. AR00074-60

(air and wildlife technical comments); AR000789-81 (water technical comments).

###### C.     The Final Environmental Impact Statement and Record of Decision

BLM released the FEIS on July 26, 2019. AR000079-80. The FEIS was extremely

similar to the DEIS; it analyzed the same five action alternatives as well as the same resources

and associated issues. *Compare* AR040131 (DEIS alternatives), AR040153-54 (DEIS resources

and issues analyzed in detail) *with* AR041120 (FEIS alternatives), AR0411142-43 (FEIS

resources and issues analyzed in detail). The FEIS also included BLM's responses to public

comments on the DEIS. *See generally* AR041510-699.

BLM's responses to SUWA's DEIS comments (identified as 6-1 through 6-53 in the response to comments) on climate and GHG emissions, wildlife and migratory birds, dark night skies, and water largely consisted of either justifications why further analysis based on those comments was not warranted or references to sections in the FEIS that BLM believed addressed the comment. AR041552-53, AR041560-61 (GHG emissions and climate); AR041553-58 (wildlife and migratory birds); AR041559 (dark night skies); AR041561-64 (water).

SUWA submitted timely additional comments on the FEIS which focused on the inadequate range of alternatives and deficient analysis regarding water resources. AR000817-71. For the latter, SUWA again supported its FEIS comments with expert analysis. AR000820-32. Nonetheless, BLM signed the ROD approving the Proposed Action for the SPP Project just four days after SUWA submitted its FEIS comments. *See* AR041960.

The ROD approved the SPP Project as proposed by CPM. In doing so, BLM approved CPM's Mining Plan, Plan of Development, associated ROWs, and the Gravel Pit Mining Plan, thereby permitting CPM to construct the full extent of the SPP Project, including evaporation ponds, dikes, roads, powerlines, a processing plant, and a rail loadout facility. AR041971; AR041155 (map showing the full extent of the SPP Project). As contemplated by the 2019 mining plan and FEIS, the Project was anticipated to last thirty-two years and expected to produce approximately 372,000 tons per year of potassium sulfate. AR041116.

III.    **SUWA's Initial Suit**

SUWA initially filed suit over the 2019 FEIS and ROD in 2023.[9] That suit was dismissed in 2024 without prejudice, prior to resolution on the merits, after CPM submitted a proposed

---

[9] *See generally S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 2:23-cv-00492 (D. Utah).

amended mining plan to BLM that was intended to replace and supersede the 2019 mining plan on which BLM based its 2019 ROD.

## IV.   The 2025 Amended Mining Plan and DNA

CPM's proposed amended mining plan went through several iterations before the BLM approved it in 2025. AR043472; AR043946. BLM approved CPM's amended mining plan through a DNA DR.

### A.   2025 Amended Mining Plan

CPM submitted its proposed 2025 mining plan to BLM in August 2024. It differed from the 2019 plan in several respects. AR043472. *First*, while the 2019 mining plan contemplated a thirty-two-year lifespan for the entire SPP project, the 2025 plan divides the Project into multiple phases. AR041116; AR043488; *see also* AR043695 (displaying the project map as distributed between various phases). Although the initial phase alone is expected to last twenty-five years, CPM has publicly stated that it now expects the entire SPP project to last at least 50 years though future phases are not detailed in the 2025 mining plan and would require subsequent approvals. *See* Compl. Ex. 4 at 5, 15 (ECF No. 1-4) ("Peak Minerals Presentation"); *see also* AR043950-51 (explaining that the 2025 mining plan only addresses phase 1 and "additional bonding" is required prior to the initiation of subsequent phases).

*Second*, the 2019 mining plan estimated that approximately 372,000 short tons of potassium sulfate would be mined annually, totaling about 10.2 million short tons of potassium sulfate produced over the life of the project. AR041117; AR041233. Comparatively, Phase 1 of the 2025 mining plan estimates an average production of 215,000 short tons of potassium sulfate mined annually, with a total output during Phase 1 of over 5.235 million short tons. AR043616.

However, CPM predicts that, with the implementation of future phases, the SPP project could produce a total of 474,000 short tons/year. Peak Minerals Presentation at 9, 15 (stating that with a Phase 2 expansion, SOP would be produced at a rate of 474 ktpa [kilo tons per annum], which is equivalent to 474,000 short tons per year). Indeed, according to the SPP Project's 2022 Feasibility Study, expansion into Phase 2 would make Peak Minerals "one of the largest producers of [potassium sulfate] in the world." AR048674. Once the SPP Project is operating at full capacity, CPM will mine nearly 25% more potassium sulfate than what was analyzed in the 2019 FEIS.

*Finally*, the 2019 mining plan would have resulted in 115,084 acres of on-playa disturbance and 1,821 acres of off-playa disturbance. AR041125. Comparatively, Phase 1 of the 2025 mining plan alone contemplates 46,472 acres of on-playa disturbance and 1,490 acres of off-playa disturbance. AR043963; *see also* AR043951 (stating that the "Proposed Action focuses on resources within the south half of the Sevier Playa (Phase 1)").

### B.     Determination of NEPA Adequacy and Decision Record

BLM originally announced its intention to analyze CPM's proposed 2025 mining plan in a supplemental environmental assessment ("EA"),[10] and held a public scoping period from February 11, 2025, to March 27, 2025. AR043965. SUWA submitted scoping comments that, among other things, urged BLM to consider: (1) analyzing the SPP Project, as modified by CPM's 2025 mining plan, in a supplemental EIS; (2) using its NEPA analysis to cure the legal deficiencies identified by SUWA in the 2019 FEIS and ROD; and (3) taking a hard look at

---

[10] *See* AR044006-07 (public comments identifying the project tracking number as "DOI-BLM-UT-W020-2025-0007-EA"). The tracking number suffix (*e.g.*, "-EA") indicates the type of NEPA documentation for the project.

impacts to resources such as climate, water, migratory birds, and dark night skies. AR044010; AR044011; AR044013.

On or around April 14, 2025, however, BLM stopped the EA process and instead proceeded to approve the 2025 mining plan through a DNA and DNA DR. *See* AR044172; AR044006.[11] Because a DNA is not a new NEPA analysis, BLM's approval relied entirely on the environmental analysis in the SPP Project's 2019 FEIS. AR043959; *see also* AR043946. SUWA sent a letter to BLM on May 19, 2025, explaining why BLM's use of a DNA in this instance was improper considering the 2019 FEIS's legal flaws. AR044172. Additionally, SUWA submitted a technical report from a certified hydrogeologist that explained why the groundwater analysis in the 2019 FEIS was inaccurate and why the agency could not rely on it to fully analyze the SPP Project's groundwater impacts. AR044176–044193. On June 10, 2025, Michael Gates, BLM's West Desert District Manager, signed the DNA DR that approved CPM's 2025 mining plan according to the conclusions made in the DNA. AR043948. Based on information and belief, CPM has not yet commenced surface-disturbing activities related to the SPP Project and 2025 mining plan.

## STANDARD OF REVIEW

When reviewing an administrative decision, the APA requires federal courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is arbitrary and capricious if the agency relied on factors which Congress has not intended it to consider, entirely

---

[11] The hyperlink on AR044006 links to the 2025 mining plan's original NEPA register page, which states that BLM decided to cancel the EA for the 2025 mining plan and instead proceed with a DNA.

16

failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or the action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It is also arbitrary and capricious for an agency to fail to comply with its own regulations and procedures. *See State ex rel. Kobach v. U.S. Dep't of Interior*, 72 F.4th 1107, 1133 (10th Cir. 2023) (citation omitted).

"An agency's decision is entitled to a presumption of regularity, 'but that presumption is not to shield the agency's action from a thorough, probing, in-depth review.'" *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)) (alteration marks omitted). Indeed, the court "retain[s] a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011). To survive judicial review under the arbitrary and capricious standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

## SUMMARY OF THE ARGUMENT

BLM violated NEPA and the APA in three ways. *First*, it failed to take a hard look at several important resources in the 2019 FEIS. Specifically, BLM did not adequately analyze GHG emissions and climate impacts, nor impacts to water resources. Additionally, BLM entirely failed to consider the SPP Project's impacts to dark night skies, merely on the (incorrect) basis that the issue was not raised during scoping. *Second*, BLM failed to prepare an environmental

document for CPM's 2025 mining plan, wrongly claiming it could rely entirely on the 2019 FEIS as a sufficient environmental analysis. *Third*, even assuming the DNA qualified as an environmental document, BLM arbitrarily relied on the unlawful 2019 FEIS to approve the 2025 mining plan.

## ARGUMENT

**I.    BLM Failed to Take a Hard Look at the Environmental Impacts of the SPP Project**

NEPA requires that BLM take a "hard look" at the impacts of proposed projects by "utilizing public comment and the best available scientific information." *Robertson*, 490 U.S. at 350; *see also* 42 U.S.C. § 4332(2)(C)(i) (2019). In doing so, BLM must analyze any potential direct, indirect, and cumulative effects of major federal actions. 40 C.F.R. § 1502.16 (2019).[12] Direct effects are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (2019). Indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019). Cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions" and "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7 (2019). General statements by BLM about "possible" effects and "some risk" do not constitute a "hard look" absent a showing of why more definitive information could not be provided. *Town of Superior v. U.S. Fish & Wildlife Serv.*, 913 F. Supp. 2d 1087, 1120 (D.

---

[12] Note that "effects" and "impacts" are used synonymously in the applicable NEPA regulations. 40 C.F.R. § 1508.8 (2019).

Colo. 2012) (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)).

As explained below, BLM failed to take a hard look at 1) GHG emissions and climate, 2) water resources, and 3) dark night skies.

**A.      BLM Failed to Take a Hard Look at Greenhouse Gas Emissions and Climate Change**

BLM made two reversible errors with regard to GHG emissions and climate change: 1) the FEIS quantified the GHG emissions that would be generated directly and indirectly by the large-scale mining operation but failed to analyze and disclose the impact of that pollution, all the while promoting the economic benefits of the mine and refusing to quantify its costs, and 2) for the cumulative impacts analysis, the FEIS merely provided a list of projects but failed to analyze and disclose their collective climate impact.

   *i.      BLM failed to analyze the impacts of GHG pollution, all while promoting the economic benefits of the SPP Project and refusing to quantify its costs*

"The impact of GHG emissions on climate change is precisely the kind of impacts analysis that NEPA requires agencies to conduct." *Diné Citizens Against Ruining Our Env't. v. Haaland* ("*Diné CARE*"), 59 F.4th 1016, 1035 (10th Cir. 2023) (internal alterations omitted) (citation omitted). Here, however, the sum of BLM's direct and indirect climate change impact analysis was to quantify the annual GHG emissions and then compare that amount to national, state, and county emissions levels. AR041198-99; *see* 40 C.F.R. §§ 1508.8(a) and (b) (2019). As a result, BLM concluded, unsurprisingly, that when compared to enormous emission levels, the Proposed Action on its own "would be a negligible contributor to GHG emissions at the county, state, and national levels." AR041198; *see also* AR041199 ("[I]f the Project were implemented,

19

the amount of CO2e emissions would increase by a small fraction, as compared to national, state, and county totals.").[13] At the same time, the FEIS contains multiple pages of "socioeconomic" analysis in which BLM touts the project's potential economic benefits. AR041261-64, AR041311-12. Nowhere, however, are the socioeconomic costs of GHG pollution and climate change discussed and analyzed. This approach to climate analysis fails to satisfy NEPA's hard look mandate.

*First*, merely comparing the project's GHG emissions to county, state, and national emissions does not satisfy NEPA, and says nothing as to how the emissions will impact the environment. The Tenth Circuit recently rejected a similar approach to climate analysis, explaining that a "comparative analysis proves only that there are other, larger sources of GHGs. It does not show that [the proposed action] . . . will not have a significant impact on the environment." *Diné CARE*, 59 F.4th at 1042.

In *Diné CARE*, the plaintiffs challenged a decision by BLM to approve 370 oil and gas drilling permits. The total of BLM's climate analysis was to quantify the Proposed Action's GHG emissions and compare them to state and national emission levels, with the brief statement that "the incremental contribution to global GHGs from a proposed land management action cannot be accurately translated into effects on climate change globally or in the area of any site-specific action." *Id.* at 1042. The Tenth Circuit concluded that this cursory and dismissive

---

[13] CO2e (carbon dioxide equivalent) is the classification of a GHG in terms of its global warming potential relative to $CO_2$ over a 100-year period. AR041198; AR008850. Phrased differently, "CO2e means the number of metric tons of $CO_2$ emissions with the same global warming potential as one metric ton of another greenhouse gas." 40 C.F.R. § 98.6 (Environmental Protection Agency's definition of "carbon dioxide equivalent"). For example, 0.049 metric tons of methane ($CH_4$) has the same global warming potential as 5,206 metric tons of $CO_2$ emitted over 100 years. AR041198; AR008883.

analysis violated NEPA: "[s]imply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions." *Id.* at 1043. Such comparisons are unhelpful because, "all agency actions causing an increase in GHG emissions will appear *de minimis* when compared to the regional, national, and global numbers." *Id.*

BLM repeated those same errors here. The 2019 FEIS quantified the Proposed Action's GHG emissions but did not analyze the significance of those emissions or their climate impact because, according to the agency, "the climate change models cannot be used to predict future climate changes at regional and small scales." AR041199. This same approach and rationale was squarely rejected by the *Diné CARE* court. 59 F.4th at 1042-43.

*Second*, further undermining BLM's cursory NEPA analysis is the fact that though numerous reliable and accurate tools and methods were available to help the agency analyze and disclose the climate impacts of the Proposed Action's GHG emissions, *see* AR000738-40; AR000754-55, BLM did not use them or explain why it chose not to. On this point, the Tenth Circuit has explained:

> [NEPA does not] require an agency to employ a specific method for determining the effects of an agency action. But NEPA does require agencies to consider whether the proposed agency action will have a significant impact on the environment and to use accurate science to do so. Thus, if an accurate method exists to determine the effect of the proposed action, BLM must perform that analysis or explain why it has not.

*Diné CARE*, 59 F.4th at 1042 (emphasis added) (citations omitted).

In *Diné CARE*, the plaintiffs recommended that BLM use the global "carbon budget" to inform its climate impacts analysis. *Id.* at 1043. BLM did not use the carbon budget, explain why doing so was unnecessary, or conduct any analysis other than quantifying emissions. Instead,

21

BLM asserted that it was "not required to use any specific protocols or methodologies[.]" *Id.* The court rejected this rationale. "It is indeed true that NEPA does not require BLM to use any particular methodologies . . . however, NEPA does not give BLM the discretion to ignore the impacts to the environment when there are methods for analyzing those impacts." *Id.* Other courts have reached similar conclusions. *See, e.g.*, *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 255 (D.D.C. 2020) ("BLM either had to explain why using a carbon budget analysis would not contribute to informed decisionmaking . . . or conduct an 'accurate analysis' of the carbon budget" (quoting 40 C.F.R. § 1500.1(b)); *High Country Conserv. Advoc. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (holding the agency acted arbitrarily by stating there was no way to measure impact of GHG emissions when at least one recognized method, the social cost of carbon method, was available).

Here, however, BLM did not perform the requisite impacts analysis or explain its failure to do so. *See generally* AR000739-40. Instead, the agency simply asserted that "the climate models cannot be used to predict future climate changes at regional and small scales." AR041199. But that response fails for two reasons: 1) it has been rejected by the Tenth Circuit, and 2) it does not address the available methods that exist or explain why they were not used. *See Diné CARE*, 59 F.4th at 1042 (rejecting BLM's claim that "the incremental contribution to global GHGs from a proposed land management action cannot be accurately translated into effects on climate change globally or in the area of any site-specific action.") ("[I]f an accurate method exists to determine the effect of the Proposed Action, BLM must perform that analysis or explain why it has not.").

*Third*, because BLM made the mistakes discussed above, the FEIS unlawfully offered a skewed analysis which promoted the socioeconomic benefits of the project while not disclosing the environmental and climate costs the project's GHG pollution will impose on society. Specifically, the FEIS contains multiple pages of analysis detailing the socioeconomic benefits of the mine. AR041261-64, AR041311-12. This includes the positive impacts to local employment and tax revenue, housing and services. AR041263.

In contrast, the socioeconomic section in the FEIS does not discuss—at all—the climate impacts or their costs from the Proposed Action, including its GHG pollution. *See* AR041261-64. BLM's failure to do so violated NEPA. In *Utah Physicians for a Healthy Environment*, this Court held that BLM could not promote the economic benefits of a mining project while ignoring its climate costs. 528 F. Supp. 3d at 1231-32. There, like here, BLM's NEPA analysis "forecast[] the number of jobs that will be created, the income from those jobs, the economic contribution from Utah-produced coal, federal royalties, tax revenue, and downstream economic effects." *Id.* at 1230. "But nowhere are the economic costs of GHGs quantified." *Id.* The Court found this lack of analysis to be "problematic." *Id.* at 1231. Specifically, it rejected BLM's analysis because:

> It is in the analysis of the GHGs from the proposed action with the climate change effects that the agency shows that it has taken a hard look at the indirect effects of the project. This is particularly true on this record, where there are multiple pages laying out the significant economic benefits in the "Socioeconomics" subsection, but no discussion there at all about the socioeconomic costs from GHGs and climate change. <u>The socioeconomic section may not lay out the economic benefits from the proposal without analyzing the socioeconomic costs of GHGs *together with* climate change</u>.

*Id.* at 1232 (underlined emphasis added). BLM has repeated the same error here—the FEIS laid out the economic benefits from the mining project in great detail without analyzing the

23

socioeconomic costs of its GHG pollution together with climate change, thereby violating NEPA. *See id.*

In sum, the FEIS unlawfully compares the project's GHG emissions to county, state, and national emissions levels to conclude that it will have a *de minimis* effect, fails to use available methods to analyze and disclose the environmental and climate impacts of the Proposed Action or explain why it did not use them, and provides an economically skewed analysis of the project's benefits without any consideration of its climate costs. *Diné CARE*, 59 F.4th at 1042-43; *Utah Physicians for a Healthy Env't*, 528 F. Supp. 3d at 1231-32.

> ii.     *BLM Failed to Analyze the Cumulative Impacts of All Relevant Projects, Instead Merely Providing a List of Those Projects*

BLM also failed to analyze the cumulative impacts of GHG pollution to the environment and climate. *See* 40 C.F.R. § 1508.7 (defining cumulative impact). In the Tenth Circuit, "[a] meaningful cumulative impact analysis <u>must</u> identify five things:"

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (emphasis added) (citation omitted). The FEIS does not meet this standard.

*First*, the FEIS does not properly define the area in which the environment will feel the effects of the Proposed Action, the very first step in the analysis—an area commonly referred to as the "cumulative impacts analysis/assessment area," or "CIAA." A properly defined CIAA is important because "if the boundaries are defined too broadly, the analysis becomes unwieldy; if

24

they are defined too narrowly, significant issues may be missed, and decision-makers will be incompletely informed about the consequences of their actions." AR044595.

Here, the FEIS defines the CIAA for air quality and climate as "a zone extending approximately 30 kilometers (km) (19 miles) in all directions from the Project's ambient air boundary," which follows the outline of the SPP Project boundary. AR041186; *see also* AR008807 (map of described analysis area). Consequently, BLM's CIAA encompasses an area smaller than Millard County, AR008807, and BLM identifies only two "primary" projects that would contribute to cumulative impacts, both of which are in Millard County.[14] AR041297.

BLM provides no explanation for why the CIAA for air quality and climate should be limited to a portion of Millard County, especially when BLM acknowledges these issues have broad implications and do not remain localized. AR041297. An undefined or poorly explained CIAA violates NEPA. *See Citizens for a Healthy Comm. v. Bureau of Land Mgmt.*, 377 F. Supp. 3d 1223, 1246 (D. Colo. 2019) (holding that BLM failed to adequately explain the scope of its CIAA).

*Second*, as discussed above, the FEIS does not analyze the climate impacts from the Proposed Action because the agency merely compared the project GHG emissions to county, state, and national emissions, and failed to use available methods (*e.g.*, global carbon budget, social cost of carbon) to analyze and disclose those costs or explain why it could not use them. *See* Argument § I.A.i, *supra*.

---

[14] Two additional Millard County projects are included "to be conservative, even though they are located outside the analysis area." AR041298.

*Third*, though the FEIS identified other actions (step three in the *San Juan Citizens Alliance* standard), AR041865 (FEIS Appendix M), it fails to disclose and analyze their impacts or expected impacts (step four). Instead, BLM quantified the emissions for the Proposed Action and three other projects in Millard County and then compared only the Proposed Action emissions to county, state, and national emissions. AR041297.[15] BLM did not analyze the cumulative climate impact of all of the projects it identified in Appendix M of the FEIS; rather, BLM only offered a few generic sentences regarding the nature of climate change and concluded: "The Project does have GHG emissions and would contribute to climate change; however, because it is a minor source, its effects alone would be negligible and not discernible from broader regional and global trends." AR041297 (emphases added). It is immaterial whether the project's effects alone are negligible, and rather the relevant question required by the Tenth Circuit standard, neither asked nor answered by BLM in the FEIS, is: what are "the impacts or expected impacts from these other actions"? *San Juan Citizens All.*, 654 F.3d at 1056 (emphasis added).

Finally, the FEIS does not analyze and disclose the overall impact that can be expected if the individual impacts are allowed to accumulate (step five in the *San Juan Citizens Alliance* standard). Instead, the total of BLM's impact "analysis" is the unhelpful statement that climate change is real and might cause a few generic changes to the environment. AR041297. In *Utah Physicians for a Healthy Environment*, this Court rejected a similar—but more robust—approach to climate analysis. 528 F. Supp. 3d at 1233-34. There, BLM established a CIAA for climate

---

[15] The three other projects were included because, according to BLM, they are the only three projects in Millard County with "reportable emissions." AR041297.

change that included two counties, listed a few other projects that fell within that CIAA, and discussed in generalities the basic nature of climate change and its likely impacts in the future. *Id.* The Court held that this approach was insufficient, however, because "the cumulative impacts section provides no data or substantive discussion about GHGs from other past and reasonably foreseeable future actions." *Id.* at 1234 (internal quotation omitted). Further, the agency's analysis violated NEPA because it "failed to substantively account for and analyze the present and reasonably foreseeable sources of GHGs." *Id.* The same is true here and the FEIS falls short of the *San Juan Citizens Alliance* standard.

### B.     BLM Failed to Take a Hard Look at Cumulative Water Impacts

Like with GHG emissions, the FEIS violates NEPA by failing to analyze all reasonably foreseeable cumulative impacts to water resources in a manner that comports with the *San Juan Citizens Alliance* standard's fourth and fifth factors: (4) a cumulative impact analysis that identifies the impacts or expected impacts from these other actions, and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate. 654 F.3d at 1056. BLM defined the CIAA for water resources as:

- The [United States Geological Survey]-defined sixth-level (Hydrologic Unit Code-12 [HUC-12]) sub-watersheds that would contain Project facilities or that are upstream of the Sevier Playa or directly tributary to the Sevier River below Gunnison Bend Reservoir
- The USGS-defined sixth-level sub-watersheds that contain the ephemeral channel of the Beaver River in Millard County east of the Sevier Playa and the Cricket Mountains…
- A 15-mile radius around the proposed freshwater supply well field that may be affected by drawdown related to groundwater pumping…

AR041279 (citations omitted); *see also* AR013006 (map of the water resources CIAA).

27

The 2019 FEIS and Water Resources Report generally describe direct and indirect impacts to water resources from the SPP Project and its alternatives, *see* AR041281-93 (FEIS); AR013044-74 (Water Resources Report), and identify a few past, present, or reasonably foreseeable future actions that may contribute to cumulative water impacts. AR041314-15. However, that is where BLM's cumulative impacts "analysis" ends.

For instance, one reasonably foreseeable future action listed in the FEIS is the West Desert Water Supply and Conservation Project ("West Desert Project").[16] AR041314-15. BLM's entire "analysis" of the West Desert Project's water impacts is set forth in one paragraph. *Id.* BLM's discussion of water quantity impacts consists of stating how much groundwater the West Desert Project would withdraw (15,000 acre-feet/year), noting that this quantity would be in addition to the 1-12 feet of groundwater pumping anticipated by the SPP Project, and vaguely concluding that the West Desert Project would contribute to water level decline in the CIAA for the foreseeable future. AR041314. BLM's discussion of how the West Desert Project would affect water flows at springs in the CIAA is likewise limited and merely states that the Project would result in reduced flows at the Wah Wah Spring and Black Rock area springs, and that the SPP Project "has the potential to change the timing of cumulative drawdown in some portions of the [CIAA], but the cumulative effects would be moderate and short term." *Id.*

BLM does not explain how the SPP Project would change the timing of cumulative drawdown, what areas of the CIAA will be affected by the drawdown, or why those anticipated

---

[16] SUWA repeatedly raised the importance of considering the West Desert Project in the SPP Project's cumulative impacts analysis. *See* AR000793 (at the time the West Desert Project was known as the Pine Valley Groundwater Development and Pipeline Project); AR000818; AR000823-24.

cumulative effects are expected to be "moderate and short term." By failing to include this information, BLM has not explained "the impacts or expected impacts" from the West Desert Project. *See San Juan Citizens All.*, 654 F.3d at 1056. At most, BLM compared the groundwater drawdown and spring flows between the two projects but did not explain the significance of what that comparison means in terms of environmental impact. AR041314. Thus, BLM has failed to meet the fourth *San Juan Citizens Alliance* factor.

BLM's cumulative impacts analysis also fell short with regard to the fifth *San Juan Citizens Alliance* factor. 654 F.3d at 1056. Nowhere in the 2019 FEIS or Water Resources Report, AR014314-15; AR013074-78, does BLM explain "the overall impact" to water resources that can be expected if the individual impacts of the SPP Project, West Desert Project, and two other cumulative actions identified in the CIAA—stock watering reservoirs and the Cricket Bench and Sage Valley Pipelines—"are allowed to accumulate." *San Juan Citizens All.*, 654 F.3d at 1056. This failure also violates NEPA's hard look mandate.

Because the 2019 FEIS contains no analysis satisfying the fourth and fifth *San Juan Citizens Alliance* factors, BLM has not taken a hard look at cumulative impacts to water and consequently, the FEIS violates NEPA.

### C.    BLM Failed to Analyze Dark Night Skies

A dark night sky "unencumbered by competing light sources…or by light refracted from…polluted air is an incredible sight" that is becoming "increasingly more difficult to observe." GBNHA Mgmt. Plan at 107. Currently, dark skies are one of the GBNHA's most significant natural resources "that set the [region] apart from all other areas." *Id.* at 75; *see also id.* at 92. In fact, the "largest contiguous region of dark skies in the United States" exists within

29

the GBNHA (and therefore encompasses the SPP Project visual resources analysis area). *Id.* at 108. However, this spectacular and increasingly rare resource is threatened by the SPP Project, which will drastically change the remote and dark character of the GBNHA by introducing large-scale industrialization to an area renowned for its lack of light pollution. *See* AR041155.

BLM violated NEPA by failing to take a hard look—or any look at all—at the SPP Project's direct, indirect, and cumulative impacts to dark night skies, including within the visual resources analysis area, the GBNHA, and Great Basin National Park (which is a designated International Dark Sky Park). BLM did this despite 1) identifying impacts to dark night skies as an issue during its internal scoping period, and 2) SUWA raising the issue in its DEIS comments.

> i.      *BLM's explanation for not analyzing dark night skies is arbitrary and capricious because dark night sky impacts were identified as a scoping issue*

The 2019 FEIS does not analyze Project impacts to dark night skies, notwithstanding that SUWA squarely raised this issue in its DEIS comments and explained that the Sevier Desert (and the greater GBNHA) is an incredibly remote location that is virtually devoid of any artificial light, and thus BLM must consider how the Project's lighting will impact the area's significantly dark skies. *See* AR000738; AR014475. BLM's excuse for <u>not</u> analyzing dark night skies was simply: "The issue of dark night skies was not identified during scoping; therefore, it was not addressed in the DEIS." AR041559.

Not so. In the 2015 Scoping Report, BLM <u>expressly</u> identified impacts on dark night skies as an issue to be analyzed in detail in the EIS. AR000601. Yet no such analysis is included in the DEIS, FEIS, or the supporting Visual Resources Report. *See generally* AR010303-410 (DEIS Visual Resources Report); AR010411-540 (FEIS Visual Resources Report). Moreover,

reference to dark night skies was eliminated in the copies of the scoping report appended to the DEIS and FEIS. *Compare* AR000601 (2015 Scoping Report table of Identified Issues for EIS analysis) *with* AR039831 (DEIS Scoping Report table of Issues Analyzed in Detail); AR041400 (FEIS Scoping Report table of Issues Analyzed in Detail); *see also* n.8, *supra* (explaining how the original Scoping Report was "updated" in 2019 to eliminate reference to dark night skies). But there is no record evidence explaining BLM's omission of dark night skies as an identified issue. *See* AR039832-33 (DEIS issues dismissed or eliminated from detailed study; no mention of dark night skies); AR041401-02 (same for FEIS); *cf. State Farm*, 463 U.S. at 43 (an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (citation omitted)).

Notably, BLM's reason for not analyzing dark night sky impacts was not based on "the best available scientific information," as is required by NEPA, nor was it based on agency determination that the SPP Project would not significantly impact dark night skies. *Ctr. for Biological Diversity*, 72 F.4th at 1178 (quoting *Dombeck*, 185 F.3d at 1171). Rather, it was simply based on BLM's incorrect assertion that during scoping—the earliest stage of the NEPA process—impacts to dark night skies was not identified as an issue for analysis. To the contrary, there is no question that impacts to dark night skies were identified. AR 000601. Thus, BLM's only proffered explanation "runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43.

> ii.    *BLM cannot ignore an issue raised in public comments merely on the belief that the issue was not previously raised in the scoping period*

Assuming, *arguendo*, that dark night skies had not been identified during the scoping period, BLM cannot ignore the issue on the basis that it was raised for the first time during the

DEIS public comment period. Although the NEPA scoping process is used to help BLM determine what issues need to be analyzed in an EIS, AR044577–578; *see also* 40 C.F.R. § 1501.7, BLM "cannot forever omit a factor from the scope of an EIS <u>solely</u> because the factor was not raised as a concern during the scoping process." *Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995) (emphasis in original). Put differently, it is unlawful for BLM to decline to analyze an issue brought up during the public comment process merely because that particular issue was (allegedly) not identified during the scoping process. 40 C.F.R. §§ 1503.4(a), 1501.7; *see also Or. Nat. Res. Council*, 52 F.3d at 1490; AR044603 (BLM's NEPA Handbook explaining that "all substantive comments received before reaching a decision must be considered to the extent feasible.").

Indeed, public participation in the NEPA process is a core component of a "hard look" analysis because it helps ensure BLM considers "every significant aspect of the environmental impact of a proposed action." *Ctr. for Biological Diversity*, 72 F.4th at 1178 (citations omitted). BLM "has a duty to assess, consider, and respond to <u>all</u> comments, even those relating to environmental factors not mentioned during the scoping process." *Or. Nat. Res. Council*, 52 F.3d at 1490 (emphasis in original) (citing 40 C.F.R. § 1503.4(a)); *see also* AR044603 (BLM "must respond to all substantive written comments submitted during the formal scoping period <u>and</u> <u>public comment period</u>") (emphasis added).[17] When responding to substantive public comments suggesting an issue be analyzed in detail, BLM's response should 1) "supplement[], improv[e], or modify[] the environmental analysis," 2) "make[] factual corrections," or 3) "explain[] why

---

[17] Substantive comments are those that "present new information relevant to the analysis." AR044604.

the comments do not warrant further agency response, <u>citing cases, authorities, or reasons</u> to support the BLM's position." AR044604 (emphasis added) (citing 40 C.F.R. § 1503.4(a)).

Regardless of the fact that dark night sky impacts were first identified during the scoping process, SUWA also raised dark night sky impacts from the SPP Project to the Sevier Desert and larger GBNHA as a substantive comment in its DEIS comments. *See* AR000738. Thus, BLM was obligated to assess and consider the Project's impacts on dark night skies. 40 C.F.R. § 1503.4(a); *Or. Nat. Res. Council*, 52 F.3d at 1490. To ensure BLM "considered every significant aspect of the environmental impact" of the SPP Project, *Ctr. for Biological Diversity*, 72 F.4th at 1178, BLM's response to SUWA's dark night skies comments should have resulted in either 1) supplemental analysis taking a hard look at such impacts, or 2) an explanation—with citations to cases or other authorities— of why SUWA's comments did not warrant further analysis, especially when the agency itself had already identified the issue as warranting of additional analysis.

Instead, as noted above, BLM's response was based on the incorrect assertion that it need not analyze impacts to dark night skies merely because BLM (inaccurately) believed the issue was not raised during scoping. AR041559. BLM's response did not provide any support for its position that it didn't need to at least consider an issue first raised in SUWA's timely DEIS public comments, nor does BLM explain why a detailed, hard look analysis of dark night sky impacts to the Sevier Desert and GBNHA is not warranted. *See id.*

Given the undeveloped region, naturalness, and near non-existent light pollution in the GBNHA, *see* Factual Background § I, *supra*, it is particularly egregious that BLM failed to even consider the SPP Project's impacts on dark night skies, let alone take a hard look at such

33

impacts. In doing so, BLM violated both of NEPA's core objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision-making. 40 C.F.R. § 1500.1(c).

## II.   BLM Failed to Conduct an Environmental Analysis of the 2025 Mining Plan

BLM violated NEPA when it arbitrarily authorized the amended mining plan through a DNA, as opposed to preparing an additional environmental analysis. Specifically, BLM was required to prepare an environmental document prior to authorizing the 2025 mining plan. A DNA, however, is not an environmental document under NEPA, and therefore does not constitute a supplemental environmental analysis.

### A.   BLM was Required to Prepare an Environmental Document Analyzing the 2025 Mining Plan

With four limited exceptions, NEPA requires that an agency prepare an environmental document (either an EIS or an EA) to evaluate the impacts of a proposed action. 42 U.S.C. § 4336(a). An EIS is required for a proposed major federal action "that has a reasonably foreseeable significant effect on the quality of the human environment." *Id.* §§ 4332(2)(C), 4336(b)(1) (2025). However, if the proposed action "does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown," the agency may prepare an EA. *Id.* § 4336(b)(2) (2025).

BLM is exempt from preparing an environmental document to consider a proposed action if: (1) "the proposed action is not a final agency action;" (2) the proposed action is categorically excluded pursuant to one of BLM/DOI's categorical exclusions; (3) the preparation of an environmental document would "clearly and fundamentally conflict" with another provision of

34

law; or (4) the proposed action "is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a)(1)-(4) (2025).

In this case, none of the statutorily allowed exemptions to NEPA apply. *First,* given that the 2025 DNA DR, AR043946, marked the end of the NEPA process for the amended mining plan and formally approved CPM's modified Plan of Operations and Plan of Development, BLM's approval constituted final agency action. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) ("As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the 'consummation' of the agency's decisionmaking process . . . And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'").

*Second,* the amended mining plan is not categorically excluded pursuant to one of BLM/DOI's categorical exclusions. As for both the *third* and *fourth* exceptions, *i.e.* that the preparation would conflict with another provision of law or that the proposed action is nondiscretionary such that the agency cannot take environmental factors into consideration, respectively, BLM's decision to prepare an EIS for the original mining plan indicates that the agency's requirement to prepare an environmental document does not conflict with another provision of law and that the proposed action is discretionary. *See Nat. Res. Def. Council, Inc. v. Berklund*, 609 F.2d 553, 558 (D.C. Cir. 1979) (stating that an agency may preclude a lease awardee from harming the environment by disapproving the mining plan).

In sum, BLM was required under NEPA to prepare an environmental document analyzing the 2025 mining plan. 42 U.S.C. § 4336(a). None of the exceptions to this requirement

35

apply so BLM's failure to prepare such a document is arbitrary, capricious, and in violation of NEPA.

      **B.**      **The 2025 DNA Does Not Qualify as an Environmental Document Analyzing the 2025 Mining Plan**

The 2025 DNA does not meet the definition of an "environmental document," 42 U.S.C. § 4336e(5), and therefore cannot be relied upon as an adequate analysis of the 2025 Mining Plan. *Id.* § 4336a(2)(C). DNAs are an "administrative convenience created by the BLM, and are not defined in NEPA." *SUWA v. Norton*, 457 F. Supp. 2d at 1255. According to BLM's NEPA Handbook, a DNA "confirms that an action is adequately analyzed in <u>existing</u> NEPA document(s)." AR044560 (emphasis added). The Tenth Circuit and other courts have explained BLM's use of a DNA is a determination of whether a prior analysis is adequate: a DNA "determine[s] the sufficiency of a previously issued NEPA document" and whether new information or changed circumstances requires the preparation of additional documentation. *SUWA v. Norton*, 457 F. Supp. 2d at 1262 (citing *Pennaco*, 377 F.3d at 1162); *see also Summit Lake Paiute Tribe of Nevada v. Bureau of Land Mgmt.*, 496 Fed. Appx. 712, 715 (9th Cir. 2012) (citing *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)). A DNA, therefore, does not represent any sort of further environmental analysis that fulfills NEPA's hard look requirement, or offers the public further opportunity for input. AR044561.

Courts have made clear that NEPA's twin purposes are for an agency to thoroughly understand the impacts of a proposed action and, in turn, to communicate that information to the public. To circumvent that process and authorize a new, different action via a DNA that relies on an outdated environmental document is directly at odds with these goals. *San Miguel*, 584 F. Supp. 3d at 973 (rejecting the proposition that because a "category of impacts anticipated from

36

oil and gas development were well-known after circulation of the Final EIS, any change in the location of extent of the impacts were immaterial." (citing *Richardson*, 565 F.3d at 707)); *Triumvirate, LLC v. Bernhardt*, 367 F. Supp. 3d 1011, 1027–28 (D. Alaska 2019) (discussing how the BLM's reliance on an old EA when evaluating the impacts of adding another heli-ski operator in a region defeats the purpose of NEPA's hard look requirement because it wrongly assumed that the second and third operators would only impose a similar level of impact as the first); *see also All. for Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1119 (9th Cir. 2018) ("Ultimately, when reviewing for NEPA compliance, we look to whether the agency performed the NEPA analysis on the subject action.") (emphasis added). BLM's NEPA Handbook acknowledges that where a new action is proposed but was not previously analyzed or discussed during the public involvement process for an existing EA or EIS, additional NEPA analysis and public involvement is necessary. AR044561.

BLM's use of a DNA as proxy for new NEPA analysis of the 2025 mining plan is not only counter to the express purpose of a DNA but also runs counter to NEPA's mandate that an agency assess the impacts of a proposed action on the human environment in an environmental document. 42 U.S.C. §§ 4336a(2)(C), 4336e(5); *see also SUWA v. Norton*, 457 F. Supp. 2d at 1266 (stating that the BLM could not have known the environmental effects of a changed action without supplemental analysis and noting NEPA's "manifest concern [is] with preventing uninformed action) (citation omitted); *see also Klamath Tribes v. U.S. Bureau of Reclamation*, No. 1:22-cv-00680-CL, 2024 WL 472047, *6 (D. Or. Feb. 7, 2024) ("An agency may not use a DNA to sidestep its obligation to take a 'hard look' at the potential impacts of its actions."). BLM's own actions confirm that the agency recognized the need to analyze the proposed 2025

37

mining plan in a new environmental document: BLM first intended to analyze the proposal in an EA and held a public scoping period to inform and support its analysis but did not follow through with finalizing the EA. AR043965; *see also* n.11, *supra*. BLM's failure to analyze the proposed 2025 mining plan in an environmental document violates NEPA and is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

**III.    BLM Arbitrarily Relied on an Existing, Unlawful NEPA Document**

BLM violated the APA and the DOI regulations implementing NEPA when it relied solely on the unlawful 2019 FEIS to support its decision to approve the 2025 mining plan. *See* 43 C.F.R. § 46.120 (2025). Although DOI's NEPA regulations encourage the BLM to use existing NEPA analyses, or the information contained therein, when assessing a proposed action and its alternatives, BLM may only rely on them "if the existing NEPA analyses include data and assumptions appropriate for the analysis at hand" and if the existing analysis "adequately assesses the environmental effects of the proposed action." 43 C.F.R. § 46.120(a)–(c)(2025). The BLM approved the 2025 mining plan after determining the original 2019 FEIS "fully cover[ed]" the environmental effects of the proposed 2025 such that the DNA complied with BLM's "requirements of the NEPA." AR043967. But as explained above, the 2019 FEIS cannot carry this load because it failed to take the requisite hard look at the direct, indirect, and cumulative impacts of the SPP Project on water, climate, and dark night skies. *See* Argument Section I, *supra*. Since the 2025 DNA did not (and could not) cure these NEPA violations by not conducting any additional NEPA analysis (because a DNA is, by definition, not a NEPA document), BLM's approval of the 2025 mining plan using the 2019 FEIS violates DOI's NEPA regulations. *SUWA v. Norton*, 457 F. Supp. 2d at 1262 (citing *Pennaco*, 377 F.3d at 1162); *see*

*also Rocky Mountain Wild v. Bernhardt*, 506 F. Supp. 3d 1169, 1188 (D. Utah 2020) (Barlow, J.) (finding that because the prior NEPA analysis relied on in the DNA was insufficient, the DNA was necessarily insufficient).

As Judge Kimball explained in *Southern Utah Wilderness Alliance v. Norton*, the lawfulness of a DNA prepared to support a prior decision "must rise or fall on the contents of the previously issued NEPA documents." 457 F. Supp. 2d at 1264. The decision to rely on a prior NEPA analysis is appropriate, therefore, when a proposed change does not create a new environmental picture from what was previously studied, and the prior evaluation took a "hard look" at the environmental contents of a proposed action. *Pennaco*, 377 F.3d at 1150–51). When an agency fails to take a "hard look" at the environmental consequences of an action, though, neither the original environmental document nor the subsequently prepared DNA are sufficient under NEPA. *High Country Conserv. Advoc. v. U.S. Forest Serv.*, 951 F.3d 1217, 1223 (10th Cir. 2020) (stating that NEPA requires agencies take a hard look at consequences. (citing *Robertson*, 490 U.S. at 350)); *see also High Country Conserv. Advoc.*, 52 F. Supp. 3d at 1199 ("It makes no sense for the agency to then turn around and 'tier' their analysis to an early analysis that never took place.").

As explained above, the 2019 FEIS is deficient in numerous ways due to BLM's failure to take the required hard look at the direct, indirect, and cumulative impacts of the SPP Project on water, climate, and dark skies. *See* Argument Section I, *supra*. BLM's DNA relied entirely on this unlawful 2019 FEIS for its environmental analysis of the 2025 mining plan, since the DNA itself is not a NEPA document. *Cf. SUWA v. Norton*, 457 F. Supp. 2d at 1255; *San Miguel*, 584 F. Supp. 3d at 955 (citing *Pennaco*, 377 F.3d at 1152). As such, BLM has failed to take a hard

look at the environmental consequences of the 2025 mining plan and prepare the "adequate report" that NEPA mandates. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Seven Cnty.*, 605 U.S. at 180. Consequently, because the 2019 FEIS failed to take a hard look at the impacts of the SPP project, the 2025 DNA and 2025 DNA DR violate 43 C.F.R. § 46.120. BLM's decision to authorize the 2025 mining plan is arbitrary, capricious, or otherwise not in accordance with law. 5 U.S.C. § 706(2).

## CONCLUSION

For the foregoing reasons, the Court should declare that BLM violated NEPA, its implementing regulations, and the APA by approving the 2019 ROD and 2025 DNA DR; declare unlawful and vacate the 2019 EIS, 2019 ROD, 2025 DNA, and 2025 DNA DR 5 U.S.C. § 706(2)(A); and enjoin Federal Defendants and CPM from taking any actions pursuant to the 2019 EIS, 2019 ROD, 2025 DNA, or 2025 DNA DR until they have complied with NEPA, its implementing regulations, and the APA. SUWA also requests the Court retain continuing jurisdiction of this matter until Federal Defendants fully remedy the aforementioned violations of law.

Respectfully submitted this 20th day of March, 2026.

*/s/ Hanna Larsen*
Hanna Larsen
Stephen Bloch

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*

40

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i) because it contains 11,814 words, excluding the parts of the brief exempted by Rule 32(f).

*/s/ Hanna Larsen*
Hanna Larsen