ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

DANIEL C. LUECKE (CA Bar No. 326695)
Trial Attorney
SHANNON BOYLAN (D.C. Bar No. 1724269)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-7863 (Luecke); (202) 598-9584 (Boylan)
Fax: (202) 305-0506
E-mail: daniel.luecke@usdoj.gov; shannon.boylan@usdoj.gov

*Attorneys for Federal Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.*,<br><br>Defendants, and<br><br>**PEAK MINERALS, INC.,**<br><br>Intervenor-Defendant. | Case No.: 2:25-cv-00657-DBB<br>Honorable Judge David Barlow<br><br>**FEDERAL DEFENDANTS' ANSWER BRIEF** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND.................................................................................. 2

    I.    The History of Sevier Playa and Its Potential for Potash Development ................. 2

    II.    BLM's Review and 2019 Approval of Peak's Original Plan ............................... 3

    III.    SUWA's Challenge to the 2019 FEIS and ROD .................................................... 5

    IV.    Peak's Amended Plan and BLM's 2025 DNA ...................................................... 5

LEGAL BACKGROUND ...................................................................................... 8

STANDARD OF REVIEW .................................................................................... 8

SUMMARY OF ARGUMENT .............................................................................. 9

ARGUMENT .......................................................................................................... 9

    I.    BLM's Analysis of the Project's Impacts Satisfies NEPA's "Hard Look" Standard ................................................................................................................ 9

        A.    The FEIS's Analysis of GHG Emissions Is Consistent With NEPA........ 10

            1.    BLM Adequately Considered Direct and Indirect Impacts Related to GHG Emissions ........................................................... 10

            2.    BLM Adequately Analyzed the Cumulative Impacts from GHG Emissions .......................................................................... 15

        B.    The FEIS Adequately Discusses Cumulative Impacts to Water Resources ................................................................................................... 17

        C.    The FEIS's Consideration of Sources of Light and Impacts on Night Skies is Adequate and Did Not Cause Prejudice ..................................... 21

    II.    BLM's Decision to Issue a DNA When Approving the Amended Mining Plan Was Permissible................................................................................................... 24

    III.    In the Event the Court Finds a NEPA Violation, Remand Without Vacatur Would Be the Appropriate Remedy...................................................................... 28

CONCLUSION...................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 28

*Am. Wild Horse Campaign v. Raby*,
  144 F.4th 1178 (10th Cir. 2025) ............................................................................. 10

*Appalachian Voices v. FERC*,
  139 F.4th 903 (D.C. Cir. 2025) ............................................................................... 25

*Ariz. Pub. Serv. Co. v. E.P.A.*,
  562 F.3d 1116 (10th Cir. 2009) ............................................................................... 10

*Arizona Mining Reform Coal. v. United States Forest Serv. (AMRC)*,
  172 F.4th 641 (9th Cir. 2026) ..................................................................... 17, 18, 20

*Bar MK Ranches v. Yuetter*,
  994 F.2d 735 (10th Cir. 1993) ................................................................................. 21

*Bd. of Cnty. Commissioners of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*,
  706 F. Supp. 3d 1180 (D. Colo. 2022) .................................................................... 26

*Blue Mountains Biodiversity Project v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ................................................................................... 9

*Chattooga Conservancy v. U.S. Dep't of Agric.*,
  No. 24-518 (TJK), 2026 WL 865760 (D.D.C. Mar. 30, 2026)......................... 15, 16

*Citizens' Comm. to Save Our Canyons v. Krueger*,
  513 F.3d 1169 (10th Cir. 2008) ............................................................................. 8, 9

*Clappier v. Flynn*,
  605 F.2d 519 (10th Cir. 1979) ....................................................................... 2, 3, 5, 6

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
  72 F.4th 1166 (10th Cir. 2023) .................................................................................. 8

*Ctr. for Biological Diversity v. U.S. EPA*,
  149 F.4th 1142 (10th Cir. 2025) ............................................................................. 30

*Dakota Res. Council v. U.S. Dep't of Interior*,
  No. 22-CV-1853 (CRC), 2024 WL 1239698 (D.D.C. Mar. 22, 2024)................... 20

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004).................................................................................................. 17

*Diné Citizens Against Ruining Our Environment v. Haaland (Diné CARE)*,
  59 F.4th 1016 (10th Cir. 2023) ............................................................... 13, 18, 20, 28

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
  52 F. Supp. 3d 1174 (D. Colo. 2014) ............................................................. 13

*High Desert Relief, Inc. v. United States*,
  917 F.3d 1170 (10th Cir. 2019) ...................................................................... 2

*Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
  702 F.3d 1156 (10th Cir. 2012) ................................................................. 10, 12

*In re Syngenta AG MIR 162 Corn Litig. (Hossley-Embry Grp. II)*,
  111 F.4th 1095 (10th Cir. 2024) ................................................................... 28

*Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ..................................................................... 22, 23

*Lee v. U.S. Air Force*,
  354 F.3d 1229 (10th Cir. 2004) ................................................................... 26

*Montana v. Haaland*,
  50 F.4th 1254 (9th Cir. 2022) ..................................................................... 13

*Montana Wildlife Federation v. Haaland*,
  127 F.4th 1 (9th Cir. 2025) ......................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983) .......................................................................... 8, 27, 29

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ...................................................................... 9

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
  565 F.3d 683 (10th Cir. 2009) ................................................................... 8, 21

*O'Rourke v. Dominion Voting Sys. Inc.*,
  552 F. Supp. 3d 1168 (D. Colo. 2021) ............................................................. 2

*Olenhouse v. Commodity Credit Corp.*,
  42 F.3d 1560 (10th Cir. 1994) ..................................................................... 28

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
  377 F.3d 1147 (10th Cir. 2004) ............................................................. 8, 26, 27

*Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*,
  684 F.3d 1002 (10th Cir. 2012) ................................................................... 21

*Protect Our Communities Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ..................................................................... 12

*Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*,
  40 F.4th 1133 (10th Cir. 2022) ................................................................... 21

*Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*,
  548 F. Supp. 3d 1042 (D. Colo. 2021) ........................................................... 21

*Rocky Mountain Wild v. Dallas*,
   98 F.4th 1263 (10th Cir. 2024) ................................................................... 24

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   250 F. Supp. 3d 1068 (D. Utah 2017) .......................................................... 23

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   44 F.4th 1264 (10th Cir. 2022) ..................................................................... 8

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   No. 2:19-CV-00297-DBB, 2021 WL 1222158 (D. Utah Mar. 31, 2021) ................. 8

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   No. CV 24-2476 (RC), 2025 WL 3680685 n.6 (D.D.C. Dec. 17, 2025) .................. 15

*San Juan Citizens All. v. Stiles*,
   654 F.3d 1038 (10th Cir. 2011) ................................................................... 15

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
   605 U.S. 168 (2025) .......................................... 8, 9, 10, 14, 15, 16, 17, 18, 20, 21, 24, 25, 28

*Sierra Club v. FERC*,
   153 F.4th 1295 (D.C. Cir. 2025) .................................................................. 29

*Sierra Club, Inc. v. Bostick*,
   787 F.3d 1043 (10th Cir. 2015) ................................................................... 10

*Silverton Snowmobile Club v. U.S. Forest Serv.*,
   433 F.3d 772 (10th Cir. 2006) .................................................................... 26

*Swomley v. Schroyer*,
   484 F. Supp. 3d 970 (D. Colo. 2020) ............................................................ 14

*Swomley v. Schroyer*,
   No. 20-1335, 2021 WL 4810161 n.3 (10th Cir. Oct. 15, 2021) ..................... 11, 14

*Taxpayers of Michigan Against Casinos v. Norton,*
   *(TOMAC)*, 433 F.3d 852 (D.C. Cir. 2006) ................................................. 15, 16

*Utah Physicians for a Healthy Environment v. U.S. Bureau of Land Mgmt.*,
   528 F. Supp. 3d 1222 (D. Utah 2021) .................................................. 14, 15, 30

*W. Watersheds Project v. Rollins*,
   No. 22-CV-214-SWS, 2025 WL 1445639 (D. Wyo. Apr. 17, 2025) .................... 29

*WildEarth Guardians v. Bernhardt*,
   502 F. Supp. 3d 237 (D.D.C. 2020) .............................................................. 13

*WildEarth Guardians v. Nat'l Park Serv.*,
   703 F.3d 1178 (10th Cir. 2013) ................................................................... 21

**Statutes**

42 U.S.C. § 4332(2)(C) .................................................................................. 8

42 U.S.C. § 4336 ................................................................................................ 9, 24, 27

42 U.S.C. § 4336(a)(1) .............................................................................................. 26

42 U.S.C. § 4336(a)(3) .............................................................................................. 26

42 U.S.C. §§ 4336a(e)(1)(A) .................................................................................... 25

42 U.S.C. 42 .............................................................................................................. 26

42 U.S.C. 4336(a)(2) ................................................................................................. 26

5 U.S.C. § 551(13) ..................................................................................................... 26

5 U.S.C. § 706(2)(A) ................................................................................................... 8

U.S.C. § 4336(a)(2) ................................................................................................... 26

## Regulations

40 C.F.R. § 1501.4 ..................................................................................................... 26

40 C.F.R. § 1502.2 ..................................................................................................... 14

40 C.F.R. § 1502.2(b) ................................................................................................ 10

40 C.F.R. § 1508.10 ................................................................................................... 27

40 C.F.R. § 98.2(a)(2) ........................................................................................... 11, 12

40 C.F.R. § 1501.1(5) ................................................................................................ 26

43 C.F.R. 3504.21 ...................................................................................................... 31

## Other Authorities

90 Fed. Reg. 10610 (February 25, 2026) .................................................................... 11

91 Fed. Reg. 8738 (February 24, 2026) ...................................................................... 11

**INTRODUCTION**

The Sevier Playa Potash Project is a mining operation that aims to extract potassium sulfate—or "potash"—from the mineral-rich brines of Sevier Playa in southwestern Utah. Potash is an essential ingredient in plant fertilizer and, at present, is largely imported from abroad into the United States. To help remedy this, the Bureau of Land Management ("BLM") first approved this Project in 2019 after conducting a thorough review under the National Environmental Policy Act ("NEPA") and issuing a Final Environmental Impact Statement ("FEIS"). Then, after the project proponent amended its mining plan, BLM approved a scaled-back version of the Project in 2025. Because BLM found that the amended version of the Project would generally reduce its environmental impacts, BLM issued a Determination of NEPA Adequacy ("DNA") rather than a new EIS.

Plaintiff Southern Utah Wilderness Alliance's ("SUWA") challenge to the FEIS and DNA ignores key aspects of BLM's analysis, misapplies NEPA principles, and disregards the deference at the core of the statute. First, BLM's analysis of impacts related to Greenhouse Gas ("GHG") emissions was reasonable and proportionate to the Project's relatively minor emissions. Second, BLM's decision to quantify the Project's cumulative impacts on water resources also satisfies NEPA. Third, although BLM did not include a discrete section on dark night skies in the FEIS, BLM adequately considered the Project's sources of light and how they would affect night skies. And, finally, BLM appropriately concluded in a DNA that the FEIS for the original plan adequately analyzed environmental impacts for the Project as amended. The Court should accordingly deny SUWA's claims and grant judgment to Federal Defendants.

Page 1 –   FEDERAL DEFENDANTS' ANSWER BRIEF
            *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

## FACTUAL BACKGROUND

**I.      The History of Sevier Playa and Its Potential for Potash Development**

The Sevier Playa, located in southwestern Utah's Millard County, "is a large terminal lakebed that is normally dry on the surface . . . approximately 26 miles long by an average of 8 miles wide." AR041135; *see also* AR041137 (mapping area around Sevier Playa). Studies of the playa from the 1970s to the 1990s showed that it contains "subsurface potassium-bearing saline brines." AR041135. These brines can be developed to produce potassium sulfate ($K_2SO_4$), also known as sulfate of potash, which is used to create potassium fertilizer. *Id.*; AR041117. This type of potash "rarely occurs naturally" and is mostly produced synthetically. AR041141.

"Fertilizer rich in potassium is in high demand to support national and global food production." AR041140. As of 2019, the United States relied on foreign imports for 90 percent of its potash supply, AR041140, and national and global potash consumption has continued to rise in the 2020s. U.S. GEOLOGICAL SURVEY, *Mineral Commodity Summaries 2025*, 138–39 (March 2025), https://pubs.usgs.gov/publication/mcs2025, last visited May 20, 2026.[1] No substitutes exist for this essential plant nutrient. *Id.*

After the mineral potential of Sevier Playa was established, BLM authorized a company to construct 3,000 acres of solar evaporation ponds and 4.8 miles of brine collection ditches, which "produced over one million tons of halite (NaCl, sodium chloride, also known as table salt)." AR041135. However, these operations ceased in 1993 before any potash could be

---

[1] "The Court is entitled to take judicial notice of official government publications." *O'Rourke v. Dominion Voting Sys. Inc.*, 552 F. Supp. 3d 1168, 1193 n.4 (D. Colo. 2021) (citing *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019); *Clappier v. Flynn*, 605 F.2d 519, 535 (10th Cir. 1979)).

produced. *Id.* BLM approved another mining plan in 1997, but this project ultimately failed due to inadequate funding. *Id.*

In 2011, after completing an environmental assessment ("EA"), BLM approved a competitive potassium lease sale on Sevier Playa. AR041136. "During the sale, 95,802 acres were leased to Peak Minerals, Inc. ['Peak'] and 22,012 acres were leased to LUMA Minerals, LLC." *Id.* The companies entered into a cooperative development agreement under which Peak would control the rights to develop and operate potassium mineral leases on all 117,814 acres of BLM-leased land, as well as an additional 6,409 acres of land leased from the state. *Id.*; *see also* AR041135. Peak subsequently submitted a proposal to conduct exploratory activities on the leases through 2018, which BLM approved in 2011. AR041136.

## II.    BLM's Review and 2019 Approval of Peak's Original Plan

In 2013, Peak provided BLM with a Mining Plan proposing the production of 300,000 metric tons of potash per year from brines extracted from Sevier Playa, concentrated through solar evaporation, and processed in a crystallization plant. AR016535. In 2014, BLM published a notice of intent to prepare an EIS for the Project in the Federal Register. AR000073. BLM initiated the scoping process in July 2015, AR000082–3, after which the agency received comments and held public meetings, AR041141. Based on the comments and discussions, BLM prepared a scoping report that identified issues for the agency to analyze in detail during its environmental review. AR000591–680. BLM spent the next several years working with cooperating federal and state agencies, Millard and Beaver Counties, and interested tribes to review and refine the Project. AR041146. BLM coordinated closely with these parties, holding monthly meetings and calls and providing numerous updates. *Id.*; *see also* AR000933–2195.

In November 2018, BLM released the Draft EIS ("DEIS") for the Project based on Peak's Mining Plan and Plan of Development (collectively "Original Plan"), AR040122, which had been updated as of 2018, AR040160. The 200-plus page DEIS analyzes effects on a range of resources, such as air quality and climate, soils, and water. AR040192–307; *see also* AR039776–40121 (DEIS appendices). In addition to a no-action alternative, the DEIS considers five action alternatives that would each involve changing a particular component of Peak's proposed plan. AR040130–31. After a 45-day comment period, BLM received comments on the DEIS from ten different groups or individuals, AR041144–45, including two letters from SUWA, AR000729–60; AR000789–801; *see also* AR000684–808 (all comments on DEIS).

BLM issued the FEIS in July 2019. AR041109. Besides some minor changes, AR041152–53, the five action alternatives were largely the same as those considered in the DEIS, AR041163–77. In general, the Project would involve extracting potassium-bearing brines on the playa, routing the brine through trenches and ponds, allowing evaporation to concentrate the brine, and transferring the saturated brine to a processing facility, where it would be turned into sulfate of potash and later transported via rail. AR041119. Like the DEIS, the FEIS analyzes impacts to a wide range of resources, AR041185–321, and also relies on more detailed reports on each specific resource. *See, e.g.*, AR008789–8902 (air quality report); AR012986–AR013090 (water report). BLM also responded to all comments that it received on the DEIS in one of several separate appendices to the FEIS. AR041510–699.

On August 27, 2019, BLM issued a Record of Decision ("ROD") approving the Project. AR041960. Subject to "all lease stipulations, applicant committed design features, mitigation measures, supplemental plans, and additional conditions of approval," the ROD approves: (1) Peak's Mining Plan; (2) issuance of rights-of-way for construction, operation, maintenance,

and decommissioning of off-lease facilities, consistent with Peak's Plan of Development; and (3) Peak's Gravel Pit Mining Plan. AR041962; AR041971. The ROD further approves supplemental plans on a range of topics, including noxious and invasive weed management, reclamation, site safety, and water monitoring. AR041974. Finally, the ROD also notes Peak's obligation to provide bonding for all phases of the project and pay royalties on all potash produced. AR041969; AR041974.

## III.   SUWA's Challenge to the 2019 FEIS and ROD.

In July 2023, SUWA sued in federal court to challenge BLM's approval of the Project. Pl.'s Opening Br. ("Pl.'s Br.") 13, Dkt. No. 29. SUWA asserted two claims under NEPA, including a claim that BLM failed to consider a "middle-ground alternative" for the Project that SUWA had proposed during the comment period. *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, Case No. 2:23-cv-00492, Dkt. No. 1, 11 (D. Utah). In contrast to Peak's initial plan to develop the whole playa, SUWA's proposed alternative would have "exclude[ed] development on the northern end" of the playa. *Id.* SUWA's 2023 lawsuit was ultimately dismissed in 2024 without prejudice after Peak submitted an amended mining plan to BLM. Pl.'s Br. 13–14.

## IV.   Peak's Amended Plan and BLM's 2025 DNA.

After Peak submitted the first set of amendments to its mining plan in September 2023, BLM began assessing whether additional environmental review would be required. AR048781. BLM continued to hold meetings on potential changes to Peak's plan into 2024 as it waited for Peak to finalize its new approach to the Project. AR048789.

By September 2024, Peak had submitted the final versions of its amended mining plan and amended plan of development (collectively "Amended Plan"). AR043472; AR043762. As well as improving the mining process, the Amended Plan narrowed the Project's scope and

proposed a phased approach. AR043488–90. BLM announced Peak's new proposal on its

ePlanning website and held a public scoping period from February 11, 2025, to March 27, 2025.

AR043965. BLM received few comments on Peak's Amended Plan aside from nearly 200

additional pages of feedback from SUWA. *Id*.; AR044007–169; AR044172–93.

On June 10, 2025, BLM issued a DNA assessing whether the agency was required to

prepare a new EA or EIS to analyze Peak's Amended Plan. AR043968. The DNA observes that

the Amended Plan "reduce[s] the scale of on-lease mining activities, specifically, construction,

extraction, and resource utilization under the initial phase of development." AR043950. Whereas

the Original Plan envisioned producing an average of 328,500 short tons of potash per year

across 114,073 acres of the playa over 32 years, the Amended Plan would produce an average of

215,000 short tons per year across 50,490 acres over 25 years. AR043951. The following images

show the different footprints of the two plans:




Page 6 –       FEDERAL DEFENDANTS' ANSWER BRIEF
           *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

AR043976–77. Notably, the reduced footprint of the Amended Plan closely resembles SUWA's proposed middle-ground alternative to the Original Plan, which would "protect[] the northeast and northwest of the playa to minimize impacts to wildlife." AR000735. Although the Amended Plan contemplates the possibility of developing the northern portion of the playa in a future phase of the Project, any such expansion would require additional submissions by Peak and approvals by BLM. AR043951.

The DNA further examines how the changes to the Project affect specific features and resources. AR043951– 58; *see also* AR048744–50 (checklist analyzing difference in impacts by resource). For example, the 922 gallons per minute of groundwater required under the Original Plan would be reduced to 502 gallons per minute under the Amended Plan. AR043954. And "[t]he overall emissions of greenhouse gases would be generally less than what is analyzed in the FEIS of the overall project life." AR043956. The DNA's analysis led BLM to conclude that Peak's Amended Plan "is within the previously analyzed FEIS scope and is not considered significantly different." AR043965. In light of this determination that no additional NEPA document was necessary, BLM approved Peak's Amended Plan through a Decision Record ("DR") on June 10, 2025. AR043948.

Despite the fact that this new iteration of the Project resembles the middle-ground alternative that SUWA proposed back in its 2018 DEIS comments, AR000735, SUWA nonetheless sued again in July 2025 to challenge BLM's approval of the Amended Plan. Compl. for Decl. and Inj. Relief, Dkt. No. 1. SUWA's complaint asserts four claims under NEPA challenging both the 2019 FEIS and 2025 DNA, *id.* at 15–23, and requests that the Court vacate the 2019 ROD and 2025 DR, *id.* at 23–24.

Page 7 –     FEDERAL DEFENDANTS' ANSWER BRIEF
             *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

## LEGAL BACKGROUND

NEPA is a "purely procedural statute" intended to "inform agency decisionmaking, not to paralyze it." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 173 (2025). "NEPA does not mandate any particular substantive result," but instead "prescribes the necessary process that must accompany agency action." to ensure that an agency "take[s] a hard look at the environmental consequences of its actions." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1179 (10th Cir. 2023) (citation modified). To achieve this, the statute requires preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment." *Id.* at 1178 (quoting 42 U.S.C. § 4332(2)(C)). However, if an existing EIS has already analyzed the impacts of the proposed action, an agency may use a DNA "to determine whether new NEPA documentation is required." *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1162 (10th Cir. 2004).

## STANDARD OF REVIEW

BLM's compliance with NEPA is reviewed under the deferential standard of the Administrative Procedure Act ("APA"). *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009). Under the APA, a court may set aside agency action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:19-CV-00297-DBB, 2021 WL 1222158, at *3 (D. Utah Mar. 31, 2021), *aff'd*, 44 F.4th 1264 (10th Cir. 2022) (quoting *Citizens' Comm. to Save Our Canyons*

*v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)). "In sum, the court's review is 'highlydeferential.'" *Id.* (quoting *Citizens' Comm.*, 513 F.3d at 1176).

## SUMMARY OF ARGUMENT

All of SUWA's NEPA claims fail on the merits because BLM's 2019 FEIS adequately analyzes the effects of Peak's Original Plan and BLM appropriately relied on the 2025 DNA to approve Peak's Amended Plan. First, the FEIS's analysis of the Project's relatively minor GHG emissions satisfies NEPA. Second, the FEIS's quantification of the Project's cumulative impacts on water resources is likewise sufficient. Third, although BLM did not analyze dark night skies as a discrete issue in the FEIS, BLM adequately considered the Project's light emissions and ruled out the need for further analysis. Fourth, contrary to SUWA's misguided argument, 42 U.S.C. § 4336 does not prohibit BLM from concluding in a DNA that a proposed action has already undergone sufficient environmental review. Finally, even if the Court were to find a NEPA violation, remand without vacatur would be the appropriate remedy.

## ARGUMENT

### I.   BLM's Analysis of the Project's Impacts Satisfies NEPA's "Hard Look" Standard.

The Court should defer to BLM's thorough NEPA analysis of the Project's environmental impacts. NEPA requires agencies to take a "hard look" at a project's "likely effects" on the environment. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998)). However, as the Supreme Court "doubly underscore[d]" just last year, courts should "afford substantial deference" to an agency's "fact-dependent, context-specific, and policy-laden choices about the depth and breadth" of its NEPA analysis. *Seven Cty.*, 605 U.S. at 183 (citation modified). Similarly, "the question of whether a particular report is detailed

enough in a particular case itself requires the exercise of agency discretion—which should not be excessively second-guessed by a court." *Id.* at 181. In short, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Am. Wild Horse Campaign v. Raby*, 144 F.4th 1178, 1191 (10th Cir. 2025) (quoting *Seven Cnty.*, 605 U.S. at 185). The FEIS's analysis of GHG emissions, water resources, and dark night skies more than satisfies this deferential standard.

### A. The FEIS's Analysis of GHG Emissions Is Consistent With NEPA.

#### 1. BLM Adequately Considered Direct and Indirect Impacts Related to GHG Emissions.

SUWA's challenge to the FEIS's discussion of GHG emissions is based on a flawed assumption—namely, that NEPA requires the same amount of GHG analysis for all projects regardless of emissions levels.[2] Such a one-size-fits-all approach to GHG analysis has no basis in case law and contradicts NEPA's focus on proportionality. It has long been the case that an agency "is only required to consider potential [environmental] impacts relative to their significance." *Hillsdale Env't Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1177 (10th Cir. 2012) (citing 40 C.F.R. § 1502.2(b)); *see also* AR044542 (2008 BLM NEPA Handbook).[3] This principle applies equally to an agency's analysis of impacts from GHG

---

[2] To the extent SUWA seeks vacatur of the 2019 ROD, SUWA has waived its argument regarding GHG emissions by failing to raise it during the administrative process. In NEPA cases, "objections must specifically raise the issue" that the plaintiff asserts before the court in a subsequent lawsuit. *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1051 (10th Cir. 2015). "[R]ely[ing] on general or vague commentary" is not enough "to avoid the established principles of waiver" *Id.* (quoting *Ariz. Pub. Serv. Co. v. E.P.A.*, 562 F.3d 1116, 1127 (10th Cir. 2009)). During the comment period here, SUWA asserted that the DEIS "failed to analyze – at all – the GHG and climate change impacts" of the Project, AR000739, then made no mention of GHGs at all in its comments on the FEIS, AR000817–71. SUWA never raised the specific arguments about contextualizing emissions or discussing socioeconomic impacts that it now asserts. SUWA's GHG-related arguments are accordingly waived.

[3] While 40 C.F.R. § 1502.2(b) was in effect when the FEIS was issued in 2019, it was rescinded

emissions. *Swomley v. Schroyer*, No. 20-1335, 2021 WL 4810161, at *4 n.3 (10th Cir. Oct. 15, 2021).

Here, BLM's analysis was appropriate given that this Project will emit GHGs on a scale orders-of-magnitude lower than the coal, oil, and gas projects at issue in the cases SUWA relies on. BLM's air quality and climate analysis spans fifteen pages of the FEIS and considers impacts from over a dozen pollutants, including GHGs. AR041186–200; *see also* AR008789–902 (114-page report on Project's effects on air quality and climate). "The three GHGs emitted from all Project sources would be $CO_2$, CH4, and N2O, with the vast majority (greater than 99 percent) being $CO_2$." AR041198. The FEIS quantifies the maximum $CO_2$e emissions from the different types of Project activities, including construction (on-road travel, off-road equipment, and stationary sources), mining operations (on-road travel, off-road equipment, and stationary sources), and rail operations (short line haul, long-line haul, and switching). AR041198–99.[4] These emissions would amount to 26,893 metric tons of $CO_2$e and occur in the fourth year, when construction and mining activities would overlap. AR041199. For reference, this is only slightly above the reportable emissions level under Clean Air Act regulations. 40 C.F.R. § 98.2(a)(2) (requiring facilities to report $CO_2$e emissions that exceed 25,000 metric tons per year).[5]

---

on April 11, 2025, along with the rest of the Council on Environmental Quality regulations. 90 Fed. Reg. 10610. The Department of the Interior now maintains the majority of its NEPA procedures in its Departmental Handbook. 91 Fed. Reg. 8738. Like § 1502.2(b), the handbook states that an EIS "should discuss effects in proportion to their significance." U.S. Dep't of the Interior, *516 DM 1 – NEPA Handbook* § 2.3(c) (February 2026), https://www.doi.gov/media/document/doi-handbook-nepa-procedures, last visited May 21, 2026.

[4] "$CO_2$e" stands for "carbon dioxide equivalent" and is a method of classifying GHGs "in terms of their global warming potential (GWP) relative to $CO_2$ over a 100-year period." AR041198.

[5] Moreover, the overall GHG emissions from the downsized version of the Project will be lower than under the original Mining Plan. AR043956; *see also* AR044354.

Page 11 –    FEDERAL DEFENDANTS' ANSWER BRIEF
          *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

To assess cumulative impacts, BLM compared the Project's $CO_2e$ emissions to the three other facilities in Millard County with reportable emissions: the Graymont/Cricket Mountain Mine/Quarry and Lime Plant; the Intermountain Power Project (IPP); and the Kern River Gas Transmission Plant. AR041293–94; AR041297. These other facilities emitted 8.7 million metric tons (9.6 million tons) of $CO_2e$ in 2016. *Id.* This amounts to 99.69 percent of the county's emissions when considered alongside the Sevier Playa Project at maximum emissions, which would account for just 0.31 percent. *Id.* At the state and national scales, the Project would make up 0.05 percent and 0.0005 percent of $CO_2e$ emissions, respectively. *Id.*

This analysis demonstrates that the Project will be a "minor source of GHG emissions" when considered alongside other sources. *Id.* While BLM could have conducted an even more detailed analysis, courts have not required this when, as here, impacts of a particular type are minor "as compared to other more significant or unmitigable environmental impacts." *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 583 (9th Cir. 2016) (approving of BLM's decision to provide "less analysis of noise effects" due to relatively minor impacts "even though the agency could have included more detailed discussion . . . or collected further information"). In *Hillsdale Environmental*, for example, the Tenth Circuit found no NEPA violation where the Army Corps of Engineers declined to analyze emissions from non-truck vehicle traffic attributable to a new facility because they were "insignificant compared to overall traffic in the area." 702 F.3d at 1177. As the court explained, the Corps was within its discretion to "focus its analysis on fugitive dust emissions and emissions from trucks, heavy equipment, and locomotives—anticipated to be the primary sources of air pollution at the intermodal facility." *Id.* In this case, BLM's decision to focus most of the FEIS's air resource analysis on other types

of pollutants—rather than the minor impacts from GHGs—likewise did not violate NEPA. *See* AR041186–1200; AR041294–98.

*Diné Citizens Against Ruining Our Environment v. Haaland* (*Diné CARE*) does not hold otherwise. 59 F.4th 1016, 1036 (10th Cir. 2023). SUWA focuses on *Diné CARE*'s general holding but ignores the context of the case, which involved the approval of 370 applications to drill for oil and gas that would emit at least 31,487,075.8 metric tons of $CO_2e$ over a 20-year lifespan. 59 F.4th 1016, 1036 (10th Cir. 2023). This works out to an average of 1,574,353 metric tons of $CO_2e$ per year—over *58 times* more than the maximum annual emissions from this Project. AR041199. Under those circumstances, the court determined that a comparison to "regional, national, and global emissions" did not "meaningfully inform the public or decisionmakers about the impact of the emissions." *Diné CARE*, 59 F.4th at 1043. The same is not true here, where the Project's emissions are plainly dwarfed by not only state and national emissions but even nearby facilities. When a project's GHG emissions are this low, the use of a "comparative percentage-based standard" does not present the same risk of "downplay[ing] and manipulat[ing]" the significance of GHG impacts that was a concern in *Diné CARE*. 59 F.4th at 1041 (citing 350 *Montana v. Haaland*, 50 F.4th 1254, 1269–70 (9th Cir. 2022)).

*Diné CARE* is not the only example of distinguishable case law in SUWA's opening brief—indeed, SUWA relies *exclusively* on cases involving fossil fuel projects with categorically higher levels of emissions than the Sevier Playa Potash Project. Pl.'s Br. 22 (citing *WildEarth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 255 (D.D.C. 2020) (oil and gas leasing); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1191 (D. Colo. 2014) (coal mining). SUWA tellingly cites no case law involving other types of projects, where courts have been reluctant to impose strict requirements on GHG analysis. In *Swomley v. Schroyer*, for

Page 13 –     FEDERAL DEFENDANTS' ANSWER BRIEF
          *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

example, the plaintiffs argued that a timber thinning project would result in multiple forms of GHG emissions that the Forest Service failed to analyze in sufficient detail. 484 F. Supp. 3d 970, 976 (D. Colo. 2020), *aff'd*, No. 20-1335, 2021 WL 4810161 (10th Cir. Oct. 15, 2021). The court rejected the plaintiffs' reliance on cases involving "projects, plans, or rules associated with the combustion or extraction of fossil fuels, such as coal, natural gas, or oil," finding that such cases were "a poor analogy to the Project at issue," *id.* at 976, 977. The Court upheld the agency's analysis and observed that the plaintiffs' arguments would "flip on its head the tiered structure envisioned by NEPA—under which agencies must only consider impacts in proportion to their significance." *Id.* (citing 40 C.F.R. § 1502.2); *see also Swomley*, 2021 WL 4810161, at *4 n.3 (declining to consider the GHG issue on the merits but agreeing with the district court's approach). The same reasoning applies here.

Plaintiffs' attempt to frame its GHG argument in terms of socioeconomic analysis fares no better. SUWA's reliance on *Utah Physicians for a Healthy Environment v. United States Bureau of Land Management*—a case about the expansion of a coal mine that would produce "two million tons of coal"—is again misplaced. 528 F. Supp. 3d 1222, 1228 (D. Utah 2021). *Utah Physicians* faulted BLM for failing to adequately explain its decision not to quantify the socioeconomic costs of a project that would emit well over 4 million metric tons of $CO_2$. *Id.* at 1231–32. As an initial matter, given that BLM did provide an explanation for its choice of analysis, *id.* at 1231, *Utah Physicians* is likely incompatible with *Seven County*'s directive that courts should provide "broad latitude" regarding "how far" an agency must go "in considering the indirect effects that might occur outside the area of the immediate project . . . due to emissions," 605 U.S. at 182.

In any event, *Utah Physicians* also declined to "adopt a categorical test that if economic benefits are quantified then economic costs always must be too, because, among other things, some costs may not accurately be reduced to numbers." 528 F. Supp. 3d at 1232. Such is the case here. As the FEIS explains, while "[t]he Project does have GHG emissions and would contribute to climate change[,]" it would be "a minor source" and "its effects alone would be negligible and not discernable from broader regional and global trends." AR041297. This rationale satisfies both *Utah Physicians* and *Seven County*, so SUWA's claim fails.

### 2. BLM Adequately Analyzed the Cumulative Impacts from GHG Emissions.

The Court should also reject SUWA's attack on the FEIS's analysis of cumulative impacts from GHG emissions, which largely rehashes SUWA's prior GHG arguments. According to SUWA, for BLM's cumulative impacts analysis to be "meaningful," it must identify:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) (quoting *Taxpayers of Michigan Against Casinos v. Norton (TOMAC)*, 433 F.3d 852, 864 (D.C. Cir. 2006)). However, even if this standard applies, it does not invalidate BLM's analysis.

First, as a court in the district of D.C. recently observed, it is unclear whether the *TOMAC* standard survives *Seven County*, which holds that "the textually mandated focus of NEPA is the 'proposed action'—that is, the project at hand"—not geographically separate projects. *Chattooga Conservancy v. U.S. Dep't of Agric.*, No. 24-518 (TJK), 2026 WL 865760, at *8 (D.D.C. Mar. 30, 2026) (quoting *Seven Cty.*, 605 U.S. at 186–87); *see also S. Utah Wilderness All. v. U.S.*

Page 15 –    FEDERAL DEFENDANTS' ANSWER BRIEF
          *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

*Dep't of the Interior*, No. CV 24-2476 (RC), 2025 WL 3680685, at \*9 n.6 (D.D.C. Dec. 17, 2025) (noting possibility that fourth and fifth factors from *TOMAC* standard are invalid after *Seven County*, but finding it unnecessary to address the issue). "But even assuming that the [*TOMAC*] test remains intact, it must be tempered by the Supreme Court's general directive that 'courts should defer to agencies' decisions about where to draw the line' about what to include in an environmental review." *Chattooga Conservancy*, 2026 WL 865760 at \*9 (quoting *Seven Cty.*, 605 U.S. at 182). Courts should therefore "give substantial deference to the agency's decisions on which projects are relevant and how to measure and contextualize the anticipated cumulative effects." *Id.*; *see also TOMAC*, 433 F.3d at 860 (observing that the Court's role in NEPA cases is a "limited one, designed primarily to ensure that no arguably significant consequences have been ignored"). SUWA's reliance on the *TOMAC* standard without incorporating principles of deference is misplaced.

Second, even if the standard from *TOMAC* is still valid, BLM satisfied it here. SUWA contends that BLM failed to justify its "cumulative impacts analysis area," or "CIAA," which SUWA claims is limited to "an area smaller than Millard County." Pl.'s Br. 25. This is inaccurate—the FEIS considers GHG emissions from all the facilities in Millard County with reportable emissions and concludes that this Project will account for just 0.31 percent of the total CO2e output. AR041297. BLM also considered cumulative impacts beyond the county by comparing the Project's emissions to state and national levels. *Id.* Given that the effects of GHG emissions are not localized like impacts on other types of resources (such as water or soils), there was no reason for BLM to compare the Project's emissions to specific facilities in other counties, particularly when a comparison within Millard County makes clear that the Project will be a

Page 16 –    FEDERAL DEFENDANTS' ANSWER BRIEF
        *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

minor emissions source. BLM's decision regarding "where to draw the line" for its cumulative effects analysis was thus rational and entitled to deference. *Seven County*, 605 U.S. at 182.

SUWA is also incorrect that BLM failed to consider the impacts from other facilities or the Project's "overall" cumulative impacts. Pl.'s Br. 26. These formulaic arguments completely ignore the principle that "the government's chosen method of analysis is entitled to substantial deference" when analyzing cumulative impacts. *Arizona Mining Reform Coal. v. United States Forest Serv. (AMRC)*, 172 F.4th 641, 659 (9th Cir. 2026). As previously explained, BLM considered the impacts from other nearby facilities by quantifying their $CO_2e$ emissions, which it then compared to this Project. AR041297. BLM was not required to waste time and duplicate efforts by further analyzing the impacts of projects that were not even slated for approval.

SUWA's argument that BLM failed to consider "the overall impact" from GHG emissions continues to improperly compare this case to *Utah Physicians*—which, again, involved a *coal mine*. Pl.'s Br. 26–27. SUWA's attempt to leverage distinguishable case law simply because it pertains to GHGs is unavailing. Because this Project will be a "minor source" of $CO_2e$, BLM reasonably concluded that its effects on climate change will be "negligible." AR041297. And because SUWA does not explain the "the usefulness of any new potential information" on this subject, its claim fails. *Seven Cnty.*, 605 U.S. at 181 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

**B.     The FEIS Adequately Discusses Cumulative Impacts to Water Resources.**

SUWA's challenge to the FEIS's analysis of cumulative impacts to water resources is similarly unpersuasive. According to SUWA, the FEIS fails to adequately analyze effects from other projects within the analysis area and overall effects on water levels. Pl.'s Br. 27. But the record shows that BLM quantified the impacts of other foreseeable projects on groundwater

drawdown in a manner that represents the combined impact on groundwater. While BLM may not have included the level of detail SUWA would prefer, this type of quantitative analysis is sufficient under NEPA.

Courts are highly deferential to agencies when they are analyzing the "potential environmental effects of future or geographically separate projects." *Seven Cnty.*, 605 U.S. at 190. In *AMRC*, for example, the Ninth Circuit recently held that the "the government's chosen method of analysis is entitled to substantial deference" when discussing a mine's cumulative impacts on groundwater when considered alongside a future housing development. 172 F.4th at 660. While the petitioners argued that the Forest Service improperly "dismissed" some of the development's impacts as "speculative," *id.* at 659, the court relied on *Seven County* and held that the agency's decision to analyze cumulative effects "qualitatively, rather than quantitatively, as Plaintiffs would prefer," was acceptable under NEPA, *id.* at 659-660.

And in *Diné CARE*, the Tenth Circuit upheld BLM's water analysis where, as here, the petitioners argued that "BLM quantified the cumulative amount of water the wells would use" but failed to "say anything about the impact the water consumption would have on the environment or specific groundwater sources." 59 F.4th at 1044. The court explained that BLM's quantitative approach was sufficient because "there is a finite amount of water supporting the various water uses in a specific region." *Id.* at 1045. Consequently, a simple comparison to overall water usage in the area showed that the challenged project "account[ed] for a small amount of the total water resources available." *Id.*

BLM's analysis in this case provides enough quantitative information to contextualize the Project's effects on groundwater alongside other uses. BLM's water analysis includes a model estimating the effects of the Project's fresh water supply wellfield on groundwater levels within a

fifteen-mile radius of the wellfield.  AR041279; AR041287. According to the model, "[t]he maximum predicted drawdown is about 12 feet at the center of the well field at the end of the 30-year pumping period." AR041287. Drawdown levels steadily decrease farther away from the wells, as depicted in Figure 9 of the Water Resource Report. AR013060. Groundwater levels would recover once pumping stops, reaching 75% of original levels after ten years and 90% after thirty years. AR041287.[6]

The FEIS then considers the Project's impacts on groundwater in relation to other foreseeable actions in the area, the most significant of which is the West Desert Water Supply and Conservation Project ("West Desert Project"). AR041314–15. The West Desert Project is 30 to 35 miles southwest of Sevier Playa and will provide water to Cedar City via a pipeline from the Wah Wah and Pine Valleys, AR041314, which are also southwest of Sevier Playa, AR038460; AR038479. Groundwater drawdown from the combined effects of the two projects could accumulate in the southern and western portions of the analysis area, where the West Desert Project is predicted to impact groundwater levels by 1-to-50 feet after 62 years. AR041315. However, as the USGS simulation cited in the FEIS shows, the West Desert Project's effects on ground water levels will be concentrated in the southern portions of the Pine and Wah Wah Valleys and diminish moving north toward Sevier Playa. AR038513. After 33 years of pumping, the West Desert Project is expected to reduce water levels at Wah Wah Springs—located well south of the Project CIAA, AR038503—by just 10%, AR041315;

---

[6] Notably, while Peak's Original Plan anticipated using 922 gallons of water per minute from its wells, the Amended Plan would only use 502 gallons per minute—a decrease of nearly half. AR043954. As a result, the current iteration of the Project will result in a much lower drawdown of groundwater.

AR038514.  Given the projects' limited geographic and temporal overlap, the FEIS reasonably concludes that their cumulative impacts will be "moderate and short term." AR041315.

SUWA insists that BLM should have done more to "explain the significance of what th[e] comparison" of groundwater drawdown from the two projects "means in terms of environmental impact." Pl.'s Br. 29. But this was precisely the argument that the Tenth Circuit rejected in *Diné CARE*. 59 F.4th at 1044. To the extent SUWA wishes BLM had further assessed the timing of drawdown and areas of effect, Pl.'s Br. 34, such analysis would require additional studies of each project that BLM was not obligated to perform. *See AMRC,* 172 F.4th at 660; *Dakota Res. Council v. U.S. Dep't of Interior*, No. 22-CV-1853 (CRC), 2024 WL 1239698, at *21 (D.D.C. Mar. 22, 2024) ("Agencies are not required to undertake new scientific and technical research to inform their analyses." (quoting 40 C.F.R. § 1502.23)). BLM disclosed the available data on the two projects' effects and quantitatively analyzed impacts on water levels within the constraints of the existing studies. This satisfies NEPA. *See Seven Cnty.*, 605 U.S. at 173 (observing that NEPA "does not require the agency to weigh environmental consequences in any particular way").

Finally, SUWA also argues that BLM failed to explain the Project's "overall impact" on water resources when considered alongside all other actions in the analysis area. Pl.'s Br. 29. But one of those actions—the continued operation of stock watering reservoirs—is "not in direct connection with the regional aquifer"; consequently, any effects would not accumulate with the impacts to groundwater from the Sevier Playa Potash Project or West Desert Project. AR041315. The other action is the planned construction of the Cricket Bench and Sage Valley Pipelines, which would transport water from the existing Mudhole Well for livestock watering. *Id.* The FEIS concludes that this project would negligibly affect availability of groundwater in the

Page 20 –    FEDERAL DEFENDANTS' ANSWER BRIEF
             *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

regional aquifer, but, because the project has not undergone environmental review, numerical data to compare with the Sevier Playa Potash Project and West Desert Project is lacking. *Id.* Nonetheless, the Mudhole Well is miles north of the 15-mile radius within which this Project's wellfield is likely to impact water levels. AR041289; AR012063. The pipelines would result in just "a small increase in the total amount of water withdrawn from the aquifer," AR041315, so BLM concluded that cumulative effects would be "negligible and limited in extent." AR041315. Given the miniscule impacts to groundwater from projects other than the West Desert Project, the Court should defer to BLM's analytical approach and reject SUWA's claim.

C.    **The FEIS's Consideration of Sources of Light and Impacts on Night Skies is Adequate and Did Not Cause Prejudice.**

Finally, although SUWA is correct that the FEIS does not analyze "dark night skies" as a discrete issue, the FEIS nonetheless sufficiently describes light sources on the Project and the resulting effects. "Deficiencies in an EIS that are mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) (quoting *New Mexico ex rel. Richardson*, 565 F.3d at 704). This means that "the failure to provide a detailed explanation" of a particular conclusion in the review process does not amount to a violation "if the Court's review of the record" shows that the agency did not act arbitrary and capriciously. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 548 F. Supp. 3d 1042, 1062 (D. Colo. 2021), *aff'd*, 40 F.4th 1133 (10th Cir. 2022).

Similarly, "[t]he harmless error rule applies to judicial review of administrative proceedings," *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993), so an APA violation "does not require reversal unless the appellant demonstrates prejudice resulting from the error." *WildEarth Guardians*, 703 F.3d at 1183 (quoting *Prairie Band Pottawatomie Nation*

Page 21 –    FEDERAL DEFENDANTS' ANSWER BRIEF
        *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

*v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012)). This means that "even where there is a violation of NEPA's procedural requirements, relief will not be granted if the decision-maker was otherwise fully informed as to the environmental consequences and NEPA's goals were met." *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42 F.3d 517, 527 (9th Cir. 1994).

Here, even if BLM incorrectly believed that impacts on dark night skies was not raised as an issue during scoping, that mistake did not materially undermine BLM's informed decisionmaking. BLM did not ignore the issue of light pollution, as SUWA suggests. To the contrary, BLM responded early in the administrative process to concerns by the University of Utah that light from the Project could interfere with its Telescope Array Project. AR000973–74. This array "encompasses more than 200,000 acres at the northeast edge of the Project," AR041869, with further expansion planned in the future, AR041883; *see also* AR041806 (mapping location of telescope array).

BLM addressed the University's concern by explaining that the Project's stipulations require Peak to "minimize the amount of light that will be produced" from the Project, including through "lighting shield, directional lighting, and use and placement of portable lights." AR000973; *see also* AR041388. Peak met this requirement by providing that "[n]o lights would be on the playa during night hours, except at the pump stations, which would be turned on when necessary" and "would include shades to focus light downward." AR041235; *see also* AR041155 (mapping pump stations).[7] More generally, only the processing and rail loadout facilities located at the southern end of the playa would operate at night, and lighting in these facilities "would be limited to areas inside or immediately around the buildings and would

---

[7] Given the reduced footprint of the Amended Plan, these light sources will be even more minimal in the operative version of the Project. AR048720.

include downward reflecting shades." AR017032. Consequently, although BLM's stipulations for the Project surmised that a "night sky model" may be required, AR039310, Peak's design features to limit light led BLM to conclude that a night sky model would not be necessary, AR000974. The University of Utah concurred and dropped its concerns about light. AR041559.

In addition, during scoping and after issuance of the DEIS, BLM sent out notifications to Great Basin National Park—which is designated as an International Dark Sky Park—but received no response. *Id.* This is significant, as SUWA's comments on the DEIS specifically noted the exceptionally dark skies at Great Basin National Park as a source of concern about Project lighting. AR041641. Although the park itself apparently did not share SUWA's concerns, BLM nonetheless responded to SUWA by pointing out that 60 miles and "several intervening mountain ranges" separate the park from the Project. AR041559.  Given that the light management plan for the park does not discuss light impacts from distant projects, BLM reasonably concluded that there would be no effects on dark night skies at the park. *Id.* BLM further responded to SUWA's comment about dark night skies by pointing out the stipulation requiring Peak to minimize light from the Project. *Id.*

Given that the BLM already considered the limited sources of light on the Project and ruled out light pollution at both the Telescope Array Project and Great Basin National Park, it is unclear why further consideration of this issue would lead to a more informed decision. Rather than answer this question, SUWA spends the entirety of its argument dwelling on BLM's misconception about whether the issue of dark night skies was raised during scoping. Pl.'s Br. 29–34. This procedural error alone does not show prejudice. *See Laguna Greenbelt*, 42 F.3d at 527. Courts in this district and elsewhere find that a NEPA error is harmless if the plaintiff fails to explain how it led to a substantively inadequate outcome. *See S. Utah Wilderness All. v. U.S.*

Page 23 –     FEDERAL DEFENDANTS' ANSWER BRIEF
              *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

*Dep't of the Interior*, 250 F. Supp. 3d 1068, 1085 (D. Utah 2017) (failure to analyze middle-ground alternative was harmless because plaintiff "failed to demonstrate" that BLM's approach did not "adequately gauge the environmental impacts of issuing" the challenged leases); *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1295 (10th Cir. 2024) (error was harmless because plaintiffs did "not explain what change in the analysis or conclusion would result if the USFS had categorized LMJV's development as a direct effect rather than an indirect effect").

SUWA has not met this burden here, and the evidence in the administrative record suggests that it cannot do so. To the extent SUWA wants BLM to conduct a more detailed analysis of impacts on dark night skies, BLM already considered this option and ruled it out. AR039310; AR000974. This satisfied the University of Utah despite the fact that it operates a light-sensitive telescope array *within* the Project area. AR041559. Given that BLM already believes it has gathered sufficient information on the Project's light effects, forcing BLM to revisit this issue due to a procedural error would not further NEPA's goal of informed decisionmaking. To the contrary, this would be an example NEPA "paralyz[ing]" a project unnecessarily—precisely what the Supreme Court has cautioned against. *Seven Cnty.*, 605 U.S. at 173. The Court should thus reject SUWA's invitation to vacate the ROD and DR based on mothering more than a flyspeck or harmless procedural error.

## II.     BLM's Decision to Issue a DNA When Approving the Amended Mining Plan Was Permissible.

Because Peak's Amended Plan is smaller-scale and lower-impact than its Original Plan, BLM reasonably determined in its DNA that no further analysis under NEPA was necessary. SUWA notably does not contend that the Amended Plan will result in greater environmental impacts or that an EA or EIS should have been prepared on that basis. Instead, SUWA attacks BLM's decision to prepare a DNA as a violation of 42 U.S.C. § 4336, which requires agencies to

Page 24 –     FEDERAL DEFENDANTS' ANSWER BRIEF
            *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

review the impacts of an action in an "environmental document."  But SUWA's argument that § 4336 forbids the use of DNAs is based on a fundamental misunderstanding of the purpose and text of that statute.

Section 4336 is part of a broader set of amendments to NEPA "meaningfully titled the 'Building United States Infrastructure through Limited Delays and Efficient Reviews Act of 2023.'" *Seven Cnty.*, 605 U.S. at 181 n.3 (quoting Pub. L. 118–5, Div. C, Tit. III, § 321, 137 Stat. 38–39(2023)). The Act provides, among other time-saving measures, that "an EIS 'shall not exceed 150 pages' and must be completed in '2 years' or less." *Id.* (quoting 42 U.S.C. §§ 4336a(e)(1)(A), (g)(1)(A)). The 2023 amendments accordingly represent Congress's attempt to "rein in NEPA," which had become a "minefield" for federal agencies tasked with implementing projects. *Appalachian Voices v. FERC*, 139 F.4th 903, 926 (D.C. Cir. 2025) (LeCraft Henderson, J., concurring) (citing Pub. L. No. 118-5, div. C, Tit. III, § 321, 137 Stat. 11, 38–46 (2023)). It is thus ironic for SUWA to argue that the 2023 amendments make the NEPA process *more* burdensome by prohibiting agencies from relying on adequate existing analysis when a project is amended in some way. Such an interpretation is in direct conflict with Congress's purpose of increasing the efficiency of environmental review through its 2023 amendments.

Nor is SUWA's construction supported by the text of the statute. Section 4336(a) simply describes four situations in which "[a]n agency is not required to prepare an environmental document"—i.e., an EIS, EA, or Finding of No Significant Impact ("FONSI")—"with respect to a proposed action." Those situations include when there is no "final agency action," § 4336(a)(1), when a "categorical exemption" applies, § 4336(a)(2), when such a document would "clearly and fundamentally conflict with the requirements of another provision of law," § 4336(a)(3), and when the proposed action is "nondiscretionary," § 4336(a)(4). SUWA assumes

Page 25 –      FEDERAL DEFENDANTS' ANSWER BRIEF
                    *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

that, if none of these exceptions apply, an agency must prepare "an additional environmental analysis" even if the effects of the proposed action have already been analyzed in an existing EA or EIS. Pl.'s Br. 34. But the word "additional" is nowhere to be found in the statute. Section 4336 does not restrict an agency's ability to rely on an environmental document it prepared in the past when approving a new iteration of an existing project.

Indeed, despite SUWA's insistence that § 4336 somehow imposes new requirements, this provision merely reiterates longstanding NEPA principles. All four of the exceptions under § 4336(a) mirror other provisions in the APA or 2020 CEQ regulations. *Compare* 42 U.S.C. § 4336(a)(1) *with* 5 U.S.C. § 551(13); 42 U.S.C. 4336(a)(2) *with* 40 C.F.R. § 1501.4; 42 U.S.C. § 4336(a)(3) *with* 40 C.F.R. § 1501.1(5); 42 U.S.C. 42 U.S.C. § 4336(a)(2) *with* 40 C.F.R. § 1501.1(5). And § 4336(b)'s description of the "[l]evels of review" under NEPA simply restates what courts have long held—that NEPA requires agencies to prepare an EIS or an EA and FONSI before approving a major federal action. *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (citing 42 U.S.C. § 4332(2)(C); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1237 (10th Cir. 2004)). Section 4336 simply provides a consolidated description of how to determine the appropriate level of analysis under NEPA.

The fact that § 4336 incorporates existing NEPA requirements dooms SUWA's claim because courts have long accepted that NEPA does not force agencies to prepare a new EA or EIS when the effects of an action have already been analyzed. The Tenth Circuit "recognize[s] that agencies may use non-NEPA procedures—including completing a Determination of NEPA Adequacy ('DNA')—to decide whether new NEPA documentation is required." *Bd. of Cnty. Commissioners of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*, 706 F. Supp. 3d 1180, 1187 (D. Colo. 2022) (citing *Pennaco Energy*, 377 F.3d at 1162). If it is not, then "the DNA is

Page 26 –    FEDERAL DEFENDANTS' ANSWER BRIEF
             *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

used to terminate the NEPA process without the preparation of a new NEPA document, e.g., a new or supplemental EA or EIS." *Id.* (citing *Pennaco*, 377 F.3d at 1152). This approach has been deemed acceptable even though "DNAs, unlike EAs and FONSIs, are not mentioned in the NEPA or in the regulations implementing the NEPA," *Pennaco*, 377 F.3d at 1162, including the CEQ regulations' definition of "environmental document," 40 C.F.R. § 1508.10. SUWA's argument that a DNA is not an "environmental document" therefore falls flat because the entire point of a DNA is to determine whether there is *already* an adequate environmental document for the action at issue.

SUWA's suggestion that the FEIS is inadequate here because it is "outdated" is likewise unpersuasive. Pl.'s Br. 36. As an initial matter, SUWA's attempt to discredit the FEIS on this basis implicitly recognizes that BLM may rely on a DNA if the underlying EIS adequately discusses the relevant impacts, 42 U.S.C. § 4336 notwithstanding. Yet despite labeling the FEIS as "outdated," SUWA never explains *why* it believes the FEIS is inadequate or *how* Peak's Amended Plan could have impacts beyond those of its Original Plan. *See* Pl.'s Br. 34–40. Instead, SUWA merely repeats its argument that, because the FEIS supposedly "failed to take the requisite hard look" at impacts to "water, climate, and dark night skies" for the original iteration of the Project, BLM could not rely on it in the DNA. *Id.* at 38. This argument fails for all the reasons explained above. *See supra* at 10–24.

SUWA provides no reason for the Court to conclude that the Amended Plan will lead to any greater impacts or new impacts that would require a new EA or EIS. In fact, SUWA's own description of the Amended Plan's shorter lifespan, lower production, and diminished acreage

Page 27 –     FEDERAL DEFENDANTS' ANSWER BRIEF
              *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

suggests the opposite. Pl.'s Br. 14–15. As a result, SUWA does not carry its burden to demonstrate that BLM erred by relying on a DNA to approve the Amended Plan.[8]

### III.   In the Event the Court Finds Any NEPA Violation, Remand Without Vacatur Would Be the Appropriate Remedy.

Although BLM did not violate NEPA by issuing either the FEIS or the DNA, in the event the Court finds otherwise, remand without vacatur would be warranted. To determine if an agency action should be vacated, "courts must consider two factors—(1) 'the seriousness of the [action's] deficiencies (and thus the extent of doubt whether the agency chose correctly),' and (2) 'the disruptive consequences of an interim change that may itself be changed.'" *Diné CARE*, 59 F.4th at 1049 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). In the NEPA context, an EIS that "falls short in some respects" will "not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty.*, 605 U.S. at 185 (citing 5 U.S.C. § 706); *see also Diné CARE*, 59 F.4th at 1049 (observing that "vacatur is not always the appropriate remedy for NEPA violations").

The supposed flaws that SUWA identifies are not the type of serious deficiencies that would make a different outcome likely on remand. Notably, SUWA does not contend that the

---

[8] The fourth claim in SUWA's complaint asserts that BLM failed to "consider new scientific information" before approving the Amended Plan, Dkt. No. 1 at 21, and specifically mentions a "technical memorandum" on hydrology that SUWA submitted to BLM, *id.* at 22. However, SUWA's opening brief makes no argument based on this memorandum or any other new information or changed circumstances that would require a supplemental EA or EIS. Any such argument is accordingly waived. *In re Syngenta AG MIR 162 Corn Litig. (Hossley-Embry Grp. II)*, 111 F.4th 1095, 1112 (10th Cir. 2024) (explaining that, "if an appellant fails to address an issue in its opening brief, [courts] ordinarily deem that issue waived," and that issues raised for the first time on reply generally will not be entertained); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (stating that "[r]eviews of agency action in the district courts must be processed as appeals," so appellate rules of procedure apply).

Page 28 –   FEDERAL DEFENDANTS' ANSWER BRIEF
    *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

FEIS is missing substantive information—BLM's analysis already discloses the Project's GHG emissions and those of nearby facilities, AR041198–99; its groundwater requirements and those of nearby projects, AR041287, AR041314–15; and the nocturnal sources of light in the project area, AR041559. *See Sierra Club v. FERC*, 153 F.4th 1295, 1309 (D.C. Cir. 2025) (vacatur inappropriate where "[t]he Sierra Club has not identified any additional information it seeks that is not already provided in FERC's environmental impact statement"). Rather than identify missing information, SUWA demands that BLM add layers of analysis by contextualizing GHG emissions with a tool like the carbon budget, Pl.'s Br. 22, or explaining the "significance" of cumulative impacts on water, *id.* at 29. SUWA provides even less detail on what type of night skies analysis it seeks, but the record shows that BLM already determined that detailed analysis of this subject is not required given the Project's measures to limit light. AR039310; AR000974; *see W. Watersheds Project v. Rollins*, No. 22-CV-214-SWS, 2025 WL 1445639, at *3 (D. Wyo. Apr. 17, 2025) (finding vacatur inappropriate where "information already in the administrative record" created "serious possibility" that agency would be able to explain its lack of analysis of impacts on prairie dogs).

SUWA's challenge to the DNA is even less supportive of vacatur. As explained above, SUWA does not assert that an EA or EIS is required because the impacts from Peak's Amended Plan will be greater than those of the original Project. There is thus little reason to think that, even if BLM were required to prepare an EA as a procedural matter (it is not), the agency would reach a different outcome. Given that the Tenth Circuit has declined to vacate if the agency "*might* be able to justify [its action] with a fuller explanation," vacatur is clearly unwarranted here where the additional analysis SUWA wants will not transform BLM's understanding of the

Project's impacts. *Ctr. for Biological Diversity v. U.S. EPA*, 149 F.4th 1142, 1152 (10th Cir. 2025).

Finally, the disruptive consequences of vacatur also weigh against that remedy. In *Montana Wildlife Federation v. Haaland*, the Ninth Circuit reversed the district court's decision to vacate 667 BLM lease sales, concluding that the "the disruptive consequences of lease vacatur . . . significantly outweigh the seriousness of the agency's procedural error." 127 F.4th 1, 52 (9th Cir. 2025). These consequences consisted entirely of "economic harm," including loss of lease revenue for BLM and the disruption of the lessees' "investment interests." *Id.* And in *Utah Physicians*—a case SUWA relies on heavily, Pl.'s Br. 23–24—a court in this district held that deficiencies with BLM's analysis of GHG impacts was not enough to warrant vacatur. 528 F. Supp. 3d at 1237. Because BLM could likely "substantiate its decision on remand," the court gave significant weight to the fact that "vacatur would disrupt the activities that have commenced since the lease approval." *Id.*

The alleged procedural NEPA deficiencies that SUWA complains of in this case similarly do not outweigh the disruptions that would result from vacatur. BLM has been working to spur development of the potassium resources on Sevier Playa for decades. AR041135–6. There is good reason for this—U.S. agriculture is heavily reliant on foreign imports to meet its fertilizer needs. AR041117; U.S. GEOLOGICAL SURVEY, *Mineral Commodity Summaries 2025*, 138–39 (March 2025), https:// pubs.usgs.gov/publication/mcs2025, last visited May 20, 2026. Further delaying this Project based on any procedural defects would be contrary to the national interest in developing a domestic supply of potash. And, given past delays with the Project, it is possible that the added uncertainty of vacatur could cause more financing difficulties that derail the

Project entirely. AR043496 (explaining that Peak implemented the phased approach to "mitigate Project risks" after financing troubles).

Vacatur would also have significant economic ramifications for the federal government and the economy of the surrounding area. "A federal potassium lease . . . provides the United States with payment of rental and production royalties [and] bonding for both production and reclamation." AR041969. The government expects to collect a 2% royalty for all potash produced under Peak's Amended Plan, 43 C.F.R. 3504.21; AR043616 (projecting average annual potash production of 215,000 tons); and will collect rent for Peak's rights-of-way, 43 C.F.R. § 2800.2806.23; AR043803–04 (identifying rights-of-way associated with Project). Peak is required to submit multiple bonds to BLM, the first of which was to be submitted before the start of operations in summer of 2025. AR043951.[9] The government would lose these substantial sources of income if the ROD and DR were vacated. And, in addition to adversely impacting Peak, vacatur would eliminate the 275 temporary and full-time jobs that the Project is expected to create, as well as the related economic benefits to the community. AR043844; AR041262.

In light of the serious disruptions vacatur would cause and the relatively minor procedural issues that SUWA raises with BLM's analysis, remand without vacatur would be the appropriate remedy in the event the Court finds any NEPA violation.

## CONCLUSION

Because BLM's approval of the Project complied with NEPA, the Court should deny SUWA's claims and grant judgment to Federal Defendants.

---

[9] Upon the Court's request, BLM can provide a detailed declaration quantifying the amount the federal government stands to lose if the Project were vacated.

Page 31 –    FEDERAL DEFENDANTS' ANSWER BRIEF
            *SUWA v. U.S. Dep't of the Interior*, Case No. 2:25-cv-00657-DBB

Respectfully submitted this 22nd day of May 2026.

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

/s/ Daniel C. Luecke
DANIEL C. LUECKE (CA Bar # 326695)
Trial Attorney
SHANNON BOYLAN (D.C. Bar No. 1724269)
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-7863 (Luecke); (202) 598-9584
(Boylan)
Fax: (202) 305-0506
E-mail: daniel.luecke@usdoj.gov;
shannon.boylan@usdoj.gov

*Attorneys for Federal Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 10,325 words, excluding items identified in Appellate Rule 32(f). It therefore complies with Local Rule 7-4(d)(4)(B) and the type-volume limitations of Appellate Rule 32(a)(7)(B)(i).

/s/ Daniel C. Luecke
Daniel C. Luecke