Shawn T. Welch, #7113
Andrew P. Revelle, #18518
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, Utah 84101
Telephone: (801)799-5800
stwelch@hollandhart.com
aprevelle@hollandhart.com

*Attorneys for Intervenor Peak Minerals, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, <br><br> Plaintiff, <br><br> vs. <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT**, **ADAM G. SUESS**, in his official capacity as Acting Assistant Secretary for Land and Minerals Management, and **MICHAEL D. Gates**, in his official capacity as Bureau of Land Management West Desert District Manager, <br><br> Defendants, <br><br> and <br><br> **PEAK MINERALS, INC.**, <br><br> Intervenor. | **DEFENDANT PEAK MINERALS' RESPONSE BRIEF** <br><br> Civil Action No. 2:25-cv-00657-DBB <br><br> District Judge David Barlow |

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ...........................................................................................................1

BACKGROUND ..............................................................................................................2

     I.     NEPA.............................................................................................................2

     II.    Potash and the Sevier Playa..........................................................................3

     III.   SUWA's 2023 Challenge ...............................................................................6

     IV.  BLM's 2025 Approval of the Modified Mining Plan ....................................7

STANDARD OF REVIEW ..............................................................................................8

SUMMARY OF ARGUMENT .......................................................................................9

ARGUMENT..................................................................................................................10

     I.     SUWA's "hard look" arguments fail because SUWA ignores the United States Supreme Court's decision in *Seven County*....................................10

           A.    *Seven County* reset judicial review of NEPA analysis by requiring "substantial deference" to the scope, content, and detail of an EIS. .................11

           B.    SUWA's arguments on the direct and indirect effects related to greenhouse gases fail because SUWA relies on abrogated legal principles that contradict *Seven County*. ............................................13

           C.    SUWA's cumulative effects arguments fail because SUWA relies on abrogated legal principles that contradict *Seven County*.................17

           D.    SUWA's dark night skies argument contradicts the record and asks the court to ignore *Seven County*.................................................20

     II.    SUWA's NEPA arguments fail because they rely on Council on Environmental Quality regulations that are ultra vires. ............................23

           A.    The Council on Environmental Quality does not have the authority to issue legally-binding regulations.......................................................24

       B.     BLM's analysis of the Project meets the requirements under NEPA and the Department of the Interior rules that applied at the time..............................28

III.     BLM's issuance of the DNA is consistent with NEPA...............................................29

IV.    To the extent the court determines that the BLM violated NEPA, the court should remand the NEPA decisions to BLM without vacatur. ..................................30

CONCLUSION.................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979)..................................................................................................26

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*,
  462 U.S. 87 (1983)...................................................................................................11

*Bd. of Cnty. Commissioners of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*,
  706 F. Supp. 3d 1180 (D. Colo. 2022)....................................................................29

*Chattooga Conservancy v. United States Dep't of Agriculture, Civil Action No. 24-518 (TJK)*,
  2026 U.S. Dist. LEXIS 67788 (D.D.C. Mar. 30, 2026)......................................12, 18

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1970)..................................................................................................25

*Citizens' Comm. to Save Our Canyons v. Krueger*,
  513 F.3d 1169 (10th Cir. 2008) .................................................................................9

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*,
  297 F.3d 1012 (10th Cir. 2002) ...............................................................................21

*Coalition of Concerned Citizens to Make Art Smart v. FTA of U.S. Dep't of Trans*,
  843 F.3d 886 (10th Cir. 2013) .................................................................................26

*Dep't of Transp. v. Pub. Citizen*,
  541 US. 752 (2004)...................................................................................................26

*Diné Citizens Against Ruining Our Env't v. Haaland*,
  59 F.4th 1016 (10th Cir. 2023) ......................................................................... passim

*Fleming v. Mohawk Wrecking & Lumber Co.*,
  331 U.S. 111 (1947)..................................................................................................25

*Friends of the Everglades, Inc. v. Sec'y of United States Dep't of Homeland Sec.*,
  No. 25-12873, 2025 U.S. App. LEXIS 23012 (11th Cir. Sep. 4, 2025)..................26

*Grand Canyon Trust v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002)..................................................................................17

*Greene v. McElroy*,
   360 U.S. 474 (1959)..................................................................................................................25

*Iowa v. Council on Env't Quality*,
   765 F. Supp. 3d 859 (D.N.D. 2025)..................................................................................25, 26

*Iowa v. Council on Envtl. Quality*,
   Nos. 25-1641, 25-1705, 2025 U.S. App. LEXIS 19747 (8th Cir. July 29, 2025) ...................26

*Marin Audubon Soc'y v. FAA*,
   121 F.4th 902 (D.C. Cir. 2024)................................................................................... passim

*Marsh v. Oregon Natural Resources Council*,
   490 U. S. 360 (1989)................................................................................................................12

*Pennaco Energy, Inc. v. United States DOI*,
   377 F.3d 1147, 1162 (10th Cir. 2004) ....................................................................................30

*Propper v. Clark*,
   337 U.S. 472 (1949)................................................................................................................25

*Rose v. McNamara*,
   375 F.2d 924 (D.C. Cir. 1967)................................................................................................25

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   Case No. 2:23-cv-00492, Dkt. No. 1 (D. Utah) .......................................................6, 7, 18, 19

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
   No. 2:19-CV-00297-DBB, 2021 WL 1222158 (D. Utah Mar. 31, 2021), *aff'd*, 44
   F.4th 1264 (10th Cir. 2022) ......................................................................................................9

*S. Utah Wilderness All. v. United States DOI*,
   No. 24-cv-2476 (RC), 2025 U.S. Dist. LEXIS 260934, 2025 WL 3680685 (D.D.C.
   Dec. 17, 2025)..................................................................................................................18, 19

*San Juan Citizens All. v. Stiles*,
   654 F.3d 1038 (10th Cir. 2011) ..............................................................................................17

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025)................................................................................................... passim

*Utah Physicians for a Healthy Environment v. United States Bureau of Land
   Management*,
   528 F. Supp. 3d 1222 (D. Utah 2021).........................................................................13, 14, 15

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U. S. 519 ...................................................................................................................12

*WildEarth Guardians v. Bernhardt*,
    501 F. Supp. 3d 1192 (D.N.M. 2020) ...............................................................................14

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................................................25

## STATUTES

5 U.S.C. § 706............................................................................................................13, 31

42 U.S.C. § 4332(C) ...............................................................................................2, 3, 28

42 U.S.C. § 4336.........................................................................................................29, 30

42 U.S.C. § 4344(3)–(4) ...............................................................................................3, 25

Administrative Procedure Act...........................................................................................8, 13

National Environmental Policy Act ........................................................................... passim

## RULES AND REGULATIONS

40 C.F.R. Part 51 Appendix W ...........................................................................................19

40 C.F.R. § 1503.4(a) (2015)..............................................................................................23

40 C.F.R. §§ 1508.7–1508.8 (2019) .....................................................................................3

43 C.F.R. Part 46...............................................................................................................27

43 C.F.R. §§ 46.10–46.450 (2008) ..................................................................................3, 28

District Court of Utah Local Rule 7-4(d)(4)(B)...................................................................33

Federal Rule of Appellate Procedure 32(a)(7)(B)(i)............................................................33

Federal Rule of Appellate Procedure 32(f) ........................................................................33

Federal Rule of Appellate Procedure 32(g) ........................................................................33

## OTHER AUTHORITIES

42 Fed. Reg. 26967 (May 25, 1977) ...................................................................................24

43 Fed. Reg. 55978 (Nov. 29, 1978)..................................................................................3

91 Fed. Reg. 618 (Jan. 8, 2026) .......................................................................................3

91 Fed. Reg. 8738 (Feb. 24, 2026) ..................................................................................3

*About the IPCC*, IPCC.CH, https://www.ipcc.ch/about/ (last visited May 25, 2026) .....................16

*Hotspot for Cosmic Rays: Touring the Telescope Array Project in Utah*, Nola Taylor
      Tillman, SPACE.COM (May 27, 2017), https://www.space.com/36994-telescope-array-
      project-tour.html .................................................................................................20

*The Intergovernmental Panel on Climate* Change, CLIMATE.MIT.EDU (April 21, 2023)
      https://climate.mit.edu/explainers/intergovernmental-panel-climate-change;........................16

*Population Growth vs Crop Production: examining Potash demand over time* (April 9,
      2025), https://www.bhp.com/news/bhp-insights/2025/04/population-growth-vs-crop-
      production-examining-potash-demand-over-time .......................................................4

United States Constitution ..............................................................................................25

*Visualized: The Surge in Global Potash Demand*, Ryan Bellefontaine,
      VISUALCAPITALIST.COM (June 16, 2025), https://www.visualcapitalist.com/ sp/bhp01-
      visualized-the-surge-in-global-potash-demand........................................................4, 5

**INTRODUCTION**

Peak Minerals, Inc.'s ("Peak Minerals") proposed Sevier Playa Project (the "Project") is a groundbreaking potassium sulfate ("potash") mining operation that is critical to the American economy. Potash is a vital ingredient in the agricultural fertilizers that support food production around the world. However, the United States is currently dependent on foreign sources of potash. The Project has the capability to provide a vital, domestic source of potash to meet America's skyrocketing demand for fertilizer.

The Department of the Interior, Bureau of Land Management ("BLM") approved the Project in 2019, after a decade of research, planning, and environmental analysis in collaboration with Peak Minerals. Pursuant to the National Environmental Policy Act ("NEPA"), the BLM issued a 700-page Final Environmental Impact Statement ("FEIS") that thoroughly analyzed potential environment impacts from the Project.

Despite the BLM approving the Project in 2019, the Southern Utah Wilderness Alliance ("SUWA") waited four years until 2023 to challenge the FEIS in this court. SUWA sought voluntary dismissal of its claims a year later upon learning that Peak Minerals proposed to modify the Project by significantly reducing the scope of mining operations. After additional review, the BLM issued a Determination of NEPA Adequacy ("DNA"), concluding that the existing FEIS was sufficient to serve as the NEPA analysis for the modified Project, and approved the changes.

Despite the fact that the modified Project conforms to the SUWA's original demands to reduce the scope of the Project, SUWA now revives its challenges to BLM's NEPA analysis. However, SUWA's claims flyspeck and contradict the voluminous 49,000-page record of the BLM's NEPA analysis. Moreover, SUWA's arguments ignore the United States Supreme Court's

decision in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025) that reshaped judicial review of NEPA analysis. SUWA's arguments are the exact type of over-intrusive, Kafkaesque criticisms that the Supreme Court prohibits courts from entertaining. The court must reject SUWA's arguments as nothing more than meritless attempts to continue obstructing a critical infrastructure project.

**BACKGROUND**

## I.   NEPA

NEPA requires federal agencies to issue a detailed statement on environmental impacts before undertaking any major federal action significantly affecting the quality of the environment. 42 U.S.C. § 4332(C). NEPA is a "purely procedural statute" that does not impose any substantive obligations on agencies, mandate any specific outcomes, or require agencies "to weigh environmental consequences in any particular way." *Seven Cty. Infrastructure Coal. v. Eagle Cty.*, 605 U.S. 168, 173 (2025); *see Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1025 (10th Cir. 2023) ("*Diné CARE*"). NEPA only requires "that the agency take a 'hard look' at the environmental consequences before taking a major action." *Diné CARE*, 59 F.4th 1016, 1025 (internal quotation marks removed).

As part of its environmental review, NEPA requires agencies to address:

   (i)    reasonably foreseeable environmental impacts of the proposed agency action;

   (ii)    any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; and

   (iii)    a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action.

2

42 U.S.C. § 4332(C). The act does not define the terms "reasonably foreseeable" or "environmental effects."

NEPA also established the Council on Environmental Quality ("CEQ") to "review and appraise" NEPA compliance and to "make recommendations to the President" regarding NEPA. 42 U.S.C. § 4344(3)–(4). Despite this advisory role, CEQ has issued regulations on how agencies must conduct NEPA analyses since 1978. 43 Fed. Reg. 55978 (Nov. 29, 1978). Among many other requirements, the CEQ regulations established a framework for NEPA analysis and required agencies to assess the "direct," "indirect," and "cumulative" effects of a project and defined these terms. 40 C.F.R. §§ 1508.7–1508.8 (2019).

In 2024, the D.C. Circuit determined the CEQ regulations were ultra vires because CEQ has no authority to issue binding regulations. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024). Following this decision, the CEQ repealed its NEPA regulations. 91 Fed. Reg. 618 (Jan. 8, 2026).

The Department of the Interior ("DOI") also issues NEPA regulations that apply to BLM. While past DOI regulations have generally referenced the concepts of direct, indirect, and cumulative effects, the regulations have not defined these terms or established any specific requirements for analyzing such effects. *See* 43 C.F.R. §§ 46.10–46.450 (2008). In 2026, the DOI partially rescinded its NEPA rules. 91 Fed. Reg. 8738 (Feb. 24, 2026).

## II.    Potash and the Sevier Playa

The Sevier Playa is a large, terminal lakebed in southern Utah, 130 miles southwest of Salt Lake City. AR041135. The Sevier Playa is approximately 26 miles long and covers a 125,000-acre stretch of remote land between the towns of Delta (30 miles to the northeast) and Milford

(25 miles to the southeast). *Id.* The area is surrounded by high mountain ranges—the Cricket Mountains to the east and the Blacks Hills portion of the House Range to the West, each reaching elevations of approximately 8,000 feet. *Id.* Beneath the surface of its typically dry lakebed, the Sevier Playa contains potassium-bearing salt brines. *Id.* Since the 1970s, industry has studied the potential to develop these brines into potassium sulfate, commonly known as "potash." *Id.*

Potash is a valuable form of potassium fertilizer that is in high demand to support agriculture in the United States and around the world. AR041117; AR041140–41. As potassium is one of the three essential nutrients for plant growth, potash is an integral part of food production in modern society. AR041140. The agriculture sector in the United States currently relies on foreign sources of potash to meet 90% of its demand. AR041117. Since 1960, "potash demand has significantly outpaced both crop production and population growth." *Population Growth vs Crop Production: examining Potash demand over time*, BHP.COM (April 9, 2025), https://www.bhp.com/news/bhp-insights/2025/04/population-growth-vs-crop-production-examining-potash-demand-over-time. And demand for potash continues to skyrocket—demand is projected to grow by 70% by 2050. *Visualized: The Surge in Global Potash Demand*, Ryan Bellefontaine, VISUALCAPITALIST.COM (June 16, 2025), https://www.visualcapitalist.com/sp/bhp01-visualized-the-surge-in-global-potash-demand/.

Peak Minerals has been working with the BLM and the State of Utah School and Institutional Trust Lands Administration ("SITLA") to develop potash in the Sevier Playa for more than fifteen years. *See* AR041117. Peak Minerals first obtained leases from SITLA in 2008 to develop potash on 6,409 acres of state land on or adjacent to the Sevier Playa. *Id.* In 2011, Peak Minerals purchased potash leases for approximately 95,802 acres of federal land in the Sevier

4

Playa managed by BLM. *Id.* Peak Minerals also entered into a cooperative development agreement with LUMA Minerals LLC ("LUMA") to develop potash rights to an additional 22,012 acres of federal land on the Sevier Playa. *Id.* In total, Peak Minerals controls the rights to develop and operate potash leases for approximately 124,223 acres of land on or adjacent to the Sevier Playa. *Id.*

In 2013, Peak Minerals submitted a Mining Plan to BLM, proposing to construct and operate the Project on these leases. AR016527. Peak Minerals originally designed the Mining Plan to produce 300,000 metric tons of potash per year. AR016535. As required to approve the Mining Plan, BLM commenced an environmental review of the Project pursuant to NEPA. AR000073. BLM conducted a public scoping process to identify environmental impacts and issues to address in its analysis. AR000583–AR000683. The scoping process included a series of public meetings to solicit public comments as well as correspondence with individual stakeholders. *Id.* Over the next several years, the BLM worked closely with other federal agencies, the state of Utah, tribal authorities, local governments, and other stakeholders—including SUWA—to meticulously analyze the potential environmental impacts of the Project. AR000875–AR002195; AR041145–48.

In November 2018, BLM issued the Draft EIS ("DEIS") for the Project as proposed in Peak Minerals' original Mining Plan, Plan of Development, and Gravel Pit Mining Plan. AR040123–AR040325. In the DEIS, the BLM analyzed the environmental effects of the Project on air quality and climate, biological resources, cultural resources, geology and minerals, lands and access, indigenous religious concerns, paleontology, range management, recreation, socioeconomics, soils, visual resources, and water resources. *Id.* The BLM also considered five

alternative versions of the Project as well as the environmental effects of not approving the Project. AR040160–89. Together with its appendices, the DEIS amounted to over 500 pages of environmental analysis. AR039776–AR040325.

The BLM provided a 45-day public comment period and received comments from ten stakeholders, including SUWA. AR000684–AR000808. Based on its review of the comments, BLM conducted additional environmental analysis of the Project. *See* AR041510–AR041699.

In July 2019, the BLM issued the Final EIS ("FEIS"). AR041109–AR041891. The FEIS detailed BLM's environmental review of the Project as revised and updated following the DEIS and public comment. The FEIS and its appendices include over 700 pages of environmental analysis and references and relies upon over 4,000 pages of additional studies, reports, and correspondence regarding specific resources. *See* AR008281–AR013342. The FEIS identifies the original Mining Plan, Plan of Development, and Gravel Pit Mining Plan as the BLM's "preferred alternative," subject to additional mitigation measures that BLM identified. AR041177.

In August 2019, BLM issued the Record of Decision ("ROD"), which approved the Project. AR041960.

### III.    SUWA's 2023 Challenge

In July 2023, nearly four years after BLM issued the FEIS and ROD, SUWA filed a lawsuit in this court, challenging the FEIS and ROD. *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, Case No. 2:23-cv-00492, Dkt. No. 1 (D. Utah). SUWA claimed that the BLM's environmental analysis of specific resources violated NEPA. *Id.* Among other claims, SUWA argued that the BLM failed to consider a "middle-ground alternative" that SUWA proposed in its comments on the DEIS. *Id.* at 11; *see* AR000734–36. SUWA's preferred alternative included reducing the scope

of the Project by excluding development on the LUMA leases, which are predominantly located on the northern half of the Sevier Playa. *Id.*

In September 2024, Peak Minerals submitted a Modified Mining Plan for the Project to BLM. AR043949; *see* AR043472–AR043761. As a result, SUWA sought voluntary dismissal of its 2023 lawsuit without prejudice, which this court granted. *See* SUWA's Br. at 13–14.

### IV.   BLM's 2025 Approval of the Modified Mining Plan

In 2023, Peak Minerals began developing changes to its Mining Plan to account for changes in economic conditions. AR043501. Peak Minerals coordinated with BLM on potential changes to the Mining Plan and submitted its final version of its Modified Mining Plan to the agency in September 2024. AR043949; *See* AR043472–AR043761. The Modified Mining Plan reduced the scale of on-lease mining activities, improved the overall recovery of potash, reduced operating costs, and proposed implementation of the Project in phases. AR043488–90; AR043950. Specifically, the Modified Mining Plan reduced the scope of mining activity from 114,073 acres in the original Mining Plan down to approximately 50,490 acres in the southern half of the Sevier Playa. AR043951. Notably, this reduction in the scope is very similar to the "middle-ground alternative" that SUWA prefers. *Compare* AR000734–36 (SUWA's comments on the alternative which excludes development on the LUMA leases on the northern half of the Sevier Playa) *with* AR043951 (limiting mining to the southern half of the Sevier Playa). The Modified Mining Plan adjusted the average production of the Project from 328,500 tons of potash per year to 215,000 tons per year. *Id.* The Modified Mining Plan also reduced the length of the Project from 32 years to an initial 25-year phase. *See* AR043951. While the Modified Mining Plan references possible

expansion of the Project, any expansions and subsequent phases of the Project would require separate approval by BLM. *See id.*

The BLM issued public notice of the Modified Mining Plan and conducted another scoping process to solicit public comments on the new plan. AR043965.

In June 2025, BLM issued a DNA analyzing whether further NEPA analysis was necessary to approve the Modified Mining Plan. AR043949–AR043984. In the DNA, the BLM considered the environmental impacts of significantly reducing the scope of the Project. AR043949–AR043984. Pursuant to its standard procedures, the BLM analyzed five criteria to determine whether the existing FEIS was adequate to serve as the BLM's NEPA analysis for the Modified Mining Plan. AR043960–65. Based on this analysis, BLM concluded that the FEIS was adequate for this purpose, primarily because the reduced scope of the Modified Mining Plan will decrease the environmental impacts of the Project. *Id.* Accordingly, on June 10, 2025, the BLM issued a DNA Decision Record ("DNA DR") approving the Modified Mining Plan. AR043946–48. In sum, the record in this case spans more than ten years and 49,000 pages of planning, research, analysis, public comments, and revisions regarding the potential environmental impacts of the Projects. AR000001–AR049274.

Despite the BLM's extensive environmental review documented in the voluminous record and Peak Minerals modifying the Project consistent with SUWA's preferred scope, SUWA continues to claim that the BLM violated NEPA and more environmental analysis is required.

## STANDARD OF REVIEW

A federal agency's NEPA analysis is subject to judicial review under the Administrative Procedure Act ("APA"). *Diné CARE*, 59 F.4th 1016, 1029. Under the APA, courts will not

8

overturn an agency's NEPA action "unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* (internal quotation marks omitted). An agency action is arbitrary and capricious if the agency

– has relied on factors which Congress has not intended it to consider;

– entirely failed to consider an important aspect of the problem;

– offered an explanation for its decision that runs counter to the evidence before the agency; or

– if the agency action is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:19-CV-00297-DBB, 2021 WL 1222158, at *9 (D. Utah Mar. 31, 2021), *aff'd*, 44 F.4th 1264 (10th Cir. 2022) (quoting *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008)).

Finally, "[c]ourts should afford substantial deference and should not micromanage" an agency's NEPA choices "as long as they fall within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal.*, 605 U.S. 168, 182–183.

## SUMMARY OF ARGUMENT

The BLM's NEPA analysis of the Project in the FEIS and issuance of the DNA were consistent with NEPA, and SUWA's arguments that the BLM violated NEPA are without merit. First, SUWA's claims that the BLM's analysis failed to meet the NEPA "hard look" standard for climate change, water resources, and dark night skies ignore the Supreme Court's decision in *Seven County*, which fundamentally reset judicial review of NEPA analyses. SUWA's argument that the

9

BLM failed to properly analyze dark night skies contradicts the record. Second, the regulations that SUWA relies upon for these arguments are ultra vires and not legally binding on BLM. Third, BLM's use of a DNA in its approval of the Modified Mining Plan was consistent with NEPA. Fourth, to the extent that the court determines that the BLM violated NEPA, the proper remedy is remand to the BLM without vacatur.

## ARGUMENT

I.     **SUWA's "hard look" arguments fail because SUWA ignores the United States Supreme Court's decision in** *Seven County.*

The United States Supreme Court's decision in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025) was a paradigm shift in NEPA jurisprudence – it reset the standards for judicial review under NEPA. *Seven County* significantly narrowed the scope of the court's role and brought "judicial review under NEPA back in line with the statutory text and common sense." 605 U.S. 168, 184. In correcting the standards for NEPA review, the Supreme Court sharply criticized courts for NEPA decisions that endlessly delayed critical infrastructure projects in the name of redundant rounds of environmental analysis. *Id*.

In arguing that the BLM's NEPA review of the Project was insufficient, SUWA ignores *Seven County*, the most consequential NEPA decision in decades. SUWA's disregard for this controlling precedent is glaring because *Seven County* undermines nearly all of SUWA's legal arguments in its Opening Brief. Instead, SUWA relies on outdated caselaw as if this monumental decision does not even exist. SUWA's failure to acknowledge the impact of *Seven County* dooms SUWA's legal arguments. SUWA asks this court to misinterpret NEPA to impose the type of delays on this critical infrastructure project that the Supreme Court explicitly sought to eliminate in *Seven County*.

**A.** ***Seven County*** **reset judicial review of NEPA analysis by requiring "substantial deference" to the scope, content, and detail of an EIS.**

*Seven County* significantly reigned in judicial review of NEPA analyses by resetting judicial review to focus on "substantial deference" to the determinations of federal agencies. *See id.* at 180. As the Court explained, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Id.* at 185.

*Seven County* concerned the U.S. Surface Transportation Board's NEPA analysis and approval of a project to construct a railroad line. *Id.* at 173. The Board followed standard NEPA procedures and issued a final EIS that included thousands of pages analyzing the significant potential impacts from the project as well as minor potential impacts. *Id.* at 175. The EIS noted that the project could cause increased upstream oil drilling and downstream refining of crude oil transported by the railroad. *Id.* Despite the Board's explanation in the EIS of why additional analysis was not necessary for these attenuated potential projects, the D.C. Circuit determined that the Board's analysis of such indirect effects failed to meet the "hard look" NEPA standard and vacated the Board's EIS and approval. The Supreme Court reversed the D.C. Circuit's decision based on its failure to afford "substantial deference" to the Board's NEPA analysis.

This "substantial deference" is based on the fact that federal agencies are "better equipped to assess what facts are relevant to the agency's own decision than a court" and the longstanding principle that courts must be at their "most deferential" when reviewing an agency's "scientific judgements" and decisions on what "qualifies as significant or feasible." *Id.* at 181–82 (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983)).

The Supreme Court recognized that NEPA requires a federal agency to use its discretion and expertise to "make a series of fact-dependent, context-specific and policy-laden choices about

the depth and breadth of its inquiry—and also about the length, content and level of detail of the resulting EIS." *Id.* at 182–183. As a result, "[c]ourts should afford substantial deference and should not micromanage those agency choices as long as they fall within a broad zone of reasonableness." *Id.* at 183. *Seven County* admonished other courts for failing to apply this "level of deference demanded by the statutory text" and for engaging in "overly intrusive (and unpredictable) review in NEPA cases." *Id.* For instance, courts should provide "broad latitude" to agency determinations regarding its depth of analysis of "the indirect effects that might occur outside the area of the immediate project. . . due to emissions or run off from the project carried elsewhere by air or water." *Id.* at 182. While the specific issue in *Seven County* concerned analysis of a project's indirect effects, the decision clarified that the course correction to substantial deference applies to the entirety of an agency's NEPA analysis. *See id.* at 179–86; *Chattooga Conservancy v. United States Dep't of Agriculture, Civil Action No. 24-518 (TJK),* 2026 U.S. Dist. LEXIS 67788, at *26, n. 8 (D.D.C. Mar. 30, 2026).

*Seven County* sharply criticized how prior misinterpretation of NEPA has caused the unnecessarily delay of important infrastructure projects and how the vacatur of NEPA documents results in redundant analysis by federal agencies that "sometimes seems to 'borde[r] on the Kafkaesque.'" *Seven County* at 184 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U. S. 519, 557). In clarifying the limited role that courts play in the NEPA process, the Supreme Court explained that:

> Congress did not design NEPA for *judges* to hamstring new infrastructure and construction projects. On the contrary, as this Court has stressed, courts should and "must defer to the informed discretion of the responsible federal agencies."

*Id.* at 184 (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)).

12

Crucially, *Seven County* also clarified that an EIS that "falls short in some respects" will "not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project it if added more to the EIS." *Id.* at 185 (citing 5 U.S.C. § 706).

### B. SUWA's arguments on the direct and indirect effects related to greenhouse gases fail because SUWA relies on abrogated legal principles that contradict *Seven County.*

The BLM's analysis of direct and indirect impacts from the Project's greenhouse gas ("GHG") emissions meets the NEPA "hard look" standard as characterized by *Seven County*. However, SUWA's Opening Brief is replete with outdated legal arguments that contradict the standard of review for NEPA analyses established in *Seven County.* SUWA cites caselaw where courts failed to apply substantial deference to NEPA analysis and instead micromanaged agency decisions that were within a broad zone of reasonableness. *Seven County* abrogates the principles that SUWA cites from this caselaw. Moreover, SUWA's application of these outdated principles to the NEPA analysis of the Project ignores the Supreme Court's particularly high degree of deference for "context-specific" NEPA determinations.

SUWA criticizes BLM's analysis of GHG impacts based on two cases undermined by *Seven County—Diné CARE*, 59 F.4th 1016 (10th Cir. 2023) and *Utah Physicians for a Healthy Environment v. United States Bureau of Land Management*, 528 F. Supp. 3d 1222 (D. Utah 2021). Neither of these cases applied the "substantial deference" to agency NEPA determinations that *Seven County* now demands. Instead, these cases simply applied the general level of deference for agency decisions and scientific determinations under the APA. *See Diné CARE*, 59 F.4th at 1029; *Utah Physicians for a Healthy Environment*, 528 F. Supp. 3d 1222, 1227. Moreover, these cases

13

micromanage the "context-specific" decisions by federal agencies regarding the scope and depth of NEPA analyses.

SUWA relies on *Diné CARE* to argue that BLM's methodology for analyzing the impact of GHG emissions from the Project violated NEPA. SUWA Br. at 19–22. Based on *Diné CARE*, SUWA claims that (1) BLM's comparison of the Project's GHG emissions to county, state, and national GHG emissions is insufficient; and (2) BLM failed to explain why it did not use SUWA's preferred method for analyzing GHG impacts. *Id.* But these criticisms are the exact type of judicial micromanagement that *Seven County* prohibits.

In *Diné CARE*, the court scrutinized the BLM's conclusion that a project represented a de minimis contribution to climate change based on a comparison of the GHG emissions from the project to the GHG emissions at the state and national levels. 59 F.4th at 1035–1044. In rejecting BLM's analysis, the Tenth Circuit acknowledged that "[c]ourts have disagreed about whether BLM's method for analyzing cumulative impacts of emissions satisfies [the NEPA] standard." *Id.* at 1040 (citing *WildEarth Guardians v. Bernhardt*, 501 F. Supp. 3d 1192, 1208-09 (D.N.M. 2020) ("[C]ourts both in and out of the Tenth Circuit have offered mixed messaging on using climate change-based data in decisions.")). The court also criticized BLM for failing to explain why it did not apply a different analytical method preferred by certain public comments, despite BLM's conclusion that there was not an accurate method for assessing the global or local effects on climate change from an individual land management action. *Id.* at 1041.

SUWA then cites *Utah Physicians*, claiming that the case establishes the highly detailed rule that the socioeconomic analysis of a project cannot identify economic benefits without discussing the costs of GHGs together with climate change. SUWA Br. at 23. Such a standard is

14

incredibly detailed and requires the court to closely parse the federal agency's context-specific decisions regarding the scope of discussion for a single aspect of the NEPA review.

*Diné CARE* and *Utah Physicians* epitomize the type of "overly intrusive (and unpredictable)" standards concerning the depth of scope and depth of NEPA analysis that *Seven County* rejects, particularly in the context of "indirect effects that might occur outside the area of the immediate project. . . due to emissions from the project carried elsewhere by air." *Seven County* at 182. Under the "substantial deference" standard established in *Seven County*, courts must defer to such context-specific agency decisions regarding the scope and depth of NEPA review that are within "a broad zone of reasonableness." *Seven County* at 183. Even if the court's reasoning in *Utah Physicians* survived the *Seven County* decision, *Utah Physicians* explained that the district court did not "adopt a categorical test that if economic benefits are quantified then economic costs always must be too, because, among other things, some costs may not accurately be reduced to numbers." 528 F. Supp. 3d at 1232.

The BLM's use of a comparative analysis to assess the impacts of GHG emissions from the Project satisfies *Seven County* because it is within this broad zone of reasonableness, particularly given the context of the relatively small amount of GHG emissions at issue. As BLM explained in the FEIS, the maximum annual GHG emissions over the 35-year life of the Project would represent merely 0.0005% of national emissions, 0.05% of Utah emissions, and 0.31% of Millard County emissions. AR041198. This level of emissions is also small compared to the emissions at issue in *Diné CARE*, which amounted to 58 times more than the maximum annual emissions from the Project. *See* Federal Defendants' Br. at 13 (citing AR041199). Nevertheless, BLM discussed this comparative analysis at length in the FEIS. AR041198–99. Given the

15

relatively low GHG emissions from this Project, the depth of BLM's analysis of direct and indirect climate change impacts is within the "broad zone of reasonableness."

BLM also cited to the Intergovernmental Panel on Climate Change ("IPCC")—the leading authority on climate change research[1]—to explain why accurate analysis of regional and local climate change impacts is not currently possible:

> Overall, while it is apparent that global warming has occurred over the last 150 years, the climate change models cannot be used to predict future climate changes at regional and small scales. According to IPCC's Fifth Assessment Report, The Physical Science Basis (IPCC 2013), there is considerable confidence that climate models provide credible quantitative estimates of future climate change, particularly at continental scales and above, but the confidence of the changes projected by global models decreases at smaller scales. Global climate models are at this time imperfect and due to their uncertainties should not be used as the only basis for public policy decisions.

AR041199. Thus, BLM provided a broadly reasonable explanation for not applying SUWA's preferred method for assessing the direct and indirect climate change impacts from the Project. That is all that *Seven County* requires.

Similarly, BLM's decision not to closely analyze the climate change impacts of the Project in the FEIS section on socioeconomic impacts is within a "broad zone of reasonableness." As BLM explained, the Project will be "a minor source" of GHG emissions and "its effects alone would be negligible and not discernable from broader regional and global trends." AR041297. Thus, it was broadly reasonable for BLM to focus on other, more significant socioeconomic impacts of the Project.

---

[1] *The Intergovernmental Panel on Climate* Change, CLIMATE.MIT.EDU (April 21, 2023) https://climate.mit.edu/explainers/intergovernmental-panel-climate-change; *see About the IPCC*, IPCC.CH, https://www.ipcc.ch/about/ (last visited May 25, 2026).

In sum, SUWA's reliance on caselaw that closely scrutinized the context-specific agency decisions on the scope and depth of NEPA analyses contradicts the current guardrails for NEPA review under *Seven County*.

### C. SUWA's cumulative effects arguments fail because SUWA relies on abrogated legal principles that contradict *Seven County*.

The BLM's analysis of the Project's cumulative effects on climate change and water resources also satisfy the NEPA "hard look" standard. BLM's decisions regarding the scope of these analyses was within the "broad zone of reasonableness" established in *Seven County*.

SUWA again misinterprets NEPA by arguing that BLM's scope of analysis for cumulative impacts on climate change and water resources was insufficient. Pet. Br. at 24–29. SUWA heavily relies on the five-element test established in *Grand Canyon Trust v. FAA*, 290 F.3d 339, 351 (D.C. Cir. 2002) and applied by the Tenth Circuit in *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1056 (10th Cir. 2011) to determine whether a cumulative impact analysis is sufficient. *Id.* This strict test is another expression of the type of detailed judicial standard that the Supreme Court denied in *Seven County*. This test purports to define the scope of cumulative impact analyses by requiring courts to reject agency analyses that fail to identify any of the following:

(1) the area in which the effects of the proposed project will be felt;

(2) the impacts that are expected in that area from the proposed project;

(3) other actions—past, present, and proposed, and reasonably foreseeable— that have had or are expected to have impacts in the same area;

(4) the impacts or expected impacts from these other actions; and

(5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*San Juan Citizens All.*, 654 F.3d at 1056.

17

This rigid, judicially-created standard violates the Supreme Court's prohibition on micromanagement of the "fact-dependent, context-specific and policy-laden choices about the depth and breadth" of a federal agency's inquiry. *See Seven County* at 183. It similarly contradicts the Supreme Court's directive that NEPA analysis focus on the "project at hand," rather than speculative effects that may occur as a result of other, separate projects. *See id.* at 182–83. The test inflates the "hard look" standard into an inflexible script that federal agencies must follow to determine the scope and content of cumulative effect analyses. As the Supreme Court clarified in *Seven* County, this is not what NEPA requires. SUWA's cumulative effects arguments fail because they hinge on this now invalid NEPA standard of review.

Even if the five-element test remains intact, "it must be tempered by the Supreme Court's general directive that 'courts should defer to agencies' decisions about where to draw the line' about what to include in an environmental review." *Chattooga Conservancy v. United States Dep't of Agriculture*, Civil Action No. 24-518 (TJK), 2026 U.S. Dist. LEXIS 67788, at *25 (D.D.C. Mar. 30, 2026); *see also S. Utah Wilderness All. v. United States DOI*, No. 24-cv-2476 (RC), 2025 U.S. Dist. LEXIS 260934, 2025 WL 3680685, at *9-11 (D.D.C. Dec. 17, 2025) (applying the test with *Seven County* deference). Additionally, courts must be highly deferential to agency analysis of "potential environmental effects of future or geographically separate projects." *Seven County* at 190. Thus, to the extent that the test still applies, courts "should give substantial deference to the agency's decisions on which projects are relevant and how to measure and contextualize the anticipated cumulative effects." *Chattooga Conservancy* at *25–*26 (upholding cumulative effects analysis under the test and the deferential *Seven County* standard); *see S. Utah Wilderness All.* at *31 (same).

The BLM's cumulative effects analysis for both climate change and water resources meets the five-part test, particularly as imbued with the substantial deference required by *Seven County.*

Regarding BLM's analysis of cumulative climate change impacts, BLM satisfied the first element of the test by identifying an analysis area "extending approximately 30 kilometers (km) (19 miles) in all directions from the Project's ambient air boundary." AR041186. This analysis area is broadly reasonable because it covers the range for near-field analysis identified in EPA guidance. *See id.* (citing "40 CFR Part 51 Appendix W, also known as the Guideline on Air Quality Models (GAQM) (EPA 2017a)"); AR008521–22 (the area of assessment for near-field air quality impacts extends 50 km from the source); AR008527 (30 km from the ambient air boundary of the Project equates to about 55 km from the center of the playa). BLM met the second element of the test by identifying the potential GHG emissions from the Project. AR041297. BLM then met the third and fourth elements of the test by identifying the GHG emissions from facilities in Millard County with reportable emissions. *Id.* Finally, BLM met the fifth element of test by assessing the GHG emissions of these facilities together with the emissions from the Project and discussing the cumulative impacts that "are projected to occur for the analysis area," including "increased warming and precipitation changes." *Id.* While SUWA may nitpick BLM's method and depth of analysis for these five elements, the record demonstrates that the BLM's analysis of cumulative climate change impacts was within a "broad zone of reasonableness" as required by *Seven County*.

The same is true for the BLM's analysis of cumulative impacts to water resources. SUWA claims that the BLM failed to assess the reasonably foreseeable impacts of other actions in the analysis area and the collective impact of these actions together with the Project's impacts on water. SUWA Br. at 27–29. As the Federal Defendants detail at length in their Opening Brief, the

19

record demonstrates that SUWA is wrong—the BLM quantified the groundwater drawdown resulting from other foreseeable actions and analyzed such impacts in tandem with the drawdown impacts from the Project. *See* Federal Defendants' Br. at 18–21. SUWA questions BLM's analytical methodology and level of detail in explaining the significance of the cumulative groundwater drawdown from the Project and other reasonably foreseeable actions. SUWA Br. at 29. But, again, the Supreme Court prohibits this level of micromanagement. *See Seven County* at 173 ("NEPA does not require the agency to weigh environmental consequences in any particular way").

**D. SUWA's dark night skies argument contradicts the record and asks the court to ignore *Seven County*.**

During the NEPA scoping process for the Project, BLM received one comment regarding potential light impacts from the Project on a University of Utah telescope array. AR000658. The comment included the following handwritten notes from Robert Cady, a University of Utah professor[2] in the Department of Physics and Astronomy:

> Telescope Array needs following information:
> Light emitted by Processing Plant
> Locations and Frequency of Communications Towers
> Dust raised by operations?

*Id.* As a result, BLM included "[p]otential effects of project lighting on night sky" in a summary of issues identified from comments during the scoping process. AR000601. BLM directly responded to this specific scoping comment by inviting the University to participate in a BLM call with "cooperating agencies" call and subsequently highlighting for the University the provisions

---

[2] *Hotspot for Cosmic Rays: Touring the Telescope Array Project in Utah*, Nola Taylor Tillman, SPACE.COM (May 27, 2017) https://www.space.com/36994-telescope-array-project-tour.html (identifying Robert Cady as a professor at the University of Utah).

of the BLM lease and the Project's Mining Plan that specifically detail how the Project will minimize the amount of light produced. *See* AR000973–74 (BLM email correspondence with the University of Utah). Among other measures to minimize light, the Mining Plan requires that "[n]o lights will be on the playa during night hours, except at the lift stations and brine transfer station" and that such lights "will include shades to focus light downward." *Id.* Based on these strict lease requirements, BLM concluded that a night sky model would not be necessary to further assess the University's comment. *Id.* The University did not identify any additional concerns regarding lighting. *Id.*; AR041559.

The BLM generally uses the scoping process to identify issues that warrant further analysis in an EIS. *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022 (10th Cir. 2002). In this case, the BLM determined not to analyze this issue in depth in the FEIS because it had resolved the University's questions during the scoping process. *See* AR041559. Nonetheless, BLM included in appendices to the FEIS an assessment of the potential interaction between the University Telescope Array and the Project based on the size and location of the Array relative to the Project. *See* FEIS Appendix M, AR041869 and AR041883; FEIS Appendix L, AR041806.

No scoping comments addressed light from the Project or the broader issue of impacts on "dark night skies." BLM included Great Basin National Park—a designated International Dark Sky Park—on the mailing lists for scoping and notification of the DEIS, but did not receive any comments from the Park. AR041559.

Nonetheless, SUWA argues that BLM violated NEPA because the BLM failed to analyze the Project's impacts on "dark night skies." SUWA Br. at 29–34. SUWA contends that this broader issue was raised during the scoping process and that the BLM failed to properly analyze dark skies

21

in response to SUWA's public comment on the DEIS. *Id.* SUWA is wrong on both counts and ignores the "substantial deference" owed to BLM when making such decisions on the appropriate scope and depth of its NEPA analysis.

First, the broader issue of "dark night skies" was not raised during the scoping process. The University of Utah raised a much narrower issue—the potential impact of Project lighting on the University's Telescope Array. AR000658. While BLM labeled this issue in a summary document as "[p]otential effects of project lighting on night sky," AR000601, the University's comment was specific to the lighting impacts on its Telescope, not on the resource of "dark night skies" as a whole. AR000658. SUWA's argument ignores this distinction in the record. BLM received no other comments relating to Project lighting or dark night skies during the scoping project. Accordingly, BLM's explanation in its response to SUWA's comment regarding dark skies analysis in the DEIS is consistent with the record.

Second, SUWA wrongly claims that the BLM failed to properly respond to SUWA's comment demanding that the BLM further analyze "dark night skies." SUWA Br. at 32–34. SUWA commented that BLM should use a specific analytical tool to consider the effects of the Project on "dark night skies," particularly in relation to Great Basin National Park. AR041559. In response, the BLM explained that it chose not to analyze the broader issue of "dark night skies" because it was not raised during the scoping process. *Id.* The BLM also detailed how the BLM addressed the University's specific comments during the scoping process. *Id.* The BLM then supplemented its response with additional analysis that BLM conducted in response to SUWA's comment, including review of the physical distance and geographic landmarks separating Great Basin National Park from the Project, the light management plan for Great Basin National Park,

22

and the provisions of the BLM leases requiring the Project to minimize light production. *Id.* This additional analysis further justified the reasonableness of the BLM's decision not to analyze "dark night skies" in the FEIS.

Accordingly, the BLM's response was sufficient under the regulatory standard that SUWA cites, because BLM "explain[ed] why the comments do not warrant further agency response, citing cases, authorities, or reasons to support BLM's position." *See* SUWA Br. at 33 (citing 40 C.F.R. § 1503.4(a) (2015)). SUWA argues that the BLM should have also added "citations to cases or other authorities" to its explanation. *Id.* However, this contradicts the standard that SUWA itself cites. *See* 40 C.F.R. § 1503.4(a) (2015) (allowing the BLM's explanation to rely on "cases, authorities, *or* reasons").

Moreover, SUWA's criticism of BLM's decision not to further analyze "dark night skies" in the FEIS is precisely the type of "overly intrusive" review of "fact-dependent, context-specific and policy-laden choices about the depth and breadth" of NEPA analysis that the Supreme Court prohibits courts from entertaining. *Seven County* at 183. SUWA effectively asks the court to ignore *Seven County* by flyspecking this discrete decision that BLM thoroughly explained in the record.

## II.    SUWA's NEPA arguments fail because they rely on Council on Environmental Quality regulations that are ultra vires.

SUWA's arguments are built upon the authority of the Council on Environmental Quality ("CEQ") regulations implementing NEPA. SUWA cites these regulations to establish the required framework of adequate NEPA review, including the requirements to analyze potential "direct," "indirect," and "cumulative effects" as well as the regulatory definitions of those terms. SUWA Br. at 5, 18–19, 22, 24, 32–34. SUWA then claims that BLM violated NEPA by failing to meet these regulatory requirements. *Id.* SUWA also relies on caselaw that analyzed the meaning and

23

requirements inherent in the CEQ regulations. *Id.* As a result, SUWA's arguments are entirely reliant on the authority of the CEQ to establish the legal requirements for BLM's NEPA analysis.

However, the CEQ regulations are ultra vires and unenforceable because CEQ does not have NEPA rulemaking authority. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902 (D.C. Cir. 2024). To be clear, BLM's NEPA analysis of the Project meets the standards of these CEQ regulations. But even if SUWA were correct that BLM's analysis did not comply with these standards, SUWA's NEPA arguments fail because the CEQ regulations are not judicially enforceable. For the purposes of the court's review of the BLM's NEPA analysis, the CEQ regulations constitute— at most—non-bonding agency guidance, rather than the strict legal standards that SUWA claims them to be.

### A. The Council on Environmental Quality does not have the authority to issue legally-binding regulations.

Resolving many years of "serious concern" about whether CEQ's regulations are legally binding, the D.C. Circuit concluded in *Marin Audubon* that CEQ does not have rulemaking authority. 121 F.4th 902. CEQ's supposed rulemaking authority was based upon a 1977 executive order instructing CEQ to issue regulations governing how federal agencies conduct environmental analyses under NEPA. *Id.* at 910 (citing Exec. Order No. 11991, 42 Fed. Reg. 26,967 (May 25, 1977)). Despite the CEQ publishing its NEPA regulations in the Code of Federal Regulations for decades, the D.C. Circuit found the regulations ultra vires because "[n]o statute confers rulemaking authority on CEQ." *Id.* at 912 ("NEPA contains nothing close to the sort of clear language Congress typically uses to confer rulemaking authority.").

For the CEQ regulations to be "legally binding" on agencies, there must be "a nexus between the regulations and some delegation of the requisite legal authority by Congress." *Id.*

24

(quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 304 (1970)). Under NEPA, the CEQ's only authority is to "review and appraise" NEPA compliance and to "make recommendations to the President." *Id.* at 910 (citing 42 U.S.C. § 4344(3)–(4)). As federal agencies are "creatures of statute, possessing only the authority that Congress has provided them," CEQ has no rulemaking authority. *Id.*

Further, the CEQ regulations are not a valid delegation of the President's obligation under the United States Constitution to faithfully execute laws. *Id.* at 913. "The Constitution does not permit the President to seize for himself the 'law-making power of Congress' by issuing an order that, 'like a statute, authorizes a government official to promulgate. . . rules and regulations.'" *Id.* at 914 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952)); *see Iowa v. Council on Env't Quality*, 765 F. Supp. 3d 859, 878–80 (D.N.D. 2025) (rejecting the argument that NEPA authorizes the President to issue regulations and the Executive Order simply sub-delegates authority to CEQ).

Nor does any possible acquiescence by Congress implicitly ratify the CEQ regulations. *Iowa*, 765 F. Supp. 3d 859, 881–82. The instances where courts have found Congressional inaction to implicitly ratify an Executive Action are generally confined to those areas that are explicitly under the President's control, such as national security and foreign affairs. *See id.* (citing *Propper v. Clark*, 337 U.S. 472, 475 (1949); *Fleming v. Mohawk Wrecking & Lumber Co.*, 331 U.S. 111, 114 (1947); *Rose v. McNamara*, 375 F.2d 924, 926 (D.C. Cir. 1967)). Moreover, "congressional inaction is insufficient when 'administrative action has raised serious constitutional problems.'" *Id.* (quoting *Greene v. McElroy*, 360 U.S. 474, 507 (1959)). As the 1977 Executive Order directing the CEQ to issue binding regulations contradicts the CEQ's role as defined by

statute, the Executive Order "implicates the exact separation of powers issues that the judicial system is bound to uphold and protect." *See id.*

While prior precedent appears to support the CEQ's rulemaking authority, courts in such cases did not scrutinize the source of this authority. *See Marin Audubon Society* at 913 (analyzing the limited scope of judicial statements on this issue in *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) and *Dep't of Transp. v. Pub. Citizen*, 541 US. 752, 757 (2004)); *see also Iowa* at 878–89. For instance, prior to the *Marin Audubon Society* decision, the Tenth Circuit has upheld the application of the CEQ regulations, but has not analyzed the source of the CEQ's rulemaking authority. *See Coalition of Concerned Citizens to Make Art Smart v. FTA of U.S. Dep't of Trans*, 843 F.3d 886 (10th Cir. 2013).

Federal courts have begun implementing the *Marin Audubon Society* decision. In *Friends of the Everglades, Inc. v. Sec'y of United States Dep't of Homeland Sec.*, No. 25-12873, 2025 U.S. App. LEXIS 23012, at *19 n.5 (11th Cir. Sep. 4, 2025), the Eleventh Circuit applied *Marin Audubon* Society to reject the use of a term as defined under the CEQ regulations. Further, the District of Iowa vacated a set of 2024 CEQ regulations based on its conclusion, consistent with *Marin Audubon Society*, that the CEQ does not have any rulemaking authority. *Iowa*, 765 F. Supp. 3d 859 (decision vacated as moot in *Iowa v. Council on Envtl. Quality*, Nos. 25-1641, 25-1705, 2025 U.S. App. LEXIS 19747, at *2 (8th Cir. July 29, 2025) because the CEQ withdrew its 2024 regulations)). Consistent with these decisions, this court should apply the straightforward analysis from *Marin Audubon Society* to hold that the CEQ regulations are ultra vires and that SUWA's arguments grounded in such regulations fail.

26

The D.C. Circuit left open the possible validity of agency regulations that adopt the CEQ rules by reference. *Marin Audubon Society* at 914. However, this circumstance is not before the court because SUWA cites the CEQ regulations as the basis of its NEPA arguments, not any NEPA regulations promulgated by BLM or the DOI. *See* SUWA Br. at 5, 18–19, 22, 24, 32–34.

In its Opening Brief, SUWA acknowledges that the CEQ repealed its NEPA regulations in 2026 but claims that the version of the CEQ regulations in effect at the time of the FEIS and ROD should control the court's review. *See* SUWA Br. at 4, n. 2. However, as the CEQ lacks the authority to issue any legally binding regulations, all CEQ regulations are void ab initio and do not govern the court's review of the NEPA analysis in this or any case. *See Marin Audubon Society* at 908 (refusing to address whether NEPA analysis complied with CEQ regulations because the regulations are ultra vires).

In the DNA, BLM acknowledged the *Marin Audubon Society* decision and explained that "the BLM has nonetheless elected to follow [the CEQ regulations], in addition to the DOI's procedures/regulations implementing NEPA at 43 CFR Part 46, to meet the agency's obligations under NEPA." AR043959. This statement does not subject BLM's NEPA analysis to judicial review under the requirements of the CEQ regulations. Indeed, no such statement can override the fact that the CEQ regulations are not legally binding and cannot form the basis of this court's review. Instead, it explains a prudent decision by BLM to ensure that its NEPA actions conform to previously controlling regulations during a time of significant change.

**B.  BLM's analysis of the Project meets the requirements under NEPA and the Department of the Interior rules that applied at the time.**

As the CEQ regulations are ultra vires and are not legally binding, the legal requirements applicable to the BLM's NEPA analysis of the Project are those established in NEPA itself and the DOI NEPA regulations in effect at the time BLM issued the FEIS, ROD, DNA, and DNA DR.

NEPA broadly requires federal agencies to assess "reasonably foreseeable environmental effects of the proposed agency action," "a reasonable range of alternatives," and "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C. § 4332(C). The statute does not further refine "reasonably foreseeable environmental effects" as requiring specific types of analysis for direct, indirect, and cumulative effects.

The DOI NEPA regulations in effect at the time generally reference the concepts of direct, indirect, and cumulative effects, but do not define those terms or establish any specific requirements for analyzing such effects. *See* 43 C.F.R. §§ 46.10–46.450 (2008). They differ from the CEQ regulations cited by SUWA which establish specific requirements for analyzing such effects. At most, these DOI regulations could be interpreted as simply requiring agencies to assess direct, indirect, and cumulative effects. But without binding legal requirements of how agencies must do so, the DOI regulations and the essential statutory requirements of NEPA afford BLM significant discretion to determine the framework and scope of its NEPA analysis.

The FEIS meets these broad analytical requirements of NEPA and the DOI regulations effective at the time. In the thousands of pages of analysis in the FEIS, supporting documents, and scientific reports, BLM thoroughly analyzed the reasonably foreseeable environmental effects from the Project, including the direct, indirect, and cumulative effects on climate change and water

28

resources. The BLM's decisions on the scope and level of detail at which to analyze these effects were reasonable within a broad zone of reasonableness, particularly under the "substantial deference" owed to such agency decisions under *Seven County*. When measured against the requirements that legally bound BLM at the time of the FEIS, BLM's NEPA analysis is more than sufficient.

### III. BLM's issuance of the DNA is consistent with NEPA.

As the BLM explained at length in the DNA, it was appropriate for BLM to use a DNA and rely on its existing NEPA review to approve the Modified Mining Plan because the Plan significantly reduces the environmental impacts of the Project and additional environmental analysis was not necessary. *See* AR043949–AR043984. SUWA does not dispute this point. SUWA only asserts a creative argument that BLM was required to issue an additional "environmental document" under 42 U.S.C. § 4336 and that a DNA does not constitute such a document. *See* SUWA Br. at 34–38.

Peak Minerals incorporates by reference the Federal Defendants' detailed explanation of why SUWA's interpretation of 42 U.S.C. § 4336 is incorrect. *See* Federal Defendants' Br. at 24–28. Congress expressly establish Section 4336 to increase the efficiency of NEPA review. Moreover, nothing in the text of Section 4336 restricts BLM from relying on an existing environmental document to approve an amended version of the Project. *Id.* at 25–26. Indeed, courts have long-held that federal agencies "may use non-NEPA procedures—including completing a Determination of NEPA Adequacy ('DNA')—to decide whether new NEPA documentation is required." *Bd. of Cnty. Commissioners of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*,

29

706 F. Supp. 3d 1180, 1187 (D. Colo. 2022) (*Pennaco Energy, Inc. v. United States DOI*, 377 F.3d 1147, 1162 (10th Cir. 2004)).

SUWA's argument amounts to a novel interpretation of Section 4336 that the text of NEPA and federal caselaw summarily debunk. As a result, SUWA fails to demonstrate why the DNA is improper under NEPA.

On a practical level, it makes sense for the BLM to rely on the existing FEIS in approving the Modified Mining Plan because the Plan significantly reduces the scale of the Project. AR043950 (detailing how the Modified Mining Plan reduces the scale of on-lease mining activities, including construction, extraction, and resource utilization). Tellingly, the Modified Mining Plan reduces the scope of the Project to a degree very similar to what SUWA requested in its public comments.

**IV.    To the extent the court determines that the BLM violated NEPA, the court should remand the NEPA decisions to BLM without vacatur.**

As explained in the Federal Defendants' brief and herein, the BLM's FEIS, ROD, DNA, and DNA DR all complied with NEPA. However, if the court determines that any of BLM's actions violated NEPA, remand to BLM without vacatur of these documents is the proper remedy.

Peak Minerals incorporates by reference the Federal Defendants' explanation, based on long-standing precedent, that vacatur of these NEPA documents would be improper given the limited nature of the deficiencies alleged by SUWA and the disruptive consequences of vacatur. *See* Federal Defendants' Br. at 24–28 (citing *Diné CARE*, 59 F.4th at 1049). As the Supreme Court emphasized in *Seven County,* NEPA analysis that "falls short in some respects" will "not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven*

30

*County* at 185 (citing 5 U.S.C. § 706). Vacatur of BLM's approval for the Modified Mining Plan is not necessary here because none of the additional NEPA analysis that SUWA claims is required would cause the BLM to disapprove the Plan. The additional analysis that SUWA demands would only add superfluous information to BLM's already thorough consideration of the Project's impacts on climate change, water resources, and the University of Utah's Telescope Array.

Peak Minerals writes separately to further emphasize the incredibly disruptive consequences of vacatur for Peak Minerals and the United States. Since 2011, Peak Minerals has diligently worked with the BLM, SITLA, and others to facilitate the development of potash in the Sevier Playa. *See* Decl. of Woods Sileroy (ECF-20-1), ¶ 5. Peak Minerals has invested tens of thousands of hours and over $100 million dollars to design, sequence, plan, and analyze the Project as well as to support BLM's NEPA review both of the original Mining Plan and the Modified Mining Plan. *Id.* at 6. Vacatur of the FEIS or the DNA would not just further delay development of the Project, but would require the BLM to restart its NEPA analysis from square one. Such a result would further compound the financial and practical challenges of developing potash in the Sevier Playa.

Vacatur would also exacerbate the economic risks of America's near-total reliance on foreign sources of potash. The Project represents the type of important infrastructure development that the Supreme Court intended to protect from endless environmental review in its *Seven County* decision.

## CONCLUSION

The BLM's environmental review of the Project was consistent with NEPA. The FEIS, ROD, DNA, and DNA DR met the analytical and procedural requirements of NEPA, as clarified

31

by the Supreme Court in *Seven County*. SUWA ignores the paradigm shift that *Seven County* represents. Instead, SUWA bases its arguments on an abrogated misinterpretation of NEPA as an exacting statute that authorizes "Kafkaesque" scrutiny of reasonable agency decisions on the scope and detail of its analysis. Moreover, SUWA relies on regulations that are ultra vires and do not govern BLM's NEPA analysis. This court must follow the Supreme Court's directives in *Seven County* and reject SUWA's overly intrusive demands for unending NEPA analysis. The stakes of the Project are too important for another round of redundant environmental review.

DATED this 1st day of June, 2026.

> HOLLAND & HART LLP
> */s/ Andrew Revelle*
> Shawn T. Welch
> Andrew P. Revelle
> *Attorney for Intervenor*
> *Peak Minerals, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant Federal Rule of Appellate Procedure 32(g), I certify that this brief contains 9,138 words, excluding items identified in Appellate Rule 32(f). It therefore complies with Local Rule 7-4(d)(4)(B) and the type-volume limitations of Appellate Rule 32(a)(7)(B)(i).

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of June, 2026, I caused a true and correct copy of the foregoing Answer Brief, along with a proposed form of order, to be served by CM/ECF upon the addressee(s) listed below:

shannon.boylan@usdoj.gov
steve@suwa.org
hanna@suwa.org


/s/ Andrew Revelle
Andrew Revelle

34