Stephen H.M. Bloch (UT #7813)
Hanna Larsen (UT #18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, UT 84111
(801) 486-3161
steve@suwa.org
hanna@suwa.org

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **SOUTHERN UTAH WILDERNESS ALLIANCE**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR** *et al*.,<br><br>Defendants, and<br><br>**PEAK MINERALS, INC.**,<br><br>Intervenor-Defendant. | **PLAINTIFF'S REPLY BRIEF**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Case No. 2:25-cv-00657-DBB-JCB<br><br>District Judge David Barlow<br>Magistrate Judge Jared Bennett |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

GLOSSARY ............................................................................................................ viii

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 1

   I.    *SEVEN COUNTY* IS NOT A "GET OUT OF JAIL FREE" CARD: BLM MUST STILL TAKE A HARD LOOK AT ENVIRONMENTAL IMPACTS ...................................... 2

   II.   *MARIN AUDUBON'S* DISCUSSION OF THE CEQ'S NEPA REGULATIONS IS NONBINDING DICTA THAT DOES NOT FORECLOSE SUWA'S CLAIMS ............ 5

   III.   BLM FAILED TO TAKE A HARD LOOK AT THE SPP PROJECT'S ENVIRONMENTAL IMPACTS ...................................................................... 8

       A.    BLM Failed to Take a Hard Look at Greenhouse Gas Emissions and Climate Change.......................................................................................................... 9

       B.    BLM Failed to Take a Hard Look at Cumulative Impacts to Water Resources ..... 15

       C.    BLM Failed to Take a Hard Look at Dark Night Skies ......................................... 18

   IV.   BLM'S ARGUMENTS SUPPORTING ITS USE OF A DNA TO APPROVE THE SPP PROJECT—RATHER THAN AN ENVIRONMENTAL DOCUMENT—ARE UNAVAILING ...................................................................................................... 25

       A.    NEPA's Plain Language Does Not Support the Use of a DNA.............................. 25

       B.    A DNA is Inappropriate When the Underlying NEPA Analysis is Flawed or Incomplete............................................................................................................. 28

   V.   VACATUR IS AN APPROPRIATE REMEDY FOR BLM'S NEPA VIOLATIONS THAT WILL NOT YIELD DISRUPTIVE OR PREJUDICIAL CONSEQUENCES.... 30

CONCLUSION............................................................................................................. 36

CERTIFICATE OF COMPLIANCE .......................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*350 Montana v. Haaland*,
   50 F.4th 1254 (9th Cir. 2022).................................................................................... 11, 12

*Adams v. Fed. Aviation Admin.*,
   168 F.4th 1271 (10th Cir. 2026).......................................................................................... 7

*Ariz. Mining Reform Coal. v. U.S. Forest Serv.*,
   172 F.4th 641 (9th Cir. 2026)................................................................................ 14, 16, 17

*Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*,
   706 F. Supp. 3d 1180 (D. Colo. 2022) ............................................................................. 27

*Biodiversity Conserv. All. v. Jiron*,
   762 F.3d 1036 (10th Cir. 2014)............................................................................ 8, 10, 14, 20

*Bostock v. Clayton Cnty.*,
   590 U.S. 644 (2020) ......................................................................................................... 25

*Carcieri v. Salazar*,
   555 U.S. 379 (2009) ......................................................................................................... 25

*Chattooga Conserv. v. U.S. Dep't of of Agric.*,
   No. 24-518 (TJK), 2026 U.S. Dist. LEXIS 67788 (D.D.C. Mar. 30, 2026) ..................... 4, 5, 16

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ......................................................................................................... 28

*Citizen's Comm. to Save our Canyons v. U.S. Forest Serv.*,
   297 F.3d 1012 (10th Cir. 2002)......................................................................................... 29

*Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*,
   4 F.3d 1543 (10th Cir. 1993)............................................................................................. 16

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   72 F.4th 1166 (10th Cir. 2023)............................................................................................. 8

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ........................................................................................................... 4

iii

*Diné Citizens Against Ruining Our Env't v. Haaland*,
59 F.4th 1016 (10th Cir. 2023)............................................................................................ passim

*Diné Citizens Against Ruining Our Env't v. Bernhardt*,
923 F.3d 831 (10th Cir. 2019)..................................................................................................... 17

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989) .................................................................................................... 33

*Grand Canyon Trust v. Fed. Aviation Admin.*,
290 F.3d 339 (D.C. Cir. 2002) ...................................................................................................... 5

*Idaho Wool Growers Ass'n v. Vilsack*,
816 F.3d 1095 (9th Cir. 2016)............................................................................................... 23, 24

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ................................................................................................................... 2, 4

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................................................... 28

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
121 F.4th 902 (D.C. Cir. 2024) ............................................................................................. 2, 6, 7

*Mont. Wildlife Fed'n v. Burgum*,
No. 4:18-cv-00069-BMM, 2026 U.S. Dist. LEXIS 131708 (D. Mont. June 12, 2026)............ 33

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .............................................................................................................. 3, 23, 24

*N.M. ex rel. Richardson v. U.S. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009)............................................................................................... passim

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ...................................................................................................... 24

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994)....................................................................................................... 8

*Or. Nat. Res. Council v. Marsh*,
52 F.3d 1485 (9th Cir. 1995)........................................................................................................ 20

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
377 F.3d 1147 (10th Cir. 2004)................................................................................................... 27

*Prairie Band of Pottawatomie Nation v. Fed. Highway Admin.*,
　684 F.3d 1002 (10th Cir. 2012) ....................................................................... 23, 24

*Protect Our Cmtys. Found. v. Jewell*,
　825 F.3d 571 (9th Cir. 2016) ................................................................................ 21

*Robertson v. Methow Valley Citizens Council*,
　490 U.S. 332 (1989) ............................................................................................... 2

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
　783 F. Supp. 3d 1354 (D. Utah 2025) .................................................................... 7

*S. Utah Wilderness All. v. U.S. Dep't of the Interior*,
　No. 24-2476 (RC), 2025 U.S. Dist. LEXIS 260934 (D.D.C. Dec. 17, 2025) ......................... 4, 5

*San Juan Citizens All. v. Stiles*,
　654 F.3d 1038 (10th Cir. 2011) ..................................................................... passim

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*,
　605 U.S. 168 (2025) ...................................................................................... passim

*Sierra Club, Inc. v. Bostick*,
　787 F.3d 1043 (10th Cir. 2015) ......................................................................... 9, 20

*St. Charles Inv. Co. v. Comm'r*,
　232 F.3d 773 (10th Cir. 2000) ........................................................................... 26, 27

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
　282 F. Supp. 3d 91 (D.D.C. 2017) ........................................................................ 32

*Sunward Corp. v. Dun & Bradstreet, Inc.*,
　811 F.2d 511 (10th Cir. 1987) .............................................................................. 19

*Swomley v. Schroyer*,
　484 F. Supp. 3d 970 (D. Colo. 2020) .................................................................... 10

*Tal v. Hogan*,
　453 F.3d 1244 (10th Cir. 2006) ........................................................................ 33, 35

*Taxpayers of Mich. Against Casinos v. Norton (TOMAC)*,
　433 F.3d 852 (D.C. Cir. 2006) ............................................................................... 5

*Thompson v. Weyerhaeuser Co.*,
　582 F.3d 1125 (10th Cir. 2009) .............................................................................. 6

v

*United States v. Goldbaum*,
　879 F.2d 811 (10th Cir. 1989) ........................................................................... 26

*Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*,
　528 F. Supp. 3d 1222 (D. Utah 2021) ........................................................... 12, 13

*Utah Shared Access All. v. U.S. Forest Serv.*,
　288 F.3d 1205 (10th Cir. 2002) ........................................................................ 16

*W. Watersheds Proj. v. Haaland*,
　69 F.4th 689 (10th Cir. 2023) ........................................................................... 30

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
　870 F.3d 1222 (10th Cir. 2017) ........................................................................ 33

*WildEarth Guardians v. U.S. Forest Serv.*,
　137 F.4th 1068 (10th Cir. 2025) ......................................................................... 7

*WildEarth Guardians v. Zinke*,
　368 F. Supp. 3d 41 (D.D.C. 2019) .................................................................... 32

**Statutes**
42 U.S.C. § 4321 .................................................................................................. 1

42 U.S.C. § 4332 ................................................................................................ 15

42 U.S.C. § 4336 ..................................................................................... 25, 26, 27

42 U.S.C. § 4336e ..................................................................................... 25, 26

5 U.S.C. § 702 ................................................................................................... 30

5 U.S.C. § 706 ............................................................................................... 1, 36

Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023) ................................ 27

**Regulations**
40 C.F.R. § 1501.11 (2023) ............................................................................... 27

40 C.F.R. § 1502.9 (2023) ................................................................................ 27

40 C.F.R. § 1508.7 (2019) ................................................................................ 16

40 C.F.R. § 1508.8 (2019) ................................................................................ 15

43 C.F.R. § 3504.25 ................................................................................................ 34

43 C.F.R. § 3504.50 .......................................................................................... 34, 35

43 C.F.R. § 3504.65 ................................................................................................ 35

43 C.F.R. § 3504.71 ................................................................................................ 35

43 C.F.R. § 46.120 ................................................................................................. 29

**Rules**

Fed. R. Evid. 201 ............................................................................................... 33, 35

**Other Authorities**

Bureau of Land Mgmt., *H-3809-2 Surface Management Bond Processing* (2016) ..................... 34

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | United States Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| CIAA | Cumulative Impacts Analysis Area |
| DNA | Determination of NEPA Adequacy |
| DOI | United States Department of the Interior |
| DR | Decision Record |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| GBNHA | Great Basin National Heritage Area |
| GHG | Greenhouse Gas |
| LUMA | LUMA Minerals, Inc. |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SPP | Sevier Playa Potash |
| SUWA | Southern Utah Wilderness Alliance |

**INTRODUCTION**

This case is about the Federal Defendants,' Bureau of Land Management, *et al.* (collectively, "BLM") flawed 2019 and 2025 decisions to authorize a large-scale potash mine to be developed in one of the wildest and most remote areas in Utah. Both BLM and Intervenor-Defendant Peak Minerals, Inc. ("Peak") largely attempt to justify BLM's approval of the Sevier Playa Potash Project ("SPP Project") through a series of impermissible *post-hoc* arguments. Those arguments maintain that there is evidence in the record for the Court to defer to, but as explained herein, there is none. Instead, the record shows that BLM has made substantial and glaring violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

For the reasons set forth below and in Plaintiff Southern Utah Wilderness Alliance's ("SUWA") Opening Brief, the 2019 Final Environmental Impact Statement ("FEIS"), 2019 Record of Decision ("2019 ROD"), 2025 Determination of NEPA Adequacy ("2025 DNA"), and 2025 Decision Record ("2025 DNA DR") should be set aside and vacated.

**ARGUMENT**

SUWA raised three main arguments in its Opening Brief: 1) BLM failed to take a hard look at the SPP Project's greenhouse gas ("GHG") emissions and its impacts to climate change, water resources, and dark night skies; 2) BLM failed to conduct the requisite environmental analysis of the 2025 mining plan; and 3) BLM arbitrarily relied on an unlawful NEPA document. In response, BLM and Peak rely heavily on *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025), to try to minimize the strengths of SUWA's arguments and the severity of BLM's errors. But *Seven County* is not the cure-all decision that BLM and

1

Peak portray it to be, and SUWA's arguments are certainly not foreclosed by *Seven County's* holding. Similarly, Peak attempts to argue that *dicta* from the D.C. Circuit's decision in *Marin Audubon Society v. Federal Aviation Administration*, 121 F.4th 902 (D.C. Cir. 2024) forecloses SUWA's hard look arguments. Basic principles of *stare decisis* render Peak's argument meritless.

Regarding the merits of SUWA's hard look arguments, BLM and Peak ignore entire aspects of SUWA's arguments, fail to meaningfully distinguish the numerous on-point and binding cases supporting these arguments, and selectively cite the administrative record to fit their narrative. Their arguments regarding the lack of environmental analysis for the 2025 mining plan, and in particular, BLM's use of a DNA, fare no better.

Finally, contrary to BLM's and Peak's claims, vacating the FEIS, 2019 ROD, 2025 DNA, and 2025 DR is appropriate and will not result in prejudicial or disruptive consequences to BLM or Peak.

## I.     *Seven County* is Not a "Get Out of Jail Free" Card: BLM Must Still Take a Hard Look at Environmental Impacts

In *Seven County*, the Supreme Court made two holdings: (1) when reviewing the adequacy of an agency's EIS the court should afford "substantial deference to the agency as to the scope and contents of the EIS," 605 U.S. at 192; and (2) agencies are not required to consider the upstream or downstream effects from separate projects over which they do not exercise regulatory authority. *Id.* at 187-88. Importantly, neither of these holdings absolve BLM from "identify[ing] significant environmental impacts" and taking a "hard look" at any such environmental impacts. *Id.* at 181; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Nor do

they eliminate an agency's duty to provide a reasoned and detailed explanation of its decision. *Seven Cnty.*, 605 U.S. at 181; *see also Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'").

BLM and Peak both rely heavily on *Seven County* to excuse BLM's failure to take a hard look at the SPP Project's GHG emissions and impacts on climate change, water, and dark night skies. *See* BLM Br. 9-10, 15-16 (ECF No. 34); Peak Br. 10-23 (ECF No. 35). They argue that under *Seven County's* "substantial deference" standard the FEIS is sufficient, even though the crux of SUWA's hard look argument for each of these resources is that BLM completely "failed to consider an important aspect of the problem," and (in the case of dark night skies) "offered an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43; *see* Opening Br. 19-33. Indeed, *Seven County* instructs that

> [s]o long as the EIS addresses environmental effects from the project at issue, courts should defer to agencies' decisions about where to draw the line—including (i) how far to go in considering indirect environmental effects from the project at hand and (ii) whether to analyze environmental effects from other projects separate in time or place from the project at hand.

605 U.S. at 182 (emphasis added). But here, as SUWA explains in its Opening Brief and in more detail below, BLM did not adequately address the environmental effects at issue and thus did not take a hard look at GHG emissions and climate, water, or dark night skies.

Furthermore, SUWA specifically argues that BLM failed to take a hard look at cumulative impacts to GHG emissions and climate and water. BLM and Peak attempt to expand *Seven County* to eliminate NEPA's required cumulative impacts analyses, and Peak boldly

3

asserts that *Seven County* abrogates *San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038 (10th Cir. 2011) and does away with BLM's duty to <u>analyze</u> cumulative impacts to the extent the Tenth Circuit requires. BLM Br. 15-16; 17-20. Not so. For one, *Seven County* does not even mention cumulative impacts at all. Rather, that decision addressed <u>indirect</u> upstream and downstream impacts and whether, or to what extent, an agency is required to consider those impacts from a project when caused by a third-party outside of the action agency's authority or control. Tellingly, *Seven County* did not overrule Supreme Court precedent that explicitly addresses an agency's duty to consider cumulative impacts and those cases remain binding on this Court. *See, e.g.*, *Kleppe*, 427 U.S. at 410, 414-15; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769-770 (2004). Likewise, the Tenth Circuit's holding in *San Juan Citizens Alliance* remains binding on this Court.

BLM's and Peak's sole reliance on two nonbinding, unpublished, and out-of-circuit district court decisions to argue otherwise is unpersuasive. *See* BLM Br. 15-16 (citing *Chattooga Conserv. v. U.S. Dep't of of Agric.*, No. 24-518 (TJK), 2026 U.S. Dist. LEXIS 67788 (D.D.C. Mar. 30, 2026) and *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 24-2476 (RC), 2025 U.S. Dist. LEXIS 260934 (D.D.C. Dec. 17, 2025)); Peak Br. 18 (citing the same). In *Chatooga Conservancy*, the court acknowledged that, at best, it's unclear how *Seven County* applies in the context of cumulative impacts because "[t]hat case was, admittedly, focused on <u>indirect</u> environmental effects, rather than cumulative ones." 2026 U.S. Dist. LEXIS 67788 at \*25. The court proceeded to apply the five-factor test set forth in *San Juan Citizens Alliance*.[1] *Id.* at \*25-

---

[1] In the D.C. Circuit, the five-factor *San Juan Citizens Alliance* test is often referred to as the "*Grand Canyon Trust*" or "*TOMAC*" test, after the D.C. Circuit cases first establishing the test. However, the elements of the *Grand Canyon Trust/TOMAC* test are identical to those in the *San*

4

33. The *Southern Utah Wilderness Alliance* court did the same: it acknowledged *Seven County*'s "substantial deference" holding, assessed whether BLM took a hard look at the cumulative impacts of the challenged oil and gas leasing decision, and concluded based on those facts that it had. 2025 U.S. Dist. LEXIS 260934, *25-31. Contrary to what BLM and Peak would like the Court to believe, BLM <u>is</u> required to analyze the cumulative impacts of a proposed project and, in the Tenth Circuit, that cumulative impacts analysis must adhere to the *San Juan Citizens Alliance* test.

In sum, SUWA has not "ignore[d] *Seven County*" or "disregard[ed]" its relevance as Peak claims. Peak Br. 10; *but see* Opening Br. 5, 40 (citing *Seven Cnty.*, 605 U.S. at 180,181). *Seven County* is simply not the cure-all BLM and Peak make it out to be. *Seven County* reinforced the longstanding principle that—when determining whether BLM took a hard look at the SPP Project's environmental impacts to GHG emissions and climate change, water, and dark night skies—the Court "should afford substantial deference to the agency." 605 U.S. at 180.

## II. *Marin Audubon's* Discussion of the CEQ's NEPA Regulations is Nonbinding *Dicta* that Does Not Foreclose SUWA's Claims

Rather than meaningfully grapple with the merits of SUWA's NEPA claims, Peak dedicates a significant portion of its brief asserting that "SUWA's NEPA arguments fail" because of the D.C. Circuit's decision in *Marin Audubon*. *See* Peak Br. 23-29. This argument is meritless because the relevant aspects of the *Marin Audubon* decision are nonbinding *dicta* that

---

*Juan Citizen Alliance* test. *Compare Grand Canyon Trust v. Fed. Aviation Admin.*, 290 F.3d 339, 351 (D.C. Cir. 2002), *with Taxpayers of Mich. Against Casinos v. Norton (TOMAC)*, 433 F.3d 852, 864 (D.C. Cir. 2006), *with San Juan Citizens All.*, 654 F.3d at 1056.

cannot supersede Tenth Circuit precedent and Peak's argument is undermined by more recent Tenth Circuit decisions.

In *Marin Audubon*, the issue on appeal was whether the Federal Aviation Administration and National Park Service violated NEPA by issuing a joint Air Tour Management Plan without first preparing any environmental analysis under NEPA. *Marin Audubon*, 121 F.4th at 908.[2] Rather than address and resolve the parties' arguments about whether the Plan complied with NEPA, the divided three judge panel *sua sponte* declared that the Council on Environmental Quality's ("CEQ") implementing NEPA regulations were *ultra vires* because CEQ does not have rulemaking authority. *Id.* at 912-14.[3] Ultimately, the lawfulness of the CEQ regulations had no bearing on the court's holdings that specifically addressed whether the agencies used a proper baseline for evaluating the environmental effects of the Air Tour Management Plan. *Id.* at 915 (stating that the baseline issue does not "invoke[e] CEQ regulations").

As such, *Marin Audubon's* discussion of whether the CEQ's implementing NEPA regulations were lawful, *id.* at 920, is simply *dicta*. *See Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009) ("*dicta* are statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential the determination of the case in hand") (cleaned up).[4] The Tenth Circuit's treatment of NEPA cases post-*Marin*

---

[2] The agencies instead completed a "Categorical Exclusion Documentation Form." 121 F.4th at 908.

[3] As the dissent points out, the question of whether the CEQ regulations themselves were lawful was not raised by any party and therefore not before the court. *Id.* at 920. On the contrary, all parties assumed the CEQ regulations applied and were binding; the only question was whether the federal agencies had <u>complied</u> with NEPA when issuing the Air Tour Management Plan. *Id.* at 909.

[4] Even if *Marin Audubon's* CEQ regulations discussion was germane to the court's holdings, it is an out-of-circuit case that is not binding on this Court.

*Audubon* is also telling. The Circuit has decided two NEPA cases after *Marin Audubon* was issued that involve the now-rescinded CEQ regulations and in both, the court applied the relevant regulations to its analyses and made no mention of *Marin Audubon's* declaration that the CEQ regulations were *ultra vires*. *See Adams v. Fed. Aviation Admin.*, 168 F.4th 1271, 1279 n.7 (10th Cir. 2026);[5] *WildEarth Guardians v. U.S. Forest Serv.*, 137 F.4th 1068, 1083 (10th Cir. 2025). The same is true for district court NEPA cases post-*Marin Audubon*. *See, e.g.*, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 783 F.Supp.3d 1354, 1359 (D. Utah 2025).

Finally, assuming *arguendo*, that *Marin Audubon* is somehow relevant, SUWA's arguments withstand any application of that case. Though SUWA cites the CEQ regulations in effect at the time the FEIS and 2019 ROD were issued, contrary to what Peak claims, SUWA's arguments are not "entirely reliant on the authority of the CEQ to establish legal requirements for BLM's NEPA analysis." Peak Br. 24. SUWA's arguments also rely heavily on NEPA's statutory language and binding precedent interpreting that language. *See generally* Opening Br.

In short, Peak's lengthy discussion of *Marin Audubon* is a red herring. That out-of-Circuit decision does not invalidate SUWA's arguments and there is no need for the Court to dwell on non-precedential *dicta*, especially in light of the Tenth Circuit's post-*Marin Audubon* treatment of NEPA cases.

---

[5] Notably, the *Adams* court cites a different section of *Marin Audubon* to explain the different levels of environmental review under NEPA, strongly suggesting that the Tenth Circuit has declined to adopt *Marin Audubon's* statements regarding the legality of the CEQ regulations. *Id.* at 1276 n.3 (citing *Marin Audubon*, 121 F.4th at 906-07).

### III.    BLM Failed to Take a Hard Look at the SPP Project's Environmental Impacts

As explained above, *Seven County* is not the panacea BLM and Peak make it out to be. *Seven County* indisputably instructs courts to "afford substantial deference" to an agency's decisions regarding its environmental analysis of a project, and yet that analysis must still be "reasonable and reasonably explained." 605 U.S. at 180. The "substantial deference" standard applies "[s]o long as the EIS addresses environmental effects from the project at issue." *Id.* at 182 (emphasis added). In other words, a court "cannot defer to a void." *N.M. ex rel. Richardson v. U.S. Bureau of Land Mgmt.*, 565 F.3d 683, 715 (10th Cir. 2009). The "grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1178 (10th Cir. 2023); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575, 1579-80 (10th Cir. 1994) (explaining that judicial review under the APA is on the record and explicitly prohibiting the court from "rely[ing] on evidence outside the administrative record"). As such the court must reject agency counsel's *post-hoc* rationalizations for the agency's decision. *Biodiversity Conserv. All. v. Jiron*, 762 F.3d 1036, 1060 (10th Cir. 2014) ("we will not…accept appellate counsel's post-hoc rationalizations for agency action—we must uphold the agency's action, if at all, on the basis articulated by the agency itself").

Here, BLM's decision not to analyze and disclose the impacts of the SPP Project's estimated GHG emissions and water usage is not "reasonable and reasonably explained." And, with respect to socioeconomic costs of GHG emissions and dark night skies, the FEIS does not even address the SPP Project's impacts on those resources at all, so there is nothing for this

8

Court to defer to. Consequently, BLM has failed to take a hard look at the SPP Project's impacts on GHG emissions and climate change, water, and dark night skies.

### A.    BLM Failed to Take a Hard Look at Greenhouse Gas Emissions and Climate Change

Contrary to what BLM and Peak argue, *Seven County* does not shield BLM's inadequate assessment of the SPP Project's GHG emission and climate impacts. BLM's defense of its insufficient impacts analysis is grounded in counsel's *post-hoc* argument that the SPP Project's emissions will be much lower than other extractive industries, so it was acceptable to merely disclose emissions estimates without explaining their significance or the socioeconomic costs of such emissions.[6] BLM Br. 10-15. And regarding its cumulative GHG emissions analysis, BLM's approach to GHG emissions and climate violates binding caselaw and its incomplete analysis does not warrant "substantial deference."

---

[6] BLM briefly argues that SUWA "waived its argument regarding GHG emissions by failing to raise it during the administrative process," alleging that SUWA did not raise the "specific arguments about contextualizing emissions or discussing socioeconomic impacts that it now asserts." BLM Br. 10 n.2. Not so. A party raising NEPA violations "must ordinarily raise relevant objections during the public comment period." *Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1048 (10th Cir. 2015). However, "commenters need not point out an [EIS's] flaw if it is 'obvious,'' nor does a commenter "waive an issue if it is otherwise brought to the agency's attention." *Id.* Here, SUWA's comments on the draft EIS explain in detail what constitutes a "hard look" at GHG emissions and why BLM's analysis in the draft EIS falls short. *See* AR000738-40; AR000754-55. SUWA's comments also cite an email from BLM's Fluid Mineral Leasing Coordinator to BLM's Great Basin Socioeconomic Specialist stating that while BLM has GHG emissions data, doing any such calculations would "set a precedent" that BLM wished to avoid. AR000740; *see also* AR026209; AR026219; AR027028; AR022620-23460 (references cited in the FEIS discussing socioeconomic impacts and climate change). SUWA did not waive its GHG emissions arguments.

i.    *BLM's analysis of direct and indirect GHG emissions and climate change impacts is inadequate*

BLM's counsel argues that the agency "adequately considered" direct and indirect impacts to GHG emissions, contending that because the FEIS concluded the SPP Project "will be a minor source of GHG emissions" it "will emit GHGs on a scale orders-of-magnitude lower than the coal, oil, and gas projects at issue in the cases SUWA relies on." BLM Br. 10-12. But this argument is an impermissible *post-hoc* rationale which cannot be relied upon, *Jiron*, 762 F.3d at 1060, and that ultimately misses the point: whether the SPP Project will emit fewer GHGs than other projects is irrelevant. The issue is that BLM did not do any <u>analysis</u> to support its conclusion that the Project's emissions are minor and therefore insignificant. As the court in *Diné Citizens Against Ruining Our Environment v. Haaland* ("*Diné CARE*") pointed out, "[s]imply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions." 59 F.4th 1016, 1043 (10th Cir. 2023).

BLM attempts to distinguish *Diné CARE* on the grounds that the decision at issue there involved oil and gas permits[7] and would result in "over 58 times" the annual emissions of the SPP Project and it was those circumstances that led the court to determine that a simple

---

[7] BLM's counsel attempts to distinguish potash mining from fossil fuel projects, arguing that GHG emissions from potash mining is more akin to GHG emissions from "other types of projects" like timber thinning where "courts have been reluctant to impose strict requirements on GHG analysis." BLM Br. 13-14 (citing *Swomley v. Schroyer*, 484 F.Supp.3d 970 (D. Colo. 2020)). Notably, this argument is not in the record; that is, BLM did not give this excuse for failing to take a hard look at GHG emissions, and as such it should be rejected as *post-hoc* argument. *Jiron*, 762 F.3d at 1060. Moreover, given that potash mining is an extractive industry just like coal mining or oil and gas development, it makes little sense to analogize it to a renewable industry like timber harvesting.

10

comparison of project emissions to "regional, national, and global emissions" violated NEPA. BLM Br. 13. BLM claims that when a project's GHG emissions are at a level such as the SPP Project's, "the use of a 'comparative percentage-based standard' does not present the same risk of 'downplay[ing] and manipulat[ing]' the significance of GHG impacts that was a concern in *Diné CARE. Id.* (quoting *Diné CARE*, 59 F.4th at 1041). This statement mischaracterizes what *Diné CARE* actually says and ignores the context in which it was made.

Specifically, the *Diné CARE* court adopted the reasoning in *350 Montana v. Haaland*, 50 F.4th 1254 (9th Cir. 2022), wherein

> the Ninth Circuit recognized the importance of a science-based standard for determining whether the cumulative GHG emissions are significant rather than a comparative percentage-based standard that can be downplayed and manipulated based on the size of the comparator.

*Diné CARE*, 59 F.4th at 1041 (citing *350 Montana*, 50 F.4th at 1269-70). Neither *Diné CARE* nor *350 Montana* suggest that the comparative percentage-based standard used in those cases would have been acceptable had the total calculated emissions been lower. Rather, those courts recognized that it was BLM's use of the faulty comparative percentage-based standard itself, not specific number of calculated emissions, that resulted in BLM categorizing those projects' emissions as having a "minor" impact on the environment because a "comparative analysis proves only that there are other, larger sources of GHGs. It does not show that [the project]…will not have a significant impact on the environment." *Id.* at 1042; *350 Montana*, 50 F.4th at 1266.

The FEIS for the SPP Project suffers the same fatal flaw. Just like in *Diné CARE* and *350 Montana*, BLM calculated the maximum annual GHG emissions for the SPP Project and compared it to national, state, and county levels, ultimately concluding that the Project would be a "negligible contributor" to total GHG emissions. AR04118-99. And, just like both of those

11

cases, in reaching this conclusion "the agency did not cite any scientific evidence supporting the characterization of the project's emissions as [negligible] nor did it identify any science-based criteria the agency used in its determination." *Diné CARE*, 59 F.4th at 1040 (citing *350 Montana*, 50 F.4th at 1266) (cleaned up). Nowhere does the FEIS demonstrate that the SPP Project's GHG emissions will, in fact, be negligible.[8] BLM's analysis of the SPP Project's direct and indirect GHG emissions does not constitute a hard look under Tenth Circuit standards and is therefore unlawful.

   ii.  *BLM failed to take a hard look—or any look at all—at the socioeconomic costs of the SPP Project's GHG emissions*

   BLM's attempt to defend its lack of analysis on the socioeconomic costs of the SPP Project's GHG emissions is particularly unpersuasive. BLM asserts that SUWA's reliance on this Court's decision in *Utah Physicians for a Healthy Environment v. United States Bureau of Land Management*, 528 F.Supp.3d 1222 (D. Utah 2021), is "misplaced," but never explains <u>why</u> *Utah Physicians* doesn't fit the facts here. BLM Br. 14-15 (summarizing *Utah Physicians* without distinguishing it from the facts of this case). Indeed, BLM doesn't even cite to the socioeconomics section of the FEIS, let alone attempt to explain why BLM's analysis is adequate. *See id.* Instead, BLM weakly claims that "*Utah Physicians* is likely incompatible with

---

[8] Peak argues that BLM's use of the comparative percentage-based standard is now acceptable under *Seven County* because "the depth of BLM's analysis of direct and indirect climate change impacts is within the 'broad zone of reasonableness.'" Peak Br. 15-16. This argument fails, however, because the entire issue with the comparative percentage-based standard is that it <u>doesn't provide any analysis</u> of whether a project's emissions will significantly impact the environment. *Diné CARE*, 59 F.4th at 1042; *350 Montana*, 50 F.4th at 1266. Without any analysis, BLM cannot "reasonably explain[]" its conclusion that the SPP Project's GHG emissions will be "negligible." *Seven Cnty.*, 605 U.S. at 180; AR041199; *see also* Opening Br. 21-22.

*Seven County's* directive that courts should provide 'broad latitude' regarding 'how far' an agency must go 'in considering the indirect effects that might occur outside the area of the immediate project…due to emissions.'" *Id.* at 14 (quoting *Seven Cnty.*, 605 U.S. at 182).

Once again, BLM takes the Court's statements out of context. *Seven County* instructs courts to provide "broad latitude" (*i.e.*, defer to an agency's decision) "[s]o long as the EIS addresses the environmental effects" in the first place. 605 U.S. at 182 (emphasis added). Here, as explained above and just like in *Utah Physicians*, BLM touted the SPP Project's socioeconomic benefits but did not analyze the environmental effects of the Project's GHG emissions, nor the socioeconomic costs of GHG emissions. *See* 528 F.Supp.3d at 1231-32. Thus, deferring to the agency on this issue would be impermissibly "deferr[ing] to a void." *Richardson*, 565 F.3d at 715.

### iii.    BLM's cumulative impacts analysis for GHG emissions and climate change does not meet the Tenth Circuit's standards

In the Tenth Circuit, an agency has taken a hard look at the cumulative impacts of a project if it identifies:

> (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.[9]

*San Juan Citizens All.*, 654 F.3d at 1056. Both BLM and Peak assert that the FEIS's cumulative impacts analysis for GHG emissions and climate change satisfies this standard. These arguments are unpersuasive.

---

[9] *Seven County's* relevance to this test is discussed in Argument § I.

BLM first takes issue with how SUWA describes the cumulative impacts analysis area ("CIAA") for air quality and climate, even though SUWA identifies the CIAA verbatim from the FEIS. BLM Br. 16; *but see* Opening Br. 25 (quoting AR041186). BLM claims that because it also considered GHG emissions from facilities outside the defined CIAA, it is "inaccurate" to characterize the CIAA as "smaller than Millard County." BLM Br. 16. But this assertion misses the point. SUWA doesn't argue that the CIAA must be bigger *per se*, but rather that the CIAA is poorly defined and BLM provides no explanation for why it defined the CIAA the way it did. Opening Br. 25. The fact that BLM considered GHG emissions from facilities outside the CIAA underscores the arbitrariness of BLM's decision. BLM further claims that the CIAA's boundaries are justified because "the effects of GHG emissions are not localized like impacts on other types of resources…[so] there was no reason for BLM to compare the Project's emissions to specific facilities in other counties." BLM Br. 16. BLM provides no record citation for this assertion because, in fact, it is not in the administrative record—it is an impermissible *post-hoc* rationale provided by BLM's counsel. *See Jiron*, 762 F.3d at 1060. As such, there is no explanation for the Court to defer to, nor is there evidence indicating that the scope and extent of the CIAA was rational.

Next, BLM asserts that "SUWA is…incorrect that BLM failed to consider the impacts from other facilities or the Project's 'overall' cumulative impacts," and argues that BLM's "method of analysis is entitled to substantial deference." BLM Br. 17 (quoting *Ariz. Mining Reform Coal. v. U.S. Forest Serv.* ("*AMRC*"), 172 F.4th 641, 659 (9th Cir. 2026)). But this argument fails under *Diné CARE*, because simply comparing the SPP Project's GHG emissions to other facilities does not, by itself, constitute an analysis of the impacts of those facilities'

14

emissions or the "overall impact that can be expected if the individual impacts are allowed to accumulate." *See* 59 F.4th at 1042-43; Argument § III.A.i; *San Juan Citizens All.*, 654 F.3d at 1056. NEPA expressly requires that an EIS include an analysis of a proposed action's environmental effects (impacts). 42 U.S.C. § 4332(2)(C). The Court cannot "substantially defer" to BLM's "method" for "analyzing" cumulative GHG emission impacts when no such impacts analysis exists in the first place.[10]

> **B.      BLM Failed to Take a Hard Look at Cumulative Impacts to Water Resources**

As SUWA explained in its Opening Brief, BLM's cumulative impacts analysis for water resources also fails to meet the *San Juan Citizens Alliance* standard. *See* Opening Br. 27-29. BLM argues that the Court should afford substantial deference to BLM's analysis of cumulative impacts to water resources because it involves "analyzing the 'potential environmental effects of future or geographically separate projects.'"[11] BLM Br. 18 (quoting *Seven Cnty.*, 605 U.S. at 190). BLM's reliance on *Seven County* is misplaced, however, because in making that statement, the Supreme Court was explaining that an agency did not need to consider the environmental effects of <u>indirect upstream or downstream</u> projects that are caused by, but separate in time or place from, the proposed action. *See Seven Cnty.*, 605 U.S. at 186-191; 40 C.F.R. § 1508.8(b) (2019) (definition of indirect effects). As explained in Argument § I, *Seven County* is silent on the issue of an agency's analysis of cumulative impacts, which in contrast, are "the impact[s] on the environment which results from the incremental impact of the action when added to other

---

[10] Peak's argument that BLM's cumulative impacts "analysis" for GHG emissions was "broadly reasonable" also fails for these same reasons. Peak Br. 19.

[11] Peak does not provide any additional argument on water resources, instead opting to summarize and entirely rely on BLM's argument. *See* Peak Br. 19-20.

15

past, present, and reasonably foreseeable future actions" and "can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2019). Therefore, it is an inapt comparison that is unhelpful to BLM's argument. *See Chattooga Conserv.*, 2026 U.S. Dist. LEXIS 67788 at *25.

Moreover, BLM's reliance on *AMRC* is unpersuasive. There, the Ninth Circuit held that the United States Forest Service's analysis of cumulative water impacts was sufficient even though it did not consider groundwater impacts from the "Superstition Vistas" housing development and its analysis was qualitative (as opposed to quantitative). 172 F.4th at 659-60. Regarding the former, the *AMRC* court pointed out that *Seven County* expressly stated that the government does not "ha[ve] an obligation under NEPA to consider the impact of a 'housing development that might someday be built' near the operative project" and there is no "evidence suggesting that the Forest Service has any regulatory authority over the Superstition Vistas development." *Id.* at 659. Second, the court explained that the Forest Service's decision not to analyze the <u>cumulative</u> water impact from the Superstition Vistas development "is the type of discretionary decision about 'how far to go in considering <u>indirect</u> environmental effects'" to which the court must defer. *Id.* (quoting *Seven Cnty.*, 605 U.S. at 182) (emphasis added). And, in any event, the Forest Service's choice to utilize a qualitative cumulative impacts methodology is "entitled to substantial deference." *Id.* at 659-60; *cf. Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1212 (10th Cir. 2002) (same) (citing *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993)).

In addition to being an out-of-circuit decision that is not binding on this Court, *AMRC's* reasoning is inapplicable to the instant case for three reasons. *First*, the court conflated indirect

16

effects with cumulative effects by stating that the Forest Service did not need to consider the impacts of the Superstition Vistas housing development simply because it is a separate project that "might be built" in the future (*i.e.*, it is separate in time). *See* 172 F.4th at 659. This conflation is further evidenced by the court's quotation about an agency's discretion in drawing the line when considering environmental effects. *Id. Second*, SUWA argues that BLM needed to explain the impacts from the West Desert Water Supply and Conservation Project ("West Desert Project"). Opening Br. 28-29. Unlike in *AMRC*, where the Forest Service did not have regulatory authority over the Superstition Vistas development, 172 F.4th at 659, BLM does have regulatory authority over the West Desert Project and has since approved the project. *See* AR041314-15; AR041884 (explaining that, at the time of the FEIS, BLM had started the NEPA process for the West Desert Project); Bureau of Land Mgmt., *Pine Valley Water Supply Project Record of Decision*, DOI-BLM-UT-C010-2020-0012-EIS (Mar. 2026). *Third*, the *AMRC* court's conclusion that a qualitative analysis was sufficient, *id.* at 659-60, is immaterial because the Ninth Circuit has not adopted the Tenth Circuit's *San Juan Citizens Alliance* standard for evaluating an agency's cumulative impacts analysis. Nor has it endorsed *Diné Citizens Against Ruining Our Environment v. Bernhardt*, which specifically held that a cumulative impacts analysis for water that does not "quantify[] the amount of reasonably foreseeable water use" is inadequate and violates NEPA. 923 F.3d 831, 858 (10th Cir. 2019) (emphasis added).

BLM further argues its water resources cumulative impacts analysis is sufficient because in *Diné CARE*, the Tenth Circuit held that "BLM's quantitative approach was sufficient," even though it did not "say anything about the impact the water consumption would have on the environment or specific groundwater resources." BLM Br. 18 (quoting *Diné CARE*, 59 F.4th at

17

1044, 1045). While it is correct that the court accepted the use of a quantitative-comparative model for water resources (unlike for GHG emissions) and found BLM's cumulative water analysis sufficient, it did so because BLM "considered how much water was likely to be used, [and] then compared that water consumption to the total amount of water projected to be used in the region." *Id.* at 1044. BLM also included some mitigating factors specific to oil and gas production." *Id.*

Here, however, the FEIS does not disclose the <u>total</u> amount of water the SPP Project is likely to use, nor does it disclose the total predicted water usage from other past, present or reasonably foreseeable future actions. *See* AR041314-15 (FEIS cumulative impacts analysis for water); AR013075-78 (cumulative impacts analysis for the Water Resources Report). Nor does BLM compare the SPP Project's "total water consumption to the total amount of water estimated to be used in the [CIAA for water]." *See ids.* For these reasons, BLM's cumulative water "analysis" for the SPP Project does not even meet the simple quantitative-comparative approach sanctioned in *Diné CARE*, and thus conclusively fails the fourth and fifth *San Juan* factors. 654 F.3d at 1056; *see also* Opening Br. 28-29. BLM has failed to take a hard look at the cumulative impacts to water resources.

**C.    BLM Failed to Take a Hard Look at Dark Night Skies**

Lastly, BLM and Peak claim that, despite not analyzing the SPP Project's impacts on dark night skies at all, let alone the Project's impacts on dark night skies in the Great Basin National Heritage Area ("GBNHA"), the FEIS still took a sufficiently hard look at such impacts. *See* BLM Br. 21-24; Peak Br. 20-23. But BLM's and Peak's arguments are entirely impermissible *post-hoc* rationales that miss the point and do not even acknowledge the fact that

18

the SPP Project is within the GBNHA. Instead, they argue that BLM's assessment of dark night sky issues is sufficient simply because the University of Utah's Telescope Array Project was not overly concerned about light pollution impacting their operations and Great Basin National Park staff did not respond to BLM's generic scoping letter.[12] *See ids.*; *see also* AR000615-16 (BLM's scoping letter to "interested parties"). Moreover, contrary to what BLM claims, BLM Br. 21-22, the failure to take a hard look at dark night skies is <u>not</u> harmless error and <u>is</u> prejudicial to SUWA's and its members' interests.

> i.      *Other parties' lack of concern over the SPP Project's dark night sky impacts does not render BLM's assessment of such impacts sufficient under NEPA*

SUWA's concern over the SPP Project's impacts on the Great Basin's expansive darkness stems from the fact that the entirety of Sevier Lake is within the GBNHA, which is the "largest contiguous region of dark night skies in the United States." Opening Br. 29-30 (quoting GBNHA Mgmt. Plan at 108).[13] Yet the FEIS does not address the Project's impacts on the darkness of the GBNHA (or any other aspect of dark night skies) at all, a point BLM concedes. BLM Br. 21 ("the FEIS does not analyze 'dark night skies' as a discrete issue"). Recognizing how significant this failure is, BLM and Peak deflect from SUWA's argument—completely ignoring the existence and relevance of the GBNHA—and instead assert that BLM did in fact "describe[] light sources on the Project and resulting effects," *id.* arguing that 1) the Utah

---

[12] This conclusion is an example of the *post hoc ergo propter hoc* (after this and therefore because of this) logical fallacy, rendering it "mere speculation and conjecture." *Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 521 n.8 (10th Cir. 1987). Indeed, there are many possible reasons for why the Great Basin National Park did not respond to the BLM's generic scoping letter, none of which are evident in the record.

[13] As noted in the Opening Brief, the GBNHA Management Plan does not display the correct Bates numbers and as such, SUWA cites to the document pages instead. Opening Br. 9 n.5.

Telescope Array Project's initial concerns about impacts to its operations were allayed by the Project's stipulations and design features; and 2) Great Basin National Park did not respond to BLM's generic scoping letter for the Project.

*First*, these arguments are impermissible *post-hoc* rationales because BLM's sole reason in the record for not analyzing dark night skies was that the issue was not raised during the scoping process.[14] AR041559 ("The issue of dark night skies was not identified during scoping; therefore, it was not addressed in the DEIS."); *see also* Opening Br. 30-31; *Jiron*, 762 F.3d at 1060. Notably, the FEIS does not state that BLM declined to further analyze dark night skies because of the University of Utah's and Great Basin National Park's lack of concern over the light produced by the SPP Project, as BLM and Peak attempt to frame the issue. AR041559; *see* BLM Br. 22; Peak Br. 21. Significantly, BLM never responded to SUWA's comments that the SPP Project would introduce new light pollution to the GBNHA. *Compare* AR041559 (BLM's response to SUWA's dark night skies comments) *with* AR000731 (explaining that the SPP Project's draft EIS fails to conform to the GBNHA Management Plan's directives regarding light

_____

[14] Peak also claims that the "broader issue of dark night skies" was not brought up during the scoping process and the reference to "[p]otential effects of project lighting on night sky" in the 2015 Scoping Report was specific and in response to the University of Utah Telescope Array Project's scoping comments on the SPP Project. Peak. Br. 22. This argument is baseless because BLM must consider issues raised in public comments at the draft EIS stage, even if such issues were not raised during scoping. *Or. Nat. Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995) (an agency "cannot forever omit a factor from the scope of an EIS solely because the factor was not raised as a concern during the scoping process") (emphasis in original); *see also Bostick*, 787 F.3d at 1048 ("Parties challenging an agency's compliance with NEPA must ordinarily raise relevant objections during the public comment period"). And regardless, there is no evidence BLM intended to limit its dark night skies analysis to addressing the SPP Project's impacts on the Telescope Array Project. The fact that BLM notified Great Basin National Park of the scoping process undermines Peak's argument. *See* AR000083-85 (showing Great Basin National Park as a recipient of BLM's scoping notice letter); AR041559.

pollution); AR000738 (citing a letter pertaining to dark night skies from the GBNHA Partnership

and explaining that Sevier Lake is within the GBNHA).

*Second*, contrary to BLM's and Peak's assertions, BLM Br. 22; Peak Br. 21, stipulations

or other mitigation measures implementing lighting restrictions do not constitute an

environmental impacts analysis for the purposes of NEPA. *See San Juan Citizens All.*, 654 F.3d

at 1053-54 ("It is not enough to merely list possible mitigation measures….Detailed quantitative

assessments of possible mitigation measures are generally necessary when a federal agency

prepares an EIS to assess the impacts of a relatively contained, site-specific proposal"). As one

court explained, BLM

> must provide an assessment of whether the proposed mitigation measures can be effective . . . and whether anticipated environmental impacts can be avoided. Because mitigation measures are projections that allow an agency to alleviate impact after construction, the EIS may not use them as a proxy for collecting baseline data before construction that would enable the agency to first understand the extent of the problem.

*Protect Our Cmtys. Found. v. Jewell*, 825 F.3d 571, 582 (9th Cir. 2016). The lighting stipulations

included for the SPP Project are a type of mitigation measure because they are intended to

"alleviate the impact" of the Project's artificial lighting at night. *See* AR041388 (explaining that

Peak is required to incorporate "measures…to minimize the amount of light that will be

produced'); AR041235 (stating that such measures include pump station lights with "shades to

focus light downward"). However, because there is no analysis of the SPP Project's impacts on

dark night skies, there is no way to know how effective (if at all) these design features will be at

21

preserving the remote and significantly dark character of the GBNHA.[15] Notably, the FEIS says nothing about how the Project's lighting, even with these design features, may affect the darkness of the sky in the GBNHA.

*Finally*, after scoping BLM determined that certain resources did not need detailed analysis and those resources were dismissed from further consideration. *Compare* AR000600-02 (2015 Scoping Report identifying "issues to be addressed in EIS analysis") *with* AR041401 (FEIS Appendix F identifying "issues eliminated from detailed study"). For instance, during scoping BLM initially identified potential concerns with fire and fuels management, hazardous waste, sensitive or rare plants, and environmental justice. AR000600-02. But as BLM explained in the FEIS Scoping Report, after further review it determined that those issues did not need to be analyzed in detail. AR041401-02 (explaining the various reasons for not analyzing those issues in detail, despite being initially identified as potential concerns).

Notably, this is not the conclusion BLM reached regarding dark night skies. *See id.* Had BLM actually considered the SPP Project's impacts on dark night skies, and in particular the sky's darkness in the GBNHA, and deemed them minor, like it did for fire and fuels management and other issues, it would have been included the FEIS Scoping Report.[16]

For these reasons, BLM's and Peak's attempts to justify BLM's "consideration" of dark night sky impacts are unpersuasive and should be rejected by the Court.

---

[15] Peak included these design features specifically to accommodate the Utah Telescope Array Project and BLM concluded that, with such features, "lighting is not expected to affect operation of the [Telescope Array] Project." AR041239.

[16] This omission is even more glaring when, in 2019, BLM appears to have retroactively edited the 2015 Scoping Report to eliminate any reference to dark night skies. *Compare* AR000601 (visual resources row) *with* AR041400 (visual resources row); *see also* Opening Br. 11 n.8, 30-31. BLM and Peak do not even attempt to justify this discrepancy.

ii.    *BLM's failure to take a hard look at dark night sky impacts is significant and not harmless error*

BLM self-servingly argues that even if its "analysis" of the SPP Project's impacts on dark night skies was inadequate, that deficiency is nonetheless a "mere flyspeck" that does not cause SUWA prejudice and amounts to nothing more than "harmless error." BLM Br. 21-22. Contrary to this argument, BLM's complete failure to consider dark night sky impacts in the FEIS is not a mere flyspeck but rather a significant NEPA violation. As such, the harmless error rule is inapplicable, but even if it was, SUWA has demonstrated sufficient prejudice to demonstrate the error was not harmless and reversal is warranted.

Under NEPA and the APA, a deficiency in an agency's environmental analysis constitutes a non-reversible "flyspeck" when it is a minor, technical, or inconsequential error that does not defeat NEPA's statutory goals of informed agency decisionmaking and informed public participation. *Richardson*, 565 F.3d at 704. The relevant inquiry is "whether the error caused the agency to be unaware of environmental consequences, thereby precluding informed decisionmaking and public participation." *Idaho Wool Growers Ass'n v. Vilsack*, 816 F.3d 1095, 1104 (9th Cir. 2016); *see also State Farm*, 463 U.S. at 43 (an agency decision is arbitrary and capricious if it has "entirely failed to consider an important aspect of the problem"). In short, an agency's error is only a "flyspeck" if it is trivial enough to ignore.

For instance, it was harmless error when the Federal Highway Administration made a technical mistake in the first phase of the required three-phase noise analysis for a new highway project. *Prairie Band of Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012). There, the court determined the error to be harmless because it did not prevent the government from proceeding to the next phase of the analysis, which it conducted correctly

23

and ensured that noise impacts were adequately considered. *Id.* at 1009-10. Similarly, it was harmless error when the Department of Energy prepared an EIS but failed to identify a "preferred alternative" as required by NEPA's implementing regulations because the agency still "engaged in significant environmental analysis before reaching a decision." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

Here, in contrast, BLM did not simply make a small technical mistake; rather, BLM "entirely failed to consider an important aspect of the problem" because there is no dark night skies analysis in the FEIS, at all, even though the proposed potash mine is located in an extremely remote area that is entirely devoid of light pollution. *State Farm*, 463 U.S. at 43; GBNHA Mgmt. Plan at 75. As a result, BLM approved the SPP Project while being "unaware of [Project's] environmental consequences" for dark night skies, "thereby precluding informed decisionmaking and informed public involvement." *Idaho Wool Growers Ass'n*, 816 F.3d at 1104. This error is prejudicial for SUWA and the public because it prevented the public from evaluating the substance and thoroughness of a light pollution impacts analysis, including whether the lease stipulations and mitigating design features would be effective (if at all) in preserving the expansive darkness of the GBNHA. *See Richardson*, 565 F.3d at 708 (holding that BLM's failure to analyze an alternative's impacts on habitat fragmentation was not harmless error because public involvement "is beneficial only to the extent the public has meaningful information on which to comment and the public did not have meaningful information on the [alternative's] fragmentation impacts"). Indeed, "[i]nformed public input can hardly be said to occur when major impacts…were never disclosed." *Id.* Consequently, BLM's failure to take a

24

hard look at dark night sky impacts is not harmless error but a significant NEPA deficiency that is prejudicial to SUWA and the public.

**IV.    BLM's Arguments Supporting its Use of a DNA to Approve the SPP Project—Rather Than an Environmental Document—are Unavailing**

NEPA does not allow an agency to authorize a project using a DNA because a DNA is not an environmental document, as defined by the statute. 42 U.S.C. §§ 4336(a), 4336e(5). Nonetheless, BLM defends the 2025 DNA and its approval of the 2025 Mining Plan by arguing that NEPA permits the use of a DNA to subsequently approve proposed amendments to a project, even when the original environmental analysis did not analyze the impacts of any alternative resembling the amended project. BLM Br. 25. But as explained below, BLM's interpretation of NEPA is flawed because the statute's plain language does not contemplate the use of a DNA. And even if a DNA could be an appropriate mechanism for subsequent project approvals, it was not appropriate here, because the FEIS also violates NEPA.

**A.    NEPA's Plain Language Does Not Support the Use of a DNA**

BLM first argues that NEPA, 42 U.S.C. § 4336, does not forbid the use of DNAs because Congress did not intend to prohibit their use, BLM Br. 25, nor does the text of NEPA, citing to the four exceptions to NEPA's requirement that an agency prepare an environmental document "mirror other provisions in the APA or 2020 CEQ regulations." *Id.* at 26. NEPA's plain language undermines both points.

A court's interpretation of a statute is controlled by the statute's unambiguous text, not speculation regarding legislative intent, subsequent developments, or policy arguments. *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020); *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). The plain language rule assumes that Congress's intent is expressed correctly in the ordinary meaning

25

of the words it employs, and "absent ambiguity or an irrational result, the literal language of a statute controls." *St. Charles Inv. Co. v. Comm'r*, 232 F.3d 773, 776 (10th Cir. 2000). "Where the language of the statute is plain, it is improper for [the] Court to consult legislative history in determining congressional intent." *Id.* Nor may legislative history "be used to create ambiguity in the statutory language." *Id.* Moreover, "if a statute specifies exceptions to its general application, other exceptions not explicitly mentioned are excluded." *Id.* (quoting *United States v. Goldbaum*, 879 F.2d 811, 813 (10th Cir. 1989)).

Here, the text of NEPA is clear. An environmental document is expressly defined as "an environmental impact statement, an environmental assessment, or a finding of no significant impact." 42 U.S.C. § 4336e(5). Congress also clearly provided four circumstances in which NEPA does not require the preparation of an environmental document:

> [a]n agency is not required to prepare an environmental document with respect to a proposed agency action if—
> (1) the proposed agency action is not a final agency action within the meaning of such term in chapter 5 of title 5, United States Code;
> (2) the proposed agency action is excluded pursuant to one of the agency's categorical exclusions, another agency's categorical exclusions consistent with [42 USCS § 4336c], or another provision of law;
> (3) the preparation of such document would clearly and fundamentally conflict with the requirements of another provision of law; or
> (4) the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action.

42 U.S.C. § 4336(a). Because NEPA specifies these four exceptions, "other exceptions not explicitly mentioned" (such as an exception to use a DNA in lieu of an environmental document, for example) "are excluded." *St. Charles Inv. Co.*, 232 F.3d at 776. And, because NEPA's statutory language is unambiguous, it is not appropriate for the Court to consider NEPA's legislative history in discerning Congress' intent in drafting NEPA's 2023 amendments

26

(including section 4336) as BLM urges. If anything, turning to NEPA's legislative history to resolve SUWA's claim would "create ambiguity in the statutory language." *Id.*

Moreover, as BLM itself recognizes, the four exceptions articulated in section 4336(a) essentially codify specific APA provisions and then-existing CEQ regulations, BLM Br. 26, thereby demonstrating that Congress was intentional in determining what circumstances did not warrant the preparation of an environmental document. If Congress had wanted to include an exception for supplemental approvals that rely on an existing NEPA document, it could have done so by codifying the CEQ regulations for tiering to existing NEPA documents (40 C.F.R. § 1501.11 (2023)) and/or supplementing existing NEPA documents (40 C.F.R. § 1502.9(d) (2023)). The fact that Congress chose not to do so is telling.

BLM further claims that SUWA's claim is "doom[ed]" because courts have previously recognized that "agencies may use non-NEPA procedures," including a DNA "to decide whether new NEPA documentation is required." BLM Br. 26 (quoting *Bd. of Cnty. Comm'rs of Cnty. of San Miguel v. U.S. Bureau of Land Mgmt.*, 706 F.Supp.3d 1180, 1187 (D. Colo. 2022) and citing *Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1152, 1162 (10th Cir. 2004)). But this argument is similarly flawed. A DNA is an agency-created tool used to confirm whether a proposed action is adequately analyzed in an existing NEPA document. AR044560 (BLM's NEPA handbook explaining when a DNA may be appropriate). Importantly, at the time *San Miguel* and *Pennaco* were decided, 42 U.S.C. § 4336 did not exist[17] and courts were required to defer to an agency's interpretation of a statute in accordance with *Chevron U.S.A., Inc. v.*

---

[17] Section 4336 was added to NEPA as a result of the Fiscal Responsibility Act of 2023. *See* Pub. L. No. 118-5, Div. C Tit. III, § 321, 137 Stat. 10, 38-39 (2023).

*Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Since then, *Chevron* was overruled, and the Supreme Court has held that "[c]ourts must exercise independent judgment in deciding whether an agency has acted within its statutory authority," without deferring to agency interpretations of statutes. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). *Loper Bright* therefore calls into question the validity of *Pennaco's* and *San Miguel's* acceptance of BLM's use of DNA forms to approve subsequent iterations of a project based on prior NEPA documents. Rather than rely on these cases, this Court must use its independent judgment to determine whether NEPA, as it is now written, allows BLM to use a DNA to approve the SPP Project's 2025 mining plan. As explained above and in SUWA's Opening Brief, 34-38, it does not.

**B.    A DNA is Inappropriate When the Underlying NEPA Analysis is Flawed or Incomplete**

Even assuming *arguendo* that approving a project via a DNA is not prohibited by NEPA, it was nonetheless arbitrary and capricious for BLM to do so here when the FEIS on which it relies violates NEPA. BLM argues that SUWA has not provided any "reason for the Court to concluded that the Amended Plan will lead to any greater impacts or new impacts that would require a new [environmental assessment] or EIS." BLM Br. 27. That is wrong for three reasons.

*First*, as SUWA explained both in its Opening Brief and herein, the FEIS is deficient with respect to its analyses of the SPP Project's impacts regarding GHG emissions and climate change, water, and dark night sky. *Second*, BLM's argument conveniently ignores the fact that the 2025 DNA and 2025 DR only considered and approved <u>Phase 1</u> of the SPP Project, which is expected to last twenty-five years, even though Peak has publicly stated that the Project is intended to have multiple phases lasting <u>at least fifty years</u>. *See* Opening Br. 14-15 (explaining

28

the differences between the plan analyzed and approved in the FEIS and 2019 ROD and the amended plan approved in the 2025 DNA and 2025 DR). Notably, the original plan approved in 2019 was expected to last a total of thirty-two years. AR041116. Yet, the 2025 DNA does not consider how the new total life of the SPP Project is anticipated to last over fifty percent longer than what was contemplated when BLM was analyzing the environmental impacts of the Project. As such, the FEIS does not contain the "data and assumptions appropriate for the analysis at hand." 43 C.F.R. § 46.120(a)–(c)(2025);[18] *cf. Citizen's Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1028 (10th Cir. 2002) (agencies cannot "minimiz[e] the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact").

*Third*, both BLM and Peak argue that because the amended mining plan evaluated in the 2025 DNA and approved in the 2025 DR "resembles the middle-ground alternative that SUWA proposed" in its comments on the draft EIS, it was appropriate for BLM to rely entirely on the FEIS and SUWA's claims challenging the 2025 DNA and 2025 DR are meritless. BLM Br. 7; Peak Br. 1, 7, 30. While SUWA did comment on an alternative that would limit development to the southern half of the playa (the "LUMA Alternative")[19] like Phase 1 of the 2025 mining plan,

---

[18] Peak argues that the FEIS is adequate because it meets the Department of Interior ("DOI") regulations implementing NEPA, 43 C.F.R. §§ 46.10-46.450. Peak Br. 28-29. But SUWA does not assert that the FEIS violates DOI's implementing NEPA regulations. Instead, SUWA argues that the 2025 DNA violates 43 C.F.R. § 46.120. *See* Opening Br. 38-40; Compl. ¶¶ 56-61. Yet Peak says nothing about whether the 2025 DNA adheres to these regulations, so its argument is irrelevant and beyond the scope of this case.

[19] Contrary to BLM's and Peak's framing, SUWA did not "propose" that alternative to BLM. *See* AR000735. BLM developed that alternative during scoping and SUWA argued that it was wrong for BLM to dismiss it from detailed analysis in the EIS. *Id.*

AR000735, that does not change the fact that the 2025 DNA and 2025 DR approving the 2025 mining plan are unlawful. Critically, BLM chose not to consider and analyze the LUMA Alternative in detail in the FEIS and thus did not take a hard look at the environmental consequences of that alternative. AR041715-16. Indeed, one of the reasons that BLM declined to consider this alternative was because "it may lead to increased environmental effects." AR041716. So, if anything, the fact that Phase 1 of the SPP Project now resembles the LUMA Alternative further underscores why BLM's approval of the 2025 mining plan via the 2025 DNA is inappropriate and unlawful.

**V.     Vacatur is an Appropriate Remedy for BLM's NEPA Violations That Will Not Yield Disruptive or Prejudicial Consequences**

BLM and Peak have not sufficiently shown that vacating the FEIS, 2019 ROD, 2025 DNA, and 2025 DR would be particularly disruptive or prejudicial, given the severity of BLM's NEPA violations. The APA permits courts to "set aside" final agency actions deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 702(2)(A). Vacatur is the correct outcome here.

To determine whether an agency's actions should be "set aside" (*i.e.*, "vacated") the Court must consider "(1) the seriousness of the agency action's deficiencies (and thus the extent of doubt whether the agency chose correctly) and (2) the disruptive consequences of an interim change that may itself be changed." *Diné CARE*, 59 F.4th at 1049 (cleaned up). However, "[a] strong showing of one factor may obviate the need to find a similar showing of the other" and "[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *W. Watersheds Proj. v. Haaland*, 69 F.4th 689, 722 (10th Cir. 2023). "[L]ooking to 'the disruptive consequences of an interim change that may itself be changed' requires consideration

of 'both the disruptive consequences to the [potash] industry, as well as the potential environmental damage that might continue unabated while [BLM] revisits its determinations.'" *Diné CARE*, 59 F.4th at 1049 (emphasis added) (citation omitted).

Here, BLM argues that remand without vacatur is appropriate for the FEIS and 2019 ROD because SUWA "demands that BLM add layers of analysis," instead of "identify[ing] missing information." BLM Br. 29. But throughout its entire involvement in the SPP Project, SUWA has repeatedly identified missing substantive information that BLM needed to consider, including but not limited to, the socioeconomic costs of the Project's GHG emissions, reasonably foreseeable water projects, and the Project's impacts on dark night skies, particularly with respect to how the SPP Project's light pollution would impact the GBNHA. *See* Opening Br. 19-34; *supra* Argument §§ III.A.ii, III.B, III.C; AR000665-72 (scoping comments); AR000729-60 (draft EIS comments); AR000789-801 (additional draft EIS comments); AR000817-71 (final EIS comments). Thus, it's not that SUWA didn't provide missing substantive information but rather that BLM chose to ignore it.

BLM further argues that vacatur of the 2025 DNA and 2025 DR is "unwarranted here where the additional analysis SUWA wants will not transform BLM's understanding of the Project's impacts." BLM Br. 29-30. But it is not counsel's place to state that "BLM's understanding of the Project's impacts" would not change had BLM taken a hard look at impacts to GHG emissions, water, and/or dark night skies. It is unknown to what extent such analyses would have yielded a different outcome with respect to the 2025 mining plan because the record does not provide any such information.

31

Finally, BLM and Peak claim that vacatur would be economically disruptive to both entities. But courts have recognized that economic disruption does not necessarily warrant forgoing vacatur because "the risk of economic harm from procedural delay and industrial inconvenience 'is the nature of doing business, especially in an area fraught with bureaucracy and litigation.'" *WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 84 n.35 (D.D.C. 2019) (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.Supp.3d 91, 104 (D.D.C. 2017)).

Peak complains that vacating the SPP Project's decisions would be disruptive because it has invested thousands of hours and millions of dollars to "design, sequence, plan, and analyze the Project, as well as to support BLM's NEPA review" of both the original and amended mining plans. Peak Br. 31. This reasoning is unpersuasive because (1) Peak inflicted its own additional costs and labor by choosing to amend its mining plan and (2) Peak has had ample opportunity but has not managed to secure sufficient Project funding in the fifteen years that it's held its leases. *See, e.g.*, Letter from Woods Silleroy, Peak Minerals, Inc., to Matthew Janowiak, Bureau of Land Mgmt. (Nov. 26, 2019) (requesting a waiver of minimum annual rent and royalties due to lack of funding despite spending "over $90 million" to develop the SPP Project); Letter from Woods Silleroy, Peak Minerals, Inc. to Matthew Janowiak, Bureau of Land Mgmt. (Nov. 13, 2020) (requesting another rent and royalty waiver for 2021 due to not being able to raise funds and facing foreclosure) (both letters attached as Ex. 1);[20] *see also* Press Release, Peak Minerals, Inc., Peak Minerals Announces Management Update (April 15, 2026) (explaining that Peak's

---

[20] BLM granted both rent and royalty waiver requests. *See* Bureau of Land Mgmt., Decision – Minimum Royalty and Lease Rent Waiver (Dec. 20, 2019); Bureau of Land Mgmt., Decision – Minimum Royalty and Lease Rent Waiver (Dec. 4, 2020) (both attached as Ex. 2).

interim CEO was hired to focus on securing fundraising and the project's "finance initiatives") (attached as Ex. 3).[21]

For its part, BLM wrongly claims that vacatur would result in "significant economic ramifications for the federal government and the economy of the surrounding area." BLM Br. 31. In particular, BLM claims that vacating the 2019 ROD and 2025 DR would lose out on "substantial sources of income" including annual rental, a two percent royalty "for all potash produced" under the 2025 mining plan, and bonding for both production and reclamation.[22] *Id.* These claims of substantial economic disruption for the federal government are unfounded because BLM fundamentally misunderstands the relationship between potash lease rental, royalties, and bonding.

For one, vacating the 2019 ROD and 2025 DR would have no effect on annual lease rentals because neither of those decisions affect the validity of Peak's potash leases. *Cf. Richardson*, 565 F.3d at 689 n.1 (explaining that oil and gas leases are issued according to a

---

[21] The Court may take judicial notice of these publicly available documents because they are "not subject to reasonable dispute" and are from "sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (explaining the court may take judicial notice of "facts which are a matter of public record") (citation omitted). Additionally, courts regularly look beyond the administrative record to help determine an appropriate remedy. *See, e.g.*, *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 n.4 (10th Cir. 2017) (considering information that was not included in the administrative record but pertained to the current status of the subject coal leases to determine whether vacatur was the appropriate remedy); *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (explaining that "courts have developed a number of exceptions countenancing use of extra-record evidence" including "in cases where relief is at issue").

[22] BLM also weakly asserts that "vacatur would eliminate the 275 temporary and full-time jobs that the Project is expected to create." BLM Br. 31. This reason for rejecting vacatur is unpersuasive because such jobs are currently nonexistent and speculative until the SPP Project begins construction and production so vacatur "would not result in chaos to over [275] workers' lives." *Mont. Wildlife Fed'n v. Burgum*, No. 4:18-cv-00069-BMM, 2026 U.S. Dist. LEXIS 131708, *32 (D. Mont. June 12, 2026) (remanding oil and gas leasing decisions <u>with</u> vacatur).

three-step process: (1) issuance of a land use plan; (2) offering and issuing oil and gas leases in accordance with the land use plan; and (3) review and approval of a lessee's plan to develop its leases. Potash leasing and development follows a similar three-step process wherein BLM must first decide to issue leases in accordance with the governing land use plan and that a lessee's plan to develop its leases requires subsequent review and approval). The 2019 ROD and 2025 DR only affect the Peak's authorization to develop its leases according to the approved mining plan; the leases themselves remain valid. Nor would BLM lose out on any royalties because, to date, there has been no production and as such, Peak has <u>never</u> paid BLM production royalties for the SPP Project.[23] Vacating the 2019 ROD and 2025 DR would thus not change the *status quo* with respect to BLM's royalty income.

Finally, BLM would not lose out on any income from having to return the SPP Project's production and reclamation bonds because, by definition, a bond is not income. A bond is a binding contract between BLM and an operator, secured by money or financial assets, that ensures the fulfillment of obligations and "protects the government, and taxpayers, against financial damages or loss arising from defaulted or terminated contracts, leases, permits, special-use authorizations, and licenses." Bureau of Land Mgmt., *H-3809-2 Surface Management Bond Processing*, I-1 (2016) (last visited July 14, 2026); *see also* 43 C.F.R. § 3504.50(a) (explaining bonding requirements for solid minerals leasing, including potash). BLM releases the bond and returns the secured financial assets once the operator fulfills all obligations, including paying all

---

[23] Peak has paid BLM some advance minimum royalties. Because advance royalty obligations are tied to the leases themselves and paid in lieu of actual production these obligations will remain in place regardless of whether the Court vacates the 2019 ROD and 2025 DR. *See* 43 C.F.R. § 3504.25(a). As noted above, however, BLM has also repeatedly waived Peak's payment of advance royalties.

rent, royalties, lease obligations, and reclamation duties. *Id.* § 3504.71. However, if the operator defaults on any of its obligations, BLM will take payment from the bond to cover any obligations on which the operator defaults. *Id.* § 3504.65.

In the context of the SPP Project, Peak has not posted the $17.7 million reclamation bond required to commence surface-disturbing activities,[24] so the Project is not yet fully permitted by the state. *See* Letter from W. Western, Utah Div. of Oil, Gas, and Mining to W. Silleroy, Peak Minerals, Inc. (Oct. 6, 2025) (attached as Ex. 4).[25] Assuming Peak eventually post the bond, (if the 2019 ROD and 2025 DR are not vacated), Peak will either adhere to all its bonded obligations and BLM will return the bonds once the Project is complete, or BLM will use the assets securing Peak's bonds to financially cover any noncompliance from Peak. In neither case does BLM profit off Peak's production or reclamation bonds, as BLM mistakenly suggests. BLM Br. 31.

In sum, BLM and Peak have not demonstrated that vacatur would be disruptive to the *status quo*. Despite BLM's authorization, the SPP Project has not yet commenced so there is no disruption to the company or the potash industry. *See Diné CARE*, 59 F.4th at 1049. Absent vacatur, however, there is a high likelihood of "potential environmental damage that might continue unabated while [BLM] revisits its determinations" because Peak would be able to develop the SPP Project, which in turn would result in irreversible GHG emissions and water usage, as well as dark night sky impacts. *Id.* (citation omitted). And as SUWA has explained in

---

[24] This bond covers both BLM and state of Utah bonding requirements. *See* 43 C.F.R. § 3504.50(b).

[25] The Court may likewise take judicial notice of this letter because it is a public record that is "not subject to reasonable dispute" and from a "source[] whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *Tal*, 453 F.3d at 1264 n.24.

35

its Opening Brief and above, the deficiencies in BLM's analyses of these impacts are significant.

BLM's failure to adhere to NEPA's requirements and cure these deficiencies prior to approving

the 2025 mining plan underscores the severity of its NEPA violations. These circumstances

warrant vacatur of the FEIS, 2019 ROD, 2025 DNA, and 2025 DR.

## CONCLUSION

For the foregoing reasons, in addition to those articulated in SUWA's Opening Brief, the

Court should declare that BLM violated NEPA, its implementing regulations, and the APA by

approving the 2019 ROD and 2025 DNA DR; declare unlawful and vacate the FEIS, 2019 ROD,

2025 DNA, and 2025 DNA DR pursuant to 5 U.S.C. § 706(2)(A); and enjoin BLM and Peak

from taking any actions pursuant to the FEIS, 2019 ROD, 2025 DNA, or 2025 DNA DR until

they have complied with NEPA, its implementing regulations, and the APA. SUWA also

requests the Court retain continuing jurisdiction of this matter until BLM fully remedies the

aforementioned violations of law.

SUWA respectfully requests that the Court hold oral argument to further assist the Court

in evaluating the parties' arguments.

Respectfully submitted this 14th day of July, 2026.

/s/ Hanna Larsen
Hanna Larsen
Stephen Bloch

*Attorneys for Plaintiff*
*Southern Utah Wilderness Alliance*

36

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with the type-volume limitations of Rule 32(a)(7)(B)(i) because it contains 11,496 words, excluding the parts of the brief exempted by Rule 32(f).

*/s/ Hanna Larsen*
Hanna Larsen