# EXHIBIT 1



Mr. Matt Janowiak
Minerals Support Manager
BLM Utah, Interior Region 7
440 West 200 South
Suite 500
Salt Lake City, UT 84101

BLM-UTAH STATE OFFICE

NOV 2 6 2019

Dear Mr. Janowiak:                                                    RECEIVED

Peak Minerals Inc. (**Peak**) is a nascent fertilizer mining company seeking to develop potassium mineral leases on the Sevier Dry Lake in west-central Utah. This effort, known as the Sevier Playa Potash Project (**Project**) has been underway for many years. Peak owns or contractually administers all federal potassium mineral leases on the Sevier Dry Lake and acts as the Project operator.

In accordance with the provisions of 43 CFR, Part 3500, Subpart 3513 of BLM regulations, Peak is requesting consideration from the BLM to waive or reduce the minimum annual rental and royalty payments as defined in Part II, Section 1(a) and Section 2(b) for all federal leases owned or operated by Peak.

**Background**
On April 5, 2011, Peak participated in an auction of Federal Potassium Mineral Leases on BLM land and was awarded forty-eight (48) leases totaling 95,801.76 acres with an effective date of June 1, 2011 at a cost of $19,377,624.73. LUMA Minerals, LLC (**LUMA**) participated in the same auction and was awarded eleven (11) leases totaling 22,011.79 acres with the same effective date for a total of $1,122,812.00.

Since the BLM leases were obtained, Peak has been working diligently to advance the Project. As a development-stage company, Peak does not have, and has never had, revenues or any other regular sources of income. It has always relied entirely upon investor capital to remain in business. Following the granting of the leases, Peak engaged in a series of efforts to secure the money to explore, develop, and permit the Project. This has resulted in an expenditure of over $90 million dollars that has gone into a series of drilling and exploration programs, engineering studies, the environmental impact statement and accompanying environmental reports, and other activities.

Peak is now working to find the funds needed to build the Project. This will require raising about $400 million dollars of new capital. We have engaged BNP Paribas to assist with the debt portion and are actively seeking parties to provide the equity. However, this is a slow and expensive process. In order to make an investment of this size, each group needs to conduct independent due diligence to confirm the work Peak has completed. With exclusivity being a common request, it means these efforts generally run in series, not in parallel, adding to the time.

Having worked diligently to demonstrate the viability of the Project, Peak fully expects the fund-raising effort to be successful. Still, the timing of funding is impossible to predict. Further, our ultimate financial partners may request modifications to the Project. Consequently, Peak must conserve its limited cash to pay the engineers, consultants, lawyers, contractors, personnel, and others needed to keep the fundraising process alive.

**General Lease Information**

Minimum rent and royalty requirements increased starting in the sixth lease year. The following rents and royalties now apply:

- Minimum Annual Rent for years 6 through 20 of $1.00 per acre, or fraction thereof
- Minimum Annual Royalty for years 6 through 20 of $3.00 per acre, or 5% of Gross Value of minerals produced on BLM leases, F.O.B. Mine, whichever is greater
- The leases stipulate that the greater amount between rent and royalty be paid each year

The LUMA leases, which are administered by Peak via operating agreements, are subject to the same regulations. The LUMA costs are paid by Peak as part of the operating agreement.

While it has always been a challenge to make these payments over the years, Peak has paid almost $1.7 million dollars in rent and royalty payments to the BLM thus far. (See attached schedule for details.)

**Justification**

The upcoming payment, which is due December 31, 2019, is for $353,511. Simply put, this will be an extreme burden on the company. Granting a waiver would allow Peak to focus on raising capital and deploying it towards achieving production. This will benefit the BLM the most because production will deliver millions of dollars in royalties each year. Conversely, if Peak were to fail now, the leases would likely be relinquished and the Project would founder. Considering that it has taken almost a decade to fully engineer and permit the project, that would be tragic since the Project might never be completed and the resulting Royalty stream could be lost forever.

The BLM has the authority under Section 39 of the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 209, 1982) and the regulations thereunder to waive or reduce rentals and minimum royalties.

Specifically, per 43 CFR § 3513.12, the BLM will consider the approval of a waiver request if it:
- a) is in the interest of conservation;
- b) will encourage the greatest ultimate recovery of the resource; and
- c) is necessary either to promote development of the mineral resources or because the entity cannot successfully operate the lease under existing terms.

All three criteria clearly apply. A waiver is in the interest of conservation if one considers the body of technical and environmental work that has been completed over the years. The Project has been studied extensively and all environmental impacts carefully considered. Receipt of the Record of Decision in July of this year strongly supports Peak's vision of an environmentally sound and economic Project.

The last two requirements are also clearly met. A waiver encourages the "greatest ultimate recovery of the resource" since it would allow Peak to focus on getting into production. For the same reason, a waiver would "promote development of the mineral resources" since it enhances the probability of achieving production. Last, it is consistent with the BLM's mission of promoting sustainable development of the nation's energy and natural resources.

In summary, if the Project were to fail now, it is unlikely that anyone would step in to take over. This would render meaningless all of the planning, analysis and environmental work completed by the BLM, and delay or likely result in no development of these valuable resources. If that were to occur, the United States and the State of Utah would lose a valuable source of royalty income.

**Request**

Peak is requesting that the BLM provide relief with one of the three following determinations:

a) the BLM waive the annual rental payments of $1.00 per acre and the minimum royalty payments of $3.00 per acre until the Project begins production and starts paying royalties based upon minerals shipped;

b) the BLM waive the annual rental payments of $1.00 per acre and the minimum royalty payments of $3.00 per acre until the Project is fully-funded and on-playa construction begins; or

c) the BLM waive the minimum royalty payments of $3.00 per acre and instead require only the annual rental payments of $1.00 per acre until the Project begins production and starts paying royalties based upon minerals shipped.

Attached you will find supporting documents outlining the payments made thus far and showing the serial number, name of record title holder, and legal description for each lease on the Project. Also included is a map showing the serial number and location of each lease.

We trust this application meets the requirements of 43 CFR, Part 3500, Subpart 3513. However, if you need additional information, please let us know. We are available at your convenience to meet with any BLM staff to discuss the application.

Regards,

Woods Silleroy
Vice President & Corporate Secretary
Peak Minerals Inc.

13877146_v2



MINERALS INC.

BLM-UTAH STATE OFFICE

NOV 1 3 2020

RECEIVED

Mr. Matt Janowiak
Minerals Support Manager
BLM Utah, Interior Region 7
440 West 200 South, Suite 500
Salt Lake City, UT 84101

Dear Mr. Janowiak:

Peak Minerals Inc. (**Peak Minerals**) is a nascent fertilizer mining company seeking to develop potassium mineral leases on the Sevier Dry Lake in west-central Utah. This proposed operation, known as the Sevier Playa Potash Project (the **Project**) has been underway since 2008 with federal potassium mineral leases obtained and under development since 2011. Peak Minerals owns or contractually administers all federal potassium mineral leases on the Sevier Dry Lake and acts as the Project operator.

Until recently, Peak Minerals was a wholly-owned subsidiary of Crystal Peak Minerals Inc. (**Crystal Peak**), a Canadian public company trading on the Toronto Venture exchange (TSX-V). For the last five years, EMR Capital Investment (No. 5B) Pte. Ltd., an affiliate of EMR Capital Resources fund 1, LP of Australia (**EMR**), has been the largest investor in the project and has been the sole source of capital. As part of its investment, EMR entered into a convertible note agreement with Crystal Peak that was secured by 100% of the outstanding common shares of Peak Minerals, together with all of its assets.

Due to challenging market conditions for junior mining companies, Covid-19, and other issues, Crystal Peak was not able to raise the funds needed to meet its obligations to EMR. To satisfy the outstanding debt, EMR exercised its legal right to foreclose on the convertible note and claim its security interests, resulting in Peak Minerals becoming a wholly-owned subsidiary of EMR.

Other than Peak Minerals being "under new management", we expect little to change for the Sevier Playa project. EMR's stated objective is to find the funds necessary to develop the project and to get it into production. They intend to begin working on this immediately with a target of 2021 to resume development.

In accordance with the provisions of 43 CFR, Part 3500, Subpart 3513 of BLM regulations, Peak Minerals is requesting consideration from the BLM to waive or reduce the minimum annual rental and royalty payments as defined in Part II, Section 1(a) and Section 2(b) for all federal leases owned or operated by Peak Minerals.

**General Lease Information**
On April 5, 2011, Peak Minerals participated in an auction of Federal Potassium Mineral Leases on BLM land and was awarded forty-eight (48) leases totaling 95,801.76 acres with an effective date of June 1, 2011 at a cost of $19,377,624.73. LUMA Minerals, LLC (**LUMA**) participated in the same auction and was awarded eleven (11) leases totaling 22,011.79 acres with the same effective date at a cost of of $1,122,812.00.

2150 SOUTH 1300 EAST • SUITE 550 • SALT LAKE CITY, UTAH 84106

Since those BLM leases were obtained, Peak Minerals has been working diligently to advance the Project. As a development-stage company, Peak Minerals does not have, and has never had, revenues or any other regular sources of income. It has always relied entirely upon investor capital to remain in business. Following the granting of the leases, Peak Minerals engaged in a series of efforts to secure the money to explore, develop, and permit the Project. This has resulted in an expenditure of almost $100 million dollars that has gone into drilling and exploration programs, engineering studies, the environmental impact statement and accompanying environmental reports, and many other activities.

Minimum rent and royalty requirements increased starting in the sixth lease year. The following rents and royalties now apply:
- Minimum Annual Rent for years 6 through 20 of $1.00 per acre, or fraction thereof
- Minimum Annual Royalty for years 6 through 20 of $3.00 per acre, or 5% of Gross Value of minerals produced on BLM leases, F.O.B. Mine, whichever is greater
- The leases stipulate that the greater amount between rent and royalty be paid each year

The LUMA leases, which are administered by Peak Minerals via operating agreements, are subject to the same regulations. The LUMA costs are paid by Peak Minerals as part of the operating agreement.

While it has always been a challenge to make these payments over the years, Peak Minerals has paid almost $1.7 million in rents and royalties to the BLM thus far. (See attached Excel schedule for details.)

**Fundraising Efforts**
With the ROD having been issued on August 27, 2019, other material permits having been obtained, and a feasibility study and other relevant engineering and geohydrology reports completed, the key remaining activity was securing the funds necessary to complete detailed engineering. Once that was done, many groups had assured the company that securing the debt and equity financing required to begin construction would be relatively easy.

In June 2019, Crystal Peak engaged the Toronto-based firm VT Capital as its financial advisor to assist with securing bridge financing, considering either equity or debt investment. Approximately $20 million would be required to complete detailed engineering and finalize cost estimates for the Project. With that in place, Peak Minerals would submit an updated mining plan, work out any necessary adjustments, and be ready to start the earth-work. The company anticipated that it would find bridge financing and complete detailed engineering in late 2019 or early 2020.

In September 2019, Crystal Peak signed a term sheet for a bridge financing loan and initiated a due diligence process with a counter-party. Two months later, though it had completed the bulk of its technical due diligence, that group informed Crystal Peak that it needed to stop work temporarily. Internal personnel turnover and other corporate issues forced this group to put the financing on hold while it addressed these problems. VT Capital maintained close contact with the firm in anticipation of closing an agreement early in 2020.

Peak Minerals commenced the detailed engineering by completing a mining plan optimization study in October 2019. This study evaluated a phased approach to project development and construction. This optimization resulted in a reduction of project risks while maintaining a robust economic 'proof of concept' plan. Peak Minerals continued to evaluate ways the mining plan could be optimized and refined throughout 2019 and into Q1 of 2020.

In late 2019, anticipating the close of bridge finance, Crystal Peak engaged BNP Paribas (**BNP**), one of the largest banks in the world, to advise it to secure Project debt finance. Additionally, Crystal Peak added in-house financial expertise to help cultivate and develop this financing. With the holidays approaching, most firms responded that they would review the proposal but would prefer to pick up negotiations in 2020.

Early in 2020, VT Capital reached out to the bridge funding source to resume due diligence. That group reported that they were still interested but would be moving slowly due to remaining unresolved internal issues. On January 20th, Crystal Peak agreed to amend its loan with EMR to provide the funds needed to complete due diligence with the bridge loan group and also to take care of basic working capital needs. However, in February the bridge finance group suddenly informed VT Capital that it was withdrawing its term sheet. This left Crystal Peak with no active bridge financing options.

Fundraising efforts suddenly became very difficult. On February 4th, President Trump used his State of the Union address to inform the public that the government would "take all necessary steps" to protect Americans from the coronavirus responsible for Covid-19. For many, this was the first alert that a serious illness was spreading world-wide. In February, the Trump Administration imposed travel restrictions on foreigners traveling from mainland China, announced a "Level 4 Travel Advisory" for parts of Italy and South Korea, barred all travel to Iran, and barred the entry of foreign citizens who had visited Iran in the last 14 days. These steps, while likely necessary, had a chilling effect on investors' appetite for risk.

Over the next several months, Crystal Peak, VT Capital, and EMR approached many potential funding sources. In total, the groups contacted over 120 different firms. BNP approached more than 80 additional potential funding sources in an effort to secure Project finance. These included strategic investors, banks, private equity firms, offtake finance sources, and others. Despite much interest expressed by a number of parties, no financing transaction could be completed.

With Covid-19 exploding world-wide, by June 2020 it became apparent that Crystal Peak was in jeopardy of violating a minimum cash balance covenant in its convertible note agreement with EMR. At that time, Crystal Peak requested that BNP focus its efforts on key strategic investors to assess their interest in any kind of transaction that would allow it to repay the debt to EMR. Despite the fact that Peak Minerals was able to show a positive feasibility study and had all material permits for the Project, no offers came from this effort.

Because no financing or alternative transaction could be found, in October 2020 Crystal Peak defaulted on its convertible note. EMR foreclosed on its security interest resulting in Peak Minerals becoming a wholly-owned subsidiary of EMR. As noted earlier, EMR plans to resume work on the Project with a target of completing pre-construction efforts in 2021.

In cooperation with EMR, Peak Minerals is now working to secure the new capital needed to advance the Project. EMR has committed to support Peak Minerals but we are also working with BNP and others to secure the full complement of debt and equity financing necessary to bring the Project to fruition. However, this is a slow and expensive process that remains adversely impacted by the Covid-19 outbreak.

In order to finalize an investment of this size, a funding source needs to confirm the work Peak Minerals has completed. With the pandemic impacting businesses and economies around the world, these efforts take time. Peak Minerals has tried to conduct independent due diligence with potential funding sources but travel restrictions, quarantines, supply chain and market disruptions, along with other complications have made securing these funds difficult.

Having worked diligently to demonstrate the viability of the Project, the company expects that fund-raising efforts will be successful once the pandemic eases. Consequently, Peak Minerals must conserve its limited cash to pay the engineers, consultants, lawyers, contractors, personnel, and others needed to keep the process alive until conditions improve.

**Waiver Justification**

The upcoming payment is for $353,511 and is due December 31, 2020. Simply put, this will be an extreme burden and one that EMR is hesitant to support as their first action as a new owner. Granting a waiver would allow Peak Minerals to focus on raising capital and deploying it towards achieving production. This will benefit the BLM because production will deliver millions of dollars in royalties each year. Conversely, if Peak Minerals were to fail, especially after a reorganization, the leases would likely be relinquished and the Project would flounder. Considering that Peak Minerals has spent almost $100 million and a decade advancing the Project, that would be a tremendously disappointing outcome for the Project since it might never be completed and the resulting royalty stream to the BLM could be lost forever.

The BLM has the authority under Section 39 of the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 209, 1982) and the regulations thereunder to waive or reduce rentals and minimum royalties.

Specifically, per 43 CFR § 3513.12, the BLM will consider the approval of a waiver request if it:
   a)  is in the interest of conservation;
   b)  will encourage the greatest ultimate recovery of the resource; and
   c)  is necessary either to promote development of the mineral resources or because the entity cannot successfully operate the lease under existing terms.

All three criteria clearly apply. A waiver is in the interest of conservation if one considers the body of technical and environmental work that has been completed over the years. The Project has been studied extensively and all environmental impacts carefully considered. Receipt of the Record of Decision on August 27, 2019 strongly supports Peak Minerals' vision of an environmentally sound and economic Project.

The last two requirements are also clearly met. A waiver encourages the "greatest ultimate recovery of the resource" since it would allow Peak Minerals to focus on getting into production. For the same reason, a waiver would "promote development of the mineral resources" since it enhances the probability of achieving production. Finally, it is consistent with the BLM's mission of promoting sustainable development of the nation's energy and natural resources.

In summary, if the Project were to fail now, it is possible that all of the planning, analysis, and environmental work completed by the BLM would be rendered meaningless and likely would result in no development of these valuable resources. If that were to occur, the United States and the State of Utah would lose jobs and valuable income.

**Request**

Peak Minerals is requesting that the BLM provide relief by waiving the annual rental payments of $1.00 per acre and the minimum royalty payments of $3.00 per acre for this year.

Attached you will find supporting documents outlining the payments made thus far and showing the serial number, name of record title holder, and legal description for each lease on the Project. Also included is a map showing the serial number and location of each lease.

We trust this application meets the requirements of 43 CFR, Part 3500, Subpart 3513. However, if you need additional information, please let us know. We are available at your convenience to meet with any BLM staff to discuss the application.

Regards,

Woods Silleroy
Vice President & Corporate Secretary
Peak Minerals Inc.

2150 SOUTH 1300 EAST • SUITE 550 • SALT LAKE CITY, UTAH 84106